IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE AIRLINE BAGGAGE FEE ANTITRUST LITIGATION | CIVIL ACTION FILE NUMBER 1:09-md-2089-TCB |
| | ALL CASES |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Pursuant to the Court's Initial Case Management Order of January 21, 2010 (Docket #51), Plaintiffs file this Consolidated Amended Class Action Complaint and show as follows:

1.     Delta Air Lines, Inc. ("Delta") and AirTran Airways, Inc. ("AirTran") (collectively "Defendants") are each other's principal competitors. Hartsfield-Jackson Atlanta International Airport ("Hartsfield-Jackson") serves as the hub for both airlines. Both airlines have a number of overlapping routes for which they have competed intensely for the business of consumers. Consumers have benefited from this competition in the form of lower prices. Vigorous competition between the airlines ended after Delta and AirTran agreed – through a series of quarterly earnings calls, industry conferences, and joint negotiations with Hartsfield-Jackson – not to compete and to coordinate business strategies to increase prices to consumers. As a direct result of their collusion, Defendants cut capacity in Atlanta to support price increases and simultaneously imposed a $15 first bag fee on

consumers.  As a consequence, during a time in which demand for airline tickets decreased due to an economic slowdown, the competing airlines charged high prices by agreeing to business decisions that, if carried out unilaterally, would have been counter to each Defendant's economic interest.

2.     On behalf of a Class of direct purchasers of Defendants' services who paid a first-bag fee, Plaintiffs seek two principal forms of relief.  First, Plaintiffs seek damages for airline passengers or entities that paid a $15 first bag fee to Defendants.  Second, Plaintiffs seek injunctive relief to enjoin Delta and AirTran from sharing with each other future plans to increase prices or cut capacity, or otherwise provide information concerning the circumstances under which either airline would increase prices or cut capacity.  As set forth in this Complaint, Defendants reached an unlawful agreement by sharing with each other their intentions to increase prices and cut capacity and their expectations as to what the other airline needed to do to "get the prices up."  No legitimate justification exists for this anticompetitive conduct.

## The Parties

3.     Plaintiff Avery Insurance Company is a business located in Woodstock, Georgia and is owned by Brent Avery.  Avery Insurance Company directly paid Delta a first bag fee for luggage checked on Delta flights to and from

2

Atlanta, Georgia in February 2009.   Brent Avery is the sole owner of Avery Insurance Company.

4.     Plaintiff Jacaranda, Inc. is a business located in Miami, Florida. Jacaranda, Inc. directly paid Delta a first bag fee for luggage check on Delta flights to and from Atlanta, Georgia in March 2009.   Thomas Whittelsey is the sole owner of Jacaranda, Inc.

5.     Plaintiff Carla Dahl is a resident of Stillwater, Minnesota.   She was a passenger on a Delta flight from Minneapolis, Minnesota to Charleston, South Carolina via Cincinnati, Ohio in June 2009 and directly paid Delta a first bag fee for luggage checked on that flight.   She was a passenger on a Delta flight from Minneapolis, Minnesota to Greensboro, South Carolina via Detroit, Michigan in September 2009 and directly paid Delta a first bag fee for luggage checked on the flight.

6.     Plaintiff Michael Edelson is a resident of Atlanta, Georgia.   He was a passenger on a Delta flight from Atlanta, Georgia to New Orleans, Louisiana in March 2009 and directly paid Delta a first bag fee for luggage checked on the flight.

7.     Plaintiff Ryan Goldstein is a resident of Atlanta, Georgia.   He was a passenger on an AirTran flight from Atlanta, Georgia to Fort Lauderdale, Florida

3

in February 2009 and directly paid AirTran a first bag fee for luggage checked on the flight.  He was a passenger on a Delta flight from Atlanta, Georgia to Las Vegas, Nevada in March 2009 and directly paid Delta a first bag fee for luggage checked on the flight.

8.     Plaintiff Laura Greenberg Gale is a resident of Balboa Island, California.  She was a passenger on a Delta flight from Santa Ana, California to Park City, Utah in May 2009 and directly paid Delta a first bag fee for luggage checked on the flight.

9.     Plaintiff Stephen Powell is a resident of Washington, D.C.  He was a passenger on an AirTran flight from Baltimore, Maryland to Boston, Massachusetts in May 2009 and directly paid AirTran a first bag fee for luggage checked on the flight.

10.    Plaintiff Martin Siegel is a resident of Wayne, New Jersey.  He was a passenger on a Delta flight from Salt Lake City, Utah to Los Angeles, California in March 2009 and directly paid Delta a first bag fee for luggage checked on the flight.

11.    Plaintiff Henryk Jachimowicz is a resident of Montgomery Village, Maryland.  He was a passenger on a Delta flight from Salt Lake City, Utah to Washington, D.C. in January 2009 and directly paid Delta a first bag fee for

4

luggage checked on the flight.

12.     Plaintiff Victoria Mertes is a resident of Beverly Hills, California. She was a passenger on a Delta flight from Los Angeles, California to New York, New York in June 2009 and directly paid Delta a first bag fee for luggage checked on the flight.

13.     Defendant Delta Air Lines, Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia.  Prior to its 2008 acquisition of Northwest Airlines, Delta was the third largest domestic airline in the United States with its principal hub located at Hartsfield-Jackson.  Delta has annual revenues of approximately $20 billion.

14.     Defendant AirTran Airways, Inc. is a Delaware corporation with its principal place of business in Orlando, Florida.  AirTran Airways, Inc. is a subsidiary of AirTran Holdings, Inc.  It operates over 750 daily flights throughout the Eastern United States and Midwest, including over 270 daily departures from Hartsfield-Jackson, which is the airline's principal hub. AirTran has annual revenues of approximately $2 billion.

### Jurisdiction, Venue, and Interstate Commerce

15.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337(a) (commerce and antitrust regulation),

because certain claims in this action arise under sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a)).

16.     Venue in this District is proper pursuant to 28 U.S.C. § 1391; and 15 U.S.C. §§ 15, 22, and 26, in that Defendants inhabit, transact business, reside, are found, or have an agent in this district, and a significant portion of the affected interstate trade and commerce described below has been carried out in this District.

17.     Defendants' anticompetitive activities were within the flow of and had a proximate, direct, substantial, and reasonably foreseeable effect on interstate commerce.  At all material times, Defendants engaged in business across state lines and charged first bag fees as a result of the illicit agreement challenged here to Plaintiffs and members of the Class across state lines.

### Facts

*Competition Between AirTran and Delta*

18.     AirTran positions itself as a discount airline – *i.e.*, an airline with low fees compared to its competition.  AirTran is well positioned to offer low fees because it maintains a low cost structure.  AirTran describes itself as maintaining "industry leading non-fuel costs."

19.     AirTran's main rival is Delta, which competes with AirTran on

6

approximately 90 percent of all routes served by AirTran, and 100 percent of routes served by AirTran from Hartsfield-Jackson.  Hartsfield-Jackson serves as the principal hub for both AirTran and Delta, and the two airlines account for approximately 92 percent of airline traffic at the airport.  AirTran describes Atlanta as the "core of [its] business."  Delta describes Atlanta as its "core strength market."

20.    Delta has been a formidable competitor to AirTran, and has consistently matched AirTran's low prices, including those to and from Hartsfield-Jackson.  The two airlines have competed intensely for market share in what has been described as "one of the fiercest rivalries in the U.S. airline industry."  Upon information and belief, when either airline analyzes or discusses domestic competition from rivals in the "industry," they typically are referring to each other.

21.    Consumers have benefited from what once was vigorous competition between AirTran and Delta in two ways.  First, both airlines have competed for market share by adding capacity on routes to and from Hartsfield-Jackson.  These capacity increases have yielded lower prices for consumers.

22.    For example, in 2006, AirTran added capacity to its Atlanta-based business by securing more gates in Hartsfield-Jackson's D concourse.  Also in 2006, AirTran added 22 airplanes to its fleet.  Overall, AirTran increased capacity

7

by 23.7 percent in 2006.  Consumers benefited from this additional capacity, as average fares in and out of Hartsfield-Jackson fell in 2006.  AirTran increased capacity by an additional 19.4 percent in 2007 by adding more airplanes to its fleet and adding new routes to its network.

23.    Consumers responded favorably to AirTran's capacity additions and low prices.  In 2007, AirTran had record revenue and profit growth compared to 2006:  revenues increased 22.1 percent to $2.3 billion and operating income increased 337 percent to $137.9 million.

24.    As a result of this success, in January 2008, AirTran projected that it would increase capacity by 10 percent in 2008 and another 10 percent in 2009 by adding additional airplanes to its fleet and by continuing to build its hub in Atlanta by, among other things, securing additional gates at Hartsfield-Jackson.

25.    Second, consumers benefited from vigorous competition between AirTran and Delta because that competition constrained both airlines from imposing certain ancillary fees on consumers – particularly a fee for the first piece of baggage a consumer checks (a "first bag fee").  Beginning in or around 2007, several airlines instituted a first bag fee, which proved to be intensely unpopular with consumers.

26.    Competition between AirTran and Delta, however, prevented either

8

airline from charging a first bag fee unilaterally.  As AirTran's CEO explained in

January 2008 at an airline conference, because AirTran competed in a highly

competitive market with Delta as opposed to a "monopoly market," AirTran could

not simply charge additional "unbundled" fees – such as a first bag fee – for fear

that its prices would be more complex and higher than Delta's and would cause

AirTran to lose customers to Delta:

> We have got a very, very competitive route network.
> And so – I showed you – we have 54 cities out of
> Atlanta.  Every one of them is served by Delta.  So we
> have got to be very careful.  We unbundle[] the product,
> we start putting out [] all the fees, we can end up being a
> higher fare than they are.
>
> And so it's one thing to be able to take a monopoly
> market and then begin to do the add-ons versus what we
> are really trying to – we could end up more expensive for
> the consumer, because our route network is much more
> competitive.
>
> . . .
>
> We're doing things today that probably three or four
> years ago we really wouldn't have done.  But we've got
> to be very, very careful that we don't become more
> complex than our competitors.

Robert Fornaro, AirTran CEO, Raymond James Growth Airline Conference

(January 31, 2008).

*Defendants' Anticompetitive Scheme*

27.    The first half of 2008 proved to be difficult for airlines because the

price of oil temporarily spiked to high levels.  A barrel of oil cost $90.82 in

January, peaked at \$132.55 in July, and ended 2008 at \$41.53 in December.  The temporary increase in oil prices impacted airline profits, including AirTran's and Delta's.  For example, AirTran could earn a profit without fare increases to consumers if the price of oil did not exceed around \$100 a barrel.  Oil prices exceeded \$100 a barrel for six months in 2008.  Thus AirTran – like other airlines – faced a dilemma:  it could either increase prices to consumers and risk losing market share or sustain losses and wait for the price of oil to abate.

28.    Rather than unilaterally adjust business plans to accommodate price fluctuations in oil or wait for the price of oil to abate, AirTran instead invited Delta to collude so that both airlines could increase prices to consumers without losing market share to the other.  Delta ultimately accepted this invitation, and the two airlines agreed not to compete to enable both airlines to increase prices through capacity reductions and the introduction of new ancillary fees – *i.e.*, the first bag fee.

29.    AirTran's and Delta's anticompetitive agreement was reached in at least three ways.  First, AirTran and Delta used a series of earnings calls with analysts to signal their willingness to enter an agreement and ultimately reach an agreement.  As publicly traded corporations, AirTran and Delta hold conference calls with securities analysts on a quarterly basis.  Any person may listen to the call

live or may listen to an archived version.  Transcripts of the calls are also publicly available.  A corporation's quarterly earnings calls are typically monitored by its competitors, and AirTran and Delta regularly monitor each other's calls.

30.     Second, AirTran and Delta used appearances and attendance at industry conferences to reach and/or reinforce an agreement.  Senior leaders at both airlines gave speeches at conferences and participated in "break out groups" in which competitively-sensitive information was shared.

31.     Third, upon information and belief, AirTran and Delta coordinated negotiations with Hartsfield-Jackson to monitor each other's commitment to abide by their agreement not to compete.  AirTran and Delta historically competed intensely for the airport's gate rights, as each airline could increase its share of flights into and out of Hartsfield-Jackson by securing additional gate rights.  In 2008 and 2009, Hartsfield-Jackson was negotiating gate leases with both airlines.  Once AirTran and Delta agreed not to compete, and upon information and belief, they coordinated to ensure that neither airline disrupted their competitive truce by securing more than its allocated share of gates from the airport.

32.     AirTran first invited Delta to collude on an April 22, 2008 first quarter earnings call, which Delta monitored.  AirTran's first quarter earnings call was originally scheduled to occur on April 24, 2008, one day *after* Delta's first quarter

11

earnings call.  On April 21, 2008, however, AirTran rescheduled its earnings call to occur on April 22 – a day *before* Delta's call.   Upon information and belief, AirTran rescheduled its call to signal to Delta a desire to jointly reduce capacity to increase prices, and to give Delta the opportunity to respond during Delta's upcoming call.

33.    On its April 22, 2008 earnings call, AirTran announced that it was "resetting its priorities to be highly profitable" and that it "strongly believe[d]" that AirTran and its competitors in the industry – *i.e.*, Delta – needed to reduce capacity to "create opportunities" for the airlines:

> Adapting to high energy prices is a challenge faced by all airlines.  It will also create opportunities for those who successfully adapt.
>
> There are two solutions for [the] industry to today's high energy prices:  either the prices our customers pay will increase to accurately reflect the cost of energy, or the price of oil will abate.  We have been working for the past several months in identifying how AirTran should adapt to these challenging times.  Today, I would like to share with you the framework of our plans, and over the coming months, we will provide additional details and updates on our execution of these plans.
>
> While several airlines have announced modest adjustments to their capacity, we strongly believe that more industry capacity needs to be removed.

Arne Haak, AirTran Executive Vice President, Q1 2008 Earnings Call (April 22, 2008).

34.     AirTran then revised its growth plans and stated that – rather than grow its capacity by 10 percent in the fourth quarter of 2008 – its capacity would remain flat within that quarter and would continue to remain flat through 2009. According to AirTran, capacity adjustments needed to be made in order "to get average prices up:"

> There is a [strong correlation] at the end of the day [] to make – between capacity and pricing.  Just raising prices, without reductions in capacity is not going to raise the average fare.   And so, in order to support the price increases, the capacity has to drop.   There is some customer segment that is [in]elastic, but a large portion of the customer base is []elastic, especially with leisure travel, so you just can't be adding increases on top of increases.
>
> The only certain way to get the average prices up is to accompany it with capacity adjustments.   Those two things have to occur simultaneously.  I think you'll see in the second quarter and in the third quarter, you will see our average fares go up[.]

*Id.*, Robert Fornaro, AirTran Chief Executive Officer.

35.     AirTran also stated that Delta's elimination of capacity was "long overdue:"

> Legacy consolidation has also recently begun with the announced plans to merge two of our largest competitors in Delta and Northwest Airlines.   Legacy airline consolidation and the corresponding elimination of inefficient and redundant domestic capacity is long overdue.

*Id.*, Arne Haak, AirTran Executive Vice President.

36.    AirTran emphasized that the price of oil was "creating a situation where all carriers are going to react" and that the carriers would "change the revenue environment" by "push[ing] up average fares" as redundant capacity – *i.e.*, AirTran's and Delta's – is cut:

> This is creating a situation where all carriers are going to react.   And what's going to happen is, we are going to change the revenue environment.     The revenue environment – you'll push up average fares as [redundant] capacity [leaves].

*Id.*, Robert Fornaro, AirTran Chief Executive Officer.

37.    Delta held its first quarter earnings call the next day, on April 23, 2008.  Delta started the call by recognizing that fuel prices were "placing a lot of pressure on the business and the industry as a whole and we'll talk about that a bit throughout the call."  Throughout the call, Delta emphasized that it:

- would "continue to be aggressive about pulling capacity in response to fuel prices";

- planned to "push[] fare increases and fee increases";

- would continue to monitor "the changing competitive landscape in order to determine whether additional capacity reductions are warranted for the fall and winter seasons";

14

- believed "the industry has got to maintain discipline with respect to capacity"; and

- was "very watchful of all the ancillary fees and the revenue opportunities that provides."

38.     In addition, Delta used the call to articulate a specific expectation about the level of capacity the industry – *i.e.*, AirTran – needed to cut so that Delta could work "in conjunction with other carriers" to "remedy the industry woes:"

> [Q:]  If you priced the product such that you could be profitable, how much capacity would you actually need to take out?
>
> . . .
>
> [A:]  Certainly, Bill.  ***I think Delta can't do it alone.  We have to do it in conjunction with the other carriers because certainly the capacity cuts that we can do on our own, while they will help us, will not remedy the industry's woes.  So, as we look forward, we're hopeful that the other carriers act responsibly and look at the demand profiles as we move into the fall.  And I would say if the industry could achieve a 10% reduction in capacity year-over-year by the fall that we'd be in pretty [good] shape, given today's fuel environment.***

Glen Hauenstein, Delta Executive Vice President, Q1 2008 Earnings Call (April 23, 2008) (emphasis added).

39.     Delta's explicit invitation of a ten percent reduction in capacity in the fourth quarter (compared to 2007) was far below AirTran's announcement the day before that its fourth quarter capacity would remain flat compared to 2007.

15

40.     On June 18, 2008, AirTran and Delta both participated in the Merrill Lynch Transportation Conference.  Speeches were given at this conference, and attendees also participated in "break out groups" in which attendees discussed, among other things, future revenues.

41.     Delta's Chief Financial Officer, Ed Bastian, spoke at the conference. During his speech, Mr. Bastian focused on Delta's own capacity cuts and on the need for the industry to cut capacity.  Mr. Bastian said that he did not believe that the "industry" had sufficiently cut capacity and cautioned that Delta was going to take "a pause" in its plans to cut capacity and would "watch" others who have made "some fairly significant announcements" to see "exactly what's coming out" and determine if further capacity cuts are warranted:

> I said no in terms of has enough capacity been cut, I think the question is with the amount of capacity that's been cut, we have to take a little bit of a pause and see where it's coming out and I think you also have to be careful that you don't cut too deeply on the front end and lose market share opportunities that will hurt your franchise over time.  So I think everyone while they've made some fairly significant announcements, ***everybody is watching each other in terms of how the capacity coming over, and exactly what's coming out.***  And from that, give us a better basis to evaluate where to go next, if indeed additional capacities come out.

Ed Bastian, Delta President and Chief Financial Officer, Merrill Lynch Transportation Conference (June 18, 2008) (emphasis added).

42.     Delta held its second quarter earnings call on July 16, 2008.  On the call, Delta lauded its own "swift action to significantly reduce domestic capacity and their related costs."  But it remained dissatisfied with AirTran's commitment to aggressive capacity reductions.  According to Delta, "more industry capacity has to come out."  Until that happened, Delta planned to maintain an increased level of capacity in Atlanta, its "core strength market:"

> There are no capacity cuts in AirTran Markets.  As a matter of fact, despite the fact we're down in general capacity by about 13 to 14% in the fall domestically, we're actually up in AirTran competitive markets into and out of Atlanta[.]  [S]ome of the point to point flying we have taken reductions in.  But into and out of Atlanta – of course Atlanta being our core strength market, we are continuing to leave that capacity in.

Glen Hauenstein, Delta Executive Vice President, Q2 2008 Delta Air Lines, Inc. Earnings Conference Call (July 16, 2008), p. 16.

43.     While it threatened AirTran with the possibility that Delta would not cut capacity in Atlanta, Delta emphasized that it was "still in the planning process for '09" and would provide more guidance on its capacity plan during its "Q3 call" after it analyzed other industry participant's planned capacity cuts.  Delta believed that "the whole industry model has got to evolve much more quickly," particularly with regard to eliminating capacity for "low end traffic" to which certain industry participants – *i.e.,* AirTran – catered:

17

I think we're still in the planning process for '09, and I think probably what we would look at doing is in the Q3 call is to try to give you a bit more of an update. But I think we need to see where the final schedule tapes come in in the fall. ***While there have been a number of announcements, we still need to see what the final schedules are and I think we've got a bit more work to do on our business plan looking out at '09. I think the model has got to, the whole industry model has got to evolve much more quickly in that kind of a fuel environment*** . . . When you think about the amount of leisure traffic, there's been a lot of capacity built in the United States over the past decade to carry pretty much low end traffic. . . . ***[I]t's probably the lower end traffic that is not going to want to purchase at the market clearing price that covers the cost of fuel. So we're spending a lot of time rethinking what that model, what the industry model looks like, and how you make it work at those levels. But a lot of it is going to depend upon what the industry reaction is to these fuel price levels and how that reaction is demonstrated in the capacity changes that are made over the next two quarters.***

*Id.*, Richard Anderson, Delta Chief Executive Officer (emphasis added).

44.     Later in the call, Delta again emphasized its willingness to eliminate

capacity going forward after it analyzed what capacity cuts the industry – *i.e.*,

AirTran – make in the fall as they "come to the party:"

> [O]ur capacity cuts have put us at the upper end of the range of where the industry is at as far [as] unit revenues go, and we think there's a lot more opportunity as we fine tune this. We've never as an industry seen pricing move as quickly as we have, of course in response to [the] run up in fuel, and that creates an entirely different demand set. So now we have to go back and analyze,

18

> individual market, every individual market, was that the right move?  Is there more upward mobility in pricing?  Do we have to move back on some markets or should we take capacity out?  ***And that's the process [] we're in right now and that's why I think we're not doing more capacity cuts right now.   We're waiting to see essentially where this equilibrium goes and how, when we fine tune it, what more we get out and as the industry starts to come to the party in the fall what the implication of that is.***

*Id.,* Glen Hauenstein, Delta Executive Vice President (emphasis added).

45.    Finally, with regard to any plan to implement a first bag fee in connection with its merger with Northwest (as Northwest had a first bag fee), Delta said that it is studying the issue and will continue to study it "but [had] ***no plans to implement it at this point.***"  *Id.* (emphasis added).

46.    AirTran held its second quarter earnings call on July 29, 2008 – thirteen days after Delta's earnings call.  AirTran's call served, effectively, as a *mea culpa* to Delta for creating a market in Atlanta for low fares – *i.e.*, low end traffic in Delta's parlance – and an assurance that the fares will increase:

> [W]e created the market in Atlanta for low fare, for close-[in] reasonable fare.  Quite frankly, those average prices need to come up.  What that says is, when the prices come up, [the] market is going to contract.  We have to find the right levels in Atlanta.

Robert Fornaro, AirTran Chief Executive Officer, Q2 2008 Earnings Call (July 29, 2008).

47.     Unlike its last earnings call – in which AirTran committed to keeping

capacity flat in the fourth quarter of 2008 (a level that Delta did not believe was

low enough) – AirTran responded to Delta's invitation to cut capacity and revised

its projections and "accelerated the amount of capacity" it planned to remove from

the market to support price increases:

> We know we need to increase o[u]r realize[d] average
> fare[s].    And we have taken some very significant
> increases to the fare structure.  Some fare[s] still need to
> be increased further.  Some fare[s] may have been too
> high.    ***We also know that our capacity needs to be
> reduced to a level that will support price increases to
> cover the increase[d] cost of jet fuel.  This capacity will
> begin to come out in September.  We have accelerated
> the amount of capacity [] we're removing.  We now
> expect the capacity to be down 7% to 8% in the
> September through December period.***

*Id.,* Arne Haak, AirTran Vice President (emphasis added).

48.     Also during this call, AirTran emphasized that its focus was "going to

be almost entirely on the balance sheet" to ensure profitability – as opposed to

AirTran's prior focus on gaining market share through low fares.  Among other

things, it would focus on "revenue improvements."  AirTran wanted to improve the

performance of "new ancillary revenues initiatives," such as revenues earned from

baggage fees.

49.     Upon information and belief, after AirTran's second quarter earnings

call in which it demonstrated to Delta a commitment to accelerate capacity cuts and increase prices in Atlanta, Delta no longer felt constrained by vigorous competition from AirTran.

50.     AirTran promptly followed through on its commitment to reduce capacity beginning in September 2008.  Around September 1, 2008, AirTran – "virtually overnight" – reversed its eight percent growth rate and cut capacity by eight percent:

> And again, a year ago we were growing at a double digit rate as the domestic marketplace was weakening and fuel was rising daily.  But we were one of the first airlines to restructure, and we did so decisively.  We deferred or sold 46 aircraft while the market was still strong.  And again, virtually overnight in the summer we went from an 8% growth rate to a minus 8% again, right around Labor Day.

Robert Fornaro, AirTran CEO, Q1 2009 Earnings Call (April 22, 2009).

51.     On September 18, 2008, AirTran participated in the "Calyon Securities Airline Conference" with Delta.  At the time of this conference, the price of oil was abating, and AirTran was projecting that oil prices in 2009 would fall to 2007 levels.  Even with this decrease in oil prices – and consistent with its assurances to Delta – AirTran remained committed to cutting capacity and increasing prices.  Compared to April 2008 – when AirTran first invited Delta to collude – AirTran's business plans and priorities had completely changed, even

though the price of oil had abated.  Unlike in April 2008 when AirTran projected

flat growth in 2009, it now projected that capacity cuts would continue throughout

2009 by an additional three to seven percent.  To support this decrease in capacity,

AirTran was selling or deferring additional airplanes.  Collusion with Delta had

fundamentally changed AirTran's business strategies.

52.     Delta's next earnings call occurred on October 15, 2008.  Delta stated:

(a) its 2009 capacity levels in Atlanta would be "significantly below" Delta's prior

projections; and (b) that it was now willing to increase ancillary fees – *i.e.*, first

bag fees – because "strategically going forward [a la carte] pricing is where we

need to go as an industry[.]"  Richard Anderson, Delta CEO, Q3 2008 Earnings

Call (Oct. 15, 2008).  Collusion with AirTran had fundamentally changed Delta's

business strategies.

53.     AirTran's third quarter earnings call occurred on October 23, 2008,

just eight days after Delta's call.  During that call, AirTran stated that its capacity

reduction plan was in place, that it was reducing the number of airplanes in its

fleet, and that "under the right circumstances"  it would be willing to further reduce

capacity:

> Fortunately, our capacity reduction plan is now in place
> and our fleet has been pared back from a planned 147 this
> year to 136.   We are prepared under the right
> circumstances to further reduce our capacity t[hrough]

22

accommodation of additional aircraft sales and further rescheduling of our order book.

Robert Fornaro, AirTran CEO, Q3 2008 Earnings Call (October 23, 2008).

54.    By the time of AirTran's earnings call, Delta had not announced its specific capacity levels for the calendar year 2009.  Just as Delta had threatened AirTran in the summer in order to encourage more capacity cuts, AirTran warned Delta that AirTran was prepared to resume aggressive competition if Delta's capacity levels in Atlanta warranted such action.  Thus, during a call in which AirTran communicated its willingness to increase prices to consumers by imposing a first bag fee jointly with Delta, AirTran also warned that it was prepared to reduce prices as the cost of oil abated and because consumers' belief that "airfares are through the roof" created "a good opportunity" for AirTran to be "a little more aggressive in the marketplace:"

> Delta has capacity against AirTran in most of the markets, they have more capacity.  The one thing we do know is it generally impacts them a lot more than it impacts us and ***it's I think it's not as if they had capacity and it's a one-way street.  I mean, I think we've proven over time that we're a pretty tough competitor*** and at least in the near term, we've got a lot more flexibility to manage our revenue base because oil's come down quite a bit and we are a low-fare carrier.  ***We can be a lot more tactical and we can be a lot more aggressive with oil prices down here versus where we were last year.***
>
> ***So again for us, I think this is a good opportunity for us***

23

> ***to get a little bit more aggressive in the marketplace.*** We can be more tactical, again our fares are up in Atlanta, but at the same time it allows us to be a little bit more promotional if necessary and it may take that if in a situation right now where the consumers' got a lot of worries.  ***I mean, the consumers got it in their minds that airfares are through the roof[.]***

*Id.,* p. 11 (emphasis added).

55.     Even though consumers already believed that "airfares are through the roof," AirTran nonetheless emphasized that it was "continu[ing] to work on expanding [its] ancillary revenue efforts."  When asked if it would impos[e] a first bag fee, AirTran stated that it wanted to implement a first bag fee, it had invested in the technological capability to quickly implement the fee, it had not implemented the fee because Delta had not done so, and it would implement the fee if Delta acted first:

> Let me tell you what we've done on the first bag fee.  We have the programming in place to initiate a first bag fee. And at this point, ***we have elected not to do it, primarily because our largest competitor in Atlanta [i.e., Delta], where we have 60% of our flights, hasn't done it. And I think, we don't think we want to be in a position to be out there alone with a competitor who --we compete on, has two-thirds of our nonstop flights, and probably 80 to 90% of our revenue -- is not doing the same thing. So I'm not saying we won't do it. But at this point, I think we prefer to be a follower in a situation rather than a leader right now.***

*Id*. (emphasis added).  AirTran added that, if Delta imposed a first bag fee, AirTran "would strongly consider it, yes."  *Id.*

56.     Following AirTran's second quarter earnings call, Delta made two announcements evidencing that its competitive decisions had changed since its July 16, 2008 earnings call.  First, as opposed to keeping its capacity in place in 2009 in "AirTran Markets" (as Delta had threatened in July), Delta decided to cut capacity in 2009 by – upon information and belief – five percent.   Second, instead of refraining from implementing a first bag fee (Delta said in July that it did not plan to implement the fee, notwithstanding the Northwest merger), Delta announced on November 5, 2008 – less than two weeks after AirTran's statement that it would "prefer to be a follower" on the first bag fee – that Delta would begin charging passengers a $15 first bag fee, effective December 5, 2008.

57.     AirTran quickly assured Delta that it would follow Delta's lead in implementing a first bag fee – as promised during its third quarter earnings call. The day after Delta's announcement, on November 6, 2008, AirTran issued a public statement that reassured Delta that AirTran would follow through on its promise to match Delta's fee:  AirTran's spokeswoman, Judy Graham-Weaver, stated that AirTran would likely make an announcement regarding a new first bag fee policy the following week.  True to its word, on November 12, 2008, AirTran

25

announced that it would impose a $15 first bag fee, effective December 5, 2008. This was the exact same fee as Delta's with the exact same effective date.

*The Direct Anticompetitive Effects of Defendants' Scheme*

58.    Defendants' agreement not to compete has directly affected competition in at least two ways.  First, Defendants' agreement led to prices that never would have prevailed had the airlines acted unilaterally.  As a result of their agreement, both AirTran and Delta imposed a $15 first bag fee that neither airline would have imposed but for their agreement.  In addition, by agreeing to reduce capacity for flights in and out of Hartsfield-Jackson, Defendants have been able to price their products at levels that would not have persisted had the capacity remained in place.  Even though the price of oil dropped substantially in 2009 compared to peak levels in 2008, Delta projected that the 2009 "fare structures" would not be "significantly lower" than the levels in 2008.  As a result, AirTran and Delta have enjoyed high prices and profits on their domestic business.  For example, during the fourth quarter of 2008 and the first quarter of 2009 – a time period in which the United States was experiencing the worst recession since the Great Depression – AirTran earned record profits.

59.    Second, Defendants ensured that – as a result of their agreement – competition between the two airlines would remain restrained for years to come.

Both airlines reduced their fleet of planes in an effort to make capacity cuts permanent. Moreover, the airlines coordinated gate-lease negotiations with Hartsfield-Jackson to ensure, upon information and belief, that neither airline would disrupt their agreement by attempting to secure more than their allocated share of the gates. In stark contrast to prior efforts by both airlines to secure gates at the airport at the expense of the other, in February 2009 AirTran acknowledged that "AirTran and Delta have been working together" to negotiate with Hartsfield-Jackson to keep costs down and to protect themselves from "congestion" (*i.e.*, lock other airlines out):

> The question has to do with Atlanta airport and they are proposing increases in fees.
>
> The situation in Atlanta is really somewhat interesting. Most of the carriers operate under 30 year [leases] and those [leases] expire in September 2010.
>
> ***And AirTran and Delta have been working together*** to – and we have a couple of principles. One is we wanted to remain the lowest cost large airport in the United States. We want to make sure that, it's protected from additional congestion and a series of things like that. And so, we're having active conversations with the airport to make sure that our cost structure is protected.
>
> Again our focus down there is, we want it to be functional but we want it to be low cost. . . . [F]or airlines that compete like AirTran and Delta, we – our interests are very closely aligned on how we view the airport in the future.

Robert Fornaro, AirTran Chief Executive Officer, Raymond James Growth Airline Conference (February 5, 2009) (emphasis added).

60. Delta's and AirTran's business decisions were counter to each airline's independent economic interest and can only be explained by the fact that the airlines had reached an agreement not to compete. For example, at the time AirTran communicated to Delta that it was prepared to impose a first bag fee, AirTran recognized that consumers already believed that airline "prices were through the roof" and that the cost of oil had abated to a level in which AirTran could lower prices to consumers. By the time AirTran and Delta implemented the first bag fee, oil cost about $41 a barrel, which was less than half its January 2008 price (when AirTran planned to grow capacity by 10 percent) and substantially below the $100 a barrel threshold that AirTran needed to earn a profit. Moreover, Atlanta and the country were in the grips of the worst recession since the Great Depression and demand for airline travel was declining as consumers were traveling less. Imposing a price increase in these circumstances would not have occurred had AirTran and Delta been acting unilaterally.

*The Pretext For – and Recognized Illegality of – Defendants' Scheme*

61. Upon information and belief, both Delta and AirTran have recognized that their collusion has created substantial legal risk. They have thus sought to

28

minimize this risk in at least two ways.

62.     First, in an effort to mask the true purpose of imposing the $15 first bag fee, Delta issued a press release stating that the fee was being imposed to conform its pricing to Northwest's.  But this explanation was simply a pretext for the true impetus of imposing the fee:  AirTran's and Delta's collusion.  Having previously rejected imposing a first bag fee to conform its prices to Northwest's, Delta was now able to impose the fee knowing that its principal competitor was no longer a competitive constraint.

63.     Unlike Delta and AirTran, Delta and Northwest were not direct competitors.  *See An Examination of the Delta-Northwest Merger: Hearing Before the Subcomm. on Antitrust, Competition Policy and Consumer Rights of the Senate Comm. on the Judiciary*, 110th Cong. 8 (2008) (statement of Doug Steenland, CEO, President and CEO, Northwest Airlines) ("The existing domestic and international route networks of Northwest and Delta are complementary, so the two carriers compete only to a minimal extent today.  Of the more than 800 domestic nonstop routes that NW and DL collectively fly, there are only 12 non-stop city-pair overlaps."); *Id*. (statement of Richard Anderson, CEO, Delta Airlines) ("I will simply say that these two airlines have complementary networks; Delta's domestic focus is in the east and mountain west while Northwest focuses

29

on the upper mid-west."). Neither Northwest nor Delta constrained the pricing of the other, which is why Northwest had previously implemented a $15 first bag fee and Delta had not.

64.     Second, after implementing a substantial price increase through collusion, both Delta and AirTran have subsequently adhered to antitrust compliance practices that were not in place when the airlines reached an agreement in 2008. For example, during an April 21, 2009 earnings call, Delta's CEO was asked whether Delta was considering implementing additional baggage fees in the future. He declined to respond because Delta's general counsel preferred that public statements of future pricing decisions comply with Department of Justice and Department of Transportation guidelines:

> I think Ben Hirst, our general counsel, would prefer
> that I not talk about any future ideas about where
> fees would go in the industry. We are very careful
> about being certain we comply with the Department
> of Justice and Department of Transportation rules
> on those sorts of matters.

Richard Anderson, Delta CEO, Q1 2009 Earnings Call (April 21, 2009).

65.     Similarly, AirTran has demonstrated a reluctance (that previously did not exist) to publicly share competitively sensitive information. For example, in stark contrast to AirTran's prior assurances to Delta that it would follow Delta's lead in implementing a first bag fee, AirTran's description on an April 22, 2009

earnings call of additional "ancillary revenue initiatives" demonstrates a new-found commitment to antitrust compliance:

> Q: Just on ancillary revenue, that's certainly been boosting the revenue trend pretty significantly this quarter for sure. Can you just talk about [how] you see ancillary revenues kind of developing throughout the year, if there are any kind of important time that we should be aware of when different fees came on and what other ancillary revenue initiatives if any you are currently considering?
>
> A: John, this is Kevin Healy. Really not going to get into the specifics of the ancillary programs that we have, but we've made a number of changes over the last year or so and tweak the way that in some cases how we presented as well. So I think changes in the presentation and some potential new programs for competitive reasons, we won't go into.

Kevin Healy, AirTran Senior Vice President Marketing and Planning, Q1 Earnings Call (April 22, 2009). During this call, AirTran even expressed "concern" that the airline "industry has a habit of being very self destructive by sharing too much information with your competition." *Id.*

### The Relevant Market for Passenger Airline Services

66. Delta and AirTran provide regularly scheduled service between a city of origin and a city of destination. Such origin-destination combinations are known in the industry as "city pairs" or "routes." Considering that Delta and AirTran imposed a first bag fee on all domestic city pairs they serve, the relevant

31

product and geographic market for purposes of this action is domestic airline passenger service city pairs served by either Delta or AirTran.

67. In the alternative, the relevant product and geographic submarkets for purposes of this action are Delta's and AirTran's domestic airline passenger service city pairs to and from Hartsfield-Jackson, where both Delta and AirTran agreed to reduce capacity to increase fares. Passengers traveling to or from Hartsfield-Jackson on a particular city-pair do not view service in alternative city pairs as a reasonable substitute: they are unlikely to substitute travel to a different destination in response to a fare increase for a city-pair to or from Hartsfield-Jackson.

68. Hartsfield-Jackson serves as the primary hub of both Delta and AirTran, and the Defendants compete for consumers flying in and out of Hartsfield-Jackson. Until 2008, this competition restrained both airlines from cutting capacity and implementing first bag fees.

69. Delta is the dominant competitor for city pairs served from Hartsfield-Jackson, with approximately 70 percent market share of domestic flights in or out of the airport. Delta refers to Atlanta as its "core strength market." AirTran is the second largest competitor for domestic city pairs served from Hartsfield-Jackson, with approximately 22 percent market share. AirTran refers to Atlanta as the "core

32

of [its] business."  Delta and AirTran collectively account for approximately 92 percent of the domestic airline traffic to and from Hartsfield-Jackson and have market power on city pairs served from Hartsfield-Jackson.

70.    The relevant market and submarkets defined above are in and part of interstate commerce, and Defendants' actions in these markets substantially affect interstate commerce.

71.    The relevant market and submarkets at issue are highly concentrated, and there are substantial barriers to market entry, including large up-front capital requirements, economies of scale, customer loyalty, commitment contracts with businesses, and restrictive practices and long-term leases limiting access to airports.

## Class Action Allegations

72.    Plaintiffs bring this action, pursuant to Fed. R. Civ. P. 23, on behalf of themselves and the following Class:

> All persons or entities in the United States that directly paid Delta and/or AirTran first bag fees on domestic flights from December 5, 2008 through the present (and continuing until the effects of Delta's and AirTran's anticompetitive conspiracy ceases).

73.    Excluded from this Class are the Court and its officers, employees, and relatives; Defendants, their parents, subsidiaries, affiliates, and co-conspirators; and the federal government.

74.    Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, it is believed to be in the thousands.  Furthermore, the Class is readily identifiable from information and records in possession of the Defendants.

75.    Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.  Among those common questions of law or fact are:

      a.  Whether the Defendants entered into a contract, combination, and/or conspiracy;

      b.  The duration of the illegal contract, combination, and/or conspiracy alleged herein;

      c.  Whether the contract, combination, and/or conspiracy caused the prices for first bag fees to be higher than they would have been in the absence of Defendants' conduct;

      d.  Whether Defendants' conduct violates the Clayton and Sherman Acts;

      e.  Whether Plaintiffs and other Class members have sustained or continue to sustain damages as a result of Defendants' wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages;

34

      f.  Whether Plaintiffs and the other Class members are entitled to an award of compensatory, treble, and/or punitive damages, and, if so, in what amount; and

      g.  Whether Plaintiffs and the other Class members are entitled to injunctive or other equitable relief.

76.    Plaintiffs are members of the Class and Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct by the Defendants, *i.e.*, they have paid unlawful first bag fees as a result of Defendants' wrongful conduct.

77.    Plaintiffs will fairly and adequately protect the interests of other Class members because they have no interest that is antagonistic to or which conflicts with those of any other Class member, and Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent Plaintiffs and other members of the Class.

78.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

79.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby rendering injunctive or declaratory relief with respect to the Class as a whole appropriate.

35

80. This class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly-situated persons and/or entities to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. The damages sustained by individual Class members, although meaningful, do not rise to the level where they would have a significant interest in controlling the prosecution of separate actions against these well-financed corporate defendants.

81. The instant case will be eminently manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### Count I:  Conspiracy to Retrain Trade in Violation of Sherman Act § 1
*(Delta and AirTran)*
*(Damages for First Bag Fees and Injunctive Relief)*

82. Plaintiffs repeat and reallege the allegations in Paragraphs 1 – 81 above as if fully set forth herein.

83. Defendants entered a contract, combination and/or conspiracy in restraint of trade and commerce that led to the imposition of the first bag fee and capacity reductions to support price increases. This contract, combination and/or conspiracy had the purpose and effect of unreasonably restraining trade in the

36

domestic airline passenger service market served by Delta and AirTran and/or submarkets for flights originating or terminating at Hartsfield-Jackson. The contract, combination and/or conspiracy consists of a continuing agreement, understanding, and concert of action among Defendants.

84.     The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination and/or conspiracy were authorized, ordered, or done by their officers, agents, employees, affiliates, owners, or representatives while actively engaged in the management of Defendants' affairs.

85.     Defendants' practices constitute an unreasonable restraint on competition, the net effects of which are anticompetitive.  Defendants' actions lack any legitimate business justification, and any purported business justifications are pretextual.

86.     Defendants' unlawful conduct substantially and adversely affects interstate commerce in the relevant market and submarkets.

87.     Defendants, by and through their anticompetitive actions as outlined herein, have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.  Defendants' contract, combination and/or conspiracy constitutes a *per se* violation of the Sherman Act.

88.     As a direct and proximate result of Defendants' violation of the

37

Sherman Act, Plaintiffs and Class members have been harmed and seek monetary damages for first bag fee payments, the amount of which is to be proven at trial. All Class members paid unlawful first bag fees as a result of Defendants' conduct. In addition, Plaintiffs and the Class are threatened with further injury unless Defendants are enjoined from continuing the unlawful conduct alleged herein and from entering into any other combinations, conspiracies or agreements having similar purposes and effects.

<u>Count II:  Attempted Monopolization in Violation of Sherman Act § 2</u>
*(AirTran)*
*(Injunctive Relief)*

89.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 – 88 above as if fully set forth herein.

90.    By inviting Delta to collude, AirTran attempted to monopolize the domestic airline passenger service market served by Delta and AirTran and/or submarkets for flights originating or terminating at Hartsfield-Jackson.

91.    AirTran engaged in anticompetitive conduct with a specific intent to monopolize:  by communicating to Delta through, *inter alia*, earnings calls and conferences AirTran's actual and potential future competitive actions concerning pricing and capacity cuts, AirTran sought to affect Delta's business practices and reach an understanding with Delta as to pricing (including a first bag fee) and

38

capacity levels.  AirTran's communications were not normal marketplace guidance and had no legitimate justification.

92.     Considering that Delta accounts for roughly 70 percent of Hartsfield-Jackson's domestic airline traffic and AirTran accounts for roughly 22 percent of the airport's domestic airline traffic, AirTran's invitation to collude had a dangerous probability of successfully monopolizing the relevant market and/or submarkets.  Sharing  actual and potential future competitive actions concerning pricing and capacity cuts in forums typically monitored by competitors competing in highly concentrated markets or submarkets will likely lead to anticompetitive monopolization and/or price coordination in violation of the Sherman Act

93.     Plaintiffs and the Class are threatened with further injury unless AirTran is enjoined from sharing actual and potential future competitive actions concerning pricing and capacity cuts in forums monitored by its competitors and from otherwise attempting to enter into contracts, combinations, and/or conspiracies that violate the Sherman Act.

Count III:  Attempted Monopolization in Violation of Sherman Act § 2
*(Delta)*
*(Injunctive Relief)*

94.     Plaintiffs repeat and reallege the allegations in Paragraphs 1 – 93 above as if fully set forth herein.

39

95.    By inviting AirTran to collude, Delta attempted to monopolize the domestic airline passenger service market served by Delta and AirTran and/or submarkets for flights originating or terminating at Hartsfield-Jackson.

96.    Delta engaged in anticompetitive conduct with a specific intent to monopolize:  by communicating to AirTran through, *inter alia*, earnings calls and conferences Delta's actual and potential future competitive actions concerning pricing and capacity cuts, Delta sought to affect AirTran's business practices and reach an understanding with AirTran as to pricing (including a first bag fee) and capacity levels.  Delta's communications were not normal marketplace guidance and had no legitimate justification.

97.    Considering that Delta accounts for roughly 70 percent of Hartsfield-Jackson 's domestic airline traffic and AirTran accounts for roughly 22 percent of the airport's domestic airline traffic, Delta's invitation to collude had a dangerous probability of successfully monopolizing the relevant market and/or submarkets. Sharing  actual and potential future competitive actions concerning pricing and capacity cuts in forums typically monitored by competitors competing in highly concentrated markets or submarkets will likely lead to anticompetitive monopolization and/or price coordination in violation of the Sherman Act.

98.    Plaintiffs and the Class are threatened with further injury unless Delta

is enjoined from sharing actual and potential future competitive actions concerning pricing and capacity cuts in forums monitored by its competitors and from otherwise attempting to enter into combinations, contracts, and/or conspiracies that violate the Sherman Act.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs, on their own behalf and on behalf of the Class, demand a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment:

a. Certifying that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class representatives and their counsel as lead Class counsel;

b. Directing that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure be given to members of the Class;

c. Awarding Plaintiffs and the Class their full monetary damages for first bag fee payments, the amount of which is to be proven at trial;

d. Awarding Plaintiffs and the Class treble their monetary damages, pursuant to 15 U.S.C. § 15;

41

e.       Awarding Plaintiffs and the Class pre-and post-judgment interest on their damages;

f.       Awarding Plaintiffs and the Class the costs of this action and reasonable attorneys' fees pursuant to 15 U.S.C. § 15;

g.       Enjoining Defendants from continuing or resuming their unlawful and anticompetitive practices; and

h.       Awarding Plaintiffs and the Class such other and further relief as the Court deems just and proper.

Dated this 1st day of February, 2010

/s/Daniel Kotchen

**LEAD COUNSEL**

Daniel Kotchen                          Cale H. Conley
Daniel Low                              Richard A. Griggs
Alicia Gutierrez                        CONLEY GRIGGS LLP
KOTCHEN & LOW LLP                       4400 Peachtree Rd., N.E
2300 M Street, NW, Suite 800            Atlanta, GA 30319
Washington, DC 20037                    Phone: 404-467-1155
Phone: 202-416-1848                     cale@conleygriggs.com
dkotchen@kotchen.com                    richard@conleygriggs.com
dlow@kotchen.com
agutierrez@kotchen.com


Andrew H. Rowell III                    R. Bryant McCulley
James L. Ward, Jr.                      Stuart H. McCluer
RICHARDSON, PATRICK,                    McCULLEY MCCLUER PLLC

42

WESTBROOK & BRICKMAN, LLC
P.O. Box 1007
1037 Chuck Dawley Boulevard,
Building A
Mt. Pleasant, SC 29465
Phone: 843-727-6500
hrowell@rpwb.com
jward@rpwb.com

1109 Van Buren Avenue
Oxford, MS 38655
Phone: 662-236-1401
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com

**LIAISON COUNSEL**

David H. Flint
Elizabeth L. Fite
SCHREEDER WHEELER & FLINT,
LLP
1100 Peachtree Street, NE, Suite 800
Atlanta, GA 30309-4516
Phone: 404-681-3450
dflint@swfllp.com
efite@swfllp.com

**OTHER COUNSEL**

Corey D. Holzer
Michael Ira Fistel , Jr.
HOLZER, HOLZER & FISTEL, LLC
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Phone: 770-392-0090
mfistel@holzerlaw.com

Jeffrey S. Abraham
ABRAHAM, FRUCHTER &
TWERSKY LLP
One Pennsylvania Plaza, Suite 2805
New York, NY 10019-1910
Phone: 212-279-5050
jabraham@aftlaw.com

William C. Wright
Law Offices of William C. Wright,
P.A.,
301 Clematis Street, Suite 3000
West Palm Beach, FL 33401
Phone: 561-514-0904

Jesse A. Davis , III
BROGDON, DAVIS & ADAMS, LLC
150 East Ponce De Leon Avenue, Suite
320
Decatur, GA 30030
Phone: 404-373-8466

wwright@leopoldkuvin.com

jess.davis@bdalaw.net

Steven A. Asher
WEINSTEIN KITCHENOFF &
ASHER LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA  19103
Phone: 215-545-7200
asher@wka-law.com

Bernard Persky
LABATON SUCHAROW LLP
140 Broadway, 34th Floor
New York, NY 10005
Phone: 212-907-0700
bpersky@labaton.com

Brant Penney
REINHARDT, WENDORF &
BLANCHFIELD
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Phone: 651-287-2100
B.Penney@rwblawfirm.com

Robert N. Kaplan
Gregory K. Arenson
KAPLAN FOX & KILSHMEIMER
LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Phone: 212-687-1980
RKaplan@kaplanfox.com
GArenson@kaplanfox.com

Martin D. Chitwood
Craig G. Harley
CHITWOOD HARLEY HARNES LLP
1230 Peachtree St NE
2300 Promenade II
Atlanta, GA 30309
Phone: 404-873-3900
mchitwood@chitwwodlaw.com
charley@chitwoodlaw.com

Eric L. Cramer
1622 Locust Street
Philadelphia, PA 19103
Phone: 215-875-3000
ecramer@bm.net

Kendall S. Zylstra
Stephen E. Connolly
FARUQI & FARUQI, LLP
2600 Philmont Avenue, Suite 324
Huntingdon Valley, PA 19006

Nadeem Faruqi
Richard Schwartz
FARUQI & FARUQI, LLP
369 Lexington Ave, 10th Floor
New York, NY 10017

Phone: 215-914-2460
kzylstra@faruqilaw.com

Ryan K. Walsh
COUGLIN STOIA GELLER
RUDMAN & ROBBINS LLP
Monarch Centre, Suite 1650
3424 Peachtree Road, NE
Atlanta, GA 30326
Phone: 404-504-6500

William C. Wright
LEOPOLD KUVIN, PA
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Phone: 561-935-4801
wwright@leopoldkuvin.com

Joshua P. Davis
LAW OFFICES OF JOSHUA P.
DAVIS
437 Valley Street
San Francisco, CA 94131
Phone: 415-422-6223

Brian S. Campf
BRIAN S. CAMPF, PC
818 SW Third Avenue #229
Portland, OR 97204
Phone: 503-849-9899
brian@bsclegal.com

Daniel E. Gustafson
Daniel C. Hedlund
GUSTAFSON GLUEK PLLC

Phone: 212-983-9330

Bonny E. Sweeney
David W. Mitchell
Katherine A. Malcolm
655 West Broadway, Suite 1900
San Diego, CA 92101
Phone: 619-231-1058

Richard Brualdi
THE BRUALDI LAW FIRM, PC
29 Broadway, Suite 2400
New York, NY 10006
Phone: 212-952-0602
rbrualdi@brualdilawfirm.com

Richard M. Volin
Michael G. McLellan
FINKELSTEIN THOMSON LLP
1050 30th Street NW
Washington, DC 20007
Phone: 202-337-8000
rvolin@finkelsteinthomson.com
mmclellan@finkelsteinthomson.com

David Andrew Bain
THE BAIN LAW FIRM PL
649 Fifth Avenue South
Naples, FL 34102
Phone: 239-434-2294
dbain@bain-law.com

650 Northstar East
Minneapolis, MN 55402
Phone: 612-333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

## CERTIFICATE OF SERVICE

This is to certify that this pleading has been prepared in 14 pt. type

consistent with the Rules of this Court and further to certify that on February 1,

2010, I electronically filed the foregoing **CONSOLIDATED AMENDED**

**CLASS ACTION COMPLAINT** using the CM/ECF system so as to

automatically send e-mail notification of such filing to the attorneys of record in

this action.

/s/ Daniel A. Kotchen

Daniel A. Kotchen, Esq.

LEAD COUNSEL