FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

AUG 02 2010

JAMES N. HATTEN, CLERK
By_____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE DELTA/AIRTRAN BAGGAGE )       CIVIL ACTION FILE
FEE ANTITRUST LITIGATION       )       NUMBER 1:09-md-2089-TCB

# O R D E R

This matter is before the Court on Defendant AirTran Airways, Inc.'s

motion to dismiss [72] and Defendant Delta Air Lines, Inc.'s motion to

dismiss [73].[1]

## I.   Background[2]

### A.   Facts

Delta and AirTran are competitors in the market for airline service.

They compete heavily on routes to and from Atlanta because

Hartsfield-Jackson Atlanta International Airport ("Hartsfield-Jackson")

serves as the principal hub for both airlines.  Indeed, together Delta and

---

[1] Additionally, Plaintiffs have filed an unopposed motion to substitute Plaintiff David Terry for Plaintiff David Watson [105], and an unopposed motion to substitute Plaintiff Jacaranda, Inc. for Plaintiff Thomas Whittelsey [125]. These motions will be granted.

[2] Because this matter is before the Court on motions to dismiss, the Court must accept the factual allegations of the complaint as true. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994).

AirTran account for approximately ninety-two percent of all of the airline traffic at Hartsfield-Jackson. AirTran describes Atlanta as the "core of [its] business." Delta describes Atlanta as its "core strength market."

AirTran positions itself as a discount airline that provides low fares compared to its competitors. Its main rival is Delta, which competes with AirTran on approximately ninety percent of all of the routes served by AirTran and on one hundred percent of all of the routes served by AirTran to and from Hartsfield-Jackson.

Delta has consistently matched AirTran's low prices, including on routes to and from Hartsfield-Jackson. Historically, the two airlines have competed for market share in what has been described by observers as "one of the fiercest rivalries in the U.S. airline industry." According to Plaintiffs,[3] prior to the unlawful collusion alleged in this action, consumers have benefited from this competition in the form of additional capacity on routes, lower prices, and fewer ancillary fees such as fees for checked bags.

---

[3] Plaintiffs currently consist of the following twelve purchasers of Defendants' services who paid a first-bag fee on flights: Brent Avery; David Terry; Michael Edelson; Martin Siegel; Jacaranda, Inc.; Patricia Freedman; Stephen Powell; Henryk J. Jachimowicz; Laura Greenberg Gale; Carla Dahl; and Victoria Mertes. Further details regarding each Plaintiff (including on which flights they traveled), which are not relevant to the present motions to dismiss, are set forth in the consolidated amended complaint and in the subsequent motions to substitute that have been filed by Plaintiffs.

Plaintiffs aver that the longstanding intense competition between Delta and AirTran prevented either airline from charging a first-bag fee[4] unilaterally.

The first half of 2008 proved to be difficult for the airline industry because the price of oil temporarily spiked to high levels. In 2008, a barrel of oil cost $90.82 in January, peaked at $132.55 in July, and ended at $41.53 in December. The temporary increase in oil prices impacted airline profits, including AirTran's and Delta's.

Plaintiffs allege that AirTran could earn a profit without fare increases to consumers if the price of oil did not exceed around $100 per barrel. However, oil prices exceeded $100 per barrel for six months in 2008. Thus, AirTran—like other airlines—faced a dilemma: it could either increase prices to consumers and risk losing market share, or sustain losses and wait for the price of oil to abate.

Plaintiffs allege that instead of resolving this dilemma in a lawful and competitive manner, AirTran and Delta colluded, ultimately causing consumers to suffer harm in the form of higher prices. Specifically, Plaintiffs allege that AirTran invited Delta to collude (through a series of earnings calls with industry analysts and speeches/break-out sessions at

---

[4] The first-bag fee—which is at the heart of this litigation—involves the $15 fee that Defendants (and many other airlines) now charge for the first bag that a passenger checks.

3

industry conferences) so that both airlines could increase prices to consumers without losing any market share. Plaintiffs allege that Delta accepted this invitation and that the two airlines engaged in anticompetitive conduct by increasing prices through capacity reductions and imposing a first-bag fee.

Plaintiffs allege that AirTran first invited Delta to collude in its April 22, 2008 first quarter earnings call, which Delta monitored.[5] During

---

[5] AirTran's first quarter earnings call was originally scheduled to occur on April 24, 2008, one day after Delta's first quarter earnings call. However, AirTran rescheduled the call to occur at 9:00 a.m. on April 22, the day before Delta's earnings call. Seizing upon this fact, Plaintiffs argue that AirTran intentionally rescheduled the call so that it could initiate collusive communications with Delta and allow Delta an opportunity to respond at its own earnings call. AirTran counters that the rescheduling of the call had nothing to do with Delta. AirTran states that it moved the call so that it could respond to investor inquiries regarding a $150 million securities filing that was set to occur at 5:05 a.m. on April 22. Ordinarily, such conflicting interpretations regarding these events would favor Plaintiffs because on a motion to dismiss, the Court must accept the facts as alleged by Plaintiffs.

However, subsequent correspondence between the parties (attached as an exhibit to Defendants' reply briefs in support of their motions to dismiss) sheds more light on this issue. Specifically, Plaintiffs had originally argued in their opposition brief to the motions to dismiss that the securities filing took place at 5:05 *p.m.* on April 22, which, if true, would have rendered implausible AirTran's argument that it had rescheduled the call to answer inquiries regarding the securities filing (if the filing did not take place until 5:05 p.m., then AirTran would not been able to utilize a 9:00 a.m. earnings call to answer inquiries regarding the filing).

Since the filing of Plaintiffs' opposition brief, Plaintiffs now concede that they misread the time stamp on the securities press release form and that the securities filing did in fact occur at 5:05 a.m. on April 22, thereby supporting AirTran's explanation. Plaintiffs have not offered any new argument to rebut AirTran's plausible explanation for the rescheduling of the call. Nevertheless, even if AirTran's motivation in rescheduling the call had nothing to do with Delta, such a fact does not render implausible Plaintiffs' core allegation that AirTran also used the call as an opportunity to invite Delta to collude.

4

that call, AirTran announced that it was "resetting its priorities to be highly

profitable" and that it "strongly believe[d]" that AirTran and its competitors

in the industry needed to reduce capacity:

> Adapting to high energy prices is a challenge faced by all
> airlines.   It will also create opportunities for those who
> successfully adapt.
>
> There are two solutions for [the] industry to today's high energy
> prices: either the prices our customers pay will increase to
> accurately reflect the cost of energy, or the price of oil will
> abate.  We have been working for the past several months in
> identifying how AirTran should adapt to these challenging
> times. . . .
>
> While several airlines have announced modest adjustments to
> their capacity, we strongly believe that more industry capacity
> needs to be removed.

Compl. ¶ 33.  AirTran then stated that rather than grow its capacity by ten

percent in the fourth quarter of 2008, its capacity would remain flat and

would continue to remain flat through 2009.   According to AirTran,

capacity adjustments needed to be made in order to "get average prices up."

AirTran also indicated during the call that Delta's elimination of

capacity was "long overdue":

> Legacy consolidation has also recently begun with the
> announced plans to merge two of our largest competitors in
> Delta and Northwest Airlines.  Legacy consolidation and the

corresponding elimination of inefficient and redundant domestic capacity is long overdue.

Compl. ¶ 35. AirTran emphasized that the price of oil was "creating a situation where all carriers are going to react" and that the carriers would "change the revenue environment" by "push[ing] up average fares" as redundant capacity is cut.

The following day, April 23, 2008, Delta held its first quarter earnings call. During the call, Delta recognized that fuel prices were "placing a lot of pressure on the business and the industry as a whole," and it emphasized that it would "continue to be aggressive about pulling capacity in response to fuel prices." Delta also emphasized that it planned to "push[] fare increases and fee increases"; it would continue to monitor "the changing competitive landscape in order to determine whether additional capacity reductions are warranted"; and it believed "the industry has got to maintain discipline with respect to capacity."

Delta responded as follows to an analyst's question regarding capacity:

[Q:] If you priced the product such that you could be profitable, how much capacity would you actually need to take out?

[A:] Certainly, Bill. I think Delta can't do it alone. We have to do it in conjunction with the other carriers because certainly the

> capacity cuts that we can do on our own, while they will help us, will not remedy the industry's woes. So, as we look forward, we're hopeful that the other carriers act responsibly and look at the demand profiles as we move into the fall. And I would say if the industry could achieve a 10% reduction in capacity year-over-year by the fall that we'd be in pretty good shape given today's fuel environment.

Compl. ¶ 38.

A couple months later, on June 18, 2008, AirTran and Delta participated in a Merrill Lynch Transportation Conference. Speeches were given at the conference, and Defendants' executives participated in "break-out" groups in which they discussed, among other things, future revenues.

Delta's chief financial officer, Ed Bastian, spoke at the conference. During his speech, he focused on Delta's capacity cuts and on the need for the industry to cut more capacity. Bastian said that he did not believe that the industry had cut enough capacity, and he said that Delta was going to take "a pause" in its plans to cut capacity and would "watch" the industry to determine if further capacity cuts were warranted:

> I said no in terms of has enough capacity been cut, I think the question is with the amount of capacity that's been cut, we have to take a little bit of a pause and see where it's coming out and I think you also have to be careful that you don't cut too deeply on the front-end and lose market share opportunities that will hurt your franchise over time. So I think everyone while they've

made some fairly significant announcements, everybody is watching each other in terms of how the capacity coming over, and exactly what's coming out. . . .

Compl. ¶ 41.

About a month after the conference, on July 16, 2008, Delta held its second quarter earnings call. During the call, Delta explained that it had taken "swift action to significantly reduce domestic capacity and their related costs." However, Delta explained that "more industry capacity has to come out." Until that happened, Delta planned to maintain an increased level of capacity in Atlanta, its "core strength market."

Delta also emphasized that it was "still in the planning process for '09" and would provide more guidance on its capacity plan during its "Q3 call" after it analyzed other industry participants' planned capacity cuts. Delta believed that "the whole industry model has got to evolve much more quickly," particularly with regard to eliminating capacity for "low-end traffic":

> I think we're still in the planning process for '09, and I think probably what we should look at doing is in the Q3 call is to try to give you a bit more of an update. But I think we need to see where the final schedule tapes come in in the fall. While there have been a number of announcements, we still need to see what the final schedules are and I think we've got a bit more work to do on our business plan looking out at '09. I think the model has got to, the whole industry model has got to evolve

8

much more quickly in that kind of a fuel environment. . . . When you think about the amount of leisure traffic there's been a lot of capacity built in the United States over the past decade to carry pretty much low end traffic. . . .[I]t's probably the lower end traffic that is not going to want to purchase at the market clearing price that covers the cost of fuel. So we're spending a lot of time rethinking what that model, what the industry model looks like, and how you make it work at those levels. But a lot of it is going to depend upon what the industry reaction is to these fuel price levels and how that reaction is demonstrated in the capacity changes that are made over the next two quarters.

Compl. ¶ 43.

Later in the call, Delta again emphasized its willingness to eliminate

capacity going forward after it analyzed what capacity cuts the industry

made in the fall:

[O]ur capacity cuts have put us at the upper end of the range of where the industry is at as far [as] unit revenues go, and we think there's a lot more opportunity as we fine tune this. We've never as an industry seen pricing move as quickly as we have, of course in response to [the] run up in fuel, and that creates an entirely different demand set. So now we have to go back and analyze, individual market, every individual market, was that the right move? Is there more upward mobility in pricing? Do we have to move back on some markets or should we take capacity out? And that's the process [] we're in right now and that's why I think we're not doing more capacity cuts right now. We're waiting to see essentially where this equilibrium goes and how, when we fine tune it, what more we get out and as the industry starts to come to the party in the fall what the implication of that is.

Compl. ¶ 44.

Finally, when asked whether it had any plan to implement a first-bag fee in connection with its recent merger with Northwest (Northwest had already implemented a first-bag fee), Delta said that it was studying the issue and would continue to study it, "but [had] no plans to implement it at this point."

Thirteen days after Delta's second quarter earnings call, on July 29, 2008, AirTran held its second quarter earnings call. AirTran's CEO Robert Fornaro made the following observation, which Plaintiffs contend was effectively a mea culpa to Delta for creating a market in Atlanta with low fares, and an assurance that the fares would increase:

> [W]e created the market in Atlanta for low fare, for close-[in] reasonable fares. Quite frankly, those average prices need to come up. What that says is, when the prices come up, [the] market is going to contract. We have to find the right levels in Atlanta.

Compl. ¶ 46. Unlike AirTran's last earnings call, in which it committed to keeping capacity flat in the fourth quarter of 2008, according to Plaintiffs AirTran responded to Delta's invitation to cut capacity and revised its projections and accelerated the amount of capacity that it planned to remove from the market:

> We know we need to increase o[u]r realize[d] average fare[s]. And we have taken some very significant increases to the fare

structure. Some fare[s] still need to be increased further. Some fare[s] may have been too high. We also know that our capacity needs to be reduced to a level that will support price increases to cover the increase[d] cost of jet fuel. This capacity will begin to come out in September. We have accelerated the amount of capacity [] we're removing. We now expect the capacity to be down 7% to 8% in the September through December period.

Compl. ¶ 47. Also during the call, AirTran emphasized that its focus was "going to be almost entirely on the balance sheet" to ensure profitability—as opposed to AirTran's prior focus on gaining market share through low fares. AirTran wanted to improve the performance of "new ancillary revenue initiatives," such as revenues earned from baggage fees.

According to Plaintiffs, after AirTran's second quarter earnings call, in which it indicated a commitment to accelerate capacity cuts and increase prices in Atlanta, Delta no longer felt constrained by vigorous competition from AirTran.

AirTran followed through on its commitment to reduce capacity beginning in September 2008. Around September 1, 2008, AirTran virtually overnight reversed its eight-percent growth rate and cut capacity by eight percent:

And again, a year ago we were growing at a double digit rate as the domestic marketplace was weakening and fuel was rising daily. But we were one of the first airlines to restructure, and we did so decisively. We deferred or sold 46 while the market

was still strong. And again, virtually overnight in the summer we went from an 8% growth rate to a minus 8% again, right around Labor Day.

Compl. ¶ 50.

On October 15, 2008, Delta held its third quarter earnings call. During the call, Delta stated that its 2009 capacity levels in Atlanta would be "significantly below" Delta's prior projections and that it was now willing to increase ancillary fees—i.e., first-bag fees—because "strategically going forward [a la carte] pricing is where we need to go as an industry." According to Plaintiffs, collusion with AirTran had fundamentally changed Delta's business strategies.

Eight days later, on October 23, 2008, AirTran had its third quarter earnings call. During that call, AirTran stated that its capacity reduction plan was in place, that it was reducing the number of airplanes in its fleet, and that under the right circumstances it would be willing to further reduce capacity.

AirTran also emphasized that it was "continu[ing] to work on expanding [its] ancillary revenue efforts." When asked if it would impose a first-bag fee, AirTran indicated that it wanted to implement a first-bag fee,

and had invested in the capability to quickly implement the fee, but had not

implemented the fee because Delta had not done so:

> Let me tell you what we've done on the first-bag fee.  We have
> the programming in place to initiate a first-bag fee.  And at this
> point, we have elected not to do it, primarily because our largest
> competitor in Atlanta where we have 60% of our flights, hasn't
> done it.  And I think, we don't want to be in a position to be out
> there alone with a competitor who—we compete on, has two-
> thirds of our nonstop flights, and probably 80% to 90% of our
> revenue—is not doing the same thing.  So I'm not saying we
> won't do it.  But at this point, I think we prefer to be a follower
> in a situation rather than a leader right now.

Compl. ¶ 55.  When asked if AirTran would consider imposing a first-bag

fee if Delta did so, AirTran responded that it "would strongly consider it,

yes."

Following AirTran's third quarter earnings call, Delta made two

announcements that indicate that its competitive decisions had changed

since its July 16, 2008 earnings call.  First, Delta decided to cut capacity in

2009 by about five percent.   Second, instead of refraining from

implementing a first-bag fee (Delta had said in July that it would not plan

to implement the fee, notwithstanding the Northwest merger), Delta

announced on November 5, 2008—less than two weeks after AirTran's

statement that it would "prefer to be a follower" on the first-bag fee—that

Delta would begin charging passengers a $15 first-bag fee, effective December 5, 2008.

AirTran quickly followed Delta's lead in implementing a first-bag fee. On November 12, 2008, AirTran announced that it would impose a $15 first-bag fee, effective December 5, 2008. This was the exact same fee as Delta's with the same effective date.

According to Plaintiffs, Defendants' agreement not to compete directly affected competition in at least two ways.

First, Defendants' agreement led to higher prices that never would have occurred had the airlines acted unilaterally. According to Plaintiffs, both AirTran and Delta imposed a $15 first-bag fee that neither airline would have imposed but for their agreement. At the time that AirTran communicated to Delta that it was prepared to impose a first-bag fee, AirTran recognized that consumers already believed that airline "prices were through the roof" and that the cost of oil had abated to a level in which AirTran could lower prices to consumers. By the time that AirTran and Delta implemented the first-bag fee, oil cost about $41 per barrel, which was less than half of its January 2008 price (when AirTran planned to grow capacity by 10 percent) and substantially below the $100 per barrel

threshold that AirTran needed to earn a profit. According to Plaintiffs, imposing price increases when the country was in grips of economic downturn would not have occurred had Delta and AirTran been acting unilaterally and in their own self-interests. Additionally, by reducing capacity for flights in and out of Hartsfield-Jackson, Defendants were able to price their services at levels that would not have persisted had the capacity remained in place.

Second, Defendants ensured that as a result of their agreement, competition between the two airlines would remain restrained. Both airlines reduced their fleet of planes in an effort to make capacity cuts permanent. Moreover, the airlines coordinated gate-lease negotiations with Hartsfield-Jackson to ensure that neither airline would disrupt their agreement by attempting to secure more than their allocated share of gates. In contrast to prior efforts by each airline to secure gates at the expense of the other, in February 2009 AirTran acknowledged that "AirTran and Delta have been working together" to negotiate with Hartsfield-Jackson to keep costs down and to protect themselves from "congestion."

## B.   **Procedural History**

Following the events described above, several individual antitrust cases were filed by Plaintiffs in various federal district courts across the country.   On October 6, 2009, the United States Judicial Panel on Multidistrict Litigation entered an order transferring all of these cases to this Court.

On January 21, 2010, this Court issued an initial case management order [51].  Pursuant to that order, on February 1, 2010, Plaintiffs filed a consolidated amended class action complaint against Defendants.

Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23, on behalf of themselves and the following class:

> All persons or entities in the United States that directly paid Delta and/or AirTran first-bag fees on domestic flights from December 5, 2008 through the present (and continuing until the effects of Delta's and AirTran's anticompetitive conspiracy ceases).

The complaint consists of three counts.  Count one alleges that Defendants engaged in a conspiracy to restrain trade in violation of § 1 of the Sherman Act.   In this count, Plaintiffs assert that Defendants entered into a conspiracy in restraint of trade that led to the imposition of the first-bag fee and capacity reductions, all in a joint and concerted effort to increase prices

to consumers.  As previously noted, Plaintiffs aver that the unilateral imposition of a first-bag fee on consumers would have been against each airline's self-interest, as each airline would have lost customers to its competitor if it had imposed such a fee on its own.  By acting in concert, however, both airlines benefited from increased revenues without suffering any loss in market share.  In connection with count one, Plaintiffs seek damages in the amount of the first-bag fee payments that were paid by consumers, as well as injunctive relief.

Counts two and three are brought pursuant to § 2 of the Sherman Act and are identical except that they pertain to each Defendant separately. Count two alleges that AirTran engaged in attempted monopolization in violation of § 2 of the Sherman Act.  Plaintiffs allege that by inviting Delta to collude, AirTran attempted to monopolize the domestic airline passenger service market served by Delta and AirTran and/or submarkets for flights originating or terminating at Hartsfield-Jackson.  Count three asserts a similar attempted monopolization claim against Delta.

In connection with counts two and three, Plaintiffs seek only injunctive relief, requesting that Defendants be "enjoined from sharing actual and potential future competitive actions concerning pricing and

capacity cuts in forums monitored by [their] competitors and from otherwise attempting to enter into contracts, combinations, and/or conspiracies that violate the Sherman Act."

On March 8, 2010, Defendants filed separate motions to dismiss, contending that all three counts in Plaintiffs' complaint fail to state a claim upon which relief can be granted.

## II.   **Discussion**

### A.   **Legal Standard**

A pleading must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The allegations in Plaintiffs' complaint are presumed true at this stage, and all reasonable factual inferences must be construed in its favor. *Hunnings*, 29 F.3d at 1484. However, "the court need not accept inferences drawn by plaintiff if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *accord*

*Lewis v. Brautigam*, 227 F.2d 124, 127 (5th Cir. 1955).[6]  To survive a motion to dismiss, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Fed. R. Civ. P. 8(a) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal punctuation and quotations omitted).  Although the Court in *Twombly* rejected the *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), liberal "no set of facts" standard, the Court did not adopt a standard requiring a heightened level of factual pleading.  The Court specifically held that "we do not require heightened facts pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  Thus, Plaintiffs must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" demonstrating the necessary elements of their claims. *Id.* at 556.  Only if Plaintiffs "have not nudged their claims across the line from conceivable to plausible" must a complaint be dismissed. *Id.* at 570.

---

[6] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

In further clarifying the *Twombly* standard, the Supreme Court has adopted a two-pronged approach to evaluating motions to dismiss: (1) eliminate any allegations in the complaint that are merely legal conclusions, and (2) where there are well-pleaded factual allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1940-41 (2009).

## B.  Analysis

### 1.  Conspiracy Pursuant to § 1 of the Sherman Act

#### a.  *Twombly*

As explained above, Plaintiffs allege that Defendants engaged in a conspiracy to restrain trade in violation of § 1 of the Sherman Act. Based upon the amount of attention devoted to this claim in the parties' briefs and the fact that this is only claim for which Plaintiffs seek class-wide relief,[7] it is apparent that it is the gravamen of this action.

Defendants raise several arguments in their motions to dismiss in an effort to demonstrate that Plaintiffs' § 1 Sherman Act claim should be

---

[7] Although Plaintiffs originally sought class-wide treatment for their claims under § 2 of the Sherman Act, it has come to the Court's attention that they are no longer seeking relief on a class-wide basis with respect to those claims.

dismissed.  The first, and primary one, is that Plaintiffs' § 1 Sherman Act claim fails to meet the plausibility standard set forth in *Twombly*.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade . . . ." 15 U.S.C. § 1.  Plaintiffs are proceeding under the "conspiracy" portion of the statute.  The threshold requirement of a conspiracy claim under § 1 is "an agreement to restrain trade."  *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 569 (11th Cir. 1998).  "To prove that such an agreement exists between two or more persons, a plaintiff must demonstrate 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful agreement.'"  *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)).  "A plaintiff cannot state an antitrust claim by merely showing parallel conduct and from it divine that an agreement must be the source from which the parallel conduct arose.  A plaintiff likewise cannot state an antitrust claim by showing only that the Defendants made price information publicly available and thus had the opportunity to conspire. . . ."  *In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895-WSD, 2009 WL 323219, at *8 (N.D. Ga. Jan. 28, 2009).

In support of their motions to dismiss, Defendants first point out that in many of the alleged collusive communications, Delta and AirTran refer to "the industry" rather than specifically mentioning each other by name. According to Defendants, the failure of Delta and AirTran to identify each other by name in all of the alleged collusive communications renders Plaintiffs' conspiracy claim implausible.

The Court rejects this argument.  It is undisputed that Delta and AirTran are each other's closest competitors.  AirTran's main rival is Delta, which competes with AirTran on approximately ninety percent of all routes serviced by AirTran and one hundred percent of routes serviced by AirTran from Hartsfield-Jackson.  It is also undisputed that the two companies monitor each other's earnings calls and attend the same industry conferences.  It is therefore reasonable to infer (at least at the motion to dismiss stage) that Delta's statements concerning the "industry" were directed to AirTran, particularly when the statements follow or were followed by AirTran's own actions and statements.  The same holds true for the statements made by AirTran referencing "the industry," which the Court can plausibly infer were directed at Delta.

Next, Defendants argue that Plaintiffs have failed to allege sufficient facts that show the plausibility of the existence of any agreement to restrain trade. Defendants state that Plaintiffs' complaint is built upon nothing more than inferences and circumstantial evidence. Relying upon language in the Third Circuit's decision in *In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 361 (3d Cir. 2004), Defendants argue that Plaintiffs must demonstrate the existence of an "actual, manifest agreement," establishing proof that "the defendants got together and exchanged assurances of common action or otherwise adopted a common plan." Defendants also cite the Seventh Circuit's decision *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 654 (7th Cir. 2002), which contains similar language.

Defendants' reliance upon the above cases is misplaced. First, those cases were decided in the context of a motion for summary judgment, not a motion to dismiss.[8]   The standard to overcome a motion for summary

---

[8] Defendants make the mistake of relying upon summary judgment cases throughout their briefs. For example, Defendants also rely heavily upon *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003). However, *Williamson* was a summary judgment case, and it explicitly involved the evidentiary burden required of a plaintiff in a § 1 Sherman Act case at the summary judgment stage of the proceedings. There, the Eleventh Circuit held that to avoid summary judgment, a plaintiff must produce certain evidence, known as "plus factors," which would tend to exclude the possibility that the alleged conspirators acted independently. Such a standard is not

judgment is considerably more rigorous than the standard applicable to a motion to dismiss. *See LTL Shipping Servs.*, 2009 WL 323219, at *8 ("*at the summary judgment stage* a plaintiff must present evidence which tends to rule out the possibility that the defendants were acting independently") (emphasis added).

Second, and more importantly, the Eleventh Circuit has explained that "it is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators." *Seagood*, 924 F.2d at 1573-74; *see also DeLong Equip. Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989) ("[c]onspiracies are rarely evidenced by explicit agreements, and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators").

Thus, the Eleventh Circuit recognizes that Plaintiffs need not allege the existence of collusive communications in "smoke-filled rooms" in order to state a § 1 Sherman Act claim. Rather, such collusive communications can be based upon circumstantial evidence and can occur in speeches at industry conferences, announcements of future prices, statements on

---

applicable at the motion to dismiss stage, where a plaintiff is only required to allege enough facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement. *Twombly*, 550 U.S. at 556.

earnings calls, and in other public ways. *See In re Valassis Commc'ns, Inc.*, FTC File No. 051-0008 (Apr. 19, 2006) ("[I]t is clear that anticompetitive coordination can also be arranged through public signals and public communications, including speeches, press releases, trade association meetings and the like"); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir. 1990) ("the *form* of the exchange—whether through a trade association, through private exchange . . . or through public announcements of price changes— should not be determinative of its legality.") (quoting R. Posner, *Antitrust Law: An Economic Perspective* 146 (1976)); *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 892-95 (N.D. Ill. 2009) (statements at industry conferences supported an antitrust conspiracy claim); *In re Travel Agency Comm'n Antitrust Litig.*, 898 F. Supp. 685, 690 (D. Minn. 1995) (denying summary judgment to the defendants in the face of allegations that they exchanged messages through public speeches, press releases, and meetings).

Courts have also found that unlawful conspiracies may be inferred when collusive communications among competitors precede changed/responsive business practices, such as new pricing practices. *See*

*Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1535 (11th Cir. 1987) (communications between a manufacturer and distributor followed by "corrective" pricing action sufficient for a jury to infer the existence of a conspiracy to fix prices); *United States v. Foley*, 598 F.2d 1323, 1331-32 (4th Cir. 1979) (one defendant's announcement regarding prices at an industry dinner followed by price increases by those in attendance was sufficient to support conspiracy); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 04-cv-3066, 2009 WL 856306, at *12-15 (N.D. Ga. Feb. 9, 2009) (communications followed by parallel price increases sufficient for a jury to infer conspiracy); *Standard Iron Works*, 639 F. Supp. 2d at 892-95 (defendants' statements in speeches at industry conferences regarding the industry "work[ing] together to keep the prices high" and maintaining "discipline" in cutting capacity followed by competitors cutting capacity supported an inference of conspiracy).

Defendants attempt to distinguish these cases by arguing that they involved more explicit and direct anticompetitive communications than alleged by Plaintiffs here. Even if Defendants' interpretation of these cases is correct, the Court is not persuaded that Plaintiffs' § 1 Sherman Act claim should be dismissed. It is true that Plaintiffs' complaint is built upon

circumstantial evidence of a conspiracy; nevertheless, the Court is unable to say at this stage of the litigation that the inferences Plaintiffs draw from this evidence are implausible. Accordingly, the Court finds that Plaintiffs have alleged sufficient facts to establish an unlawful § 1 Sherman Act conspiracy.

To summarize the allegations that were detailed previously, Plaintiffs aver that Defendants (1) engaged in collusive communications through earnings calls and industry conferences; (2) aligned their business practices following the collusive communications; (3) implemented business practices contrary to their self-interest following the communications; (4) offered a pretextual explanation for the implementation of the first-bag fee; and (5) undertook this concerted action to achieve higher revenues at the expense of higher prices for consumers.

More specifically, Plaintiffs have alleged that Delta and AirTran communicated with each other in public regarding how both airlines could "get average prices up"; "push fare increases and fee increases"; work "in conjunction" to increase prices; and would impose a first-bag fee during a recession even though it was counter to either Defendant's self-interest to do so alone. According to Plaintiffs, AirTran first invited Delta to collude during its April 22, 2008 earnings call. AirTran's invitation to collude

sparked a roughly six-month dialogue between the parties concerning each Defendant's own plans to reduce capacity,[9] increase prices, and set expectations as to what the other needed to do to increase prices. Following these communications, Defendants made changes to their business practices, including reducing capacity and imposing a first-bag fee. These changed business practices—combined with the preceding communications—support a plausible inference of a conspiracy to restrain trade.[10]

Defendants also argue that dismissal is warranted because courts have held that price announcements by competitors in and of themselves may be lawful. *See, e.g., United States v. Standard Oil Co.*, 316 F.2d 884,

---

[9] Defendants take Plaintiffs to task because the complaint neither describes the specific routes on which capacity was reduced nor identifies the specific time periods during which these capacity reductions took place. At this stage of the proceedings, the Court is not convinced that Plaintiffs are required to provide such a high level of detail, and Plaintiffs have indicated that they are willing to provide further details to Defendants on this issue.

[10] Plaintiffs allege in their complaint that AirTran and Delta participated in investor conferences in which break-out discussions between executives occurred regarding pricing and other industry issues. Defendants argue that Plaintiffs' reliance upon these break-out sessions is in error because a so-called opportunity to conspire cannot, standing alone, sustain a claim of an agreement to restrain trade. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009). Although this is a correct statement of the law, Plaintiffs have alleged much more in their complaint than just the existence of these break-out sessions. The Court rejects Defendants' argument that Plaintiffs should be barred from exploring the content of these break-out discussions during discovery to determine what exactly was discussed and whether these discussions may support Plaintiffs' overall theory of this case.

896 (7th Cir. 1963) (discussing distinction between price announcements and solicitations to act in concert); *United States v. Gen. Motors Corp.*, No. 38219, 1974 WL 926, at *21 (E.D. Mich. Sept. 26, 1974) ("The public announcement of a pricing decision cannot be twisted into an invitation or signal to conspire; it is instead an economic reality to which all other competitors must react.").

Here, however, Plaintiffs do not allege mere price announcements; they allege that each Defendant signaled its willingness to cut capacity and increase prices if the other Defendant acted in concert. The Court therefore finds that this case (at least at this early stage of the proceedings) is distinguishable from cases where mere price announcements were made by competitors.

Additionally, it bears noting that unlike many antitrust complaints, Plaintiffs' complaint is not lacking in detail. Plaintiffs' conspiracy allegations detail how and when the alleged conspiracy was reached, who was involved in the alleged collusive communications, the content of the communications, the changed business practices following the collusive communications, and the pretextual reasons for the changed business practices. *Cf. Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir.

2009) (allegations of conspiracy were "vague and conclusory" and did not allege specifically "when or with whom" defendant conspired); *CIBA Vision Corp. v. De Spirito*, No. 1:09-cv-1343, 2010 WL 553233, at \*7 (N.D. Ga. Feb. 10, 2010) ("[Counter-claimant] has not described with whom Plaintiff is in a conspiracy or where or when these agreements were made"); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) ("The complaint . . . provides no details as to when, where, or by whom this alleged agreement was reached.").

Because the allegations in Plaintiffs' complaint contain sufficient factual specificity to establish an unlawful conspiracy, dismissal would be improper. *Twombly* imposed a plausibility requirement at the pleadings stage, not a *probability* requirement. *Twombly*, 550 U.S. at 556. The complaint must contain enough facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement. *Id.* Plaintiffs' complaint meets this standard.

Although the Court reaches this conclusion, it does not do so lightly. The complaint has its weaknesses. For example, as Defendants highlight, many of Plaintiffs' allegations are based upon statements made by Defendants' executives *in response* to analysts' questions rather than from

prepared speeches and statements.  Obviously, the fact that some of the alleged collusive communications came in response to questions may weaken the probative value of those statements.

Additionally, Delta has also articulated potentially legitimate and lawful justifications for why it imposed a first-bag fee when it did.  Delta contends that it imposed a first-bag fee, not for anticompetitive reasons, but because it had recently completed its merger with Northwest Airlines, which had already imposed a first-bag fee.  According to Delta, it had committed to a seamless integration of the two airlines following the merger.  Thus, Delta insists that it elected to impose a first-bag for reasons wholly unrelated to AirTran's public statement.  If this is true, it would presumably provide a valid justification for why the first-bag fee was implemented.    However, Plaintiffs contend that Delta's proffered justification for imposing the first-bag fee is pretextual; in particular, Plaintiffs point to the fact that Delta had previously rejected imposing a first-bag fee to conform its prices to Northwest's even though Delta's acquisition of Northwest was well underway.

Moreover, Defendants argue that the uncertain economic climate in 2008 (including the oil price spike) caused them to reveal more detail

31

regarding their future capacity and pricing plans than would normally be the case because the investment community was particularly interested in how each airline would respond to the economic conditions. If it is true that the economic conditions in 2008 (rather than any anticompetitive motivation) led Defendants to take certain actions that are alleged to be unlawful, this may provide Defendants a viable defense to the charge that they acted against their own self-interest. However, Plaintiffs should be afforded the opportunity to prove that imposing this type of price increase during an economic downturn was counter to each Defendant's self-interest.

Finally, it is well settled that two competitors may lawfully observe each other's public statements and decisions without running afoul of the antitrust laws. This is commonly referred to as conscious parallelism, which is not unlawful under the Sherman Act. *See Twombly*, 550 U.S. at 553-54 ("Conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interest and their interdependence with respect to price and output decisions is not in itself unlawful"); *In re LTL Shipping Servs.*, 2009 WL 323219, at *8 ("A plaintiff cannot state an antitrust claim by merely showing parallel conduct

and from it divine that an agreement must be the source from which the parallel conduct arose."); *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1276 (N.D. Ga. 2002) ("in competitive markets, particularly oligopolies, companies will monitor each other's communications with the market in order to make their own strategic decisions. . . ."); *In re Airline Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280, 283 (D. Minn. 1997) ("[I]n an oligopolistic market, such as that in which the airlines operate, rapid price coalescence is the norm and is not, in itself, illegal").

Can Defendants' conduct be characterized as merely conscious parallelism that is inevitable in an oligopolistic market? Depending upon the type of evidence that Plaintiffs adduce during discovery, the answer to this question may vary. But it would be both improper and imprudent to dismiss a case of this magnitude, where the interests of consumers are at stake, on the mere hunch that Defendants' conscious parallelism defense (and their other defenses for that matter) may prove valid. The Court is not permitted to evaluate the relative strength of evidence submitted by the parties at the motion to dismiss stage. Defendants' motions to dismiss ask the Court to do just that. For all of these reasons, the Court rejects

Defendants' argument that *Twombly* compels dismissal of Plaintiffs' § 1 Sherman Act claim.[11]

### b.    **Implied Preclusion**

Defendants also argue that the legal doctrine of implied preclusion explained in the Supreme Court's decision in *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007), should bar Plaintiffs' antitrust claims.

*Billing* involved an antitrust action brought by a group of securities buyers against underwriting firms that market and distribute initial public offerings ("IPOs").  The plaintiffs alleged that the underwriters unlawfully agreed with one another that they would not sell shares of a popular new issue to a buyer unless that buyer committed to (1) buy additional shares of that security later at escalating prices, (2) pay unusually high commissions on subsequent security purchases, or (3) purchase from the underwriters other less desirable securities.  The Supreme Court held that the federal securities laws implicitly precluded application of the antitrust laws to the underwriters' alleged anticompetitive conduct, explaining that implied preclusion applies where the laws are "clearly incompatible."  551 U.S. at 285.

---

[11] In reaching this conclusion, the Court also finds it noteworthy that Defendants' conduct is currently being investigated by the Antitrust Division of the United States Department of Justice.

The Court articulated four considerations for determining within a given context whether securities laws and antitrust laws are clearly incompatible: (1) whether the challenged practices lie squarely within an area of financial market activity that the securities laws seek to regulate; (2) the existence of regulatory authority under the securities laws to supervise the activities in question; (3) ongoing SEC regulation; and (4) a resulting risk that the securities laws and antitrust laws, if both applicable, would conflict. *Id.* at 285.

Although the Court applied implied preclusion in *Billing*, implied preclusion is disfavored. *See Gordon v. N.Y. Stock Exch.*, 422 U.S. 659, 682 (1975). Implied preclusion "can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system." *United States v. Nat'l Ass'n of Secs. Dealers, Inc.*, 422 U.S. 694, 719 (1975). "Courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 372-75 (1973).

Defendants broadly argue that implied preclusion should apply here because many of the statements upon which Plaintiffs rely in support of their antitrust claims were made to the investment community in quarterly

earnings calls.  Because the securities laws encourage truthful statements to the investor community, including information about a company's future plans and expectations, Defendants argue that imposing antitrust liability here would undermine that core SEC objective.

Having reviewed this action in light of the considerations set forth in *Billing*, the Court finds that at least at this early stage of the case, Defendants have failed to demonstrate that implied preclusion applies.[12] Plaintiffs' complaint alleges that Defendants went well beyond disclosing the type of financial information that companies must legitimately convey to their shareholders pursuant to SEC regulations.  Moreover, Defendants do not cite any SEC regulation that clearly regulates the unlawful conduct alleged in this case.  Assuming that Defendants colluded on earnings calls and industry conferences, the Court is at a loss as to what SEC authority would prevent such anticompetitive coordination.  Unlike the plaintiffs in *Billing*, who had a cause of action for damages under the securities laws, no cause of action exists for Plaintiffs under the securities laws for the conduct alleged here.  Indeed, Defendants' argument, if accepted, would essentially give businesses a free pass to collude in public forums and leave consumers

---

[12] Notably, Defendants have not cited any cases in which the securities laws precluded an antitrust challenge to collusion reached through public disclosures.

who are harmed by such anticompetitive conduct no remedy.  For all of these reasons, at least at this stage of the proceedings, the Court finds no merit in Defendants' implied preclusion argument.

### c.   *Noerr-Pennington*

As previously noted, as part of their overall conspiracy theory, Plaintiffs allege in their complaint that Defendants sought to cement their alleged agreement to increase prices by limiting their gate leases at Hartsfield-Jackson.  Plaintiffs allege that historically, Delta and AirTran competed intensely for the airport's gate rights, as each airline could increase its share of flights into and out of Hartsfield-Jackson by securing additional gate rights.  According to Plaintiffs, this competition ceased and Defendants coordinated to ensure that neither of them secured additional gate rights.

Defendants argue that any allegations in Plaintiffs' complaint pertaining to their negotiations with Hartsfield-Jackson regarding gate leases should be dismissed pursuant to the *Noerr-Pennington* doctrine. Under the *Noerr-Pennington* doctrine, private entities are immune from liability under the antitrust laws for their attempts to influence public officials. *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*

37

365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965). Thus, under *Noerr-Pennington*, "[c]oncerted action that would ordinarily constitute a conspiracy violative of the Sherman Act does not do so if such action is directed toward influencing governmental bodies." *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1558 (11th Cir. 1992). Because Hartsfield-Jackson is operated by the City of Atlanta—a governmental entity—Defendants contend that the *Noerr-Pennington* doctrine should bar Plaintiffs' allegations with respect to the gate leases.

At this stage of the case, the Court is not persuaded by Defendants' argument that *Noerr-Pennington* categorically bars Plaintiffs' allegations concerning the gate leases. Although it is somewhat unclear, it does not appear to the Court that Plaintiffs seek to impose liability on Defendants for the outcome of their gate negotiations with Hartsfield-Jackson. Instead, Plaintiffs allege that Defendants' coordinated negotiations with Hartsfield-Jackson gave them an opportunity to cement their overall conspiracy to increase prices. In other words, the gate lease issue is not being used by Plaintiffs as an independent basis for antitrust liability, but rather to show Defendants' motive, opportunity, and intent with respect to the alleged overarching conspiracy to increase prices. On this basis at least, the Court

will allow Plaintiffs' allegations concerning the gate negotiations to proceed. *Accord MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1160 (7th Cir. 1983) ("Evidence of activity that is protected by the *Noerr* doctrine may be admitted to show the purpose and character of other activities if doing so is not overly prejudicial to the defendants") (quoting *Feminist Women's Health Ctr. v. Mohammad*, 586 F.2d 530, 543 n.7 (5th Cir. 1978)); *Cont'l Airlines, Inc. v. Am. Airlines, Inc.*, 824 F. Supp. 689, 702-03 (S.D. Tex. 1993) (although efforts to influence public officials cannot standing alone form the basis of antitrust liability, such efforts may help serve as additional evidence of a larger conspiracy).[13]

For all of these reasons, the Court denies Defendants' motion to dismiss with respect to count one of Plaintiffs' complaint.

---

[13] Plaintiffs also argue in cursory fashion that *Noerr-Pennington* does not apply because Defendants were negotiating with the City of Atlanta in its "commercial capacity" as landlord of Hartsfield-Jackson, rather than its governmental or political capacity. However, it is unclear whether a so-called commercial exception to the *Noerr-Pennington* doctrine exists in the Eleventh Circuit. *See TEC Cogeneration, Inc. v. Fla. Power & Light Co.*, 76 F.3d 1560, 1573 (11th Cir. 1996) (noting that the "Supreme Court and this circuit have never expressly considered the validity of . . . the commercial exception to the *Noerr-Pennington* doctrine, and we are not required to do so now."). Without further guidance from the Eleventh Circuit on this issue or more extensive briefing by the parties, the Court is not inclined to adopt such an exception at this time.

### 2.  Attempted Monopolization Pursuant to § 2 of the Sherman Act

Counts two and three of Plaintiffs' complaint are attempted monopolization claims pursuant to § 2 of the Sherman Act. *See* 15 U.S.C. § 2. Attempted monopolization occurs when a defendant engages in "predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Monopoly power is defined as "the power to control prices or to exclude competition." *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 111-12 (3d Cir. 1992).

Count two alleges that by inviting Delta to collude, AirTran engaged in attempted monopolization. Count three is identical except that it pertains to Delta. The only relief requested in counts two and three is an injunction seeking to preclude Defendants from (1) "sharing actual and potential future competitive actions concerning pricing and capacity cuts in forums monitored by its competitors," and (2) "otherwise attempting to enter into combinations, contracts, and/or conspiracies that violate the Sherman Act."

As pointed out by Defendants, there are several fundamental problems with Plaintiffs' § 2 Sherman Act claims.

First, although the Court has found that Plaintiffs' complaint plausibly sets forth a § 1 Sherman Act violation, it fails to meet the plausibility threshold with respect to § 2.  Plaintiffs have failed to allege conduct by Defendants that could have plausibly led to the across-the-board coordination necessary for the exercise of monopoly power.  The Court finds it implausible that any agreement on first-bag fees that Defendants may have entered into could lead to the monopolization of commercial air travel in Atlanta when such fees are only a small part of the total price paid for air travel, by just a subset of consumers.  Moreover, Plaintiffs have failed to clearly designate the specific markets in which a dangerous probability of monopolization allegedly arose.

Second, Plaintiffs appear to concede that their § 2 claim against AirTran depends upon the Court's willingness to entertain a rather novel theory of "joint" attempted monopolization.  Given the twenty-two-percent market share that AirTran is alleged to possess in the narrowest of route grouping proposed by Plaintiffs and the absence of any alleged conduct through which AirTran could oust Delta from any route, AirTran could not unilaterally achieve monopoly power.  Instead, Plaintiffs must combine the

market shares of each Defendant in order to argue that they jointly engaged in attempted monopolization.

The only district court in this circuit to rule upon Plaintiff's joint attempted monopolization theory has rejected it, as have other several other circuits.[14]   *JES Props., Inc. v. USA Equestrian, Inc.*, No. 8:02-cv-1585T24-MAP, 2005 WL 1126665, at \*18 (M.D. Fla. May 9, 2005) (declining to accept the concept of a shared monopoly as a basis for § 2 liability under the plaintiffs' claims for monopolization and attempted monopolization); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir. 1995) ("To pose a threat of monopolization, one firm *alone* must have the power to control market output and exclude competition"); *Midwest Gas Servs., Inc. v. Ind. Gas. Co.*, 317 F.3d 703, 713 (7th Cir. 2003) ("a § 2 claim can only accuse one firm of being a monopolist"); *Ind. Grocery, Inc.*

---

[14] Section 2 of the Sherman Act is directed against "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. Thus, under the statute, there are three distinct claims that can be brought: (1) monopolization; (2) attempt to monopolize; and (3) conspiracy to monopolize. As has been explained, Plaintiffs elected to proceed pursuant to prong (2) alleging that Defendants engaged in attempted monopolization. The fact that a separate offense (a conspiracy claim) exists under the statute for concerted action pertaining to monopolization suggests that any joint monopoly theory must be brought pursuant to that subsection of the statute rather than pursuant to the "attempted monopolization" prong. *See Carpet Group, Int'l v. Oriental Rug Importers Ass'n*, 256 F. Supp. 2d 249, 283-85 (D.N.J. 2003) (noting that "[b]y their very terms, section 2's monopolization and attempted monopolization claims prohibit unilateral action"). Thus, this observation further undercuts Plaintiffs' joint attempted monopolization theory.

*v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1416 (7th Cir. 1989) ("Section 2, however, does not govern single-firm anti-competitive conduct"); *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) (affirming district court's conclusion that market shares of two defendants could not be aggregated to establish an attempted monopolization claim); *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 646 (E.D. Pa. 2003) (rejecting section 2 claim "based on the alleged existence of a . . . duopoly").[15]

Third, even if Plaintiffs could utilize a joint attempted monopolization theory, their request for injunctive relief pursuant to § 2 of the Sherman Act is legally infirm. As previously noted, Plaintiffs seek only injunctive relief in connection with § 2.

Injunctive relief under the Sherman Act is governed by 15 U.S.C. § 26, which permits a plaintiff to sue for injunctive relief "against threatened loss or damage by a violation of the antitrust laws." As the Supreme Court has

---

[15] Moreover, the few cases cited by Plaintiffs that lend support to their theory involved evidence of joint monopolization that are much more egregious than the facts alleged here. In particular, in *United States v. American Airlines, Inc.*, 743 F.2d 1114 (5th Cir. 1984), upon which Plaintiffs principally rely, the court was faced with direct and unequivocal efforts to enlist competitors in working cartels. Accordingly, to the extent that a shared monopoly theory for an attempted monopolization claim is a viable legal doctrine in this circuit, the Court finds that the facts presented in this case do not warrant its application.

explained, to pursue a claim for injunctive relief under the antitrust laws, a plaintiff must "demonstrate a significant threat of injury from an impending violation of the antitrust laws." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969).

Defendants argue—and the Court agrees—that Plaintiffs' complaint fails to demonstrate a significant threat of injury from an impending violation of the antitrust laws. This is because the complaint indicates that Defendants have resumed their adherence to the antitrust laws. *See* Compl. ¶ 64 ("Delta and AirTran have subsequently adhered to antitrust compliance practices"). Although Plaintiffs attempt to retreat from this averment by noting that the complaint also alleges that they are threatened with future injury unless an injunction is issued, this is an entirely conclusory and speculative allegation that is insufficient to state a claim for injunctive relief. *See In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d 6, 16 (D.D.C. 2004) ("When seeking injunctive relief to present a future injury, the plaintiff must show that he 'is immediately in danger of sustaining some direct injury' and that the threat of injury is 'real and immediate,' and not

'conjectural' or 'hypothetical'") (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).[16]

For all of these reasons, the Court finds that Plaintiffs' § 2 Sherman Act claims are subject to dismissal.

## III.  Conclusion

For the foregoing reasons, the Court DENIES IN PART AND GRANTS IN PART Defendants' motions to dismiss [72 & 73]; GRANTS Plaintiffs' motion to substitute David Terry for David Watson [105]; and GRANTS Plaintiffs' motion to substitute Jacaranda, Inc. for Thomas Whittelsey [125].   Plaintiffs' § 1 Sherman Act claim shall proceed, and Plaintiffs' § 2 Sherman Acts claims are dismissed.

IT IS SO ORDERED this 2nd day of August, 2010.

---

[16] Moreover, Plaintiffs' proposed language for the injunction that it seeks is problematic.  Plaintiffs seek to enjoin Defendants "from sharing actual and potential future competitive actions concerning pricing and capacity cuts in forums monitored by its competitors."  However, merely stating future plans—such as announcing prices—does not constitute an antitrust violation. *In re LTL Shipping Servs.*, 2009 WL 323219, at *8 ("A Plaintiff . . . cannot state an antitrust claim by showing only that the Defendants made price information publicly available").  Indeed, as requested, the injunction could tread on Defendants' First Amendment rights because it would render it unlawful for Defendants to disclose *any* pricing or capacity plans.  Although Plaintiffs' proposed language for the injunction could presumably be limited and altered by the Court at a later date, this deficiency further reveals the flaws in Plaintiffs' § 2 Sherman Act claims.

45

Timothy C. Batten, Sr.
United States District Judge