# ALSTON&BIRD LLP

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424

404-881-7000
Fax: 404-881-7777
www.alston.com

Randall L. Allen        Direct Dial: 404-881-7196        Email: randall.allen@alston.com

August 2, 2011

**CONFIDENTIAL**

*Via E-mail to julee_smilley@gand.uscourts.gov;*
*alice_snedeker@gand.uscourts.gov*

Judge Timothy C. Batten, Sr.
c/o Ms. Julee Smilley and Ms. Alice Snedeker
1788 Richard B. Russell Federal Building
75 Spring Street, S.W.
Atlanta, GA 30303-3309

       RE:    **In re Delta/AirTran Baggage Fee Antitrust Litigation**
               **No. 1:09-md-2089-TCB**

Dear Judge Batten,

On behalf of Delta Air Lines, Inc. ("Delta"), I write in response to David Flint's July 25, 2011 letter ("Plaintiffs' Letter").

Plaintiffs' July 25th letter requests that the Court do four things: (1) reopen discovery for over four months to allow Plaintiffs to "explore" "topics or issues about which new or additional information is provided by documents produced after the close of discovery"; (2) establish a revised case schedule; (3) impose sanctions against Delta, including to prohibit Delta from using "highly relevant" newly produced documents, and award costs associated with Plaintiffs' prior failed spoliation motion; and (4) order Delta to produce correspondence with the Department of Justice related to the agency's first bag fee investigation. Plaintiffs attempt to support these requests by devoting much of their letter to arguing the evidence, including (i) applying their own interpretations to the documents in an attempt to convince the Court that the newly produced documents are somehow helpful to Plaintiffs' case, and (ii) attempting to convince the Court to ignore the recently produced documents that make clear there was no agreement between Delta and AirTran on first bag fees. Delta will respond to these issues in turn.

### A. Delta Does Not Object to a Limited Reopening of Discovery

I have consistently told Plaintiffs' counsel that Delta does not oppose a limited reopening of discovery. In fact, discovery has, for all intents and purposes, already

reopened. In order to determine how much time is really necessary to complete any additional discovery, the parties and the Court need to have some understanding of what discovery limited to the newly produced documents Plaintiffs propose. With that information the parties may be able to agree or the Court can promptly resolve any issue about how much additional time is required.

Delta completed its production of documents from the hard drives that were collected in May 2009 for the previously agreed bag fee custodians, as well as the documents Delta volunteered to review and produce from the recently discovered backup tapes over two months ago. *See* Exh. 1, May 31, 2011 Letter from Randall Allen to Judge Batten. Since then, Plaintiffs presumably have been reviewing the documents to determine whether they believe they need any additional discovery. In response to my repeated requests that they identify what additional discovery they need to now seek, Plaintiffs responded by, among other things, requesting that Delta search the files of over 20 new custodians. *See* Exh. 2, June 17, 2011 Letter from Daniel Kotchen to Randall Allen (listing 22 new custodians by name, and identifying two categories of additional custodians). Notwithstanding the fact that none of these individuals was involved in or responsible for Delta's decision to adopt a first bag fee, Delta has already agreed to review and produce documents from the files of some of these custodians only to avoid yet another unnecessary discovery dispute, and the parties continue to discuss the production of responsive documents from the others.

Delta has asked Plaintiffs several times what discovery they contend is now called for as a result of their review of the documents. So far, Plaintiffs have taken the same position with Delta that they have now taken with the Court. They have refused to tell us what discovery they claim will be necessary.[1] Delta is legitimately concerned that Plaintiffs tactically elect to conceal the true scope of their intended discovery because they hope to use whatever time the Court permits, at least in part, to pursue discovery that is not rationally connected to any issue presented by the newly produced documents. For example:

- Plaintiffs have pressed Delta to now search the files of Brian Conti, an analyst in Delta's Finance Department. In support of their claim that a search of Mr. Conti's files was somehow linked to any newly produced document, Plaintiffs claimed that Mr. Conti was "the only individual outside of the investor relations group who has been identified by Delta as someone who accessed [the October 23, 2011 AirTran earnings call]." *See* Exh. 4, July 18, 2011 Letter from Daniel Low to Randall Allen. The fact that Mr. Conti may have listened to the AirTran earnings call has been known to Plaintiffs for over a

---

[1] The only discovery that Plaintiffs have discussed doing is a deposition of Delta relating to the location of the backup tapes. *See* Exh. 3, July 11, 2011 Email from Daniel Low to Randall Allen. Since Plaintiffs have already filed their motion for sanctions related to the backup tapes, this discovery is presumably no longer necessary.

year. *See* Exh. 5, DLBF-00035311 (October 24, 2008 email from Delta Investor Relations attaching the transcript of AirTran's October 23, 2008 earnings call, which was produced to Plaintiffs on April 8, 2010). Thus, any suggestion that discovery from Mr. Conti is an "issue" arising out of the newly produced documents is specious.

- Plaintiffs have asked Delta to search the files of Steve Scheper (former Managing Director, Online Sales & Services). Plaintiffs claim Mr. Scheper presented fee change recommendations to the CLT in March 2008 and that he was a member of the "Fee Team," a group of Delta employees from various divisions responsible for evaluating potential fee revenue opportunities. Mr. Scheper was member of the Fee Team because he was responsible for analyzing and recommending fees for on-line reservation services. He played no role in Delta's analysis or decision to adopt a first bag fee. Moreover, Delta disclosed documents evidencing Mr. Scheper's inclusion on the Fee Team at the outset of discovery. Thus, even though his name may appear in a newly produced document, he is not rationally connected to any of the issues germane to this case.

- Plaintiffs have insisted that Delta search the files of Delta employees Suzanne McGeehan and Antonio Newsom, or whoever else was "the individual . . . responsible for preparing the baggage study referenced in DLBAG-00010950." *See* Exh. 6, June 30, 2011 letter from Daniel Low to Randall Allen. Responsive documents from the "owners" of the study within Delta's Customer Insight & Analytics group (Smita Premkumar, Paul Brooks and Rita Shepard) were produced to Plaintiffs at the outset of discovery. Moreover, the baggage study is not new. It was produced on April 5, 2010 (DLBF-00034056). It was also a topic of inquiry during last year's deposition of Delta employee Stephen Almeida. Plaintiffs were apparently dissatisfied with Mr. Almeida's testimony about that document, but did not seek any further discovery on that issue. Plaintiffs should not be permitted to resume discovery on documents and issues they had every opportunity to pursue, but failed to do so to their satisfaction, during the original discovery period.

Thus, while Delta does not oppose reopening discovery (and in fact has already agreed to search the files of some new custodians requested by Plaintiffs) on a limited basis, Delta does not believe Plaintiffs' current open-ended proposal is helpful to the parties or the Court. Any additional discovery should be limited to information contained in the newly produced documents bearing on Delta's decision to adopt a first bag fee in 2008. Delta requests a clear instruction from the Court on the purpose and scope of any new discovery and attaches a Proposed Order to that effect. Since Plaintiffs have had over two months to review the newly produced documents, they are presumably in a position to share with the parties and the Court a candid assessment of any depositions that they contend need to be taken. Thus, Delta requests that Plaintiffs identify (or be

required to identify) what additional depositions (or other proposed discovery) need to be conducted during the proposed new discovery period.[2] From that starting point, the Court will be able to quickly resolve how much time should be allotted for additional discovery.

### B. Plaintiffs' Proposed Schedule

With respect to Plaintiffs' proposed schedule, Delta finds it generally acceptable, subject to two additional modifications.

First, Plaintiffs request that any new discovery period run for four months "after Delta completes its document production." Delta completed its document production several months ago, so that language is superfluous. Delta is currently attempting to resolve some *new* document production requests Plaintiffs raised after Delta completed its document production and Delta will continue to work with Plaintiffs to do so, but it should not impact the discovery period.

Second, Plaintiffs also include in their proposed schedule a proposed unilateral "supplemental brief regarding class certification" only by Plaintiffs. Plaintiffs provide no explanation for why supplemental class briefing is necessary. Delta proposes that such supplemental briefing be deleted from the schedule. In the event supplemental briefing is found to be necessary as a result of any new discovery, the parties should be directed to first discuss among themselves and approach the Court as necessary.[3]

### C. Delta Will Respond to Plaintiffs' Motion for Sanctions As Required Under the Rules

Plaintiffs' motion for sanctions under Rules 26 and 37 levels serious allegations against Delta and its counsel. Delta plans to respond in full to these allegations on or before August 11, 2011, pursuant to the time period set forth in the Federal Rules and the Local Rules of this Court.

---

[2] In the event Plaintiffs believe new issues arise during the course of the reopened discovery, Delta is not suggesting that Plaintiffs would be foreclosed from pursuing them.

[3] Plaintiffs have actually already amended the expert report previously filed with the Court on February 4, 2011 as an exhibit to their reply brief in support of their motion for class certification. *See* Dkt. 269, at Exh. 45 (Merits Report of Hal J. Singer, Ph.D.). After the deposition of Plaintiffs' expert, Dr. Hal Singer, he modified his report purportedly to "clarif[y]" that "he will not offer an opinion at trial as to whether Defendants entered into an unlawful agreement or otherwise colluded." Exh. 7, Feb. 22, 2011 Letter from Daniel Kotchen to Counsel for Defendants. Plaintiffs have not withdrawn the previously filed report. In any event, to the extent the Court believes that additional class briefing would be helpful, Delta would request the opportunity to respond to any supplemental brief filed by Plaintiffs.

In the meantime, Delta does not dispute that (1) Delta neglected to search and produce responsive documents from the hard drives collected in May 2009 from the relevant bag fee custodians, and (2) Delta located and identified additional backup tapes containing emails from certain custodians after the close of discovery. Delta readily acknowledged these inadvertent mistakes in letters to the Court on March 17 and April 15, 2011. Since then, however, Delta has made every effort to resolve these errors so that the case may proceed to the merits as quickly as possible. I will not belabor here the steps Delta took both to produce documents and satisfy numerous additional requests from Plaintiffs' counsel in an effort to get the case back on track. However, when Plaintiffs informed Delta that they were planning to ask the Court for discovery sanctions, I responded by telling Plaintiffs' counsel that Delta was willing to discuss those issues without the Court's involvement, provided Plaintiffs could share some more iinformation about the discovery they plan to seek that was caused by the production of documents after the discovery period. Indeed, in a July 8, 2011 letter, I explained that Delta was "willing to discuss" Plaintiffs' additional discovery requests and discovery sanctions, but "[i]n order for Plaintiffs and Delta to discuss properly this important issue, Plaintiffs [had to] first articulate the discovery they wish to take" as a result of the newly produced documents. *See* Exh. 8, July 8, 2011 Letter from Randall Allen to Daniel Low, at 4. Plaintiffs never did, and still have not provided any details about the discovery they intend to seek. For example, Plaintiffs have stated that they intend to take "depositions of individuals who Plaintiffs were not previously able to ask about the newly produced documents." *See* Exh. 2, June 17, 2011 Letter from Daniel Low to Randall Allen. Delta can only guess as to what that means, as, read literally, it could include anyone. Now, Plaintiffs apparently want this Court to order Delta to compensate Plaintiffs for whatever discovery Plaintiffs – in their unfettered discretion – later decide to conduct. There is no basis in law or in fact for such an order.

In addition, Plaintiffs curiously request that the Court prohibit Delta from using any of the newly produced documents. There is no basis for such a sanction, and the request only underscores the weakness of Plaintiffs' claim that the newly produced documents "help demonstrate that Defendants imposed a first bag fee as the result of conspiracy." Plaintiffs' Letter at 1. As discussed below, the new documents only provide additional evidence disproving that Delta conspired to adopt a first bag fee, which is precisely why Plaintiffs want the Court to prohibit Delta from using them. In any event, Delta will submit next week a formal response to Plaintiffs' request for sanctions.

### D. Delta's Production of Ongoing and Future Correspondence with the DOJ

Delta has already produced to Plaintiffs the documents provided to the DOJ in connection with the agency's bag fee investigation, as well as its correspondence. Thus, Plaintiffs have whatever documents or testimony Delta has provided to the DOJ that relate in any possible way to the facts surrounding Delta's decision to adopt a first bag fee. Without any explanation, Plaintiffs now seek an order requiring Delta to essentially

produce in some seriatim fashion all ongoing correspondence with DOJ. As the Court is aware, the DOJ's bag fee investigation is, by statute, confidential. 15 U.S.C. § 1313(c). Plaintiffs have informed us that they are in regular contact with the DOJ. Plaintiffs' efforts to birddog the DOJ investigation is simply not designed to lead to the discovery of admissible evidence. Rather, Plaintiffs seek to monitor Delta's communications with the DOJ in hopes of gaining some tactical advantage in this litigation. It is both unfair and abusive. *See In re Urethane Antitrust Litig.*, No. 04-MD-1616-JWL (D. Kan. Dec. 17, 2010) (denying motion to compel documents relating to a government antitrust investigation in part because "defendants have presented no persuasive argument or authority that information about an investigation into a possible conspiracy by plaintiffs (as opposed to plaintiffs' underlying actions) is relevant to a claim or defense in this litigation.").

### E. Plaintiffs Ignore or Inaccurately Represent to the Court The Contents of the Recently Produced Documents and the Testimony of Delta's Witnesses

As the Court will recall, the leadership of Delta's Airport Customer Service (ACS) division led the effort in Delta to adopt a first bag fee in October 2008. Plaintiffs' primary claim in their letter is that the newly produced documents contradict the testimony of ACS representatives about *when* they began to favor the first bag fee. In support of that claim, Plaintiffs contend that the testimony of the leaders of ACS, Gil West and Steve Gorman, is contradicted by new documents because they indicate that before AirTran's earnings call, ACS and Revenue Management (led by Glen Hauenstein and Gail Grimmett) were "united in their opposition to first bag fees." Plaintiffs' Letter at 5. Plaintiffs also claim that new documents "make clear" that AirTran was part of Mr. Gorman's "consideration set" in deciding to adopt the fee in October 2008, which they assert contradicts Mr. Gorman's testimony. *Id.* at 7.

These purported inconsistencies are a sideshow, and should not distract the Court from what is noticeably absent from Plaintiffs' letter: *any* evidence, in the newly produced documents or otherwise, supporting their allegations that Delta entered into an *agreement* with AirTran to adopt the first bag fee.

Moreover, Plaintiffs' claims are demonstrably wrong. Putting aside the fact that Plaintiffs make these claims before having taken any of the discovery they say they need to "explore these issues" (leaving Delta to wonder why they deem such discovery necessary in the first place), Plaintiffs ignore or attempt to downplay other newly produced documents (which, tellingly, they also seek to prohibit Delta from using in the case) that confirm that Delta made a unilateral decision to adopt a first bag fee, not pursuant to any conspiracy with AirTran, and that AirTran's earnings call statement had no effect on that decision. Indeed, it remains incontrovertible that:

**(1) Delta's two most senior executives and the ultimate decision makers – CEO Richard Anderson and President Ed Bastian – decided that Delta should adopt a first bag fee in advance of AirTran's earnings call statement.**

Both Anderson and Bastian decided to favor adoption of a first bag fee before AirTran's statement for reasons wholly unrelated to AirTran's earnings call, including the fact that every other legacy carrier adopted the bag fee during the summer of 2008,[4] and that they did not believe that there was any significant risk of "share shift" to other carriers as a result of adopting the fee.[5] Recently produced documents corroborate that testimony. They also conclusively establish that the first bag fee was put on the October 27th CLT agenda on **October 21, 2008 –** *two days prior to AirTran's earnings call* **–** at **the express request of CEO Richard Anderson** to review the post-merger fee structure:

- On September 28, 2008, Mr. Anderson sent an email to Mr. Bastian titled "First Bag Fee" stating: **"We need to think about implementing the fee post merger. A lot of revenue involved."** Mr. Bastian responded: **"Think we**

---

[4] *See, e.g.*, Exh. 9, Anderson Dep. at 66:18-67:3 ("Q. At what point in time did you change your point of view that a first bag fee was not part of the basic bargain? A. It would have been sometime after – after we'd gone through the summer and we'd seen a number of matches by other carriers. Those matches had not resulted in any discernable share shift or issues around revenues because, you know, by the time we got to the decision in early November of this year, you know, we'd seen everybody's earnings over the summer and it didn't seem to have made any difference."); Exh. 10, Bastian DOJ Dep. at 56:8-57:14 ("Q. And what if anything had changed in the industry from the spring when Delta had decided not to adopt the first-bag fee? A. I would say that we didn't make a decision not to adopt it per se. . . . That we were going to watch it. . . And what had changed was certainly had a lot more knowledge and experience as to customer acceptance around the fee, which we didn't have in the spring; we were still learning, and we had gotten through in the summer. And had that which was a substantial amount of data which was in terms of customer acceptance. We had an economic picture that was continuing to unravel, while in the spring fuel was the big issue facing the airlines, by the fall fuel was coupled with a collapsing economy. So the economic pressures on the carriers were also a substantial matter of concern and consideration. And I think we had customer -- our customers in general had come to accept the fact that they are not liked necessarily, but accept the fact that there were being fees charged for baggage services, was a topic of conversation throughout that spring and summer, it was new, novel. And it was not something that I saw Delta per se getting a lot of credit for not implementing the first-bag fee.")

[5] *See, e.g.*, Exh. 9, Anderson Dep. at 66:14-17 ("A. . . . We came to the conclusion that there was no share shift effect and that unbundling of certain of our services from the price of the ticket wouldn't have any effect on share."); Exh. 10, Bastian DOJ Dep. at 58:15-59:14 ("A. . . . We were estimating at Delta that we would generate . . . somewhere between two and three hundred million dollars of revenue a year if we did; coupled with the fact that Northwest was generating a couple hundred million dollars on its own . . . So when you look at needing to align the two carriers, it was close to a $500 million revenue decision."); *id.* at 75:9-12 ("A. . . . We couldn't afford to be taking bets on the margin about share shift when we had the size of the revenue and economic pressures facing the company.").

prob[ably] should do but as part of integrating [the] two companies." Anderson replied simply: "**Agree**."[6] The two executives acknowledged that Glen Hauenstein (the head of Delta Revenue Management) had a different view (opposed to the fee), and agreed that he would given an opportunity to express his views "at [the] right time."

- On October 21, 2008 – after having learned that DOJ Staff was not going to oppose the Delta/Northwest merger, but still before the AirTran earnings call[7] -- Richard Anderson pressed Gil West and Gail Grimmett about their progress in reaching an accord on a post-merger fee structure, a task he had given them back in early September, consistent with Delta's decision to reevaluate the fee after the summer.[8] Mr. West responded by explaining that ACS and Revenue Management had agreed on all of the fees except the first bag fee: "Gail and I have coordinated the post merger fee structure. **The one loose end is the first bag fee.**" Anderson then forwarded that exchange only to Mr. Gorman on October 22, 2008 – *the day before AirTran's third quarter earnings call* – to make clear his views on the first bag fee: "**We need to do it**."[9] On the same day, Mr. Anderson approved the addition of the first bag fee discussion to the agenda of the next CLT meeting, scheduled for the following Monday, October 27, 2008.[10]

- On October 30, 3008, Eric Phillips (Delta Revenue Management) e-mailed Delta Corporate Communications summarizing Richard Anderson's rationale for deciding to adopt the fee, as expressed during the October 27th CLT meeting. These are the same points *every* witness at the October 27th CLT meeting, including Mr. Anderson and Mr. Bastian, testified as being the basis for the decision. Importantly, AirTran is not mentioned:

    - "**Delta is the only major carrier without the bag fee.**

    - **The bag fee is worth several hundred million dollars to the**

---

[6] Exh. 11, DLTAPE-3069 (emphasis added).

[7] By early October, 2008, Delta had learned that DOJ Staff had recommended that the merger not be challenged. Exh. 9, Anderson Dep. at 60:6-9 ("And we knew in early October that the justice department staff was not going to oppose our merger. So that was early October, so we knew we were going to close pretty quick.").

[8] *See* Exh. 12, DLBAG-39291-92, at 92 (Sept. 5, 2008 email from Gil West to Gail Grimmett: "Gail, We had a deep dive on Tuesday with [Richard Anderson] on the [Customer Experience Team]. As part of that discussion, the process to determine post merger fees came up. RA asked that the two of us determine the fees for the 'new' DL unilaterally (without NW input due to anti-trust) and be prepared to start implementing after we close.").

[9] Exh. 13, DLTAPE-2907 (emphasis added).

[10] Exh. 14, DLBAG-9901, DLBAG-6181, and DLTAPE-3087.

Judge Timothy C. Batten, Sr.
August 2, 2011
Page 9

> combined company and thus, vitally important to profitability (and profit sharing).
>
> - **In the coming years, Delta has significant obligations (including pension, fleet, etc.) – any contribution we can make to funding those is imperative.**
>
> - **Delta runs a quality airline, and we should not be embarrassed about charging for great service.**"[11]

- On October 31, 2008, after Ed Bastian instructed that a final decision on the fee not be postponed for a week because "time is money" and "losing a week of new fees could be millions," Glen Hauenstein responded privately to Bastian to reiterate his concerns about losing share to AirTran if Delta implemented the bag fee before AirTran: "I thought we kind of agreed that for [standalone Delta] it is a wash. I know you really believe in it but [Northwest] where the real money is already has it. I can assur[e] you that we would be facing more [AirTran] sales this week if we did the bag fee." Bastian replied to make clear he disagreed with Mr. Hauenstein, and his concerns about "share shift": "**We may disagree but the fees are real and large. It's a question if we have dilution due to customer satisfaction.**"[12]

The new evidence, therefore, confirms the prior undisputed testimony that both Anderson and Bastian – whose opinions were dispositive – came to the view before the AirTran earnings call that Delta should adopt the first bag fee. That fact, standing alone, disproves any notion that Delta adopted the first bag fee "as a direct result of" AirTran's statement. *See* Plaintiffs' Letter at 6.[13]

### (2) The leaders of Airport Customer Service ("ACS") – Gil West and Steve Gorman – came to a decision that Delta should adopt a first bag fee, and advocated that position, *long before* AirTran's earnings call statement.

With respect to the newly produced documents they cite in support of their claims about the perceived contradictions between the testimony of the leaders of Delta ACS (Mr. Gorman and Mr. West) about when they came to favor Delta's adoption of a first bag fee, Plaintiffs mischaracterize or omit portions of those documents and testimony.

---

[11] Exh. 15, DLBAG-5727 (emphasis added).

[12] Exh. 16, DLTAPE-1276 (emphasis added).

[13] Whether Delta did or did not "consider" the AirTran statements is, however, of no moment. The law permits Delta to act in response to public information, including the statements by Mr. Fornaro. *See United States v. Standard Oil Co.*, 316 F.2d 884, 896 (7th Cir. 1963) ("[A]ny defendant which heard of [its alleged co-conspirator's] price announcement was not thereby immobilized and precluded from acting in a normal fashion as its interests might dictate so long as it was not pursuant to an understanding or agreement.").

For example, Plaintiffs assert that Mr. Gorman testified that "he supported ACS's position in favor of first bag fees by July 2008." Plaintiffs' Letter at 5 (citing Plfs' Letter Exh. 19, Gorman Dep. Tr. 40:13-17, 43:9-22). However, Plaintiffs fail to mention that Mr. Gorman actually testified that he could not recall the exact date he came to favor adoption of the first bag fee "because it's not fresh in my memory from a couple years ago," and that his recollection was prompted merely by dates of the documents he was shown by Plaintiffs' counsel: "I wouldn't even know the dates if we didn't have these exhibits, exactly." *Id.* at 40:5-15.

Similarly, Plaintiffs assert that an August 22, 2008 email from Mr. Gorman contradicts his testimony that AirTran's position on first bag fees was not part of his "consideration set" when deciding to adopt a first bag fee in late October 2008. Plaintiffs' Letter at 7 (quoting Plfs' Ex. 24, DLTAPE-3404. However, Plaintiffs selectively omit the portion of the quote from that document that makes clear Gorman was merely reiterating the position adopted in June 2008 that Delta should wait until after the summer to revisit adoption of a first bag fee: "I still do not recommend first bag fee. **My point to Mike [Randolfi] was we need to keep on the radar screen of the CLT and do a continual review because of the size of the bucks.**" Plfs' Letter Exh. 24, DLTAPE-3404.

Moreover, of the seven new documents Plaintiffs cite in support of their claims about the consistency of ACS's position in favor of the first bag fee throughout 2008, six documents are dated on or before September 5, 2008 (the date of Continental Airlines' first bag fee announcement, which left Delta as the only major legacy carrier without a first bag fee) – *more than 6 weeks before AirTran's October 23, 2008 earnings call statement*. Not surprisingly, Plaintiffs ignore or attempt to downplay numerous other documents that confirm Mr. West's and Mr. Gorman's testimony that they came to favor, and advocated for, Delta's adoption of a first bag fee long before AirTran's October 23, 2008 earnings call:

- September 18, 2008: Gorman emailed Glen Hauenstein to lobby in favor of the fee, informing him that "**NWA is telling employees in meetings that 1st bag is already bringing in $450,000 a day of profit and growing.**"[14] While Gorman acknowledged Hauenstein's position that Delta's competitive situation was different from Northwest's at its major hubs, this (and other documents cited below) reflect a continuing campaign by Gorman and West to convince Hauenstein (and others in Revenue Management) as to the wisdom of adopting the bag fee.

- September 19, 2008: "2008 Unit Cost Outlook" presentation reflecting ACS's contribution to the effort to close the "revenue gap" for the fourth quarter 2008 by proposing to adopt a first bag fee: "**Gap Closure Opportunities as**

---

[14] Exh. 17, DLTAPE-6643 (emphasis added).

Judge Timothy C. Batten, Sr.
August 2, 2011
Page 11

>    Identified by Divisions (December Quarter 2008 Realization). Airport Customer Service. Domestic First Bag Fee ($15) . . . $26.9 [million]."[15]

- September 30, 2008: Notes of Mr. Gorman's remarks from a meeting with Delta employees quote Gorman as stating: "**In this competitive environment as we merge with Northwest other items will have to be reviewed like 1st bag fee . . . NW has a first bag fee and it would be a substantial amount of revenue.**"[16]

- October 8, 2008: In an e-mail exchange between Neel Shah (VP Delta Cargo) and Gil West, West congratulates Shah for a cargo success saying "Congratulations! We are going to need all the revenue we can get in 2009," to which Shah responds "You bet. **This and the first bag!!**" West replies: **"Amen. I'm on a mission."**[17]

- October 9, 2008: West asked Gorman whether he has "**heard anymore from Glenn [Hauenstein] on the first bag fee. If it's a go, we'll need some time to prepare for a roll out.**" Gorman responded by assuring Mr. West that he would discuss it with Mr. Hauenstein that day.[18]

- October 21, 2008: Richard Anderson e-mailed Gil West and Gail Grimmett on their progress in reaching an accord on a post-merger fee structure. Mr. West responded by explaining that ACS and Revenue Management had agreed on all of the fees except the first bag fee: "**Gail and I have coordinated the post merger fee structure. The one loose end is the first bag fee.** Gail has been analyzing the impact of the first bag fee would have on pax revenue. We'll set up a review with you."[19]

- October 27, 2008: Shortly after the conclusion of the CLT meeting at which Delta tentatively decided to adopt the fee, Mr. Gorman sent Mr. West a congratulatory note on the decision to adopt the fee: "**We got there.**" West responded by stating: "Thanks. **It's the right decision in my view. The execution will be a bit difficult but well worth it.**"[20]

The leaders of ACS thus favored Delta's adoption of a first bag fee well in advance of Mr. Fornaro's October 23, 2008 earnings call statement. Any contention

---

[15] Exh. 18, DLBAG-39293-12, at 39303 (emphasis added).

[16] Exh. 19, DLTAPE-3580-85, at 84 (emphasis added).

[17] Exh. 20, DLBAG-39341 (emphasis added).

[18] Exh. 21, DLTAPE-17777 (emphasis added).

[19] Exh. 13, DLTAPE-2907 (emphasis added).

[20] Exh. 22, DLBAG-9935 (emphasis added).

otherwise cannot be reconciled with the evidence.[21]

### (3) Revenue Management, led by Glen Hauenstein, was implacably opposed to the first bag fee before and after the AirTran earnings call.

Even after AirTran's October 23, 2008 earnings call -- which prompted Hauenstein to raise the probability of an AirTran match from 50% to 90% -- Hauenstein and Revenue Management remained firmly opposed to the bag fee.[22] New documents only underscore the depth of Revenue Management's objection to the first bag fee – showing their continuing skepticism about the wisdom of adopting the fee as expressed among themselves and to others even after the decision had been made.[23] As was the

---

[21] In light of this evidence, Gil West's statement in an email to Mark Zessin on October 23, 2008 informing him that Revenue Management's draft Value Proposition presentation portrayed the first bag fee as "a was[h] in terms of net revenue which would mean we would not implement the fee" (Plfs' Letter Exh. 28, DLBAG-11053), cannot be read as expressing Mr. West's view (as Plaintiffs contend) but reflected his understanding of Revenue Management's position. As evidenced by numerous other documents, Mr. West and Mr. Gorman recognized that Revenue Management's views opposing the fee needed to be changed or overcome before Delta would adopt a first bag fee. *See, e.g.*, Exhs. 13, 17 & 20-22. Indeed, that same October 23rd email from Mr. West foreshadows the upcoming debate on the first bag fee scheduled for the October 27th CLT meeting: "This will be discussed on Monday's CLT." Plfs' Letter Exh. 28. As described above, Revenue Management's view opposing the fee was ultimately overcome at the October 27th CLT meeting by the views of Delta's two most senior executives, CEO Richard Anderson and President Ed Bastian, both of whom favored adoption of the fee prior to AirTran's October 23rd earnings call.

[22] Significantly, in Hauenstein's view, the change in probability of an AirTran match to 90% did *not* make the fee revenue positive – $26 million on a company with over $30 billion in revenues is a rounding error. *See* Exh. 23, Hauenstein Dep. at 125:20-24 ("Q. So is the best estimate of your team at this point that a first bag fee would be revenue accretive? A. I would say revenue neutral. $26 million on a $35 billion company is -- you know, the margin of error is zero."), 134:19-25 ("A. . . . The numbers are represented in here, but the numbers are not huge one way or another. Q. They're not? A. Not in the final analysis. It was a $26 million variation at a mid point for a $32 billion corporation.").

[23] *See, e.g.*, Exh. 24, DLTAPE-8814-15, at 14 (October 28, 2008 email from Hauenstein to members of the CLT regarding Continental's announcement of a first bag fee waiver for Continental credit card holders: "**How much would this take away from our numbers if we matched their policy**"; Gail Grimmett forwards the email to Eric Phillips, who responds: "I saw this announcement too and wondered the same thing. . . **the $265 [million in Delta first bag fee revenues] is getting smaller and smaller.**") (emphasis added); Exh. 16, DLTAPE-1276 (October 31, 2008: Hauenstein emails Bastian privately rehashing the same arguments about "share shift" set forth in the Value Proposition document: "I thought we kind of agreed that for [Delta] it is a wash. I know you really believe in it but [Northwest] where the real money is already has it. I can assur[e] you that we would be facing more [AirTran] sales this week if we did the bag fee." Bastian replied to make clear he disagreed with Mr. Hauenstein, and his concerns about "share shift": "**We may disagree but the fees are real and large. It's a**

case with Richard Anderson, Ed Bastian and the leaders of ACS, AirTran's earnings call statement had no effect of the pre-existing views of Revenue Management.

### (4) Information provided by Northwest to Delta after the merger and before Delta's final decision confirming the substantial profitability of the bag fee renders any theory that Delta made the decision to adopt the first bag fee "as a direct result of" AirTran's statement wholly implausible.

Delta deferred a final decision on the first bag fee in order to obtain information about Northwest's experience with the fee.[24] That information confirmed Delta's key executives' views that the bag fee would produce substantial revenue without any significant effect on market share or operations.[25] Thus, even if, contrary to fact, prior to the merger Delta had been concerned about AirTran's possible reaction to Delta's adoption of the first bag fee, after the merger the information provided by Northwest to Delta would have made AirTran's reaction to Delta's adoption of the fee irrelevant.

I apologize for the unfortunate length of this letter. We felt it was important to

---

**question if we have dilution due to customer satisfaction**." Mr. Hauenstein responded: "OK.") (emphasis added).

[24] *See, e.g.*, Exh. 25, Bastian Dep. at 45:1-8 ("Northwest had already implemented a first bag fee. We wanted to get their view as to whether they agreed that that was the right decision. We – they obviously had more experience at it than we did and we couldn't conclude, we didn't want to conclude, until we had their point of view."); Exh. 26, DLBAG-9924 (Oct. 30, 2008 email from Gil West to Crystal Knotek (Northwest Vice President Customer Service): "Let's connect today if possible to discuss fees. We are finalizing the new fees going forward and I wanted to touch base with you before the last 't' is crossed. We had a very interesting discussion on first bag fee.").

[25] *See, e.g.*, Exh. 27, DLBAG-2555 (October 31, 2008 email from Mark Zessin to Gil West regarding Northwest "Bag Fee Study": "**It might be helpful at the CLT.**" The study measured customer reaction to Northwest's adoption of a first bag fee and shows that **84% of summer leisure passengers "paid fee no problem,"** and only 2% were "upset" by having to pay the fee.) (emphasis added); Exh. 28, DLBAG-3336-37 (October 31, 2008: reflecting report from "NWA baggage folks" that the first bag fee was generating **"$400K/day."**); Exh. 29, DLBAG-13207-10, at 08 (November 3, 2008, Northwest Operations Senior Staff Meeting: "**NW Bag Fees are about $0.5 [million] per day.** We are discussing with DL what the harmonized policy should be. **Since the fees started we are handling 18% fewer bags per enplanement.**") (emphasis added); *accord* Exh. 9, Anderson Dep. at 62:3-8 ("But what the – what – what was insightful after we closed the merger was to get the take of the Northwest executives on whether or not they had seen share shift. And it was very clear that the – as a result of their experience that the unbundling did not result in any share shift."); Exh. 26, Bastian Dep. at 45:3-8, 160:18-23 ("Northwest had already implemented a first bag fee. We wanted to get their view as to whether they agreed that that was the right decision. We – they obviously had more experience at it than we did and we couldn't conclude, we didn't want to conclude, until we had their point of view. . . . we knew it was a significant revenue source. We knew the size of the -- a size of the source. We knew that they were not having any operational challenges attached to collecting the fee, so it was -- you know, we were aware of the benefits of having a first bag fee.").

Judge Timothy C. Batten, Sr.
August 2, 2011
Page 14

provide the Court with some substantive response to Plaintiffs' submission. I have attached a draft order addressing the scheduling issues. As Delta believes it is premature to finalize the order, we have left the proposed date for the close of discovery blank. We believe it would be most helpful if the Plaintiffs would illuminate us all on what discovery they feel they must now take as a result of the recently produced documents.

I think it would be helpful to all of the parties to come in for a Rule 16 conference to discuss these issues and get this case moving forward again. Thank you in advance for your consideration.

Sincerely,

Randall L. Allen

Enclosures
cc:   Roger Fones, Esq.
      Bert Rein, Esq.

LEGAL02/32778845v1