ALSTON&BIRD LLP

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424

404-881-7000
Fax: 404-881-7777
www.alston.com

**Randall L. Allen** **Direct Dial: 404-881-7196** **Email: randall.allen@alston.com**

August 11, 2011

**CONFIDENTIAL**

*VIA E-MAIL to:*
*julee_smilley@gand.uscourts.gov*
*alice_snedeker@gand.uscourts.gov*

Honorable Timothy C. Batten, Sr.
c/o Ms. Julee Smilley
1788 Richard B. Russell Federal Building
75 Spring Street, SW
Atlanta, GA 30303-3309

Re: *In re Delta/AirTran Baggage Fee Antitrust Litigation*, No. 1:09-md-2089

Dear Judge Batten:

I write to respond to Plaintiffs' request for discovery sanctions against Delta in their letter of July 25, 2011 ("Pls. Letter"). Plaintiffs' sanctions motion is based on Delta's location and production of documents responsive to Plaintiffs' document requests after the close of discovery. Delta does not dispute the two facts that led to the production of these documents: (1) Delta inadvertently failed to search and produce responsive documents from the hard drives collected in May 2009 of relevant bag fee custodians, and (2) Delta located and identified additional backup tapes containing emails from certain custodians after the close of discovery. When Delta first discovered these mistakes in March and April 2011, Delta promptly alerted the parties and the Court. *See* Pls. Letter at Exhibits 6 & 8 (Delta Letters to Your Honor dated March 17 & April 15, 2011). Plaintiffs contend that this conduct warrants sanctions under Rule 26(g), Rule 37(b)(2), and Rule 37(c)(1) of the Federal Rules of Civil Procedure. Plaintiffs' motion for sanctions should be denied for the reasons explained herein.

**Delta's Discovery and Disclosure of Discovery Mistakes**

In a February 17, 2011 letter, the Department of Justice inquired why several first bag fee documents produced in response to an unrelated DOJ investigation in October 2009 were not produced in response to the DOJ's February 2009 first checked bag fee CID ("Bag Fee CID"). (Pls. Letter Ex. 5). Upon receiving the DOJ's inquiry, Delta retained PricewaterhouseCoopers

LLP ("PwC") to investigate Delta's Bag Fee CID document collection and production. (Ex. 1, Declaration of J. Scott McClain ("McClain Dec.") ¶ 9). During that investigation, Delta and PwC discovered the two facts that underlie Plaintiffs' sanctions motion.

1. ***Although Delta imaged and preserved data from numerous hard drives in connection with its response to the Bag Fee CID, these drives were inadvertently not searched for responsive documents due to a misunderstanding by Delta's IT department of its instructions from counsel.***

Although Delta imaged and preserved data from the hard drives of various custodians in May 2009 as part of Delta's efforts to collect and preserve documents potentially responsive to the Bag Fee CID, Delta's legal team first learned in March 2011 that the contents of these hard drives had not been uploaded into Delta's internal electronic discovery search tool (Clearwell), as they had previously believed. (*Id.* ¶ 9) As a result, when Delta conducted its searches of the collected electronic data for documents responsive to the Bag Fee CID, the user files located on the custodians' hard drives, including any archived e-mails contained on the hard drives rather than upon shared server files, were not searched and produced. Instead, the only electronic records searched and produced were located on Delta's active email servers or shared network servers. (*Id.* ¶ 9) This oversight later affected discovery in this matter because Delta (pursuant to an agreement with Plaintiffs) used the same Bag Fee CID collection and production to respond to Plaintiffs' First Request for Production of Documents. *See* Ex. 2, March 5, 2010 Letter from Michael Mitchell to Daniel Kotchen.

The failure to load the contents of the imaged hard drives into Clearwell for searching was the product of a misunderstanding between Delta's counsel and Delta's internal technology group (the Computer Security and Investigative Response Team, or "CSIRT").[1] After communicating with the DOJ in May 2009 about the Bag Fee CID, Scott McClain, Delta's in-house counsel, instructed CSIRT on May 13, 2009, to capture the hard drives and shared server files, including e-mail files, of the list of custodians that had been identified as relevant to the Bag Fee CID investigation. (Ex. 1 McClain Dec. ¶ 5). On May 22, 2009, CSIRT informed Delta's counsel that the collection was nearly complete and asked if all of the data should be loaded into Delta's Clearwell appliance, a new electronic data search tool that Delta was in the process of acquiring at that time to facilitate electronic data review in connection with litigation and internal investigations. (*Id.* ¶ 6) Mr. McClain responded to CSIRT's question that day by confirming that all of the data should be loaded for review when it was ready. (*Id.*) CSIRT informed Mr. McClain that it would take some additional time to process the collected material to extract the user-generated data and have it ready for review, and estimated that it would be ready the following week. (*Id.*) Approximately two weeks later, on June 5, 2009, Mr. McClain followed up with CSIRT to verify that the materials loaded into Clearwell were ready for attorney review. (*Id.* ¶ 7) Mr. McClain specifically asked the CSIRT technician who was

[1] Delta's Law Department and CSIRT are physically located in separate buildings in Atlanta, approximately one mile apart.

processing the data to confirm that the material loaded into Clearwell was "100% of the user-generated data from the recent sweep." (*Id.* ¶ 7)

It was not until PwC concluded its investigation on March 11, 2011, that Delta counsel learned that when CSIRT processed the Bag Fee CID data and loaded it into Clearwell for attorney review back in May 2009, only files from Delta's shared servers had been loaded into the Clearwell appliance for review. (Ex. 3, Declaration of Randall Allen ("Allen Dec.") ¶ 4; Ex. 1, McClain Dec. ¶ 9). As a result, while the imaged hard drives had been preserved by CSIRT, they were not previously searched for responsive documents. (Ex. 1, McClain Dec. ¶ 9). The same day that Delta and its counsel were informed by PwC that the imaged hard drives had not been loaded into Clearwell, Delta informed Plaintiffs' counsel and began to process, review and produce (to both the DOJ and Plaintiffs) responsive documents from those drives. (Ex. 3, Allen Dec. ¶ 4).

2. ***Despite inquiries to CSIRT, Delta failed to locate and identify 2008 and early 2009 backup tapes containing emails of relevant custodians.***

Plaintiffs assert that Delta's counsel asked CSIRT "for the first time" in March 2011 where backup tapes were normally stored. (Pls. Letter at 3). That is simply not true. As previously explained to the Court, Delta's counsel and CSIRT team corresponded with staff at IBM (a third-party technology contractor that maintains and operates Delta's e-mail backup procedures) in May and June 2009 in an attempt to identify the oldest e-mail backup tapes that were then available for preservation in response to the Bag Fee CID. (Ex. 1, McClain Dec. ¶¶ 10-11; Pls. Letter Ex. 41). As the Court is also aware, in June 2009, pursuant to Delta's instruction IBM removed the April 2009 monthly backup tapes of Delta's email servers from Delta's normal disaster recovery backup tape rotation, and delivered them to Delta's CSIRT in order to preserve them in connection with the Bag Fee CID. (Ex. 1, McClain Dec. ¶ 11) It was Delta counsel's understanding, based on discussions with CSIRT and IBM, that these were the oldest e-mail backup tapes available at that time. (*Id.* ¶¶ 11, 31) Those backup tapes were then stored by the CSIRT in its "evidence locker" from that date forward. (*Id.* ¶ 11)

The evidence locker is not a location in which backup tapes are routinely stored in the ordinary course of Delta's business. (*Id.* ¶ 12) It is used by CSIRT for the specific purpose of storing evidentiary materials (including in some cases backup tapes) that have been collected by the CSIRT in connection with litigation and internal or external investigations. (*Id.* ¶ 12) IBM was the normal custodian of Delta's e-mail backup tapes, not CSIRT. (*Id.* ¶ 13)

In August 2010 – prior to Delta's receipt of any discovery request from Plaintiffs for information about the backup tapes in Delta's possession, custody or control – Delta's in-house counsel asked CSIRT to confirm that they were continuing to preserve the April 2009 tapes. (*Id.* ¶ 14) At that time, Delta's counsel continued to believe that the oldest available e-mail backup tapes for the relevant custodians were the April 2009 tapes that had been received from IBM in June 2009 and preserved continuously by CSIRT since then. (*Id.* ¶ 17)

Pursuant to Mr. McClain's August 2010 request, CSIRT confirmed that the April 2009 backup tapes were still being preserved. (*Id.* ¶ 15) CSIRT also confirmed that it was preserving a set of later backup tapes, delivered by IBM to CSIRT in the September/October 2009 time frame, pursuant to a preservation instruction from the Law Department in connection with an unrelated government investigation (into a proposed transaction involving a swap between Delta and US Airways of airport landing slots at Washington and New York area airports). (*Id.* ¶ 16) However, CSIRT did not inform Mr. McClain that it was preserving any earlier set of backup tapes in the evidence locker at that time. (*Id.*¶ 17) Nor was there any reason for Delta's legal team to suspect that any earlier backup tapes would be stored in the CSIRT evidence locker because they were aware of no other open investigation or litigation in which Delta's Law Department had instructed CSIRT to preserve such tapes prior to the preservation instruction in connection with the Bag Fee CID in May 2009. (*Id.* ¶ 18)

Several weeks later, in response to Plaintiffs' 30(b)(6) notice regarding Delta's document collection, Delta counsel conducted yet another round of inquiries concerning Delta's backup tapes. (*Id.* ¶ 19; Ex. 3, Allen Dec. ¶ 20). During this inquiry, both Delta's in-house and outside counsel conferred in several phone calls with CSIRT and IBM about the removal of backup tapes from the normal rotation process, and those conversations confirmed Delta counsel's understanding that the April 2009 backup tapes that had been preserved in connection with the Bag Fee CID were still being preserved and were the oldest available e-mail backup tapes. (Ex. 1, McClain Dec. ¶ 20; Ex. 3, Allen Dec. ¶¶ 20-21). To further verify this conclusion, Delta's counsel inquired with the law firm that handled the collection of materials for production to the government in connection with the DOJ review of the Delta/Northwest 2008 merger to determine whether the electronic data collected was still available as an alternative source of older data. (Ex. 1, McClain Dec. ¶ 21; Ex. 3, Allen Dec. ¶ 22). The law firm confirmed that the materials collected in connection with merger review had been purged in November and December 2008, shortly after the DOJ investigation was concluded and the merger closed. (Ex. 1, McClain Dec. ¶ 21; Ex.3, Allen Dec. ¶ 22).

Based on these reasonable inquiries, Delta's in-house counsel and outside counsel believed that the April 2009 backup tapes were the oldest available backup tapes in Delta's possession until they learned otherwise as a result of the March 2011 PwC investigation. (Ex. 1, McClain Dec. ¶ 31; Ex. 3, Allen Dec. ¶ 24). Accordingly, Delta stated in its discovery responses and deposition testimony that the earliest known backup tapes being preserved were believed to be the April 2009 backup tapes of its Microsoft Exchange servers.

When Delta's in-house and outside counsel, CSIRT, and PwC met at CSIRT's offices in March 2011 for purposes of investigating Delta's 2009 document collection, Delta's in-house counsel asked to see the April 2009 backup tapes so that he could verify first-hand that they were still being properly preserved at CSIRT. (Ex. 1, McClain Dec. ¶ 23). During this meeting, a member of CSIRT for the first time identified for counsel an unmarked box of computer tapes which he indicated were also being stored in the CSIRT evidence locker. (*Id.* ¶ 24) Based on the tape labels, certain of these appeared to be e-mail backup tapes dating back to 2008, but the labeling did not provide information about what or whose files the tapes backed up. (*Id.* ¶ 25;

Ex. 3, Allen Dec. ¶ 5 ). Nothing on the tape labels explained why they were being preserved. (Ex. 1, McClain Dec. ¶ 26). Nor could CSIRT explain what the tapes were or why they were being preserved in the evidence locker. (*Id.* ¶ 27) Neither CSIRT nor IBM has been able to determine who requested that the tapes be preserved or why they were being stored in the evidence locker. (*Id.* ¶ 28)

In order to confirm the dates of the tapes and determine whether the tapes contained information from the relevant bag fee custodians, Delta retained a vendor (eMag Solutions LLC) to perform a forensic scan of the tapes.[2] (*Id.* ¶ 29; Ex. 3, Allen Dec. ¶ 5). Delta also tasked PwC to investigate whether any other backup tapes were within Delta's possession. (Ex. 1, McClain Dec. ¶ 31). Upon ascertaining the existence of relevant tapes, Delta promptly informed Plaintiffs of their existence and volunteered to process and search, at very significant cost, the relevant custodian emails on those tapes.[3] (Ex. 3, Allen Dec. ¶ 5).

3. ***Delta's review and production of materials on the imaged hard drives and backup tapes, and attempt to stay in regular contact with Plaintiffs.***

Since discovering that the user-generated data on the hard drives collected in May 2009 (before the first case in this litigation was filed) had never been reviewed by counsel, and learning of the existence of the previously-unidentified backup tapes pre-dating April 2009, Delta has worked diligently to ensure a complete production of any additional responsive documents, address Plaintiffs' supplemental discovery demands, and to cure any inconvenience to the parties and this Court. As mentioned, on the same day Delta was informed by PwC that the imaged hard drives had not been loaded into Clearwell, Delta informed Plaintiffs' counsel and began to process those drives. (*Id.* ¶ 4) Similarly, upon ascertaining the existence of the relevant backup tapes, Delta promptly informed Plaintiffs and began to process emails on those tapes. (*Id.* ¶ 5) Delta also stayed in regular communication with Plaintiffs' counsel during this period to keep them informed of Delta's progress and address Plaintiffs' questions about Delta's document production. (*Id.* ¶¶ 3, 6)

Specifically, Delta, after conferring with Plaintiffs, employed electronic search terms agreed to with Plaintiffs in order to search for and produce documents responsive to Plaintiffs' non-bag fee related document requests (even though Plaintiffs had previously informed Delta that they no longer intended to pursue those claims), and also agreed to collect, search, and review documents for three additional custodians/sources not previously requested by Plaintiffs. (*Id.* ¶ 7) In addition, Delta searched materials collected in connection with the unrelated DOJ investigation that had triggered the original DOJ inquiry of February 17, 2011. (*Id.* ¶ 7)

---

[2] Although Delta initially believed that 25 of the tapes potentially contained relevant files, it was determined that 24, not 25, of the backup tapes contained emails from the inboxes, sent items, and deleted items folders of bag fee custodians.

[3] Delta informed Plaintiffs and the Court of the backup tapes *before* Delta had completed its examination and assessment of the located tapes. (Ex. 3, Allen Dec. ¶ 5; Pls. Letter Ex. 8).

Delta also agreed to numerous additional discovery requests made by Plaintiffs, often under the threat of motion to compel, in an effort to avoid further burdening the Court and the parties with more discovery disputes.[4] (*Id.* ¶¶ 8, 10) For example, Plaintiffs insisted on the production of a list of all of the Delta employees whose emails were located on the backup tapes, even though only a small number of those custodians had any involvement in Delta's consideration or decision to adopt a first bag fee. (*Id.* ¶ 8) Delta produced the list, which contained the names of more than *3,000* Delta employees. Plaintiffs also demanded that Delta identify all of the individuals employed within Delta's ACS division between July and November 2008, and to identify their title and supervisor. (*Id.*) With the assistance of Delta's vendor that manages certain human resource issues for the company, Delta produced that list, which consisted of approximately 20,000 employees. (*Id.*) When Plaintiffs learned that the list contained 20,000 names, Delta agreed to Plaintiffs' request to cull the list so that it identified only the ACS employees from the relevant time period whose files were on the backup tapes. (*Id.*) Delta created the list and produced it to Plaintiffs.[5] (*Id.*) None of these requests was reasonably calculated to lead to the discovery of admissible evidence. Nevertheless, Delta agreed to provide the requested information to alleviate Plaintiffs' purported concerns, and to avoid additional unnecessary discovery motions practice.[6]

With respect to its collection, review, and production of files from the imaged hard drives and backup tapes, Delta produced a total of 9,581 responsive documents – of which 6,097 were from the imaged hard drives and 3,484 from the tapes – over a period of approximately seven weeks in April and May 2011.[7] (*Id.* ¶ 25) The majority of these documents did not relate to bag fees, but to Plaintiffs' other (previously abandoned) allegations concerning capacity decisions and gate-lease negotiations with the Atlanta Airport.

**<u>Delta's Attempts in May-July 2011 to Discuss Plaintiffs' Discovery and Sanctions Requests</u>**

Following production of its files in May, Delta waited several weeks for Plaintiffs to complete their review and provide a status update to the Court. As we informed the Court on

---

[4] In April-May 2010, Plaintiffs, in connection with their additional discovery requests, threatened Delta with a motion to compel on at least five occasions. (Ex. 3, Allen Dec. ¶ 10).

[5] ACS is responsible for the collection of bag fees as well as primary interface with the passengers at airports (*i.e.*, ticket agents, gate agents, baggage handlers, etc.).

[6] Plaintiffs also demanded (and threatened to compel) Delta to use the agreed-to search terms to search the entire universe of files on all of the backup tapes. (Ex. 3, Allen Dec. ¶ 9). Such an exercise would have likely cost Delta well into the hundreds of thousands (if not millions) of dollars and would have required the search of files not even remotely connected to this case. (*Id.*)

[7] Delta produced 1,226 documents on April 1, 2011, 1,540 documents on April 11, 2011, 5,037 documents on May 9, 2011, 1,528 documents on May 16, 2011, and 250 documents on May 18, 2011. (Ex. 3, Allen Dec. ¶ 25).

May 31, 2011, Delta regularly contacted Plaintiffs to determine if Plaintiffs had any additional discovery demands, but Plaintiffs responded that they wished to complete their review of the documents before addressing what, if any, additional discovery they wanted to pursue. (Ex. 4, Randall L. Allen Letter to Honorable Timothy C. Batten, Sr. dated May 31, 2011).

On June 17, 2011, approximately one month after Delta completed its production, Plaintiffs wrote Delta for the purported purpose of identifying additional discovery they wished to conduct. (Ex. 5, Daniel Kotchen Letter to Randall Allen dated June 17, 2011). Plaintiffs stated in their letter that they were "still analyzing Delta's production and [we]re not yet certain of the scope of additional discovery that [they] plan[ned] to take." In addition to its uncertainty, the letter also asserted vague discovery demands many of which were completely unrelated to the merits of this case or to any document produced by Delta after the close of discovery. For instance, the letter did not identify a single person whom Plaintiffs wished to depose, but instead asked for "Depositions of individuals who Plaintiffs were not previously able to ask about the newly-produced documents," a request that, literally read, includes everyone. Plaintiffs likewise requested that Delta search the files of new custodians, some identified by name, others only by category. Of the 22 new custodians identified by name, (a) three were custodians whose documents had already been provided to Plaintiffs (a fact that had been communicated to Plaintiffs), (b) three others that were not custodians at all (but rather server files, which, again, had already been identified to Plaintiffs), and (c) 16 employees scattered across various groups in Delta and Northwest Airlines (*e.g.*, cargo, reservations, international sales, media relations), none of whom played any role in Delta's decision to implement a first bag fee. Plaintiffs similarly stated in general fashion that it "plan[ned] to ask for discovery sanctions." No particulars about what those sanctions might be were provided, and Plaintiffs stated that they "assum[e]d Delta w[ould] oppose the request," and asked Delta to let them know "if [Delta] would like to confer about it."

Delta met and conferred with Plaintiffs on June 28, 2011, about their June 17, 2011 letter. (Ex. 3, Allen Dec. ¶¶ 11-12). During the call, Delta asked Plaintiffs for the basis of their request that Delta search the files of 22 new custodians. (*Id.* ¶ 12) Delta explained that it was open to compromising on the number of additional custodians and documents to search, and discussed with Plaintiffs the connection (or lack thereof) of the new custodians to the newly produced documents. (*Id.*) Delta also explained that it was agreeable to re-opening discovery with respect to the newly produced documents, and that four months – the time period suggested by Plaintiffs – was not inherently unreasonable, but that before Delta could agree to that time period, it needed to have some idea of the discovery the parties should expect to complete during the additional four months. (*Id.* ¶ 13) Plaintiffs declined to provide any details, including the identities of anyone they wanted to depose or re-depose. (*Id.* ¶ 14) They also refused to discuss details of the discovery sanctions they planned to seek. (*Id.*)

Delta and Plaintiffs renewed discussions over the ensuing days and weeks through several calls and letters. (*Id.* ¶ 15) Although Delta – as a compromise – suggested it search the files of 9 of the newly identified custodians (and suggested that Plaintiffs choose which 9), Plaintiffs continued to press for eight other names remaining at issue, with little regard for their

lack of involvement in Delta's decision to adopt a first bag fee or connection to Delta's newly produced documents. (*Id.*) Plaintiffs also continued to refuse to provide substantive details about either their desired discovery or the sanctions they would seek against Delta. (*Id.* ¶ 16) As Delta explained to Plaintiffs on numerous calls and in a July 8, 2011 letter, Delta remained "willing to discuss" Plaintiffs' discovery and discovery sanctions, but "[i]n order for Plaintiffs and Delta to discuss properly this important issue, Plaintiffs [had to] first articulate the discovery they wish to take." Plaintiffs refused to discuss these issues with Delta.[8] (*Id.* ¶ 17; Pls. Letter Ex. 13)

Rather than discuss or even identify their demands with Delta, Plaintiffs submitted their July 25, 2011 letter to the Court. In that letter, Plaintiffs stated that they "conferred with" Delta "about re-opening discovery, a proposed schedule, [and] discovery sanctions," but that the parties "were unable to reach agreement." *See* Pls' Letter at 9 & n.16. That statement strains the boundaries of good faith given that Delta clearly agreed in correspondence with Plaintiffs to re-open discovery, repeatedly acknowledged that Plaintiffs' proposed four-month schedule was not inherently unreasonable (so long as Plaintiffs would identify the particular discovery they wanted), and repeatedly indicated it was willing to discuss Plaintiffs' discovery sanctions. (Ex. 3, Allen Dec. ¶¶ 12-18) Yet Plaintiffs refused to discuss the substance of any of these items. (*Id.* ¶¶ 14-19) By way of example, Plaintiffs never once conferred with Delta about whose depositions they believed they would need to take or re-take as a result of the newly produced documents, even though Delta expressed – during discussions and in writing – a willingness to engage in reasonable discussions of those issues. (*Id.* ¶ 18) Put simply, the parties were not able to "reach agreement" on issues raised in Plaintiffs' July 17 letter, not because Delta rebuffed Plaintiffs' demands, but because Plaintiffs refused even to identify the nature of their demands. It is apparent that Plaintiffs wanted another sanctions motion more than to move on with discovery or to face the motions for summary judgment that will follow.

---

[8] Delta's July 8, 2011 letter addressed Delta's frustration with Plaintiffs' refusal to discuss their discovery and sanctions plans: "Regarding the extra four months Plaintiffs propose to take to conduct their additional fact discovery, I have told you that such time period does not sound unreasonable to me, but I cannot formally agree to such length until Plaintiffs identify particular discovery they wish to take. On several occasions I've inquired about Plaintiffs' discovery plans, but Plaintiffs have declined to provide any substantive answers. Sharing that information would help the parties have an informed discussion, and I urge you to do so. Finally, your [letter] shed[s] virtually no light on the sanctions Plaintiffs intend to seek from the Court. The only specific sanction you mention is the costs and fees related to Plaintiffs' spoliation motion, which Delta will not agree to pay for a variety of reasons. In order for Plaintiffs and Delta to discuss properly this important issue, Plaintiffs must first articulate the discovery they wish to take. When you are prepared to do that, I am willing to discuss the issue with you." (Pls. Letter Ex. 13).

**<u>Plaintiffs Are Not Entitled to Sanctions Under Rule 26(g) or Rule 37</u>**

Plaintiffs seek to impose discovery sanctions against Delta under Federal Rules of Civil Procedure 26(g), 37(b)(2) and 37(c)(1). Sanctions are not justified under any of these provisions.

1. ***<u>There is no basis for sanctions under Rule 26(g).</u>***

Although they seek sanctions under Federal Rule of Civil Procedure 26(g), Plaintiffs make no attempt to address the actual elements of that rule. Rule 26(g) governs the certification of discovery responses, and states, in pertinent part, that:

> [A]n attorney or party [in signing a discovery response] certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry it is:
>
> (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;
>
> (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and
>
> (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

Plaintiffs contend that Delta should be sanctioned because it failed to conduct a "reasonable inquiry" before certifying certain discovery responses. However, Plaintiffs do not identify any discovery response supposedly certified by Delta or its counsel with the "knowledge, information and belief" that such response was (i) not "consistent" with the federal rules or existing law, (ii) "interposed for any improper purpose," or (iii) "unreasonable [or] unduly burdensome or expensive." Indeed, Plaintiffs completely ignore these elements of the Rule. *See* Fed. R. Civ. P. 26(g), advisory comm. notes ("The signature is a certification *of the elements* set forth in Rule 26(g).") (emphasis added). Plaintiffs' motion for sanctions under Rule 26(g) must be denied on this basis alone.

Even if Plaintiffs' construction of the rule were valid, Plaintiffs still have not established (and cannot establish) that Delta provided discovery responses without first conducting a "reasonable inquiry." Fed. R. Civ. 26(g), advisory comm. notes ("The duty to make a 'reasonable inquiry' is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. . . . . Rule 26(g) does not require the signing attorney to certify the truthfulness of the client's factual responses to a discovery request."). Plaintiffs appear to take issue with two Delta discovery responses (both addressing the existence of backup tapes): a request for admission response signed by Delta outside counsel, and interrogatory response verified by Delta in-house counsel. (Pls. Letter at

n.5).[9] Neither response was provided absent a reasonable inquiry. To the contrary, each response was given only after Delta counsel had engaged in several conversations with Delta's CSIRT department and/or IBM to verify the relevant backup tapes Delta had in its possession. (Ex. 1, McClain Dec. ¶¶ 10-22; Ex. 3, Allen Dec. ¶¶ 20-22). This sort of inquiry with technology personnel is precisely the type considered appropriate by the federal courts, as Plaintiffs themselves concede. *See* Pls. Letter at 10-11 ("Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched. This will invariably involve *speaking with information technology personnel*, who can explain system-wide backup procedures . . . .").

That Delta's responses, in hindsight, may have proved incorrect, does not render them sanctionable. *See In re Mroz*, 65 F.3d 1567, 1572 (11th Cir. 1995) ("The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted."); Fed. R. Civ. 26(g), advisory comm. notes ("The certification speaks as of the time it is made."). Indeed, Rule 26, and in particular subsection Rule 26(e)(1), specifically contemplates that parties may need to supplement responses due to newly discovered information or if they discover their prior responses were incorrect. Under the established process, once Delta became aware of the backup tapes, it was obligated to provide "in a timely manner" "the additional or corrective information," and Delta did so. (Rule 26(e) is discussed in greater detail below.)

Plaintiffs rely principally upon *Mancia v. Mayflower Textile Services*, 253 F.R.D. 354 (D. Md. 2008), to set forth the putative obligations of Rule 26(g). That case only demonstrates the inapplicability of Rule 26(g) to the facts presented here. Far from addressing whether a party should be sanctioned for providing an incorrect discovery response, the court in *Mancia* stressed that Rule 26(g) was enacted to eliminate "kneejerk discovery requests" and "the equally abusive practice of objecting to discovery requests reflexively – but not reflectively – and without a factual basis." *Id.* at 358. The court went on to explain, "[t]he rule and its commentary are starkly clear: an objection to requested discovery may not be made until after the lawyer has 'paused and considered' whether, based on a 'reasonable inquiry,' there is a factual basis for the objection." *Id.* (quoting Fed. R. Civ. P. 26(g) advisory committee notes). In this case, Plaintiffs do not and cannot claim that Delta "reflexively object[ed]" to Plaintiffs' discovery requests.[10]

---

[9] Plaintiffs also take issue with a deposition response, but Rule 26(g) does not encompass depositions. Fed. R. Civ. 26(g), advisory comm. notes ("The term 'response' includes answers to interrogatories and to requests for admit as well as responses to production requests.").

[10] Plaintiffs also mistakenly claim that two cases – *Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees*, 212 F.R.D. 178 (S.D.N.Y. 2003) and *R&R Sails, Inc. v. Ins. Co. of State of Pa.*, 251 F.R.D. 520 (S.D. Cal. 2008) – present "similar facts." (Pls. Letter at 13) Those two cases, and in particular *Metropolitan Opera*, are nowhere close. In *Metropolitan Opera*, the defendant's counsel assigned document collection and production to an untrained layperson and never implemented a document retention system or supervised the layperson, such that the client essentially failed to collect any emails or electronic documents, resulting in the destruction of "at

As discussed above, Delta's counsel made a reasonable inquiry with CSIRT, IBM, and others in 2010 about Delta's backup tapes and attempted to respond substantively and accurately to each of the above discovery requests based on that inquiry. Sanctions under Rule 26(g) should be denied.

2. ***There is no basis for sanctions under Rule 37.***

Plaintiffs also seek sanctions under Federal Rule Civil Procedure 37, and in particular, Rule 37(b)(2) and Rule 37(c)(1). Sanctions are inappropriate under either subsection.

There is no basis for Plaintiffs' request for Rule 37(c)(1) sanctions. Rule 37(c)(1) permits courts to issue sanctions against a party that "fails to provide information or identify a witness as required by Rule 26(a) or (e)."[11] *See Payless Shoesource Worldwide, Inc. v. Target Corp.*, 2006 WL 3350649, *1 (D. Kan. Nov. 17, 2006) ("In determining whether 37(c)(1) sanctions are appropriate, the court must first determine whether there has been a failure to amend a prior response pursuant to Rule 26(e)[])." Rule 26(e) provides, in pertinent part:

> A party . . . who has responded to an interrogatory, request for production, or request for admission, must supplement or correct its disclosure or response in a timely manner if the party learns in that in some material respect the . . . response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Plaintiffs do not identify the information they contend Delta failed to provide in keeping with Rule 26(e).[12] Nor can they, as Delta acted in accordance with the plain terms of the rule.

---

least a year's worth of electronic documents." 212 F.R.D. at 222-23, 229. Moreover, "no attorney performed any significant review of [defendant's] files until . . . after the close of discovery," and through additional poor attorney oversight, the defendant failed to respond at all to a set of document requests. *Id.* at 223. It was the defendant attorney's continuing carelessness that belied any claim that his certified discovery responses were the product of a "reasonable inquiry" required by Rule 26(g). In *R&R Sails*, the defendant had denied, both in discovery responses and at a court hearing, that it possessed certain logs. 251 F.R.D. at 522. Because the court was "skeptic[al]" that the logs did not exist, it ordered the defendant to produce the logs or verify in a declaration that they were not in defendant's possession. *Id.* The defendant signed and submitted a false declaration. *Id.* at 522-23.

[11] Presumably, Plaintiffs are claiming that Delta failed to provide information required by Rule 26(e), not 26(a), as there is nothing in Plaintiffs' letter to suggest they believe Delta failed to provide information required by Rule 26(a) (initial disclosures, expert testimony, and pretrial disclosures).

[12] The advisory committee notes to Rule 26 indicate that the duty to supplement "applies to interrogatories, requests for production, and requests for admissions, but not ordinarily to deposition testimony." Fed. R. Civ. 26(e), advisory comm. notes.

Upon learning that that it had backup tapes from the 2008 time period, Delta promptly informed Plaintiffs (and this Court) of that fact. Likewise, the same day Delta was informed by PwC that the imaged hard drives had not been loaded into Clearwell, Delta informed Plaintiffs' counsel. Per Rule 26(e), Delta acted "in a timely manner" to make known the "corrective information." Accordingly, there is no basis for sanctions under Rule 37(c)(1).

Plaintiffs also seek sanctions under Rule 37(b)(2), on the ground that Delta's late production of documents "amounts to a failure to comply with this Court's discovery Orders." (Pls. Letter at 11). The only specific "Order" Plaintiffs reference in their letter (Pls. Letter at 2 n.1) is a May 13, 2010 order entered near the outset of discovery requiring defendants to produce documents responsive to Plaintiffs' first set of document requests by June 30, 2010 – a deadline to which Delta had agreed in advance of any order,[13] and, until this spring, thought had been fully satisfied.[14] General discovery orders of this nature, in any event, do not constitute the pre-requisite "order" that is required under Rule 37(b), especially, where, as here, the offending party complied in part with the general directive. *See R.W. Int'l Corp. v. Welch Foods, Inc.*, 937 F.2d 11, 16-17 (1st Cir. 1991) (reversing Rule 37(b) sanctions for failure to produce documents within time called by court scheduling order because the court's "broad-form discovery order" did not constitute the necessary "order commanding production of the specific material," and also observing that Rule 37(b)(2) sanctions are "unripe" unless the failure to comply with a general directive is "absolute, or nearly so").

Plaintiffs' cited cases likewise demonstrate that Rule 37(b)(2) sanctions are appropriate only when a party willfully disobeys an extant order (and usually multiple orders) compelling production of *specified* materials or information – not for mere inadvertent non-compliance with a general scheduling deadline. *See Gratton v. Great Am. Communications*, 178 F.3d 1373, 1375 (11th Cir. 1999) (affirming Rule 37 sanctions for, among other things, "flouting" an order asking for specific information concerning spoliated evidence, failing to appear at a hearing, and "ignor[ing]" a court order to release records); *Devaney v. Continental Am. Ins. Co.*, 989 F.2d

---

13 *See* Ex. 6, Letter of Randall Allen to the Honorable Timothy C. Batten, Sr. dated May 12, 2010 ("As we have advised Plaintiffs' counsel, barring unforeseen circumstances we expect to have completed our document production to Plaintiffs before July 1, 2010. . . . We therefore have no objection to the Court setting that date as a deadline for Delta for producing documents in response to the currently outstanding requests, subject to unforeseen logistical problems arising between now and then.").

14 Plaintiffs, in their May 10, 2010 letter that eventually led to the May 13, 2010 hearing and order, stated they were seeking to "compel" materials from AirTran, but made no such motion with regard to Delta. (Ex. 7, Letter of David Flint to Judge Timothy C. Batten dated May 10, 2010). Specifically, Plaintiffs sought "an order compelling AirTran to produce documents responsive to [a] single document request", and acknowledged earlier in their letter that other than "one exception" concerning AirTran, "Defendants ha[d] agreed to produce documents responsive to [Plaintiffs' outstanding document requests]." *Id.* at 1-2.

1154, 1163 (11th Cir. 1993) (affirming Rule 37(b)(2) sanctions where party ignored multiple orders compelling responses to interrogatories).[15]

Plaintiffs' request for Rule 37(b)(2) sanctions is also misplaced because there is no evidence, or even any allegation, that Delta has acted in bad faith.[16] Although, as Plaintiffs indicate, willfulness or bad faith is not *required* to justify sanctions under Rule 37(b)(2), the Eleventh Circuit has explained that bad faith is highly relevant and important to the assessment. *See Familias Unidas v. Briscoe*, 544 F.2d 182, 192 (5th Cir. 1976) ("we have adopted the view that the presence or lack of good faith is relevant to the orders which should be made from the bench and the severity of the sanctions imposed on a delinquent party" under Rule 37(b)); *B.F. Goodrich Tire Co. v. Lyster*, 328 F.2d 411, 415 (5th Cir. 1964) (similar).[17] In fact, Plaintiffs' cited Rule 37(b)(2) sanctions cases uniformly contain bad faith or evidence of an intent to disrupt the discovery process.[18]

---

[15] *See also Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1319 (10th Cir. 2011) (affirming Rule 37(b) sanctions for violation of "not one but two judicial orders compelling production of the requested materials"); *Kipperman v. Onex Corp.*, 260 F.R.D. 682, 700 (N.D. Ga. 2009) (issuing Rule 37 sanctions after noting defendants had "blatantly ignored orders of the court and prompted multiple motions to compel"); *Scquare Int'l, Ltd. v. BBDO Atlanta, Inc.*, 2008 WL 228032, *1-3 (N.D. Ga. Jan. 25, 2008) (sanctioning defendant for failing to produce particular documents subject to order on motion to compel); *Metropolitan Opera*, 212 F.R.D. at 224 (sanctioning defendants that had "failed to comply with several court orders"); *Thompson v. U.S. Dep't of Housing & Urb. Dev.*, 219 F.R.D. 93, 95 (D. Md. 2003) (sanctioning defendants that violated "prior court orders requiring production of e-mail records").

[16] Plaintiffs do not seek sanctions pursuant to the Court's inherent powers, which necessarily require a finding of bad faith. *See In re Mroz*, 65 F.3d at 1575 ("Invocation of a court's inherent power requires a finding of bad faith."); *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006) ("the key to unlocking a court's inherent power is a finding of bad faith").

[17] *See also Dorsey v. Academy Moving & Storage, Inc.*, 423 F.2d 858, 860 (5th Cir. 1970) ("The sanctions available under Rule 37(b) . . . are predicated upon the presence of such factors as willful disobedience, gross indifference to the right of the adverse party, deliberate callousness, or gross negligence.").

[18] *See, e.g.*, *In re Seroquel Products Liability Litigation*, 244 F.R.D. 650, 656, 664-65 (M.D. Fla. 2007) (twice stating that "bad faith," while not required by Rule 37(b)(2), is "relevant to the sanction to be imposed," and opting to issue sanctions only after concluding the defendant had been "*purposely* sluggish" in its production in an attempt to squeeze the time Plaintiffs had "to review information and to follow up."); *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 127 F.R.D. 224, 232 (1989) ("The sequence of events in the litigation compels the conclusion that counsel made a deliberate choice to bury the evidence and prevent disclosure."); *Anheuser-Busch, Inc. v. Natural Beverage Distrs.*, 151 F.R.D. 346, 353-54 (N.D. Cal. 1993) (party's withholding of documents "was willful and in bad faith;" party's representative "continuously lied about those documents"); *Metropolitan Opera* 212 F.R.D. at 224 ("there is ample evidence

Plaintiffs never suggest that Delta made anything other than a mistake during the course of its document collection and production efforts. A case far more factually on point than any cited by Plaintiffs is *Fleet National Bank v. Tellier*, 171 B.R. 478 (D.R.I. 1994). There, the defendant had responded to "several document requests and interrogatories" by stating that "certain memoranda did not exist." The defendant "later found [two memos] and voluntarily and without further prodding produced" them. *Id.* at 482. The plaintiff moved for sanctions under Rule 37 (albeit Rule 37(d)) for defendant's failure to produce timely the two memos. The district court rejected that motion, observing "[t]here is nothing in the record to suggest that the failure to produce was other than the result of a careless mistake or even that the failure substantially affected a determination of the merits of the pending claims." *Id.* at 483. The same is true in this matter.[19]

Because Plaintiffs have failed to satisfy the elements of either Rule 37(b)(2) or Rule 37(c)(1), sanctions under those provisions are unwarranted and should be rejected.

**The Sanctions Against Delta that Plaintifs Seek Are Not Justified.**

Even if Plaintiffs had properly shown that Delta should be sanctioned, and they have not, Plaintiffs still have not established that their four requested sanctions are justified or warranted to prevent prejudice to Plaintiffs.

1. ***Plaintiffs Have Not Established the Prejudice Necessary to Justify Sanctions Against Delta.***

The Eleventh Circuit has emphasized that, in granting sanctions, courts "must analyze the needs of the case." *Chudsama v. Mazda Motor Corp.*, 123 F.3d 1353, 1372 (11th Cir. 1997).

---

of willfulness and bad faith on the part of both counsel and [defendant]"); *Lee v. Max Int'l, LLC*, 638 F.3d at 1321 ("a party's thrice repeated failure to produce materials that have always been or remain within its control is strong evidence of willfulness and bad faith"); *Gratton*, 178 F.3d at 1375 (affirming sanctions after noting, "almost from the very beginning," plaintiff was "unwilling[] or [u]nabl[e] to comply with the civil rules, ordinary and expected litigation and procedures, and the orders of this court").

[19] Plaintiffs claim that two cases – *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 127 F.R.D. 224 (1989), and *Scquare*, 2008 WL 228032 (N.D. Ga. Jan. 25, 2008) – present "factual situations similar to this case." (Pls. Letter at 14). As Plaintiffs' own recitations of those cases reveal, however, those cases are critically different inasmuch as the defendants there did not disclose the existence of the relevant evidence. *See BankAtlantic*, 127 F.R.D. at 227 (plaintiff discovered missing evidence "through independent investigation"); *Scquare*, 2008 WL 228032 at *1-*2 ("plaintiff became aware that defendant had failed to produce a number of documents"). Another case cited by Plaintiffs – *Marbled Murrelet v. Pac. Lumber Co.*, 163 F.R.D. 308, 326 (N.D. Cal. 1995) – likewise issued sanctions after observing it was "another source" and not the producing party that revealed the missing relevant evidence. Like the defendant in *Fleet National Bank*, Delta promptly revealed its missing evidence and produced the relevant information from those sources "without further prodding."

This Court has similarly observed that "the sanctions imposed should be 'no more drastic than those actually required to protect the rights of other parties.'" *Hawkins v. Fulton County*, 96 F.R.D. 416, 420 (N.D. Ga. 1982) (quoting *Diaz v. So. Drilling Corp.*, 427 F.2d 1118, 1126 (5th Cir. 1970)). Delta's production mistakes were discovered in advance of any summary judgment briefing and trial preparation, effectively preventing any impairment of Plaintiffs' ability to present their case. Any harm to Plaintiffs was further averted when the Court suspended the schedule, thereby allowing Plaintiffs more than adequate time to review Delta's late-produced documents. In addition, Plaintiffs are free, from Delta's perspective, to pursue additional discovery that is actually related to those documents. In short, although Plaintiffs claim – without any factual support – that they have suffered "substantial prejudice" from Delta's mistakes (Pls. Letter at 15), it is clear that Plaintiffs have not even attempted to establish any actual prejudice caused by Delta's late production.

Plaintiffs' letter to the Court substantiates that conclusion. The putative prejudice Plaintiffs initially identify are general "litigation expenses" they might incur, but they never specify what those expenses are, were, or will be, nor do they cite any case issuing sanctions for such vague and undefined expenses. To the contrary, courts, including those cited by Plaintiffs, regularly require specific and itemized expenses prior to granting any monetary sanction. *See, e.g.*, *R&R Sails, Inc. v. Ins. Co. of State of Pa.*, 251 F.R.D. 520, 527 (S.D. Cal. 2008); *Kipperman v. Onex Corp.*, 260 F.R.D. 682, 700 (N.D. Ga. 2009); *see also Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (11th Cir. 1985) (reversing Rule 37 sanctions because the district court "failed to set forth an accounting adequate to justify the [monetary] figure it adopted").

Plaintiffs next argue they have been prejudiced by the fact that they have been "denied the opportunity to ask witnesses about the newly produced documents while the witnesses' memories were relatively fresh." (Pls. Letter at 15) This argument is unavailing, in at least two respects. First, they quote *Calhoun v. Lilenas Publishing*, 298 F.3d 1228, 1237 (11th Cir. 2002), but do not disclose that they are citing a concurrence that involves copyright infringement, and that the case has nothing to do with prejudice tied to late production of documents. *Id.* at 1235-37. Second, the additional delay caused by Delta's late production of documents can hardly be said to have made a material difference on the relative memory of witnesses, given that depositions would have taken place approximately two years after Delta's decision to adopt a first bag fee even if the documents had been produced prior to the close of discovery.

Plaintiffs next complain that they have been prejudiced because they "have been *forced* to address collateral discovery issues rather than focus on the merits." (Pls. Letter at 16). Putting aside that Plaintiffs were not "forced" to file this motion, nor were they "forced" to file their prior spoliation sanctions motion, Plaintiffs again misconstrue their own cases. Plaintiffs cite *Lee v. Max, Int'l*, 638 F.3d 1318, 1321 (10th Cir. 2011), but curiously use ". . ." to omit <u>the single word</u> "two" from the block quote they cite, thereby avoiding the import of the case, which was that prejudice was found and sanctions appropriate because the party violated "not one but two judicial orders compelling production of [] requested materials." *Id.* at 1319. In other words, the collateral issues (and resulting prejudice) addressed in *Lee* flowed from the party's flagrant and recurring disobedience of basic discovery procedures that completely bogged down

the case. Plaintiffs cannot in good faith argue that Delta's actions are akin to the gross misconduct present in *Lee*.

Finally, Plaintiffs rely on a quote from *In re Phenylpropanolamine Products Liability Litigation*, 460 F.3d 1217, 1236 (9th Cir. 2006), to support Plaintiffs' contention that "prejudice from unreasonable delay is presumed." (Pls. Letter at n.31). In that case, the court was attempting to handle a huge, constantly evolving MDL involving hundreds of underlying, newly filed cases, and was doing so by requiring plaintiffs to answer specific "fact sheets" to determine if they were viable plaintiffs. *Id.* at 1224. Because plaintiffs refused to fill out the forms in a timely fashion, the progress of literally hundreds of cases was hindered. It was in this context that the court noted that prejudice was presumed by unreasonable delay. *Id.* at 1235-37. *Phenylpropanolamine* by no means supports the general proposition that delayed production of documents results in presumed prejudice to the receiving party.

Simply put, Plaintiffs fall well short of establishing that they have been prejudiced by Delta's late production.

2. ***The Four Sanctions Plaintiffs Seek Are Not Justified.***

Plaintiffs request that the Court enter four specific discovery sanctions against Delta. None are justified.

a. ***Fees and Expenses in Seeking Plaintiffs' Discovery Sanctions***

Plaintiffs' unwillingness to meet and confer in good faith with Delta pursuant to Local Rule 37.1 to determine whether the parties could resolve the issues raised in their letter renders wholly unjust Plaintiffs' request that Delta should have to pay for Plaintiffs' filing of this motion. *See Brannon v. Allied Interstate, Inc.*, 2010 WL 5463254, *1 (S.D. Ga, Dec. 29, 2010) (denying Rule 37 motion to compel for failure to show a "good-faith effort to resolve the discovery dispute without court intervention, and noting "federal courts have 'vigorously implemented this requirement'"). If Plaintiffs had been willing to identify the substance of the discovery they wished to conduct and the sanctions they intended to seek, the parties might have been able to reach a resolution. But Plaintiffs' refusal made such an agreement between the parties impossible.

Plaintiffs declined the opportunity to meet and confer in good faith, choosing instead to file yet another sanctions motion against Delta. The Court should not reward this gamesmanship, and instead require Plaintiffs to engage in good-faith discussions about any real and identifiable costs incurred as a result of the fact that Delta produced documents after the close of discovery. Plaintiffs alone should bear the costs associated with filing this motion.

***b. Fees and Expenses Related to Plaintiffs' Motion for Spoliation Sanctions***

Plaintiffs' request that Delta reimburse Plaintiffs for their fees and expenses related to their prior failed motion for spoliation sanctions (Dkt. # 196) is unjustified for several reasons. First, Plaintiffs chose to file a flawed motion, which the Court properly denied as a matter of law

on multiple grounds (*e.g.*, Plaintiffs failed to prove Delta had acted in bad faith) that have nothing to do with the newly located documents. (Dkt. # 248). Second, Plaintiffs cite no case awarding fees and expenses for filing a *failed* motion, much less a failed *sanctions* motion. Third, Plaintiffs' request is based entirely on their statement that they would not have filed their motion in light of the recently produced documents. (Pls. Letter at 16). This self-serving and after-the-fact statement is not credible given that they (i) concede, as they must, that their prior sanctions motion was only "partly related to backup tapes" (*id.* at 12); (ii) devote numerous pages of their letter to re-arguing the prior motion (Pls. Letter at 2-3, 7-8, 12-13); (iii) speculate that "additional evidence remains missing" and that other backup tapes may have been "destroyed" (*id.* at 8); (iv) emphasize that several Delta custodians "are missing from" the located backup tapes (*id.* at 4); and (v) want to conduct discovery that appears aimed at even another prospective spoliation motion. *See* Plaintiffs June 17, 2011 Letter (stating Plaintiffs seek "discovery and testimony related to Delta's search for and production of documents in this litigation and in response to the DOJ CID, including documents related to search and collection by PwC and other vendors"). Plaintiffs cannot have it both ways. Plaintiffs should not be rewarded for filing a failed spoliation motion that they apparently intend to revive at some later date, despite their concession that, given Delta's recent document production, such motion was "not necessary." (Pls. Letter at 16).

***c. Delta's Use of Late-Produced Documents or Evidence***

Plaintiffs' request that Delta be precluded from using "any late-produced documents or evidence during any proceeding" is extraordinary. (Pls. Letter at 14). Plaintiffs appear to request that Delta be barred from using not only (i) the late-produced documents, which Plaintiffs concede are "highly relevant," but also (ii) any deposition testimony tied to the late-produced documents, as well as (iii) any other evidence (including deposition testimony and documents produced from custodians Plaintiffs only recently identified) gleaned after the close of fact discovery last December. In other words, Plaintiffs want four months of additional discovery that they alone can use.

It is well-settled that cases are ordinarily to be settled on their merits. *See In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1295 (11th Cir. 2003) ("there is a strong policy of determining cases on their merits); *Hawkins*, 96 F.R.D. at 422 ("[t]here is a strong policy favoring a trial on the merits"). As such, the Eleventh Circuit has explained that courts in imposing sanctions "should not go beyond the necessities of the situation to foreclose the merits of controversies as punishment for misbehavior." *Dorsey v. Academy Moving & Storage, Inc.*, 423 F.2d 858, 860 (5th Cir. 1970).

Precluding a party from using late-produced documents is an extraordinary sanction. *See, e.g.*, *Tritchler v. Consolidation Coal Co.*, 91 F.3d 134, *2 (4th Cir. 1996) ("Generally, preclusion is considered a drastic remedy, and it is not imposed unless the party's conduct is in bad faith or callous disregard of the discovery rules."). When courts opt to impose that sanction, they invariably do so only when the production of those documents occurs after summary judgment or on the eve of trial, thereby preventing prejudice to the receiving party. Several of Plaintiffs' cited cases make this fact clear. *See, e.g.*, *R&R Sails*, 251 F.R.D. at 527 ("[P]reclusion sanctions

are warranted if there is a risk of prejudice to the requesting party and less drastic sanctions are unavailable. In the context of preclusion sanctions, prejudice to the party is defined as the impairment of that party's ability to go to trial or threat of interference with rightful decision of the case.").[20] Delta's late production of documents, by contrast, has not hindered Plaintiffs' ability to address the merits of their case. Plaintiffs will have (and have had) ample time to review Delta's documents prior to summary judgment or trial. Moreover, as mentioned, Delta is willing to permit additional discovery on its late-produced documents.

Moreover, the preclusion sanctions Plaintiffs seek would work a serious injustice. Plaintiffs have asked for this extraordinary sanction precisely because, as described in detail in my August 2, 2011 letter to the Court, much of the newly produced evidence is highly relevant and refutes Plaintiffs' allegations of collusion and conspiracy. In the absence of any prejudice, there is simply no justification for a sanction that would hinder Delta's ability to prove that Plaintiffs' unfounded claim lacks merit. This injustice is further magnified when considering the very substantial treble damages Plaintiffs seek.[21]

*d. Fees and Expenses Incurred in the Extended Discovery Period*

Plaintiffs seek four months of additional discovery, but thus far have refused to identify any individual they wish to depose, or any particular written discovery they plan to propound. Instead, Plaintiffs state only an intent to seek "discovery related to topics or issues about which new or additional information is provided by documents produced after the close of discovery." (Pls. Letter at n.16). As discussed in Delta's August 2nd letter to the Court, this open-ended proposal provides no meaningful limitation on the discovery Plaintiffs may seek.

If Plaintiffs are willing to engage in good-faith discussions about specific discovery they wish to conduct, Delta is willing to discuss whether it should pay for such discovery. For

---

[20] *See also Stallworth v. E-Z Serve Convenience Stores*, 199 F.R.D. 366, 367-368 (M.D. Ala. 2001) (striking exhibits for purposes of summary judgment that were produced for the first time in a summary judgment reply brief; receiving party "was prejudiced by having to spend additional time and resources, at the eleventh hour, analyzing and responding to this 'highly relevant and crucial' material"); *Scquare*, 2008 WL 228032 at *3 (refusing to allow defendant to introduce evidence at trial regarding late-produced documents after noting "the Court may have granted summary judgment on plaintiff's copyright claim if it had been privy to the documents that defendant withheld"); *Thompson.*, 219 F.R.D. at 103-05 (precluding use at trial of emails discovered "during the last minute," as there was "no effective way to cure the surprise" to the receiving party); *see also Kipperman v. Onex Corp.*, 260 F.R.D. 682, 700 (N.D. Ga. 2009) (refusing to strike answer for late produced documents given "Plaintiff has the raw material and documentation it needs to proceed with its case and this court has the means, through re-depositions and supplemental expert reports, to minimize a large portion of the damage done.").

[21] *See generally Kipperman*, 260 F.R.D. at 700 (declining to strike answer because doing so would possibly "grant[] the largest default judgment sought by a plaintiff in the history of the nation").

CONFIDENTIAL



example, if the parties had agreed on an appropriate limitation to the scope of the additional discovery that will occur, Delta would likely have agreed to reimburse Plaintiffs for reasonable costs associated with having to re-convene and re-depose a Delta witness for the limited purpose of asking that witness about documents that were not previously produced. On the other hand, there is no basis for requiring Delta to subsidize Plaintiffs' continuing open-ended fishing expedition for new discovery that they were fully capable of seeking during the discovery period had they chosen to do so. Nor is there any basis for requiring Delta to pay for depositions of any *new* witnesses Plaintiffs now seek to take, since the costs of any such depositions are costs that Plaintiffs would have incurred anyway. Again, Delta stands ready to confer with Plaintiffs on these issues, but they have so far refused to do so.

**Conclusion**

Plaintiffs have not established that Delta should be sanctioned under Rule 26(g) or Rule 37 of the Federal Rules of Civil Procedure. Nor have they shown that the particular sanctions they seek to impose on Delta are justified. Plaintiffs also failed properly to meet and confer in good faith with Delta prior to seeking the Court's assistance concerning the issues raised in their letter. Delta therefore respectfully submits that Plaintiffs' motion for discovery sanctions should be denied in its entirety.

Sincerely,

Randall L. Allen

Enclosures

cc: Dan Kotchen, Esq.
David Flint, Esq.
Roger Fones, Esq.
Bert Rein, Esq.
James Denvir, Esq