UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CIVIL ACTION |
| DELTA/AIRTRAN BAGGAGE FEE | ) | FILE NO. 1:09-MD-2089-TCB |
| ANTITRUST LITIGATION | ) | |
| _____ | ) | |

## NON-PARTY TRUSTED DATA SOLUTIONS, LLC'S APPLICATION FOR PAYMENT OF FEES AND EXPENSES

Non-party Trusted Data Solutions, LLC ("TDS") hereby submits this Application for Payment of Fees and Expenses.  As set forth below, TDS respectfully requests that the Court award TDS its reasonable fees and expenses incurred in connection with the work performed by Plaintiffs' e-discovery expert, Bruce Pixley.

## STATEMENT OF FACTS

TDS is a leading expert in the field of backup tape restoration and data conversion.  Among other things, TDS can restore, index, and process every backup tape format that has been used commercially over the past 30 years.  In addition, TDS has extensive experience in email archive migration, which includes extracting email data from backup tapes, de-duplicating, and converting the data into an appropriate load file.

## A.      Precision Discovery Retains And Directs TDS' Work

Due to its experience and expertise, TDS was initially contacted in late 2012 by Bruce Pixley, the Vice President of Computer Forensics at Precision Discovery, regarding a large case that he had been brought into because proper e-discovery processes had not been followed.  Mr. Pixley informed TDS that he had been hired by the plaintiffs' attorney to review the processes and procedures utilized by the defendant's e-discovery vendors.  Mr. Pixley told TDS that he already informed his client that he would be hiring TDS to perform the tape restoration component of the project.  (Exhibit A – Declaration of Steve Flitter ("Flitter Decl.") ¶¶ 4-5.) Throughout the course of its involvement in this case, TDS communicated primarily with representatives of Precision Discovery.  To that end, Precision Discovery provided all direction for work to be performed and approved all scope of work and proposed pricing.  (Exhibit B – Declaration of Michael Fragale ("Fragale Decl.") ¶¶ 4-17.)

TDS received its first directions for this case on March 1[1], when it received an email from the Computer Forensics Director at Precision Discovery: John Ruiz. Mr. Ruiz told TDS that he had 40 EDB files (approximately 158 gigabytes) that needed to be restored with all of the PST files to be exported, all of which needed

---

[1] Unless otherwise noted, all dates referenced are in 2013.

to be on an "expedited" basis.[2]  (Flitter Decl. ¶¶ 6-7; Fragale Decl. ¶ 4; Exhibit C –

Mar. 1, 2013 email chain, p. 3.)  In response, TDS sent Mr. Ruiz an email outlining

the scope of work and proposed pricing as follows:

> SCOPE
>
> Precision Discovery to submit 40 Exchange EDB files
> (with the associated files) on a hard drive; approximately
> 158 GB in total.
>
> 1 EDB is approximately 100 GB; the remaining EDBs
> are small.
>
> Precision Discovery requires expedited processing.
>
> TDS to restore EDB files and extract all of the PSTs and
> place them onto a hard drive.
>
> All custodian PSTs are required.
>
> EXPEDITED PRICING
>
> $200/EDB inclusive of the extraction of up to 25 PSTs.
>
> For each additional 50 PSTs beyond 25, the cost would
> increase incrementally by $40.
>
> + target media and shipping at cost (if applicable).

(Ex. C, p. 2.  See also Flitter Decl. ¶ 7; Fragale Decl. ¶ 4.)  The proposal reflected

TDS' standard pricing for expedited projects.  (Flitter Decl. ¶ 7; Fragale Decl. ¶ 4.)

---

[2] As this Court is well-aware, EDB files are exchange database files that act as a
pointer to a user's Microsoft Outlook profile, and PST files are personal storage
folder files in Microsoft Outlook.  (Doc. 394, p. 22 nn. 14-15.)

In acceptance of TDS' proposal, Mr. Ruiz hand delivered a hard drive to TDS on March 1 for processing.  (Fragale Decl. ¶ 5.  <u>See</u> <u>also</u> Exhibit D – Mar. 1, 2013 email.)  After TDS began restoring the EDB files from the hard drive, Mr. Ruiz asked TDS to provide a list of PST files before they exported all of them.  (Exhibit E – Mar. 4, 2013 email chain, p. 5.)  TDS complied, and sent Mr. Ruiz and Mr. Pixley a list of all 11,149 mailboxes found in the restored EDB files.  (<u>Id.</u> at p. 4.)  In response, Mr. Pixley identified a single mailbox that he needed, but noted that he anticipated receiving more tape data that he would send to TDS for processing.  (<u>Id.</u>)

Mr. Pixley also informed TDS that he "would like to be able to know which items are located in the dumpster," and asked "[w]hat is the best way to produce that."  (Ex. E, p. 4.)  When TDS informed Mr. Pixley that its PST extraction process includes dumpster items (but such items get restored to their original folders), Mr. Pixley said "[i]t will be important to know which items were dumpster items.  If you just simply restore them and we have no way of knowing which ones where *[sic.]* in the dumpster, I will not be able to use TDS for the follow-up work in this case."  (<u>Id.</u> at p. 3.)  TDS then notified Mr. Pixley that the deliverable he requested would require special processing and programming, which constituted "professional services" that TDS bills at a standard hourly rate

of $250.00.  (Id. at p. 2; Fragale Decl. ¶ 7.)  TDS also told Mr. Pixley that it would require approximately five to ten hours of "professional services" to complete the processing necessary for the dumpster-items.  (Ex. E, p. 2; Fragale Decl. ¶ 7.)  Mr. Pixley responded: "Go ahead and proceed with the dev[elopement] work so we are prepared for the additional Exchange data when it arrives."  (Ex. E, p. 2; Fragale Decl. ¶ 7.)

A few weeks later, TDS spoke to Mr. Pixley about additional work that he needed done, including processing 24 backup tapes that TDS received on March 20.  (Flitter Decl. ¶ 9; Fragale Decl. ¶¶ 8-9.  See also Exhibit F – Mar. 22, 2013 email chain, p. 4.)  Based on the discussions with Mr. Pixley regarding the work he wanted done on the backup tapes, on March 22, TDS sent Mr. Pixley an updated scope of work and proposed pricing for approval:

> Scope of Work (Work to be Expedited)
>
> TDS to Session Level Catalog all 24 LTO 1/LTO 3 tapes
>
> TDS to Mount EDB's and Restore all 24 LTO 1/LTO 3 tapes
>
> TDS to Mount EDB's and Restore Data from 2 HDD's
>
> TDS to Provide Precision Discovery with all of the Exchange data (EDB's, Log Files, STM Files) off the tapes onto two separate sets of target HDD's as a separate deliverable before extracting custodian mailbox .pst's

TDS to Extract up to 50 Custodian Mailbox PST's and provide extracted data to Precision Discovery on appropriately sized target HDD's

Expedited Delivery Pricing

Tape Cataloging – (All 24 Tapes) - $75/Tape

Tape Restoration – (All 24 Tapes) - $425/Tape Inclusive of EDB Mounting/PST Extraction for up to 50 Custodians of Interest.  Pricing assumes a 1:1 ratio of EDB's per tape.  EDB's in excess of 24 will be charged $125/EDB.  For Custodian Mailbox PST's in excess of 50 to be extracted, there will be a charge of $40 per additional batches of 50 to be extracted.

Mounting of "Standalone" EDB's from 2 HDD's)/PST Extraction - $200/EDB Inclusive of PST Extraction for up to 50 Custodians of Interest.  For Custodian Mailbox PST's in excess of 50 to be extracted, there will be a charge of $40 per additional batches of 50 to be extracted.

Professional Services – (If required and with prior approval) - $250/Hour

Target Media HDD – At Cost

Shipping – At Cost.

(Ex. F, pp. 2-3.)  Like the original proposal, the updated proposal reflected TDS' standard pricing for expedited projects given that Precision Discovery had requested that all work be done on an expedited basis.  (Flitter Decl. ¶ 10; Fragale Decl. ¶ 8.)  Mr. Pixley responded: "This is acceptable."  (Ex. F, p. 2.)  In the same

email, Mr. Pixley, <u>for the first time</u>, notified TDS that all invoices needed to be sent to "counsel in this matter": Kotchen & Low LLP.  (<u>Id.</u>  <u>See</u> <u>also</u> Flitter Decl. ¶ 10; Fragale Decl. ¶ 10.)

After Mr. Pixley accepted TDS' updated scope of work and proposed pricing, TDS began processing the backup tapes and data as agreed.  During that time, TDS was regularly in contact with Mr. Pixley regarding the progress of the project.  For example, on March 26, TDS informed Mr. Pixley that it had completed the "session-cataloging" and was almost done with the EDB restoration and creation of the mailbox listings for the 24 backup tapes received on March 20. (Exhibit G – Apr. 3, 2013 email chain, p. 2.)  TDS also provided Mr. Pixley with some of its preliminary findings regarding the 24 backup tapes, including that the tapes comprised "13 tape sets," three of which were incomplete.  (<u>Id.</u>)  Hoping to avoid any surprises, TDS also notified Mr. Pixley that there were well over 1,000 EDBs being processed from the 24 backup tapes.  (<u>Id.</u>)  Also on March 26, Mr. Ruiz delivered 2 additional USB hard drives to TDS for processing consistent with the updated proposal that Mr. Pixley had approved on March 22.  (Fragale Decl. ¶ 11.)

In addition, on April 3, Mr. Pixley requested TDS create a second copy of all of the EDBs restored to be provided to Price Waterhouse Coopers.  (Ex. G, p. 2.)

7

As requested, TDS created two sets of four hard drives (one for Precision Discovery and one for Price Waterhouse Coopers), with each set containing 1,110 EDBs and associated log and STM files as restored from the 24 backup tapes. Also on April 3, after TDS sent Mr. Pixley a list of the 81,405 PSTs found in the 1,110 EDBs from the 24 backup tapes, Mr. Pixley instructed TDS to extract PSTs for 58 targeted custodians.  (Fragale Decl. ¶ 12; Exhibit H – Apr. 3, 2013 email chain, pp. 2-3.)  As instructed, TDS extracted the 2,190 PSTs for the 58 custodians identified.

Then, on April 4, Mr. Pixley requested TDS perform additional work on the project, including extracting 193 particular mailboxes.  (Fragale Decl. ¶ 13; Exhibit I – Apr. 4, 2013 email.)  Mr. Pixley noted that extracting the 193 mailboxes was in addition to the other deliverables he had previously requested.  (Ex. I.)

One week later, on April 12, TDS sent Mr. Pixley a list of the 10,581 mailboxes found in the 501 EDBs on the two additional hard drives TDS was provided on March 26.  (Exhibit J – Apr. 19, 2013 email chain.)  In response, Mr. Pixley instructed TDS to extract the mailboxes for the same 58 custodians previously identified.  (Id.)  Pursuant to Mr. Pixley's instructions, TDS extracted 1,343 PSTs for the 28 custodians that were found in the EDBs on the two additional hard drives.

A few weeks later, on April 25, Mr. Pixley requested TDS perform additional work on the project.  This time, Mr. Pixley instructed TDS to extract all mailboxes from 23 backup tapes and to apply the same processing (extract full PSTs and process dumpster-only PSTs) as previously discussed.  Mr. Pixley asked TDS to "expedite the processing" because he was under a "tight deadline." (Exhibit K – Apr. 25, 2013 email.)

On April 26, TDS sent its first invoice (Invoice No. PREC2994) for the project to Mr. Pixley and Daniel Kotchen and Daniel Low at Kotchen and Low LLP.  TDS' invoice reflected the proposed pricing that Mr. Pixley had accepted and the work he had requested.  Specifically, the invoice, which totaled $259,055.63, reflected the following work:

> Session catalog 24 backup tapes @ $75.00 per tape - $1,800.00
>
> Restore 24 backup tapes; output all EDBs to hard drives @ $425.00 per tape - $10,200
>
> Extract targeted PSTs from 1,081 EDBs restored from tapes @ $125.00 per EDB (in excess of 24) - $135,125.00
>
> Process 539 EDBs from hard drives; extract targeted PSTs @ $200 per EDB - $107,800.00
>
> Professional services (custom development to identify and extract PST dumpster items) – 10 hours @ $250 per hour - $2,500.00

(Exhibit L – TDS Invoice No. PREC 2994.)  The invoice also included the actual costs for media (hard drives) and shipping for 11 hard drives shipped to Precision Discovery and/or Price Waterhouse Coopers.  (Id.)  Hoping to avoid any surprises, TDS contacted Mr. Pixley approximately one week before sending the invoice out. (Flitter Decl. ¶ 11; Fragale Decl. ¶14.)   TDS wanted to notify Mr. Pixley in advance because the invoice was more than originally anticipated due to the amount of data Precision Discovery had requested TDS to process.  (Flitter Decl. ¶ 11; Fragale Decl. ¶ 14.)  Mr. Pixley thanked TDS for the notice, but told TDS that Delta had been sanctioned by the Court and TDS' invoice would have to be paid. (Flitter Decl. ¶ 11; Fragale Decl. ¶ 14.)  When TDS told Mr. Pixley that its invoice would be approximately $250,000.00, Mr. Pixley responded that's a "drop in the bucket" compared to what Precision Discovery and others were invoicing so there would not be an issue with TDS getting paid for the work Precision Discovery had requested.  (Flitter Decl. ¶ 11; Fragale Decl. ¶ 14.)

Following its first invoice, TDS continued working on the project at Mr. Pixley's and Precision Discovery's direction.  To that end, from April 30 to May 10, TDS extracted 9,493 PSTs and sent those PSTs to Mr. Pixley in seven rolling productions, pursuant to Mr. Pixley's request on April 25.  (See Ex. K.)  On May 10, Mr. Pixley instructed TDS to extract additional mailboxes (and apply the same

processing) for three particular custodians as a separate deliverable to be sent as soon as possible to both Precision Discovery and Price Waterhouse Coopers. (Exhibit M – May 10, 2013 email.)  Then, on May 16, TDS sent Mr. Pixley an amended proposal to reflect additional work Mr. Pixley had requested.  (Flitter Decl. ¶ 12.)  TDS informed Mr. Pixley that the additional services he requested required approximately 10 hours of "professional services" work, which TDS bills at a standard hourly rate of $250.00.  (Id.; Exhibit N – May 16, 2013 email chain, p. 2.)  Mr. Pixley responded and "[a]pproved" the amended pricing.  (Ex. N, p. 2.)

In the meantime, TDS extracted the 6 PSTs for the three new custodians requested on May 10 and continued working on Mr. Pixley's April 25 request, including extracting 2,750 PSTs.  On May 30, Precision Discovery provided TDS with a list of 14 priority custodians to begin the dumpster-item processing. (Fragale Decl. ¶ 15.)

On June 4, pursuant to instructions from Mr. Pixley, TDS stopped all processing work pending further instructions on when to resume.  (Fragale Decl. ¶ 16.)  As of June 4, TDS had completed the following deliverables for Precision Discovery: processed 1,620 EDBs, extracted 15,976 PSTs, and processed dumpster items for 403 PSTs.  (Id. at ¶¶ 16-17.)  TDS, however, never received further instructions to resume processing work.  (Id. at ¶ 18.)

Based on the additional work completed since its first invoice, TDS sent Mr.

Pixley, Mr. Kotchen, and Mr. Low its second invoice (Invoice No. PREC 3067) on

June 28.   Like the first invoice, the second invoice, which totaled $5,905.82,

reflected TDS' proposed pricing that Mr. Pixley had accepted and the work he had

requested, including the following:

> Professional services (output copy of all extracted PSTs
> for PWC) – 10 hours @ $250 per hour - $2,500
>
> Professional   services   (custom   processing   of   PST
> dumpster items for 118 EDBs) – 6 hours @ $250 per
> hour - $1,500.

(Exhibit O – Invoice No. PREC 3067.)  The invoice also included the actual costs

for media (hard drives) and shipping for 14 additional hard drives shipped to

Precision Discovery and/or Price Waterhouse Coopers.  (Id.)

**B.**     **TDS' Attempts To Get Paid**

As of the middle of July, TDS had not received any payment for its work on

the project, despite submitting its first invoice on April 26 and its second invoice

on June 28.  As such, on July 13, TDS emailed Mr. Low asking about the two past-

due invoices.    A few days later, Mr. Low responded, saying that Delta is

responsible for paying TDS' invoices, but Delta appears unwilling to pay anything

until after the Court's hearing scheduled for July 24.  (Exhibit P – Aug. 1, 2013

email chain, pp. 2-3.)

After additional attempts to find out the status of payment, TDS exchanged emails with Mr. Pixley on August 20.  At that time, TDS asked for an update on payment.  Mr. Pixley responded,

> Papers were submitted [to the Court] yesterday.  No answer from court yet.  <u>I made sure our papers to the court addressed your invoices.</u>  It was also brought up during the hearing last month so it is on the record.
>
> Kotchen & Low also submitted papers to the court, but I have not read it.
>
> Any payments will be made through Kotchen & Low as they were responsible for setting up any engagements. That is why I had you go through them and direct all invoices to them.

(Exhibit Q – Aug. 20, 2013 email chain, p. 2) (emphasis added).  TDS followed up with Mr. Pixley a few more times in August and September, as well as with Mr. Low in mid-September.  (Flitter Decl. ¶ 13.)  When TDS had received no update by the middle of October, it followed up with Mr. Pixley again on October 18.  (<u>Id.</u> at ¶ 14.)  TDS also followed up with Mr. Low on October 18, who responded by attaching a copy of this Court's September 25 Order regarding Precision Discovery's Fees (Doc. 394).  (Exhibit R – Oct. 18, 2013 email chain.)

Notably, Mr. Low's October 18 email was the first time TDS was notified that the Court had ruled on the issue of fees and expenses.  Moreover, TDS learned for the first time – when it reviewed the Court's September 25 Order after

receiving it from Mr. Low on October 18 – that its invoices had <u>not</u> been submitted to the Court for payment.  (<u>See</u> Doc. 394, p. 10 n.7; <u>Id.</u> at p. 23 n.16.)  Indeed, Mr. Pixley told TDS on more than one occasion, including in his August 20 email (<u>see</u> Ex. Q, p. 2), that he made sure that TDS' invoices were addressed in Precision Discovery's submissions to the Court.  (Flitter Decl. ¶ 13.)

Not sure what to make of the Court's Order, especially the note that Precision Discovery had not submitted TDS' invoices for payment and "did not indicate in its report or at the hearing that its request for payment extended to TDS," (Doc. 394, p. 23 n.16), TDS called Mr. Pixley on October 22 to get an explanation.  When TDS called, however, it was informed that Mr. Pixley had been terminated from Precision Discovery the day before.  (Flitter Decl. ¶ 14.)  At that point, TDS reached out to Precision Discovery's CEO, Jerry Barbanel, regarding the outstanding invoices.  TDS continued to reach out to Precision Discovery regarding payment because Precision Discovery was the entity that retained TDS, as well as the entity that directed TDS' work and approved all proposed pricing on the project.

Ultimately, TDS has been forced to come to this Court and request that it get paid for its outstanding invoices.  To that end, TDS attempted multiple times to obtain payment from Precision Discovery, Kotchen & Low, and/or Delta's

counsel.  Despite its multiple attempts to obtain payment without involving the Court, TDS has continued to receive the "run-around."  As such, TDS retained the undersigned counsel to file this Application for Payment of Fees and Expenses.

As explained below, TDS respectfully requests that this Court grant this Application and award TDS its reasonable fees and expenses incurred in performing work on this case at the direction of Precision Discovery and Bruce Pixley.

## ARGUMENT AND CITATION OF AUTHORITY

As explained, TDS became involved in this case when it was contacted by Mr. Pixley and Mr. Ruiz, both with Precision Discovery.  Throughout the course of its involvement, TDS always communicated and dealt with, and received all directions for its work from, Mr. Pixley and others at Precision Discovery.  Indeed, TDS has never received any instructions from this Court, the Plaintiffs, the Plaintiffs' counsel, Delta, or Delta's counsel regarding the work to be performed. The only Court orders TDS has seen from this case are the September 25 Order regarding Precision Discovery's Fees (Doc. 394), the March 20 Order regarding TDS complying with the Court's confidentiality order (Doc. 378), and the January 21 Initial Case Management Order (Doc. 51).  Notably, TDS has never seen the Court's November 19, 2012 Order, outlining the tasks for Mr. Pixley and Precision

Discovery.   (Doc. 375.)   As such, TDS never had a reason to question the directions given by Mr. Pixley.

Moreover, all of the work TDS performed was based on requests from Mr. Pixley (or others with Precision Discovery).  TDS also did not undertake any work without getting prior approval from Mr. Pixley regarding the scope of work and the proposed pricing.  (Fragale Decl. ¶ 6; see also Exs. C, D, E, F, G, H, I, J, K, M, and N.)

While TDS is aware of this Court's ruling reducing the amount of fees and expenses to Precision Discovery, TDS submits that it should be paid the full amount of its fees and expenses since its situation is materially different from Precision Discovery and Mr. Pixley.  To that end, the Court's September 25 Order concluded that Precision Discovery's fees were unreasonable, in part, because Precision Discovery "should have sought clarification from the Court as to the scope of work required by the November 19 order."  (Doc. 394, p. 37.  See also Id. at p. 31.)  However, unlike Precision Discovery, TDS was never made aware of the Court's November 19 order and was not under an obligation to submit a report to the Court.  Instead, TDS was retained by Precision Discovery and, at that time, Mr. Pixley provided a very general overview of the case and the work he was

performing.  As such, TDS had no reason to know that Mr. Pixley was directing it

to do work that may not have been necessary.[3]

## CONCLUSION

Accordingly, TDS respectfully requests that this Court award TDS its fees

and expenses reasonably incurred in connection with this case.  As reflected in the

two invoices, TDS's fees and expenses in this case total $264,961.45.  (See Exs. L

and O.)

Respectfully submitted,

**FREEMAN MATHIS & GARY, LLP**

*/s/ Jonathan J. Kandel*
Neil L. Wilcove
Georgia Bar No. 658401
nwilcove@fmglaw.com
Jonathan J. Kandel
Georgia Bar No. 940584
jkandel@fmglaw.com

Attorneys for Trusted Data Solutions, LLC

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
T: 770.818.0000
F: 770.937.9960
iManage_916490_1

---

[3] As this Court's March 20 Order explicitly states, TDS would be "acting at the direction of Plaintiffs' discovery expert (Precision Discovery LLC)."  (Doc. 378, p. 1.)

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D, I hereby certify that the foregoing **NON-PARTY TRUSTED DATA SOLUTIONS, LLC'S APPLICATION FOR PAYMENT OF FEES AND EXPENSES** has been prepared in Times New Roman, 14-point font, in compliance with Local Rules 5.1B and C.

*/s/ Jonathan J. Kandel*
Jonathan J. Kandel
Georgia Bar No. 940584
jkandel@fmglaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing **NON-PARTY TRUSTED DATA SOLUTIONS, LLC'S APPLICATION FOR PAYMENT OF FEES AND EXPENSES** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record who have appeared in this matter.

This 3rd day of January, 2014.

/s/ Jonathan J. Kandel
Jonathan J. Kandel
Georgia Bar No. 940584
jkandel@fmglaw.com