# EXHIBIT "B"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE: ) | CIVIL ACTION |
| DELTA/AIRTRAN BAGGAGE FEE ) | FILE NO. 1:09-MD-2089-TCB |
| ANTITRUST LITIGATION ) | |
| _____ ) | |

### DECLARATION OF MICHAEL FRAGALE

1.

My name is Michael Fragale. I have personal knowledge of the facts set forth in this Declaration and know them to be true and correct. I am over 18 years of age, am under no disabilities, and am competent to execute this Declaration.

2.

I am a Senior Project Manager for Trusted Data Solutions, LLC ("TDS"), a data restoration and email migration firm headquartered in New York City. I have personal knowledge of the matters described in this Declaration, knowledge which I acquired in the course of my duties for TDS.

3.

I have over 5 years of experience providing backup tape related project management services.

4.

On March 1, 2013, I worked with Steve Flitter, the Director of Sales and Business Development at TDS, to prepare a proposal for a project for Precision Discovery. Based on information from John Ruiz, Computer Forensics Director at Precision Discovery, and Mr. Flitter, I prepared a proposal that included a scope of work and proposed pricing using TDS' standard pricing for expedited projects. I then sent the proposal to Mr. Flitter so he could forward to Mr. Ruiz. (See Exhibit C attached to TDS' Application for Payment of Fees and Expenses.)

5.

Later that day, March 1, 2013, Mr. Ruiz hand delivered a one terabyte USB hard drive to TDS for processing consistent with the scope of work and proposed pricing sent. (See Exhibit D attached to TDS' Application for Payment of Fees and Expenses.) At that point, I began overseeing the project for TDS.

6.

Throughout TDS' involvement on the project for Precision Discovery, I communicated with Mr. Ruiz and/or Bruce Pixley, Precision Discovery's Vice President of Computer Forensics, regarding the progress of the project. (See, e.g., Exhibits C through L and M through N attached to TDS' Application for Payment of Fees and Expenses.) All of the work TDS performed was based on requests

from Mr. Ruiz, Mr. Pixley, or others at Precision Discovery. (See, e.g., Id.) Likewise, TDS did not perform any work without getting prior approval from Mr. Pixley or Mr. Ruiz regarding the scope of work and the proposed pricing. (See, e.g., Id.)

7.

On March 4, 2013, I emailed Mr. Pixley a proposal for processing dumpster-items, which are files that a user has deleted twice: once from their mailbox and again from their deleted items/trash folder. TDS' standard process for extracting PSTs includes dumpster-items being restored to their original folders. Mr. Pixley had previously mentioned that he needed dumpster-items to be specially processed so that he could determine what files had been dumpster-items. After discussing Mr. Pixley's request with TDS' technical team, I notified Mr. Pixley that TDS could produce the deliverable he requested, but it would require custom programming. Consistent with TDS' standard pricing, I informed Mr. Pixley that the custom programming work constituted "professional services," which TDS bills at a standard hourly rate of $250.00. I also notified Mr. Pixley that TDS' technical team estimated it would take approximately five to ten hours of professional services to complete the custom programming necessary for the dumpster-items. In response, Mr. Pixley said to proceed with the custom

programming work. (See Exhibit E attached to TDS' Application for Payment of Fees and Expenses.)

8.

On March 20, 2013, I had a telephone call with Mr. Pixley to discuss additional work he wanted done. Mr. Pixley informed me that he wanted TDS to restore all of the Exchange data (e.g., EDBs, Log Files, STM Files) off of 24 backup tapes and to extract custodian mailboxes (or PST files). Based on the conversation (as well as other communications with Mr. Pixley), Mr. Flitter sent Mr. Pixley an updated scope of work and proposed pricing for his approval on March 22, 2013. (Exhibit F attached to TDS' Application for Payment of Fees and Expenses.) Like the first proposed pricing, the updated pricing was based on TDS' standard pricing for expedited projects given that Precision Discovery requested all work be done on an expedited basis.

9.

On March 20, 2013, 24 backup tapes were hand delivered to TDS for processing consistent with the updated scope of work and proposed pricing sent to Mr. Pixley.

10.

On March 22, 2013, Mr. Pixley approved the updated scope of work and proposed pricing. (Exhibit F attached to TDS' Application for Payment of Fees and Expenses).

11.

On March 26, 2013, Mr. Ruiz hand delivered 2 USB hard drives to TDS for processing consistent with the updated scope of work and proposed pricing that Mr. Pixley had approved on March 22, 2013.

12.

On April 3, 2013, I sent Mr. Pixley an email, which included an attachment listing the 81,405 mailboxes (or PST files) found in the 1,110 EDBs restored from the 24 backup tapes. Mr. Pixley responded the same day with a list containing 58 custodians that he wanted TDS to extract mailboxes (or PST files) for. (See Exhibit H attached to TDS' Application for Payment of Fees and Expenses.)

13.

On April 4, 2013, Mr. Pixley emailed me, requesting TDS perform additional work on the project, including extracting particular mailboxes (or PST files). (See Exhibit I attached to TDS' Application for Payment of Fees and

Expenses.) The list attached to Mr. Pixley's email, identifying the mailboxes (or PST files) he wanted extracted, contained 193 separate mailboxes (or PST files).

14.

Approximately one week before TDS' first invoice was sent out (on April 26, 2013), Mr. Flitter and I called Mr. Pixley to notify him about the invoice ahead of time. We wanted to give Mr. Pixley advance notice because the invoice was more than originally anticipated due to the amount of data Precision Discovery had asked TDS to process. Mr. Pixley thanked us for the heads up, but said Delta had been sanctioned by the Court and TDS' fees would have to be paid. Mr. Pixley then asked how much we expected the invoice to be, to which we responded approximately $250,000.00. Mr. Pixley replied, that's a "drop in the bucket" compared to what Precision Discovery and others involved were invoicing. He also said that as long as TDS was not billing $1,000,000.00 or more, "there will be no issue" with TDS getting paid for the work it was asked to do by Precision Discovery.

15.

On May 30, 2013, I had a telephone conference with Mr. Pixley, Jeffrey Hudson, a Project Manager at Precision Discovery, and others at Precision Discovery to discuss the special processing of dumpster-items. After the telephone

conference, Mr. Hudson emailed me a list of the 14 priority custodians to start processing dumpster items.

16.

Between May 31, 2013 and June 4, 2013, Mr. Pixley notified me that, after completing the deliverable of the dumpster items for the 14 priority custodians, TDS should stop all processing work and await further instructions on when to resume work. On June 4, 2013, TDS completed processing the dumpster items for the 14 priority custodians, and sent the deliverable to Mr. Pixley.

17.

As of June 4, 2013, TDS had completed the following deliverables for Precision Discovery: processed 1,620 EDBs, extracted 15,976 PSTs, and processed dumpster items for 403 PSTs, all at Mr. Pixley's (and Precision Discovery) direction.

18.

On July 11, 2013, I emailed Mr. Pixley, asking for an update on when TDS should resume processing dumpster-items. In response, Mr. Pixley said the Court scheduled a hearing for July 24, 2013, and to wait until after the hearing for further instructions. I did not receive any further instructions from Mr. Pixley.

19.

Pursuant to 28 U.S.C. § 1746, by my signature below, I declare under penalty of perjury that the foregoing is true and correct.

_____
Michael Fragale

_12/30/2013_____
Date