# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

IN RE: DELTA/AIRTRAN BAGGAGE
FEE ANTITRUST LITIGATION

Civil Action No.
1:09-md-2089-TCB

ALL CASES

### DELTA AIR LINES, INC.'S BRIEF IN RESPONSE TO
### NON-PARTY TRUSTED DATA SOLUTIONS, LLC'S APPLICATION FOR
### PAYMENT OF FEES AND EXPENSES

Delta Air Lines, Inc. ("Delta") sought to have the Trusted Data Solutions,

LLC ("TDS") bills addressed as part of the July hearing last year, and now it has

become clear why Plaintiffs and their expert Precision Discovery ("Precision") did

not.  The new information revealed by TDS confirms that Plaintiffs and Precision

pursued a course of work unbound by any notion of reasonableness – assuring TDS

that "there will be no issue" with charges up to one million dollars and

characterizing a quarter of a million dollars as just a "drop in the bucket."  It is

only now known that Precision had TDS processing data weeks before Plaintiffs or

Precision informed Delta of TDS's involvement and before the Court was able to

1

issue an order governing TDS's handling of the data.  Precision also took the same casual approach to compliance with the Court's "cease and desist" Order, and TDS did not complete its work until after the Order to cease all work was issued.

Delta has long contended that the charges by TDS are unreasonable, and were the result of Plaintiffs' and Precision's abuse of the process established by the Court's November 19, 2012 Order.  Although the Court did not expressly rule on the reasonableness of TDS's charges in its September 25, 2013 Order, the Court suggested that, if the issue were presented, it would likely order Delta to pay a portion of TDS's charges, consistent with the Court's finding that Plaintiffs, Precision and Delta were "evenly" at fault for Precision's and Plaintiffs' excessive charges.  Accordingly, before TDS filed its motion, Delta told Plaintiffs that they should first resolve with their vendor TDS a reasonable charge for its services. Delta and Plaintiffs could then promptly resolve what portion of that amount Delta should pay.

Delta remains willing to pay an appropriate portion of the reasonable charges incurred by TDS.  However, in light of the remarkable revelations in the TDS submission concerning Bruce Pixley's cavalier disregard for the costs TDS was incurring and his less than forthright handling of this issue with TDS, and with Delta and the Court, Delta believes that there are grounds for the Court to revisit

the question of whether Delta and Plaintiffs and Precision are equally responsible for the excessive charges TDS incurred.

## <u>BACKGROUND</u>

### A.  The July 2013 Hearing and the Court's September 25, 2013 Order

In late April 2013, near the end of Precision's work, Plaintiffs' counsel began sending Delta copies of a TDS invoice billed to an account in the name of Kotchen & Low, LLP.  (TDS Invoice (Ex. L to TDS Motion); Emails from April 30, May 6, May 19 related, in part, to TDS invoice (Exhibit 1.2 to Sept. 25, 2013 Order (Dkt. 394))).  It was unclear to Delta at the time whether TDS was retained by Precision Discovery (who was required to direct their work) or Plaintiffs' counsel (whose name was on the bill).  Regardless, Delta believed that the TDS bills should be raised at the Court's hearing in the summer of 2013 (re-scheduled from June 21 to July 24).   Delta thus raised that issue with Precision and Plaintiffs more than a month before the hearing.  (Emails of June 17 (attached as Ex. 1) ("We believe any TDS invoices for work performed at your direction should be presented to the Court for its consideration at the June 21 hearing.")).

TDS's filing reveals that Bruce Pixley assured TDS that he had "made sure [Precision's] papers to the court addressed your invoices."  (TDS Application at 13).  According to its filing, TDS did not learn that this representation was false

until reading the Court's September 25 Order.  (*Id.* at 13-14 (citing Sept. 25, 2013

Order (Dkt. 394) at 10 n.7 & 23 n.16)).  Accordingly, although Delta addressed the

TDS charges at the hearing and in its proposed order (*see* Delta's August 19, 2013

Proposed Order, pp. 17-18, 20 (attached as Ex. 2)), the Court was not able to rule

on the TDS work because neither Precision nor Plaintiffs had presented the charges

to the Court for reimbursement.  Had Precision (or Plaintiffs) presented the TDS

charges to the Court as it represented to TDS that it had, the Court would have

been able to rule on the reasonableness of those charges along with the other fees

and expenses that were sought by Precision.

## B. Delta's Position Following the Court's September 25 Order

In light of the Court's September 25 Order, Delta has been and remains

willing to pay an appropriate portion of TDS's reasonable charges.  Because TDS

invoiced Plaintiffs' counsel Kotchen & Low and because only Precision Discovery

can evaluate whether the charges are consistent with what was requested or

authorized, Delta's position has been that Plaintiffs should reach a resolution with

TDS on the amount to be paid based on the instructions that were given TDS.

Then, Delta could resolve with Plaintiffs what portion of that amount would be

paid by Delta, and what portion would be paid by Plaintiffs and/or Precision.

Delta informed Plaintiffs of its position in a December 6, 2013 email (attached as

Ex. 3).[1]   Delta received no response, and did not hear anything further on this subject from TDS, Plaintiffs, or Precision until the filing of TDS' application on January 3.

## ARGUMENT

Delta was not equally at fault for the TDS charges.  The new information revealed in the TDS application clearly establishes that Plaintiffs' expert made *no* effort to control costs in its dealings with TDS – even after TDS brought the exorbitant costs of the out of ordinary project to Precision's attention.  The TDS application lays bare to a degree not previously evident Plaintiffs' and Precision's money-is-no-object approach to its charge from the Court.  It also reveals that Precision misled Delta and the Court about TDS's work and that it operated in disregard of the Court's orders.

### 1.   Precision Discovery and Plaintiffs Ran Up the Costs

The materials submitted by TDS confirm the concern Delta expressed at the July 24 hearing – that Precision and Plaintiffs pursued the process established by the Court's November 19 Order with no concern for containing costs that they believed would be borne by Delta.  As Delta stated at the outset of the hearing:

---

[1] Delta also orally conveyed to TDS its view that TDS should first resolve the amount of its account with Plaintiffs' counsel (to whom the bills were directed).

> There were alternative ways that Mr. Pixley or Mr. Avery could have done what they did without reinventing the wheel, and they chose, frankly, the most expensive route that they could. Also I guess, fortunately or unfortunately, depending upon your view, the most lucrative for them, depending on how this hearing turns out, way to go about this.

(Hearing Tr., p. 8 ln. 17-23). Precision, of course, assured the Court that the costs were reasonably incurred and necessary. Mr. Pixley told the Court, "we are not looking to run up costs." (Hearing Tr., p. 57 ln. 12). Mr. Avery said, "the reason these costs are where they are, it is because it took a tremendous amount of effort." (Hearing Tr., p. 93 ln. 22-23).

But TDS has now pulled back the curtain on the truth of Precision's attitude about cost containment. Precision instructed TDS to pursue a cost is no object approach to processing the backup tapes. It instructed TDS to process enormous amounts of unnecessary backup tape data,[2] to do so at "expedited" rates, to perform hours of "special processing" and "custom programming," and to perform non-standard "dumpster item" extraction. When TDS appropriately raised concerns with Precision about the very significant costs that would be incurred of

---

[2] TDS's Application contradicts Precision's repeated claims at the hearing that the back-up tape processing was "limited" and that Precision only explored non-custodian mailboxes for one tape. (*See, e.g.,* Hearing Tr., p. 181 ln. 11-16). TDS explains that, "Mr. Pixley instructed TDS to extract all mailboxes from 23 backup tapes", and that "the invoice was more than originally anticipated due to the amount of data Precision Discovery had requested TDS to process." (TDS Application, p. 9-10).

approximately $250,000, "Mr. Pixley replied, that's a 'drop in the bucket' . . . ." (TDS Ex. A, ¶ 11; TDS Ex. B, ¶ 14) (emphasis added).  Indeed, consistent with the money is no object attitude he displayed generally, Mr. Pixley essentially encouraged TDS to run up costs when he assured TDS that "as long as TDS was not billing $1,000,000.00 or more, 'there will be no issue'…" (TDS Ex. A, ¶ 11; TDS Ex. B, ¶ 14) (emphasis added).

This new information casts serious additional doubt on the reasonableness of the work Precision instructed TDS to perform.  It also calls into question more broadly the reliability of Mr. Pixley's sworn testimony at the July 24 hearing in which he attempted to justify his scorched-earth approach to this entire process, and excessive charges that were incurred as a result.  Delta submits that the blatant disregard for costs by Precision revealed by this new information – and worse, the apparent encouragement by Mr. Pixley of TDS to do the same – at a minimum warrants revisiting the question of whether Delta is equally at fault as it applies to the TDS charges.

### 2.  Delta and the Court Were Misled About TDS's Work

Not only did Precision mislead TDS about seeking recovery of its costs, but much more troubling, Precision misled Delta and the Court about the nature and timing of TDS's work and Precision's compliance with Court Orders.

Based on TDS's motion, it is now clear that Precision sent Delta's confidential data to TDS weeks before Delta was informed of TDS's possible involvement and before the Court permitted TDS to receive Delta's data pursuant to the Court's March 20, 2013 Order.  We therefore now know that while Plaintiffs and Precision were seeking Delta's and the Court's permission to send confidential data to TDS, substantial amounts of Delta's data were already there and being processed.  Neither Plaintiffs nor Precision ever advised Delta or the Court of this fact, even though they knew of Delta's significant concerns about its data being processed by a third party not subject to the protective order.  Their silence both before and after entry of the Court's Order – when they knew of facts material to that Order – is troubling at the very least.

When Delta first learned in mid-March 2013 that Precision might send Delta's data to a third-party vendor, Delta immediately raised concerns with Plaintiffs and Precision about the protection of its data and the potential utilization of a third-party not bound by the Court's orders.  (Mar. 16, 2013 Email to B. Pixley (attached as Ex. 4) (raising, *inter alia*, questions about who third-party vendor is and how to ensure compliance with Court's Order)).  After multiple emails and a conference call, the parties agreed to a proposed Order governing TDS's receipt of data.  (Emails dated from March 17-19, 2013 (attached as Ex. 5)).

Among other things, the Order subjected TDS to the confidentiality order in this case, obligated TDS to maintain the data in the strictest confidence, and required TDS to execute an acknowledgement that it would abide by the Court's orders. (March 20, 2013 Order (Dkt. #378), pp. 1-2).

Unknown to either Delta or the Court, Precision had *already* provided a one terabyte hard drive of Delta's data to TDS, which TDS had begun processing. (TDS Application, p. 1 ("TDS received its first directions for this case on March 1."), p. 4 ("Mr. Ruiz hand delivered a hard drive to TDS on March 1 for processing."); TDS Ex. D (reflecting March 1 delivery of 1 terabyte harddrive); TDS Ex. E, p. 4 (March 1 Email attaching list of 11,149 mailboxes on data at TDS)).  This was a flagrant violation of Precision's obligations under the Court's November 19 Order.[3]  It also reveals that Precision's and Plaintiffs' agreement to the careful process for transferring data was a sham.[4]

---

[3] The November 19 Order stated: "Only Plaintiffs' expert and its employees are authorized to handle Delta's equipment," and "Plaintiffs' expert and its employees will maintain all information in the strictest confidence."  Nov. 19, 2012 (Dkt. 375) at 8.

[4] For example, Delta was adamant that it receive the signed acknowledgement from TDS (required by the jointly-proposed Order) before delivering data to TDS. (March 20, 2013 Emails (attached as Ex. 6)).   Unbeknownst to Delta, TDS already had data, had performed processing on it, and provided results to Precision.

### 3.   Work Continued After the Report and After the Stop Work Order

Precision's response to the Court's June 3, 2013 Order instructing Precision to "cease and desist" (TDS Ex. B, ¶ 16) is a further example of its casual disregard for the Court's Orders.  Pursuant to the Court's March 6, 2013 Order (Dkt. 377), Mr. Pixley was to have completed and submitted his report on May 20, 2013. Instead, Mr. Pixley submitted assertedly incomplete reports from himself and Mr. Avery on that date.  Delta wrote the Court on May 28, 2013 raising concerns about the reports, the excessive fees sought by Precision, and Precision's plan continue work and issue additional report(s).  On June 3, 2013, the Court entered an Order that stated, in relevant part:

> It is hereby ORDERED that until further Order of this Court, Bruce Pixley, Thomas Avery and Precision Discovery shall immediately cease and desist providing any services in this case except to the extent expressly requested by Defendant Delta Air Lines, Inc.

(June 3, 2013 Order (Dkt. 384)).

Mr. Pixley repeatedly suggested during the July 24, 2013 hearing that he ceased any further work upon receipt of the "stop work" order.[5]  TDS's submission reveals a more relaxed attitude toward compliance:

- "On May 30, Precision Discovery provided TDS with a list of 14 priority custodians to begin the dumpster-item processing." (TDS Application, p. 11 (citing TDS Ex. B, ¶ 15)).

---

[5] *See, e.g.,* Hearing Tr., p. 104 ln. 3-6;  p. 113 ln. 18;  p. 151, ln. 12-14.

- "Between May 31, 2013 and June 4, 2013, Mr. Pixley notified me that, after completing the deliverable of the dumpster items for the 14 priority custodians, TDS should stop all processing work and await further instructions on when to resume work." (TDS Ex. B, ¶ 16).

- "On June 4, 2013, TDS completed processing the dumpster items for the 14 priority custodians, and sent the deliverable to Mr. Pixley." (TDS Ex. B, ¶ 16).

Thus, Precision had TDS start a new project after the May 20 report was issued and after Delta raised concerns with the Court. It then instructed TDS to continue the work to completion, even though completion and delivery did not occur until after the Court's Order to stop work "immediately."

## CONCLUSION

Delta has previously provided the Court with testimony, argument, and proposed order language regarding the unreasonableness of TDS's charges.[6] In light of the Court's September 25 Order, Delta will promptly comply with any direction to pay an appropriate portion of the reasonable charges incurred by TDS. However, Delta respectfully submits that based upon the new information submitted by TDS, the Court's finding in its September 25 Order that Delta was "evenly" at fault for the extensive charges incurred during Precision's work is not

---

[6] *See, e.g.,* Delta's August 19, 2013 Proposed Order, pp. 17-18; July 24, 2013 Hearing Tr., pp. 150 ln. 13 – 153 ln. 19; pp. 181 ln. 11 – 183 ln. 23; pp. 213 ln. 14 – 217 ln. 21; pp. 233 ln. 25 – 234 ln. 13.

also true of the charges incurred by TDS and the amount Delta is required to pay

should be adjusted accordingly.

Dated: January 21, 2014                    Respectfully submitted,[7]

                                           s/ Samuel R. Rutherford
                                           Randall L. Allen
                                           Georgia Bar No. 011436
                                           randall.allen@alston.com
                                           Samuel R. Rutherford
                                           Georgia Bar No. 159079
                                           sam.rutherford@alston.com
                                           ALSTON & BIRD LLP
                                           1201 West Peachtree Street
                                           Atlanta, GA 30309-3424
                                           Tel: 404-881-7196
                                           Fax: 404-253-8473

                                           James P. Denvir
                                           jdenvir@bsfllp.com
                                           Scott E. Gant
                                           sgant@bsfllp.com
                                           Michael S. Mitchell
                                           mmitchell@bsfllp.com
                                           BOIES, SCHILLER & FLEXNER LLP
                                           5301 Wisconsin Avenue, NW
                                           Suite 800
                                           Washington, DC 20015
                                           Tel: 202-237-2727
                                           Fax: 202-237-6131
                                           *Counsel for Defendant Delta Air Lines, Inc.*

---

[7] Pursuant to L.R. 7.1D, counsel for Delta certifies that this brief was prepared with a font and point selection approved in L.R. 5.1B.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel certifies that on this day the foregoing DELTA AIR LINES, INC.'S BREIF IN RESPONSE TO NON-PARTY TRUSTED DATA SOLUTIONS, LLC'S APPLICATION FOR PAYMENT OF FEES AND EXPENSES was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record who have appeared in this matter.

This 21st day of January, 2014.

s/ Samuel R. Rutherford
Samuel R. Rutherford
Georgia Bar No. 159079
sam.rutherford@alston.com
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Tel: 404-881-7196
Fax: 404-253-8473

*Counsel for Defendant Delta Air Lines, Inc.*