UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| In re: Delta/AirTran Baggage Fee Antitrust Litigation | Civil Action No. 1:09-md-2089-TCB |
|---|---|

**PRECISION DISCOVERY LLC'S RESPONSE TO NON-PARTY TRUSTED DATA SOLUTIONS, LLC'S APPLICATION FOR PAYMENT OF FEES AND EXPENSES AND DELTA AIR LINES, INC.'S BRIEF IN RESPONSE TO NON-PARTY TRUSTED DATA SOLUTIONS, LLC'S APPLICATION FOR PAYMENT OF FEES AND EXPENSES**

While Delta and Trusted Data Solutions, LLC ("TDS") have attempted to turn this dispute into a free for all in which the fundamental principles of contract law do not apply, this is nothing more than a contract dispute between two parties: TDS and Plaintiffs' counsel. Based upon our conversations with counsel subsequent to the filing of these briefs, we now understand that TDS' goal is to seek recovery from any source possible.

Delta and TDS have teamed up against Precision in an effort to squeeze it to pay fees it never agreed to pay, claiming that Precision gave TDS carte blanche to incur fees Delta has unilaterally deemed unreasonable. These allegations, and specifically the statements attributed to Precision's former employee, Bruce Pixley, are completely false and have compelled Precision to submit this memorandum in

response to those claims, and the claims that the work Precision directed TDS to perform was somehow excessive. As set forth in the accompanying declaration of Bruce Pixley, he never told TDS that their fees would be a "drop in the bucket" or that "there will be no issue" as long as their fees were under $1 million. These specious claims are nothing more than a last-ditch effort by TDS to put Precision on the hook for fees Delta or Plaintiffs' counsel is responsible for, but have refused to pay.

## BACKGROUND

The Retention of TDS by Plaintiffs' Counsel

On or about January 13, 2013, Precision requested that Delta provide it with copies of its backup tape data in its efforts to comply with the Court's November 19, 2012 Order (the "November 19 Order"). Delta refused to provide much of this data, agreeing only to provide the majority of the tapes, months later, in March. By the time Precision received these tapes from Delta – some of which contained data that Precision believed had not previously been processed – the Court had already extended the deadline by which Precision had to submit its Expert Report, two times.

During its investigation Precision also learned that Delta's own tape vendor eMag, had failed to properly log the work it performed leaving Precision unable to rely on eMag's representations that it extracted deleted items from the pst. files

contained on the tapes. Precision also learned during its interviews with employees of PWC, that eMag could not be trusted. This discovery came on the heels of Delta's own admissions, in October 2012, that it had failed to process approximately 40 of its backup tapes during its initial collection and production efforts.

In that connection, Precision contacted TDS to see whether it would be willing to assist with the extraction of data from backup tapes of Delta in order to allow Precision to analyze the data on some of those tapes. (Pixley Declaration ¶ 2). Precision explained to Steve Flitter at TDS that Precision was engaged by the Plaintiffs' law firm Kotchen & Low and that TDS would need to be so engaged by that firm as well. (Pixley Declaration, ¶ 2). Steve Flitter provided a scope of work and proposed pricing for the project that was acceptable to Precision, but Precision informed Mr. Flitter that all invoices were to be submitted to Kotchen & Low for payment and that Kotchen & Low would be responsible for getting TDS' invoices paid. (Pixley Declaration ¶¶ 3-4).

As directed, TDS sent Plaintiffs' counsel its first invoice in April 2013. Plaintiffs' counsel forwarded that invoice to Delta. Delta refused to pay the invoice and claimed that the Court should determine whether and how much of the TDS invoice Delta was required to pay. While Delta requested that a hearing be held to determine the reasonableness of *Precision's* fees, it did not include in that

application a request that the Court also hear evidence with respect to the TDS invoice. Precision did not understand the purpose of the July 24, 2013 hearing to include the reasonableness of TDS' fees. However, as an accommodation to TDS, it did include in its proposed order provision for the award of those fees. (A copy of Precision's proposed order is annexed hereto as **Exhibit A**).

## ARGUMENT

### I. THE COURT DOES NOT HAVE JURISDICTION OVER THIS CONTRACTUAL DISPUTE

While Precision does not dispute that TDS did the work and should get paid by the appropriate party, Precision is certainly not that party. Moreover, we understand that the Court has reservations about its jurisdiction to entertain this application. Based upon our review of the relevant case law, those reservations are well taken. While TDS would have this Court believe otherwise, this is a contractual dispute between it and Plaintiffs' counsel. To the extent TDS believes that it is entitled to damages based upon counsel's breach of that agreement, the appropriate course of action is to commence an action for breach of contract in a Court with jurisdiction over those claims. Instead, TDS seeks to bypass the filing of a proper complaint hoping that this Court will award it fees, with the added benefit of a potential recovery from Precision, a non-party to the contract.

While TDS has not even alleged that supplemental jurisdiction over its contractual dispute with Plaintiffs' *counsel* exists, the law is clear that it does not.

The decision of the District Court for the Northern District of Illinois in *Riva Technologies v. Zack Electronics, Inc.*, 2002 WL 1559584 (N.D. Ill 2002) is instructive. There, the plaintiff sued the defendant in connection with its claims that the defendant failed to perform part of an asset purchase agreement executed by the parties. During the course of the litigation, the plaintiff's former law firm moved in that action for an award of outstanding attorney's fees it claimed to be owed. The court denied the law firm's motion for fees holding that no supplemental jurisdiction over the fee dispute existed under 28 U.S.C.§ 1367. In finding that no supplement jurisdiction existed, the District Court reasoned that

> to accept [the law firm's] argument would open the door to federal jurisdiction over a myriad of collateral state law disputes that parties may have with various professionals or vendors retained to assist them in federal court litigation. It is not uncommon for a party to retain a variety of personnel to support the litigation effort, such as consulting and testifying experts; outside photocopying services; translators in a case involving foreign language documents; and graphics companies to prepare trial exhibits. A party, or its lawyer, may enter into contractual arrangements with these types of experts and vendors, which will be governed by state law. If all that is necessary for a fee dispute to fall within the purview of a federal court is for it to relate to services arising out of the litigation, then we see no principled reason why contractual disputes with these other experts or vendors likewise would not fall within the sweep of supplemental jurisdiction as [the law firm] would have the Court define it. We do not believe that the doctrine of

> supplemental jurisdiction was intended to create such a gaping hole in the principle of limited federal jurisdiction.

*Id*. at *5.

TDS' application reflects exactly the concern articulated by the court in *Riva Technologies*. Simply being an aggrieved vendor hired in connection with a litigation does not give a non-party standing to bring a fee dispute before the court in the pending federal court action nor does it provide a federal court with the supplemental jurisdiction required to hear such a dispute. For this reason, TDS' application should be denied.

## II. PRECISION ACTED IN GOOD FAITH AND IN ACCORDANCE WITH THE COURT'S NOVEMBER 19, 2012 ORDER WHEN IT DIRECTED TDS TO PERFORM ITS WORK ON THIS PROJECT

Even if this Court had supplemental jurisdiction over this contractual dispute, there is no basis to impose a contractual obligation upon Precision because one does not exist. Precision never agreed to act as a guarantor for the payment of services rendered by TDS. Indeed, Mr. Pixley directed TDS to contract with and send its invoices to Plaintiffs' counsel. And while Plaintiffs' counsel had the reasonable expectation that those fees would have been paid by Delta, due to the November 19 Order and Delta's serial discovery abuses, none of this translates into an obligation of Precision.

In any case, Precision acted in good faith and in accordance with the November 19 Order when it directed TDS to perform the work that is performed on this project. While Delta has argued that there were other, less expensive means by which Precision could have analyzed the backup tape data, all of Precision's directives to TDS were given in good faith and according to the Court's November 19 Order. That Delta may argue in hindsight that some other method *could* have been more efficient or cheaper, this has nothing to do with the integrity of Precision's methods or its directives to TDS, all of which Precision stands behind.[1]

The first task Precision asked TDS to perform was to process 40 backup tapes which were recently discovered by Delta but which Precision believed had not been previously processed in this matter. While Delta states repeatedly that this was a one terabyte drive – suggesting a haphazard and large data dump by Precision – the amount of data actually contained on that drive was significantly less than one terabyte. (Pixley Declaration, ¶ 9). Precision directed TDS to process the 40 tapes on the drive in accordance with the directive in the November 19 Order that it locate "any new sources of documents" and determine whether any "relevant documents [had] not been collected." (Pixley Declaration, ¶ 9). The

[1] Delta's inclusion in its response brief of a self-serving quotation from its *own opening statement* at the July 24, 2013 hearing as evidence that there was some alternative method for Precision to analyze Delta's data is hearsay, evidence of nothing and should not be considered by the Court.

"processing" performed by TDS first involved the creation of a list of custodians, without which Precision could not identify to whom the pst. files on the tapes belonged. Once a list of custodians was prepared by TDS, Precision compared the list with the lists of relevant custodians in this matter. (Pixley Declaration, ¶ 9). Precision proceeded this way in order to be as cost effective as possible. Because the tape contained emails of only one relevant custodian, Precision instructed TDS to extract only that one file. (Pixley Declaration, ¶ 9).

Delta's inflammatory suggestion that Precision's intent to keep data confidential was a "sham" is at best, a gross overstatement. Precision was committed to keeping the information it received confidential. (Pixley Declaration ¶ 10). The hard drive on which these tapes were stored was sent to TDS on March 1 – prior to the entry of the March 20, 2012 Order – for the sole purpose of obtaining from TDS a list of the custodians whose data was on the tapes. (Pixley Declaration, ¶ 10). Precision needed this information because unlike some of the other tapes it received, Precision had no information as to which custodian information these tapes contained. For that reason, Mr. Pixley instructed a Precision employee to hand deliver the drive containing the tapes to TDS and wait while the task was completed. (Pixley Declaration, ¶ 10).

Precision next asked TDS to review 24 backup tapes which were delivered to it by PWC. Precision asked TDS to review these 24 backup tapes because based

upon the server from which they were copied and the date range of the data copied, Precision determined, in accordance with the Court's directives, that the tapes could contain relevant information not previously produced.

(Pixley Declaration ¶ 11). While these tapes had been processed by Delta's tape vendor, eMag, Precision questioned eMag's reliability both based on its conversations with PWC employees and eMag's inability to provide any logs reflecting that it had recovered and restored deleted items from each of the pst. files. (Pixley Declaration ¶ 12). For this reason, Precision asked TDS to perform two tasks with respect to this data. First, Precision provided them with information that eMag prepared about the tapes and asked TDS to confirm the reliability of that data. (Pixley Declaration ¶ 12). On March 21 Mr. Pixley wrote to TDS about these 24 backup tapes and said

> As you process the tapes, I will need you to validate eMag's information. If it is not accurate please let me know. I have relied on not reviewing other tapes in this matter based on the scan information eMag provided.

(Attached as **Exhibit B** hereto). Then Precision asked TDS to review the data to determine whether any recoverable deleted items existed and to provide those items to Precision for analysis in a separate file. (Pixley Declaration, ¶ 12). TDS reported that 81,405 separate pst. files existed on those tapes. However, instead of extracting all of the files, Precision directed that TDS extract the files of 58

custodians who were listed as relevant custodians in this case. (Pixley Declaration, ¶ 13).

Precision asked TDS to perform the same task with respect to two other hard drives containing data extracted by eMag. Instead of reprocessing the tapes, which would have been costly, Precision simply asked TDS to confirm that what eMag claimed was on the drives actually was on the drives and then asked TDS to extract only the 28 mailboxes on the drives belonging to relevant custodians. (Pixley Declaration, ¶ 14).

The November 19 Order directed that Precision identify potential new sources of documents. Given the amount of data that existed and keeping costs in mind, Precision employed an "audit" approach to determine whether it made sense to do a fuller review of all the backup tapes. Precision directed TDS to extract 193 files from one backup tape, which represented one day of backup data, from one specific server. This sampling of data allowed Precision to determine whether potential new sources of data existed, including new custodians. (Pixley Declaration, ¶ 15).

Precision also undertook to determine whether any new sources of documents existed on the backup tapes of Delta's legal hold server. For that reason, on April 25, 2013, Precision directed TDS to extract the other mailboxes

from the backups of the legal hold server containing mailboxes for the other relevant custodians.

## III. PRECISION DID NOT TRY TO "RUN UP COSTS" BY DIRECTING TDS TO PERFORM ITS WORK ON AN EXPEDITED BASIS

Delta's claim that Precision asked TDS to perform its work on an expedited basis in order to drive up costs is completely false and nonsensical. Delta has not articulated any motivation for Precision to increase fees paid to another vendor, and none exists. Precision asked TDS to perform the work on an expedited basis was because Delta failed to timely turn over information to Precision for analysis. Precision initially had a 30 day deadline to complete the Expert Report. Precision's ability to comply with this directive was made impossible by Delta's continued refusal to provide it with the requested data, specifically its backup tapes. Precision requested these backup tapes from Delta on or about January 13, 2013. By the time Precision got the majority of the backup tapes from Delta, in March, Precision's deadline to submit its expert report had already twice been extended by the Court. In order to meet what became the final May 2013 deadline, Precision was compelled to direct TDS to perform the work as quickly as possible. (Pixley Declaration, ¶ 18).

The statements attributed to Mr. Pixley by TDS are also false, designed to vilify Precision now that TDS has been unable to collect on its invoices. As set

forth in Mr. Pixley's declaration, he never told TDS that their fees would be a "drop in the bucket" or that "there will be no problem" as long as TDS' fees are under $1 million. (Pixley Declaration, ¶ 6). Mr. Flitter and Mr. Fragale asked him on that call whether plaintiffs' counsel would have "sticker shock" over the invoice TDS was preparing because the fees totaled about $250,000. (Pixley Declaration ¶ 6). He responded that there would not and compared their work to the work already performed by Precision's e-discovery component of the project, which would cost a few million dollars. In addition, "drop in the bucket" is not a phrase he uses or would have used. (Pixley Declaration, ¶ 6).

## IV. PRECISION DIRECTED TDS TO CEASE WORKING WHEN THE COURT ISSUED THE STOP WORK ORDER

While Delta claims that TDS continued performing work after the court issued its June 3, 2013 order directing Precision to stop working (the "June 13 Order"), Precision notified TDS that work was to cease as of that date. If TDS continued to perform work after the June 13 Order was issued, it was not at the direction of Precision.

Mr. Pixley received notice from the Court on June 3, 2013 that Precision should cease all work pending the hearing that was scheduled. Upon receipt of that notice, Mr. Pixley told Michael Fragale at TDS to send Precision work that was completed, but to cease work on any ongoing assignments. (Pixley

Declaration ¶ 17). For that reason, on June 4, 2013, TDS sent Precision its work product with respect to the dumpster items it had located on the backup tapes. On July 11, 2013, after Mr. Pixley gave that direction, Michael Fragale wrote to Mr. Pixley that despite his directive, TDS continued to perform work. Mr. Fragale wrote:

> ***Although you had asked us to hold off, we did continue processing*** in order to catch-up, and to have a large batch of data ready to ship once you asked for it. If you would like us to send this data out, please advise.

(A copy of the July 11, 2013 email annexed here to as **Exhibit C**).

Mr. Pixley responded by email to Mr. Fragale that same day and said "***The court directed us to stop so let's hold off until the hearing.***" (*See* Exhibit C). That TDS may have continued performing work despite Precision's directive that it should not, is certainly is not the fault of Precision.

## CONCLUSION

Precision stands behind all of the work that it performed in this matter, including the work that it directed TDS to perform. Attempts by Delta and TDS to hold Precision responsible for a contract to which was not even a party, should not be entertained. This is a dispute between contractual parties and to the extent this Court hears TDS' application, it should be decided in accordance with the contractual principles which govern the agreement between TDS and Plaintiffs' counsel.

Dated: January 29, 2014

Respectfully submitted,[2]

*/s/ Steven J. Cohen*

Steven J. Cohen
cohen@wmllp.com
WACHTEL MISSRY LLP
1 Dag Hammarskjold Plaza
885 Second Avenue -47th Floor
New York, NY 10017
(212) 909-9500
(212) 909-9463

[2] Pursuant to L.R. 7.1D, counsel for Precision certifies that this brief was prepared with a font and point selection approved in L.R. 5.1B.