UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE: DELTA/AIRTRAN BAGGAGE FEE ANTITRUST LITIGATION | Civil Action No. 1:09-md-2089-TCB<br><br>ALL CASES |

## PLAINTIFFS' RESPONSE TO TRUSTED DATA SOLUTIONS, LLC'S APPLICATION FOR PAYMENT OF FEES AND EXPENSES AND TO DELTA'S RESPONSE TO THAT APPLICATION

Plaintiffs oppose Trusted Data Solutions, LLC's ("TDS's") application for payment of fees to the extent that TDS (or Delta) seeks to require Plaintiffs to pay any portion of the fees. It is undisputed that Plaintiffs did not retain or direct TDS's work, and TDS has failed to identify any cause of action or jurisdictional basis under which it would be appropriate for this Court to hold Plaintiffs liable for the requested fees.

Like TDS, Delta fails to provide any basis for Plaintiffs to be held responsible for TDS's fees. Delta attempts to use TDS's application as an opportunity to malign Plaintiffs' counsel and Bruce Pixley through false and misleading assertions prior to a decision on the pending sanctions motion. But it is Delta whose discovery transgressions resulted in the appointment of Precision Discovery and its retention of TDS. Moreover, as set forth below, Delta – and not

1

Plaintiffs – knew the volume of data that was delivered to TDS and, as the evidence shows, Plaintiffs' counsel did not order or condone any alleged bill inflation.

## I.   BACKGROUND

In early 2012, the Court found that Delta had engaged in a variety of discovery misconduct, and had made "myriad emphatic and unqualified assurances that it had produced absolutely every document in its possession, custody or control that Plaintiffs had requested," but that those assurances had proven "woefully inaccurate."  Order at 7, 42 n.13 (Feb. 3, 2012) (Dkt. #263).  Later in 2012, Plaintiffs and Delta informed the Court of additional discovery misconduct by Delta.  Order at 2-3 (Nov. 19, 2012) (Dkt. #375).  Plaintiffs moved to compel additional discovery, while Delta requested that an expert be appointed to help resolve outstanding questions about Delta's discovery deficiencies.  In response, the Court ordered Plaintiffs to retain an expert to investigate Delta's discovery issues, and ordered Delta to pay "all fees and costs associated with Plaintiffs' expert."  *Id.* at 9.

Plaintiffs retained Bruce Pixley, who headed Precision's computer forensics practice, to conduct computer forensics work.  Another individual, Tom Avery, headed Precision's e-discovery practice.  In January 2013, Precision asked Plaintiffs to approve a statement of work under which Precision's e-discovery

2

practice would become involved in the investigation, and would incur $468,000 in processing charges, plus various other fees and expenses.[1]  Plaintiffs expressed their concern that $468,000 was expensive for native file processing and inquired whether there was a more economical means to complete the task.  After consultation, Plaintiffs and Precision agreed that Precision would take a more targeted approach, focusing on a limited number of custodians to begin.  Under this revised scope of work, Precision projected that the native file processing would cost $27,300.  Plaintiffs approved this scope of work.[2]

In January 2013, a dispute arose between Delta and Plaintiffs about what role Plaintiffs' counsel was to play in the expert process.  Delta was successful in shielding from Plaintiffs what data Delta was providing to Precision Discovery, including the amount of data being provided.  At Delta's request and over Plaintiffs' objection, on February 5 the Court ordered that Delta's counsel could communicate directly with Precision, including to produce data sources, without copying Plaintiffs on those communications.  Order at 2 (Dkt. #376).  The Court explained that Plaintiffs would not be harmed by these *ex parte* communications because Mr. Pixley was serving as Plaintiffs' expert: "Plaintiffs' concerns about

---

[1] Statement of Work at 5 (Jan. 4, 2013), Ex. A.

[2] E-mail from D. Low to B. Pixley (Jan. 24, 2013), Ex. B (approving quote for e-discovery "that is being conducted as part of [Precision's] efforts to comply with the Court's Order.").

Delta's behavior are addressed by the fact that Pixley is their expert and will be reviewing every document Delta produces." *Id.* at 2.

As a result of the Court's Orders, Plaintiffs' counsel: (a) did not have access to the actual data being provided to Precision; (b) did not have visibility about what data sources were being produced to Precision; (c) did not know when data sources were produced to Precision; and (d) did not know the amount of data being produced to Precision. Plaintiffs' counsel had little option but to rely on Precision to perform the tasks assigned to it by the Court in a reasonable fashion.

On April 2, 2013, Precision sent Plaintiffs an invoice for data processed amounting to $765,238. Plaintiffs' counsel promptly had a series of calls with Precision raising questions about the charges and were told by Tom Avery, who headed Precision's e-discovery practice, that the work was necessary to complete the tasks ordered by the Court. Specifically, Mr. Avery explained that, in light of misconduct uncovered in the course of Precision's investigation, he had decided as a matter of professional opinion that the targeted approach Plaintiffs and Precision had discussed was insufficient to complete the appointed tasks. Mr. Avery and Jerry Barbanel, Precision's CEO and President, assured Plaintiffs that Delta (and any other experienced e-discovery company) would understand the reasonableness of Precision's fees and work. They expressed the view that Plaintiffs' counsel were raising an issue where none existed. Mr. Avery and Mr. Barbanel also

expressed that Precision was approved and retained by the Court, and that Precision would do the processing and other work that they believed was necessary to complete the tasks assigned by the Court. Plaintiffs also inquired about whether Precision would discount its per GB fee for processing in light of the large volume of data processed. Precision stated that they had already discounted their rate by approximately 30% and would not discount it any further.

At the time, Plaintiffs understood that Precision had already completed the majority of the processing that would be performed during the engagement.[3] In light of the assurances that Delta would not view these fees as excessive based on industry standards and the amount of work Precision had performed, Plaintiffs believed the best course was to send the invoices to Delta. Plaintiffs' counsel sent the invoices to Delta's counsel on April 12, 2013.[4] Plaintiffs followed up on April 19, inquiring when payment could be expected.[5] Delta remained silent until May 6, 2013, when its counsel sent an email expressing its view that it was not required to make any interim payments and that it would be more efficient to address the fee

---

[3] The amount of data processed had already exceeded the amount included in the rejected original scope of work (Ex. A), which Plaintiffs had understood to be all of the relevant data other than relevant backup tape data, which Plaintiffs understood to be limited.

[4] Email from D. Low to R. Allen (Apr. 12, 2013), Ex. C.

[5] Email from D. Low to R. Allen (Apr. 19, 2013), Ex. C.

issue after Precision submitted its report.[6]  While Delta asked for additional detail regarding some of the charges, Delta did not express an opinion that Precision's fees were unreasonable or that it would refuse to pay any portion of the fees.[7]

Delta's suggestion that Plaintiffs were trying to run up Precision's and TDS's fees is baseless, and makes no sense because Plaintiffs had every incentive to try to control Precision's work (including any TDS work directed by Precision).[8]

## II.   ARGUMENT

### A. The Court Lacks Jurisdiction To Enter An Award Against Plaintiffs' Counsel.

The Court does not have jurisdiction to order Plaintiffs to pay TDS's fees. TDS has not filed suit against Plaintiffs, and such a suit presumably would not be appropriate in this venue.[9]  The only apparent basis for a fee award to TDS in this

---

[6] Email from R. Allen to D. Low (May 6, 2013), Ex. D.  Plaintiffs were surprised when they received an invoice from Precision later on May 6 that included a charge for over $1.8 million in native file processing.  Plaintiffs did not have any inkling that Precision had processed more than twice as much data in April as it had in March.

[7] *Id.*

[8] After the Court's Order reducing Precision's (and Plaintiffs') fees, Precision informed Plaintiffs that it may sue Plaintiffs' counsel for approximately $2.45 million in unpaid fees.

[9] TDS has not moved to intervene in this action, and would not be entitled to do so. *See* Fed. R. Civ. P. 24(b) (allowing permissive intervention only where allowed by statute or where the intervening party's claim shares a "common question of law or fact" with the primary action); Fed. R. Civ. P. 24(c) (requiring a party to file a

case would be as a discovery sanction, which has been ordered only against Delta.[10]

## B. There Is No Factual Basis Upon Which To Order Any Payments From Plaintiffs' Counsel.

TDS admitted that Plaintiffs' counsel did not retain TDS or direct its activities:

> Throughout the course of its involvement, TDS always communicated and dealt with, and received all direction for its work from, Mr. Pixley and others at Precision Discovery. Indeed, TDS has never received any instructions from this Court, the Plaintiffs, the Plaintiffs' counsel, Delta, or Delta's counsel regarding the work to be performed.

TDS Application at 15 (Dkt. #421). In light of this admission, there is no basis upon which to conclude that Plaintiffs' counsel owe any money to TDS. TDS has not offered a legal or factual theory under which Plaintiffs' counsel could have any obligation to pay TDS.[11]

---

motion to intervene attaching a pleading that sets out the claim of the intervening party).

[10] The Court presumably has jurisdiction to order Delta to pay TDS's fees (or to order Delta to reimburse Precision for fees paid by Precision to TDS) as a discovery sanction against Delta. Order at 9 (Dkt. #375) ("Delta will be responsible for paying for all fees and costs associated with Plaintiffs' expert").

[11] Although TDS was not Plaintiffs' vendor, Delta refused to pay any of TDS's fees, and instead informed Plaintiffs that it would only negotiate payment of TDS's fees if Plaintiffs initially paid TDS's fees. Delta Br. Ex. 3 (Dkt. #423-3) (demanding that Plaintiffs "determine the appropriate amount, if any, that should

## C. TDS's Fees Were Incurred Because of Delta's Misconduct.

TDS's fees and expenses were incurred as a direct and proximate result not only of Delta's discovery misconduct – which led to Precision's investigation, but also of Delta's failure to cooperate fully with Mr. Pixley from the outset. On January 7, 2013, Mr. Pixley requested the data that eMag had extracted from backup tapes so that he could verify if eMag had extracted the dumpster items.[12] But Delta did not preserve most of the data eMag had extracted, so Mr. Pixley requested access to the backup tapes themselves to determine whether there were dumpster items that had not been searched.[13] By the time Delta made the tapes available in mid-March 2013, there was very little time for Precision to complete its appointed task, and Mr. Pixley concluded that he would not have the opportunity to conduct spot checks in multiple rounds.[14] And because time was of the essence, this extraction had to be completed on an expedited basis. Thus, the magnitude of TDS's invoice is the direct result of Delta's misconduct, its failure to

---

be paid to TDS and pay it" before Delta would consider paying any of TDS's invoices).

[12] E-mail from B. Pixley (Jan. 7, 2013), Ex. E (requesting "8. All Exchange .EDB files, including associated files such as .STM and log files that were extracted by eMag from the Exchange backup tapes").

[13] July 24, 2013 Hr'g Tr. 150:13-152:10, Ex. F.

[14] *Id.*

preserve the eMag extraction data, and its delay in producing the tapes to Precision for review.

**D.     Delta Inappropriately Attempts To Use TDS's Application As An Avenue To Make Unfounded Attacks.**

Delta appears to have decided that its response to TDS's application is an appropriate avenue to make unfounded attacks on Plaintiffs' counsel and to smear the work conducted by Mr. Pixley.  These attacks are inappropriate and are transparent attempts to distract from Delta's egregious discovery misconduct.

**1.     Delta's Attacks On Plaintiffs' Counsel Are Baseless.**

Delta makes two unfounded attacks on Plaintiffs.  First, Delta argues that Plaintiffs sought to run up the bills.  *See, e.g.*, Delta Br. at 1 ("The new information revealed by TDS confirms that Plaintiffs and Precision pursued a course of work unbound by any notion of reasonableness. . . .").  But Delta does not cite to one shred of evidence that Plaintiffs' counsel sought to run up the bills, and TDS's application makes clear that Plaintiffs' counsel had *no* involvement in TDS's work. *See* TDS Application at 15 (stating that TDS was not retained by Plaintiffs and that "TDS has never received any instructions from . . . the Plaintiffs [or] Plaintiffs' counsel").

Moreover, rather than try to run up bills as Delta represents, Plaintiffs attempted to control costs.  As described above, Plaintiffs asked Precision to craft a more refined approach when the initial Scope of Work suggested that there would

9

be $468,000 in processing fees, sought clarification when they received the invoice for work performed in March 2013, and asked Precision to reduce its rates.[15] Because Plaintiffs had limited visibility into Precision's actions – partly as a result of Delta's January 31, 2013 motion – Plaintiffs were unable to effectively oversee Precision's actions and were forced to rely on Precision's representations about their reasonableness.

Delta similarly suggests, without basis, that "Plaintiffs . . . . knew of facts material to [the March 20 TDS confidentiality] Order," and suggests that Plaintiffs misled the Court about the confidentiality of data provided to TDS.  *See* Delta Br. at 8.  Defendants do not cite one shred of evidence that Plaintiffs knew that *any* data had been provided to TDS prior to March 20.  And to be clear, Plaintiffs' counsel did not know that data was provided to TDS before March 20.  Delta's assertion is unfounded and lacking in any basis in fact.[16]

---

[15] On a January 24, 2014 call, this Court stated that it may, *sua sponte*, reconsider its November 25, 2013 fee Order in light of new information provided by TDS.  To the extent that the Court intends to reconsider its fee Order, there is no basis to reduce Plaintiffs' fees.

[16] Delta never asked Plaintiffs or Mr. Pixley about this issue, even though Delta deposed Mr. Pixley on January 7, 2014, shortly after TDS's motion was filed.

### 2.   Delta's Attacks On Precision Discovery's Conduct Are Misleading.

As with its attacks on Plaintiffs, Delta's arguments that Precision inappropriately inflated TDS's fees are unsupported. Delta appears to intentionally misconstrue the information provided by TDS.

First, Delta misconstrues a discussion between Mr. Pixley and two TDS employees that occurred on or around April 19, 2013. *See* TDS Application Ex. A ¶ 11 (referring to a conversation that occurred approximately one week prior to an invoice being sent out on April 26, 2013). Delta represents that this conversation related to "very significant costs that *would* be incurred of approximately $250,000." Delta Br. at 6-7 (emphasis added). And Delta represents that Precision "encouraged TDS to run up costs" based on another statement made during that conversation. *Id.* at 7. But this conversation occurred *after* the vast majority of the work had already been completed. As set out in the declarations to which Delta cites, the conversation at issue occurred when TDS's employees called Mr. Pixley to give him "advance notice" that the forthcoming first invoice would be for approximately $250,000.[17] *See* TDS Application Ex. A ¶ 11, Ex. B ¶ 14. It was in response to this "advance notice" of work that *had already been completed* that Mr. Pixley assured TDS that Plaintiffs would not have sticker shock at receiving

---

[17] TDS's total billings are approximately $265,000.

11

the invoice, which was relatively modest compared to other fees that were being incurred in the case. Delta's attempt to construe this after-the-fact conversation about fees already incurred as a before-the-fact encouragement to incur fees is misleading. In fact, the fees that TDS incurred after its first invoice were only $5,906. TDS Application Ex. O.

Second, Delta's protestation that Precision did not immediately order TDS to stop work on June 3, 2013, when the Court entered its stop work order, is frivolous. TDS stopped work within one day of the Court's June 3 stop work order. TDS's invoice contains two line items for June 4 – a $53.11 charge for a single "output" drive and a $53.29 charge for shipping that "output" drive. *Id.* Leaving aside the fact that the "work" to which Delta objects is of a *de minimis* amount, Plaintiffs suspect that this was merely TDS saving the data in its system onto a hard drive and shipping it to Precision. Plaintiffs suspect this Court did not intend its June 3 Order to mean that vendors could not save their work prior to stopping.[18]

\* \* \*

---

[18] Delta also attacks Precision's handling of Delta's confidential data. Plaintiffs do not have any knowledge of Delta providing data to TDS before the March 20 confidentiality Order. Plaintiffs note, however, that Delta has never suggested that any of its data was used for an improper purpose or disclosed by Precision or TDS to any other third party.

Plaintiffs did not want Precision or TDS to inflate fees, and the record is clear that Plaintiffs did not order or condone any such conduct. The litigation over Precision and TDS's fees has distracted the Court and the parties from focusing on the merits of this litigation and addressing the very conduct that resulted in these experts' appointment by the Court.

In attempting to divert the Court's attention, Delta engages in yet more misconduct and inappropriate behavior in making false *ad hominem* attacks on Plaintiffs' counsel and by willfully misconstruing statements contained in TDS's declarations in an attempt to discredit Mr. Pixley.

### III.  CONCLUSION

For the foregoing reasons, Plaintiffs request that TDS's application for fees be denied to the extent that TDS is seeking those fees from Plaintiffs or their counsel.

/s/ David Flint
David H. Flint
Georgia Bar No. 264600
Michelle Kraynak
Georgia Bar No. 429353
SCHREEDER WHEELER & FLINT, LLP
1100 Peachtree Street, NE, Suite 800
Atlanta, GA 30309-4516
dflint@swfllp.com
jheald@swfllp.com

*Interim Liaison Counsel for Plaintiffs*

Dated: January 29, 2014

| | |
|---|---|
| Daniel A. Kotchen<br>Daniel L. Low<br>Robert A. Klinck<br>KOTCHEN & LOW LLP<br>1745 Kalorama Road, NW, Suite 101<br>Washington, DC 20009<br>dkotchen@kotchen.com<br>dlow@kotchen.com<br>rklinck@kotchen.com<br><br>R. Bryant McCulley<br>Stuart H. McCluer<br>McCULLEY MCCLUER PLLC<br>1919 Oxmoor Road, No. 213<br>Birmingham, AL 35209<br>bmcculley@mcculleymccluer.com<br>smccluer@mcculleymccluer.com | Cale H. Conley<br>Richard A. Griggs<br>CONLEY GRIGGS LLP<br>4400 Peachtree Rd., N.E<br>Atlanta, GA 30319<br>cale@conleygriggs.com<br>richard@conleygriggs.com<br><br>Andrew H. Rowell III<br>James L. Ward, Jr.<br>Robert S. Wood<br>RICHARDSON, PATRICK,<br>WESTBROOK & BRICKMAN, LLC<br>P.O. Box 1007<br>1037 Chuck Dawley Blvd., Building A<br>Mt. Pleasant, SC 29465<br>hrowell@rpwb.com<br>jward@rpwb.com<br>bwood@rpwb.com |

*Interim Co-Lead Counsel for Plaintiffs*

## CERTIFICATION UNDER L.R. 7.1D

Pursuant to Northern District of Georgia Local Rule 7.1D, the undersigned hereby certifies that the above and foregoing is a computer document prepared in times new roman (14 point) font in accordance with Local Rule 5.1B.

So certified, this 29th day of January, 2014.

/s/ David. H. Flint
David H. Flint
Georgia Bar No. 264600
Michelle Kraynak
Georgia Bar No. 429353

Liaison Counsel for Plaintiffs

Schreeder, Wheeler & Flint, LLP
1100 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-4516
(404) 681-3450
dflint@swfllp.com
mkraynak@swfllp.com

**CERTIFICATE OF SERVICE**

The undersigned counsel certifies that on this day the plaintiffs' Response to TDS's Application for Fees was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record who have appeared in this matter.

This 29th day of January, 2014.

/s/ David H. Flint
David H. Flint
Georgia Bar No. 264600

Schreeder, Wheeler & Flint, LLP
1100 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-4516
(404) 681-3450
dflint@swfllp.com