IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE DELTA/AIRTRAN BAGGAGE FEE ANTITRUST LITIGATION | CIVIL ACTION FILE No. 1:09-md-2089-TCB |

## **O R D E R**

Presently before the Court is Special Master Bruce P. Brown's
Report and Recommendation [520], as supplemented [523, 527]
(collectively, the "R&R"), which recommends granting Plaintiffs' fourth
motion for sanctions [413] against Defendant Delta Air Lines, Inc. and
awarding Plaintiffs $1,855,255.09 in fees and expenses incurred as a
result of Delta's violations of its discovery obligations. The R&R
recommends denying Plaintiffs' request for evidentiary or merits
sanctions based on alleged spoliation of evidence by Delta. Plaintiffs do
not seek any sanctions against Defendants AirTran Airways, Inc. or
AirTran Holdings, Inc. (collectively, "AirTran").

1

Plaintiffs and Delta have objected to the R&R [528, 529]. Plaintiff has responded to Delta's objections [536], and both Delta and AirTran have responded to Plaintiffs' objections [537, 538].

## I.  Background

### A.  Factual Overview

This multidistrict litigation ("MDL") involves a claim against Delta and AirTran under Section 1 of the Sherman Act based upon their alleged collusion in the implementation of a first-bag fee.[1]

In May 2008, American Airlines became the first domestic air carrier to charge a fee for a passenger's first checked bag. Two months later, in July, Delta stated in an earnings call that it was studying the issue but had "no plans" to implement a similar fee on its flights. In an AirTran earnings call held on October 23, AirTran stated that it had the ability to impose a first-bag fee but had elected not to do so because it would "prefer to be a follower" in charging for first checked bags and its

---

[1] Plaintiffs also asserted claims for attempted monopolization in violation of Section 2 of the Sherman Act, but the Court previously dismissed those claims. *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1366-68 (N.D. Ga. 2010) ("*Delta 2010*").

primary competitor—Delta—had not yet imposed a first-bag fee.[2] Two weeks later, Delta reversed course, announcing on November 5 that it would implement a $15 first-bag fee effective December 5. On November 8, AirTran followed suit and announced that it too would begin charging passengers a $15 first-bag fee on December 5.

Defendants maintain that the two airlines independently arrived at the decision to impose a first-bag fee. In the lawsuits that are now consolidated in this MDL, Plaintiffs allege that the simultaneous imposition of a first-bag fee was the result of collusion. But before those lawsuits were filed, Defendants learned that the bag-fee implementation was the subject of a federal antitrust investigation.

## B.   The DOJ CID and Delta's Initial Efforts to Preserve Bag-Fee Evidence

In February 2009, the Antitrust Division of the United States Department of Justice ("DOJ") served a Civil Investigative Demand ("CID") upon Delta seeking information regarding its decision to impose

---

[2] At the time, and indeed until AirTran's eventual merger with Southwest Airlines after these lawsuits were filed, Delta and AirTran were fierce competitors for market share at Atlanta's Hartsfield-Jackson International Airport, where the two airlines collectively accounted for more than ninety percent of airline traffic. *See Delta 2010*, 733 F. Supp. 2d at 1351.

3

a first-bag fee.[3] The CID required Delta to, first, identify each person responsible for analyzing, recommending, or approving changes in its baggage-fee policies, and second, produce all documents relating to any actual or contemplated changes in its bag-fee policies or practices. As discussed in greater detail below, Delta creates backup tapes of its servers for disaster-recovery purposes, and those tapes are periodically overwritten pursuant to Delta's electronic-document-destruction policy. Delta's response to the CID evinced its understanding that it needed to preserve bag-fee evidence by copying files from employee computers that might contain responsive documents and by ceasing its practice of overwriting server-backup tapes.

Consequently, on February 3, 2009, Delta Assistant General Counsel Scott McClain circulated a document-preservation and litigation-hold notice to twenty-two Delta employees (the "custodians") whose computers Delta believed might contain documents responsive to

---

[3] The DOJ is authorized to issue a CID when it "has reason to believe that any person may be in possession, custody, or control of any documentary material, or may have any information, relevant to a civil antitrust investigation." 15 U.S.C. § 1312(a).

the CID.[4] McClain's notice directed the custodians to search for and preserve "documents (including both paper and electronic files) . . . relating to any actual or contemplated changes in checked baggage fee policies of Delta or any other airline." [413-4], p.346. Custodians were instructed to "take any necessary steps to prevent the destruction or deletion of any of these documents currently in your possession." *Id.* Delta's legal department then collected responsive documents from the custodians and produced them to the DOJ.

In May 2009, Delta's counsel directed its information technology group—known as the "Computer Security and Investigative Response Team," or "CSIRT"—to copy the custodians' hard drives and upload that data onto Delta's internal document-review program. Mistakes made throughout this process would later come to light and are discussed below. Meanwhile, however, on May 22, 2009, the first of these civil lawsuits arising from the imposition of first-bag fees was filed.

---

[4] The number of first-bag fee custodians eventually grew to twenty-five.

### C.    The Instant Litigation and Prior Sanctions Motions

Between May and September 2009, several class action lawsuits were filed against Delta and AirTran alleging that the airlines' imposition of a first-bag fee was a conspiracy to restrain trade in violation of the Sherman Act. In October 2009, the Judicial Panel on Multidistrict Litigation ("JPML") issued a transfer order [1] creating this MDL and consolidating the bag-fee lawsuits for coordinated pretrial proceedings before the undersigned.

Since discovery commenced in February 2010, this case has been plagued by a veritable deluge of discovery disputes and a corresponding succession of motions for discovery sanctions against Delta. It is not hyperbolic to say that this lawsuit has turned into litigation about litigation: the time, energy, and resources spent on discovery abuses equals or exceeds those that have been dedicated to litigating the merits of the case. Plaintiffs filed four sanctions motions in as many years, with each motion building on its predecessors. The instant motion is no exception. It is therefore necessary to briefly review the prior motions

and the Court's disposition of those motions before proceeding to an analysis of the current request for sanctions.

### 1.    First Motion for Sanctions

Plaintiffs' first motion for sanctions [194] was filed in November 2010 in response to revelations about two crucial mistakes made by Delta in its early efforts to preserve and produce e-mails and other electronic evidence in response to the CID.

By way of necessary background, Delta employs two e-mail servers that are relevant to this case: a standard Microsoft Exchange server and a litigation-hold server. Sent and received e-mails stored on Delta's standard server are sent to a "deleted items" folder after sixty days and are permanently deleted after another sixty days, unless the employee manually deletes an e-mail or moves it to a personal folder before it is automatically deleted. The litigation-hold server does not automatically delete e-mail messages, thus preserving them for use in ongoing or anticipated litigation. Delta contracts with IBM to create daily and monthly backup "snapshots" of both e-mail servers, which are saved to backup tapes for disaster-recovery purposes. A limited number

7

of backup tapes are used in a rotating sequence; thus, tapes are periodically overwritten with new data.

Following its receipt of the CID in February 2009, Delta delayed taking two important actions that should have been taken more promptly in order to preserve e-mail evidence. First, Delta waited until May 13, 2009 to instruct CSIRT to move the custodians' e-mail accounts from Delta's standard server onto its litigation server to prevent automatic deletion of their e-mails. Second, Delta did not instruct IBM to suspend its practice of periodically overwriting server backup tapes until sometime between May 19 and June 5, 2009. If IBM had stopped overwriting backup tapes in February, it would have preserved e-mails and data dating to July 2008. But because IBM continued to overwrite the tapes until sometime after June 6, the oldest existing backup tape available in this litigation—created in April 2009—contained e-mails dating only to December 2008. These actions, and the corresponding loss of data for the time period of July through November 2008, was the subject of Plaintiffs' first motion for spoliation sanctions.

To obtain spoliation sanctions, Plaintiffs bore the burden—just as they do again now—of proving that "(1) the missing evidence existed at one time; (2) Delta had a duty to preserve the evidence; and (3) the evidence was crucial to Plaintiffs being able to prove their prima facie case." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011) ("*Delta 2011*"). Additionally, to be sanctionable, spoliation must have been "predicated on bad faith." *Id.* On February 22, 2011, the Court denied Plaintiffs' motion, finding that they had failed to meet their burden. The Court held that Delta's receipt of the DOJ CID in February 2009 did not make civil litigation reasonably foreseeable and therefore triggered no duty by Delta to Plaintiffs to preserve evidence. The Court also found that Plaintiffs had failed to show "that critical evidence existed and was destroyed" or that Delta had acted in bad faith. *Id.* at 1308. Thus, although the Court admonished Delta for its delay in preserving evidence after receipt of the CID, it found sanctions for spoliation inappropriate.

In addition to the reasons expressly set forth in the *Delta 2011* Order, the Court later noted that its ruling on Plaintiffs' first motion for

sanctions had been "influenced by Delta's myriad emphatic and unqualified assurances that it had produced absolutely every document in its possession, custody, or control that Plaintiffs had requested." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1339-41 (N.D. Ga. 2012) ("*Delta 2012*"). Indeed, the Court went so far as to say that "it would be impossible for Delta to have been more forceful in its assurances that it had fully complied with Plaintiffs' document requests and the DOJ's CID." *Id.* at 1341. But just days after the Court entered its February 22, 2011 Order, it became clear that Delta's rhetoric was far removed from reality.

### 2. Second Motion for Sanctions

On March 1, 2011, Delta's counsel informed the Court that it had become aware of additional "potential issues" relating to Delta's document production. At the time, the DOJ was conducting an unrelated antitrust investigation into Delta's proposal to swap airport landing slots with U.S. Airways at certain airports outside of Atlanta. During that investigation, Delta provided the DOJ with several

documents that were relevant to, but had not been produced in connection with, the DOJ's bag-fee investigation.

Delta's counsel in the slot-swap investigation, who collected and produced the new bag-fee evidence, were not involved in the bag-fee investigation or the ensuing civil litigation, but after the DOJ brought the new evidence to light, the slot-swap documents were made available to Delta's bag-fee counsel. Their review of those documents uncovered previously unproduced documents that were responsive to Plaintiffs' discovery requests in this litigation. The investigation into how Delta had missed these documents revealed two more discovery errors by Delta—aptly described by the special master as "colossal blunders," [520], p.12—that led to Plaintiffs' second spoliation motion.

In March 2011, Delta learned that CSIRT had failed to comply with the instruction from Delta's counsel—given almost two years prior, in May 2009—to upload copies of the custodians' hard drives onto Delta's internal document-review program. "Consequently, when Delta searched its electronic documents in 2009, only Delta's active email servers or shared network servers were searched; files located on the

custodians' hard drives, including archived emails on the hard drives but not on the shared servers, were not searched and thus not produced." *Delta 2012*, 846 F. Supp. 2d at 1342.

Also in March 2011, Delta discovered a previously unknown box of server backup tapes in what can hardly be described as an inconspicuous location: CSIRT's "Evidence Locker." Really.

Neither Delta, CSIRT, nor Delta's e-discovery vender, PricewaterhouseCoopers ("PwC"), was able to explain what the tapes were, why they were in the evidence locker, or who had requested they be placed there. A review of the tapes revealed that they pre-dated the April 2009 backup tapes, which Delta had previously believed to be the oldest available tapes. It thus became clear that, contrary to Delta's prior representations, backup tapes were not necessarily overwritten every fourth month, and at least sometimes, IBM would deliver a tape to CSIRT and replace it with a new tape.

Delta and PwC searched the new data, and in April and May 2011—approximately five months after the initial discovery period closed—Delta produced an additional 60,000 pages of documents to

Plaintiffs, prompting Plaintiffs to file a second motion for spoliation

sanctions [294]. The Court granted the motion in part and denied it in

part. The evidence showed that "Delta clearly failed to comply with its

obligation to produce documents—and misrepresented through counsel

that it had not so failed," *Delta 2012*, 846 F. Supp. 2d at 1349, but found

"no evidence that Delta willfully withheld production of [the late-

produced] documents," *id.* at 1358. The Court denied Plaintiffs' request

for evidentiary sanctions but reopened discovery and, pursuant to Rules

26(g) and 37(c) of the Federal Rules of Civil Procedure, sanctioned Delta

by requiring it to pay Plaintiffs' reasonable fees and expenses caused by

the violation, totaling $1,285,144.13.

### 3.   Third Motion for Sanctions

For the next six months, the case cruised along as the parties

spent their time and energy in discovery relating to the substantive

merits of the case. But in September 2012, in what would eventually

become their third motion for sanctions, Plaintiffs raised new concerns

regarding the adequacy of Delta's document production, and discovery

disputes again threw this case into a tailspin. Over the next month, the

parties exchanged letters to the Court. In one such letter, Delta disclosed that it had found an additional twenty-nine backup tapes that had not previously been reviewed or searched for bag-fee evidence. The tapes had been delivered to CSIRT by IBM in June 2011, but CSIRT—which had recently delivered other backup tapes to PwC for review—inexplicably failed to advise Delta's counsel or PwC that it had received the new tapes. It was not until October 2012, when CSIRT transferred the new tapes to PwC in connection with a different DOJ inquiry, that PwC notified Delta that the tapes had not previously been inventoried.

Delta's position was that the new tapes were largely redundant of backup tapes that had already been searched. Nevertheless, it readily conceded its error and requested that the Court appoint an independent discovery expert to expedite resolution of these discovery issues. On November 19, 2012, the Court entered an Order directing Plaintiffs to hire such an expert, making clear that Delta would be responsible for paying fees and costs incurred by the expert and Plaintiffs' attorneys in connection with the newest discovery dispute. [375], p.9. Plaintiffs hired Bruce Pixley with Precision Discovery. Delta was directed to give Pixley

virtually unfettered access to its files, e-mails, databases, or other data sources requested by Pixley, without regard for relevance or privilege concerns. Consequently, the Court directed that neither Plaintiffs nor their counsel would be given access to the information made available to their expert.

For six months, Pixley engaged in an intensive review of Delta's electronic files and its discovery efforts in this case. In May 2013, Pixley issued a 100-plus-page initial report and an invoice totaling almost five million dollars. The Court required Delta to pay $3,490,520.72 to Plaintiffs' counsel, Pixley, and a vendor retained by Pixley to assist in restoring the backup tapes. The Court never addressed the merits of Pixley's conclusions. Instead, the Court directed Plaintiffs to file a new motion for sanctions if, after reviewing Pixley's report, they felt such sanctions were warranted.

### D.    The Instant Motion for Sanctions

On December 3, 2013, Plaintiffs accepted the Court's invitation, and emphatically so, filing a motion for sanctions that, inclusive of

appendices and exhibits, exceeded 2,300 pages [413].[5] Succinctly

summarized, Plaintiffs complain that Delta (1) destroyed certain

evidence, (2) concealed and only belatedly produced other evidence, (3)

made false statements designed to mask its misconduct, and (4) is

continuing to withhold documents, as evidenced by Pixley's "spot check"

of Delta's database and the testimony of a Delta employee, Kelly Turner

Brown.[6] Based on what Plaintiffs characterize as Delta's widespread

pattern of bad-faith spoliation, the fourth sanctions motion seeks the

following relief:

> As a result of Delta's misconduct, the Court should preclude
> Delta from disputing the existence of a conspiracy with
> AirTran to impose first bag fees. If issue preclusion is not
> granted, the Court should require the jury to draw an
> adverse evidentiary inference against Delta based on its
> pattern of misconduct. In addition, Delta's summary
> judgment motion should be denied, as Delta's actions create
> (at the very least) a fact issue regarding bad faith spoliation,
> which renders summary judgment inappropriate. Finally,
> Plaintiffs should be awarded reasonable fees and expenses
> incurred as a result of Delta's discovery misconduct.

---

[5] Delta responded in like turn with its own 2,300-page submission [434].

[6] Kelly Turner Brown is not related to Special Master Bruce Brown, who is sometimes referred to in this Order as "Brown." For clarity, she will be referred to herein by her full name or as "Ms. Brown."

16

[413], pp.1-2.

### E.    The Special Master's R&R

On May 14, 2014, after providing the parties notice of its intention

to do so, the Court referred the motion for sanctions to Special Master

Bruce Brown. The parties completed briefing on the motion, and

between August and September 2014, Brown presided over four days of

evidentiary hearings relating to the merits of Plaintiffs' motion and the

amount of fees and expenses to which Plaintiffs would be entitled if an

award were made. After those hearings, Kelly Turner Brown contacted

Plaintiffs' counsel and produced what she regarded as additional

evidence of Delta's misconduct. This led to the production of additional

documents, Ms. Brown's deposition in September, and another lengthy

hearing before the special master in October.

On November 21, 2014, Brown issued his R&R. Like the Court's

prior orders, Brown rejects Plaintiffs' spoliation arguments, finding

insufficient evidence to support Plaintiffs' claims that unique,

responsive information was lost or destroyed, concluding that Plaintiffs

had not shown that Delta acted in bad faith, and reasoning that Delta's

late production of documents is irrelevant to Plaintiffs' spoliation claim because the documents at issue were never destroyed.

However, that does not end the analysis, and the special master does recommend that Delta be sanctioned under a non-spoliation theory. From his thorough review of the voluminous record, Brown finds "no dispute" that Delta breached its discovery obligations under Rules 16, 26, and 37; indeed, he finds that Delta failed to make any "credible argument that it has been in substantial compliance with its discovery obligations." [520], p.102. He further finds that "Delta does not and could not claim that, despite its due care, it was unable to comply" with those obligations. *Id.*, p.103. Accordingly, although he finds evidentiary or merits sanctions unwarranted, Brown recommends that the Court impose $1,855,255.09 in monetary sanctions against Delta to "compensate[] Plaintiffs for the additional time and expenses that they have incurred as a result of Delta's failure to comply with its discovery obligations" and to deter similar misconduct in the future. *Id.*, p.107.

Plaintiffs promptly moved the special master to reconsider the R&R [521], arguing that he failed to consider all the evidence and

arguments put forth by Plaintiffs, particularly that which is contained in their appendices and reply appendices. On December 15, 2014, Brown issued an Order on Plaintiffs' motion for reconsideration [523]. Although he acknowledged that the R&R was not as explicit as it could have been regarding his review of Plaintiffs' appendices, he made clear that "[t]he extensive arguments and evidence presented by the Plaintiffs in their Reply Appendix were considered" by him prior to the issuance of his R&R. [523], p.2. The special master reviewed Plaintiffs' arguments, clarified some of the R&R's findings and recommendations, but found in the end that no substantive change to the R&R was warranted.

The next day, the Court granted the parties' joint motion extending time to file objections to the R&R and responses to those objections. Before those objections became due, intervening events required Brown to issue a supplement to his R&R [527].

In early December 2014, Kelly Turner Brown contacted Plaintiffs' counsel claiming that she was in possession of additional documents that were responsive to Plaintiffs' discovery requests in this litigation.

Delta would not consent to Ms. Brown—still a Delta employee—communicating directly with Plaintiffs' counsel about the merits of the case. The Court held a teleconference with the parties and ordered that the special master interview Ms. Brown in the presence of counsel. At the parties' suggestion, Brown agreed to conduct the interview in the form of a deposition. He also directed Delta's counsel to produce copies of the documents Ms. Brown had identified. On December 22, the special master conducted Ms. Brown's telephonic deposition.[7] He concluded that the "allegedly new information" provided by Ms. Brown "does not have an impact upon the reasoning or recommendations of the R&R." [527], p.5.

Plaintiffs and Delta filed objections to the R&R, and each side has responded to the other's objections. In addition, AirTran—against which no sanctions are sought—filed a response to Plaintiffs' objections. The substance of these objections and arguments are addressed below.

---

[7] Ms. Brown's deposition was originally scheduled for December 19, but she failed to appear, claiming that morning—after counsel and the special master had convened for the deposition—that she was not feeling well and was working from home.

## II.     Analysis

### A.     Legal Standard on a Special Master's R&R

"In acting on a master's order, report, or recommendations, the court must give the parties notice and an opportunity to be heard; may receive evidence; and may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." FED. R. CIV. P. 53(f)(1). The district court must make a *de novo* determination of those findings of fact or conclusions of law to which objections are made. FED. R. CIV. P. 53(f)(3), (4); *United States v. KPMG LLP*, 316 F. Supp. 2d 30, 34 (D.D.C. 2004). "Parties filing objections must specifically identify those findings objected to. Frivolous, conclusive or general objections need not be considered by the district court." *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir. Unit B 1982)[8]; *accord United States v.*

---

[8] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc). Decisions issued after that date by the Unit B panel of the former Fifth Circuit are binding in both this circuit and the current Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982); *United States v. Rojas-Martinez*, 968 F.2d 415, 420 n.11 (5th Cir. 1992) ("Consistently, . . . we have treated Unit B cases as precedential."). The Fifth Circuit has since overruled *Nettles—see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)—but "that does not change the binding effect of *Nettles* in this Circuit because *Douglass* was decided after October 1, 1981, and was not a Unit B decision." *United States v. Schultz*, 565 F.3d 1353, 1360 n.4 (11th Cir. 2009) (per curiam).

*Washington*, 626 F. Supp. 1405, 1492 (W.D. Wash. 1985) (Objections that were "equivocal," "ambiguous," and "merely a referral to memoranda previously filed" were "too general to be valid.").

In light of the breadth of the parties' objections and the significance of the issues involved in this motion, the Court has conducted a careful *de novo* review of the R&R, the supplements to it, the parties' objections, and their responses to the other parties' objections. In so doing, the Court has independently reviewed the arguments submitted by the parties to the special master and the relevant evidence, including deposition and hearing testimony. Having done so, the Court finds the R&R thorough and well reasoned and is unpersuaded by the majority of the objections filed by the parties. However, the Court finds merit in Plaintiffs' objections regarding the amount of the monetary sanction to be imposed. The Court will therefore adopt the R&R in part, subject to the modifications set forth in Section II(C)(5) below. First, though, the Court will address Delta's objections.

**B.   Delta's Objections to the R&R**

Delta makes clear that it "agrees with the vast majority of the R&R's findings and its overall conclusions concerning the absence of bad faith conduct or evidence of spoliation," but it objects to the recommendation that further monetary sanctions be imposed. [528], pp.1-2. Delta argues that it would be unjust to require it to compensate Plaintiffs for the delays in the case since November 2012 because it contends that it is not Delta, but Plaintiffs who bear responsibility for those delays. The Court adamantly disagrees.

Without question, it is Delta's ineptitude and missteps that have caused the vast majority of the excessive time, expenses, and energy that the parties have expended in discovery for the last five years. "[Delta]'s discovery violations have been taxing to plaintiff[s] and the Court, and have expanded this litigation in ways [Delta] still does not seem to grasp." *SCQuARE Int'l, Ltd. v. BBDO Atlanta, Inc.*, No. 1:04-cv-641-JEC, 2008 WL 228032, at *3 (N.D. Ga. Jan. 25, 2008). Delta's discovery misconduct has rendered the Court's attempts to manage this litigation and move it toward a resolution on the merits as futile and

maddening as Sisyphus's efforts to roll his boulder to the top of the hill. The Court's prior sanctions orders have partially compensated Plaintiffs for some of this misconduct, but there is ample evidence to support an award of further sanctions for conduct occurring since the Court's last sanctions order, as well as for Delta's overall pattern of discovery violations. The Court agrees with the special master that a monetary award is the appropriate sanction.

For their part, Plaintiffs, their counsel, and their discovery expert and vendors are not entirely beyond reproach for their own roles in belaboring discovery and convoluting the process of briefing the instant sanctions motion. That shared fault, as well as the fact that Plaintiffs have previously been partially compensated for Delta's misconduct, is best accounted for by the amount of the sanction to be imposed; it would be a disproportionate remedy to deny further sanctions altogether. *See generally Wyatt ex rel. Rawlins v. Sawyer*, 67 F. Supp. 2d 1331, 1351 (M.D. Ala. 1999) (describing "months and months of overly and unnecessarily contentious discovery disputes," noting that "while some fault can be placed with the plaintiffs, most of the fault lies with the

defendants," and attributing some of the plaintiffs' lack of cooperation to their "understandable exasperation with, and lack of trust in, the defendants").

Viewed in a vacuum, the special master's recommendation that Delta be sanctioned to the tune of almost two million dollars might seem harsh. Yet those familiar with the protracted and contentious history of this case will recognize the R&R as a victory for the airline. Delta has dodged the bullet of spoliation sanctions for the fourth time now, each shot coming closer to the mark than the one that preceded it, though none ultimately hitting the bull's eye. Delta's argument that it should be held blameless and avoid any additional sanctions is quickly dismissed, and its objections are overruled. And as explained in the next section, the Court will actually impose a more severe monetary sanction than that recommended by the special master.

## C.    Plaintiffs' Objections to the R&R

Plaintiffs' objections to the R&R are far more comprehensive than Delta's. They include objections to specific factual findings, arguments that the special master erred in rejecting Plaintiffs' spoliation theory,

and a plea to impose evidentiary or merits sanctions even under a non-spoliation theory. In the event the Court does adopt the recommendation to impose only a monetary sanction, Plaintiffs' objections ask the Court to reverse some of the reductions applied by the special master to their fee request. The Court will address each of these objections in turn, but it will begin by addressing an issue raised repeatedly in Plaintiffs' objections—though never asserted as a separate, freestanding objection—which is the special master's alleged failure to consider the entire record.

### 1.   The Special Master's Consideration of the Record

A theme permeating Plaintiffs' objections to the R&R is their belief that the special master failed to give due consideration to all of the arguments and evidence submitted by Plaintiffs, particularly those arguments presented in the appendices and reply appendices accompanying Plaintiffs' briefs. *See*, *e.g.*, [529], p.1 n.1 ("[T]he R&R did not thoroughly analyze the record, but initially overlooked 65 pages of key filings, and conducted only a cursory review of specific pages of these filings in response to Plaintiffs' motion for reconsideration."); *id.*,

p.14 n.45 ("Plaintiffs mistakenly assumed that the Special Master had already read all the filings, including the reply appendices"); *id.*, p.19 n.57 (arguing that the special master's order on reconsideration "ignor[ed] the case law cited by Plaintiffs in Appendix H"); *id.*, p.29 n.86 ("The submissions the Special Master reviewed excluded 65 pages of reply appendices."). The Court rejects this argument.

The special master faced the laborious task of producing a comprehensive yet comprehensible report and recommendation from the parties' voluminous submissions. The manner in which Plaintiffs elected to prepare their briefs—most significantly, by including substantive, lengthy arguments in appendices to their briefs and then incorporating those arguments by reference in the briefs—unnecessarily made that burden all the more daunting and forced the special master and the Court to parse through a dense, labyrinthine record in a search for the supporting material on which Plaintiffs intended to rely.[9]

---

[9] By way of example, if one wanted to analyze the veracity of Plaintiffs' assertion that "Delta has destroyed or withheld documents without substantial justification, including data sources containing evidence from relevant custodians that was created during the relevant time period," [529], pp.11-12, the footnote accompanying that text directs the reader to three pages in the R&R, six pages in Plaintiffs' reply brief, and the entirety of their Appendices A and D and Reply

Despite this unenviable task, however, the special master did

consider everything submitted by Plaintiffs, as he expressly noted in

addressing their motion for reconsideration:

> The extensive arguments and evidence presented by the
> Plaintiffs in their Reply Appendix were considered by the
> Special Master. The materials in the reply appendices were
> largely duplicative of arguments the Plaintiffs had made
> earlier in their initial Motion for Discovery Sanctions [413],
> or had made later in their Pre-Hearing Brief [492], or had
> made during the hearing itself, which lasted the better part
> of five days. It was not possible or necessary for the R&R to
> discuss every argument or counter-argument that the
> parties advance. The R&R instead focuses upon those
> arguments that the parties emphasized in their briefs, in the
> testimony, and in their presentations at the hearings.
>
> Plaintiffs' Motion is well-taken, however, because the
> R&R does not cite to the Reply Appendices where it might
> have, and the R&R should have addressed several of the
> arguments Plaintiffs raised in their Reply Appendix more
> directly. In light of Plaintiffs' Motion, it is appropriate to
> review carefully those instances in which Plaintiffs assert
> that their arguments and evidence were not considered.

[523], pp.2-3. After again reviewing Plaintiffs' submissions in light of

their motion for reconsideration, the special master found "that no

---

Appendices A and D. Those four appendices consist of almost 100 pages of single-
spaced argument by counsel and themselves include cross-references to other
appendices, reply appendices, deposition transcripts, excerpts of the Pixley report,
and other sources. It is no exaggeration to compare the search for evidence
supporting many of Plaintiffs' objections to one for a needle in a haystack.

substantive change to the Report and Recommendation [was] warranted." *Id.*, p.19.

It would be impractical if not impossible for a sanctions order of any reasonable length to specifically address each and every example, argument, or piece of evidence or testimony referred to by Plaintiffs in their briefs, appendices, and exhibits. The special master did a commendable job of reviewing and synthesizing the parties' submissions, explaining his factual findings and legal conclusions, and producing an R&R that sheds light on his rationale and addresses the most significant arguments and evidence but does not burden the reader with an unmanageable and unending discussion of each fact and allegation raised by the parties, even those not critical to the outcome of the motion. The fact that Brown ultimately did not accept many of Plaintiffs' arguments does not mean that he failed to consider them. Thus, Plaintiffs' objections are overruled to the extent they contend that the special master's consideration of the record was in any way inadequate.

### 2.   Plaintiffs' Objections to Specific Factual Findings in the R&R

Plaintiffs raise objections to several of the special master's specific factual findings with respect to destroyed data sources, withheld data sources, and Delta's false discovery certifications. [529], pp.19-25.

### a.   Destroyed Data Sources

Plaintiffs begin by challenging certain of the special master's findings regarding destroyed data sources. First, they contend that they did establish the source of Delta's obligation to preserve custodians' USB drives and SharePoint, a web-based tool used by Delta employees to share files. They point to a piece of March 2010 correspondence from Delta's counsel as giving rise to the duty to preserve these data sources, but neither of the data sources at issue is expressly referenced in that correspondence. *See* [479-1], pp.1-2; [413-4], pp.311-317.

Everybody agrees that "Delta did not have the duty to save every scrap of paper relating to first-bag fees." [520], pp.52-53. Plaintiffs have failed to offer any articulable basis to determine, without the benefit of hindsight, what more Delta should have known to do to preserve and search these particular data sources in connection with this litigation.

"It can be difficult to draw bright-line distinctions between acceptable and unacceptable conduct in preserving information and in conducting discovery, either prospectively or with the benefit (and distortion) of hindsight." *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010). "The fact that, with perspective adjusted by hindsight and over a year of discovery, it might have been helpful" for Delta to preserve the data sources now at issue is insufficient to support a motion for sanctions if it is not shown that the duty to preserve reached this evidence to begin with. *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 591 (S.D.N.Y. 2013).

Plaintiffs' objections are likewise misguided in their reference to any assumption by the special master that destruction of discovery on discovery could not give rise to spoliation sanctions. The R&R made no such assumption. The special master merely found that bad-faith spoliation had not occurred. His recommended monetary sanction expressly accounts for misconduct in connection with both merits discovery and discovery on discovery. *See*, *e.g.*, [520], p.103 (sanctioning Delta, in part, because Delta "failed to flag obviously responsive

31

documents for production" and "failed to maintain . . . records of what it had done, what it had searched, and what it had found" in discovery).

Plaintiffs next object that the R&R ignores Delta's admission concerning the 2010 destruction of 12.6 terabytes of slot-swap data. Not so. The evidentiary support for Brown's finding that the slot-swap data was either duplicative of data preserved elsewhere or simply not relevant to bag fees is plentiful. Among other places, it finds support in the testimony of Delta's expert, Eric Friedberg, [481], pp.31-32, and in the testimony of Scott McClain, [544], p.380.[10] After *de novo* review, the Court agrees with the special master's conclusions that the slot-swap data was preserved elsewhere to the extent it was relevant to the bag-fee litigation and responsive to Plaintiffs' discovery requests and that Plaintiffs failed to show that Delta had a duty to preserve any slot-swap data that was not relevant or not responsive.

---

[10] The Court also disagrees with Plaintiffs' characterization of Friedberg's testimony regarding backup tape coverage for the custodians. Friedberg conceded that there were some custodians for whom there was no backup-tape coverage, but he did not testify that "most" of the "key custodians" had no coverage on backup tapes, as Plaintiffs contend. Regardless, after the extensive discovery that has taken place in this litigation over the last five years, Plaintiffs have failed to show that any relevant, responsive evidence was lost by virtue of Delta's handling of its backup tapes.

32

Next, Plaintiffs object to the R&R's finding that they failed to prove that six of the twenty-three missing data sources contained relevant bag-fee evidence. Plaintiffs address only one of these six sources: the file-and-print server backup tapes.[11] Only one bag-fee custodian—Mike Becker—used a file-and-print server, and Plaintiffs have pointed to no evidence that was likely lost as a result of Delta's failure to preserve the file-and-print server backup tapes. It is well established that the party seeking spoliation sanctions has the burden of proving, among other things, that relevant evidence was destroyed and that prejudice resulted from the destruction of that evidence. *Rimkus Consulting Grp.*, 688 F. Supp. 2d at 615-16; *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003); *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 801 (N.D. Tex. 2011). That showing

---

[11] The other five data sources identified by the special master as not containing evidence that was lost were the non-Atlanta e-mail exchange server e-mail backup tapes, uncollected tapes mislabeled as not being relevant, IBM custodians' documents, manually deleted e-mails, and merger tapes. [520], p.92 n.28. With respect to these five data sources that are not discussed in Plaintiffs' objections, Plaintiffs have raised only "conclusive or general objections" that the Court need not consider. *Nettles*, 677 F.2d at 410 n.8.

has not been made with respect to the missing data sources identified in footnote twenty-eight in the R&R.

Plaintiffs' final objection with respect to the destroyed data sources goes to the R&R's refusal to revisit the issue of Delta's failure to preserve backup tapes between February and June 2009. The Court has reviewed the "new case law and new evidence" relied upon by Plaintiffs and contained within their Reply to Appendix A, [529], p.21 n.64, and it agrees that Plaintiffs present no persuasive reason to re-examine Delta's failure to preserve its server backup tapes. The Court stands by its prior ruling that Delta's receipt of the DOJ CID did not trigger a duty to preserve that is enforceable by Plaintiffs. *Delta 2011*, 770 F. Supp. 2d at 1307-08. That is not to say that a government investigation can never give rise to a duty to preserve evidence, but the cases relied upon by Plaintiffs do not affect the conclusion that, on the facts of this case, no such duty arose.

In sum, the Court agrees with the special master's well supported findings regarding the destroyed data sources.

### b.    Withheld Data Sources

Plaintiffs next argue that the R&R erred "by giving so little weight to Delta's withholding of relevant documents," [529], p.22, and by finding that its belated production of documents is "not relevant to Plaintiffs' spoliation claim," [520], p.65. They correctly note that the withholding of documents can, under appropriate circumstances, support a finding of bad faith. *Byrne v. Nezhat*, 261 F.3d 1075, 1121 (11th Cir. 2001); *Bates v. Michelin N. Am., Inc.*, No. 1:09-cv-3280-AT, 2012 WL 453233, at *21 (N.D. Ga. Jan. 13, 2012). But both the special master's review of the record and the Court's lead to the conclusion that the circumstances surrounding Delta's withholding of documents do not support a finding of bad faith here. To the extent the late-produced documents are favorable to Plaintiffs, they will have the opportunity to rely on them at summary judgment. But as far as the Court can tell, these documents do not contain any smoking guns, do not shed light on any other evidence destruction by Delta, and do not appear to be particularly damaging to Defendants' position in this litigation. That makes this case materially distinguishable from other cases in which

discovery delay and belated production have been found to support a finding of bad faith.

For example, in *Bates*, the plaintiffs brought a products liability and negligence suit relating to an alleged defect in a tire designed and manufactured by Michelin. Michelin raised baseless trade-secret objections to the plaintiffs' document requests, and even after the parties addressed those objections in a confidentiality order, Michelin produced "a strikingly small number of documents" that required the plaintiffs to obtain a court order compelling Michelin to produce additional documents. 2012 WL 453233, at *1. Michelin moved for reconsideration and, even after its motion was denied, still failed to produce the documents at issue. After the plaintiffs moved for sanctions, Michelin produced some of the discovery, but redacted material information that had been requested, and Michelin's counsel repeatedly misled the court regarding who made the redactions and attempted to raise a baseless attorney-client-privilege objection to avoid coming clean that it was she, not her client, who made the redactions.

The *Bates* order details other intentionally evasive, misleading, and shifting representations made by Michelin's counsel that supported Judge Totenberg's conclusion that Michelin had engaged in a "pattern of prejudicial discovery abuse" and "subterfuge" amounting to a willful violation of the court's prior discovery orders. *Id*.

Here, by contrast, however careless and sloppy Delta's discovery efforts have been, they are a far cry from Michelin's insolence, insubordination, and conscious disregard of the court's discovery orders in *Bates*. The Court does not believe that, at this point, Delta's belated document production warrants a finding of bad faith.

### c.    False Discovery Certifications

Neither do Delta's false statements and discovery certifications justify a finding of bad faith. According to Plaintiffs, the R&R errs in failing to sanction "Delta's continuing false certifications of the completeness of its discovery efforts, and its failure to correct its 'myriad emphatic and unqualified assurances that it had produced absolutely every [responsive] document in its possession, custody or control.'" [529], p.24 (quoting *Delta 2012*, 846 F. Supp. 2d at 1339). The

37

false certifications and representations made by Delta and its counsel
that were sanctioned in *Delta 2012* were of a different nature than
those "continuing" misrepresentations Plaintiffs complain of now. As
the R&R accurately found, many of the statements now at issue were
statements of opinions or products of zealous advocacy by counsel; they
stand in contrast to the unequivocal and explicit assertions previously
made and sanctioned.[12]

Plaintiffs correctly note a factual error in the R&R regarding Scott
McClain's testimony, but that inaccuracy is immaterial. In 2012,
McClain responded affirmatively when asked whether "SharePoint
[had] been searched for responsive documents in this case." [413-3],
p.106. In 2013, McClain was asked the more specific question, "[w]hich
SharePoint sites did you search?" and he explained that Delta searched
"any SharePoint sites where custodians identified that site as being the
source of documents that we needed to collect in the case. . . . We did
not image—you know, wholesale image the network system of Delta

---

[12] To the extent Plaintiffs complain of new harm resulting from Delta's prior
misstatements, they failed to present evidence to support that contention.

and search it for responsive documents . . . ." [413-3], p.4. The special

master mistook this 2013 testimony for 2010 testimony. But even

though McClain's more specific explanation was given after the more

general assertion that SharePoint had been searched, his 2013

testimony is not an abandonment of his prior position and does not

suggest improper motives or an attempt to mislead Plaintiffs or the

Court. *See Byrne*, 261 F.3d at 1125 (false statements "made for a

harassing or frivolous purpose" support a finding of bad faith). More

importantly, neither McClain's comments nor those of Delta's other

representatives and counsel change the Court's conclusion that

monetary sanctions, not evidentiary sanctions, are the appropriate

remedy on these facts.

For all of these reasons, Plaintiffs' objections to the R&R's factual

findings are overruled.

### 3. Rejection of Spoliation Theory and Whether a Jury Issue Exists Regarding Spoliation

The Court will also overrule Plaintiffs' objections to the special

master's rejection of their spoliation theory. Critical to the Court's

decision in this regard is its finding that Plaintiffs have failed to show

39

prejudice. Most of the evidence at issue was eventually produced, albeit belatedly. Plaintiffs will therefore be able to use that evidence in opposing Defendants' motion for summary judgment and at trial, severely undermining any claim of prejudice. The only lost data source likely to contain non-duplicative information was the "folder of notes" that was placed in Box CID 11 in May 2009. [520], pp.30-33. Brown correctly concluded that this loss was substantially if not entirely non-prejudicial to Plaintiffs. Plaintiffs' objections to the R&R's factual findings have already been overruled, and the Court finds no basis upon which to reject the R&R's refusal to impose sanctions based on spoliation of evidence.

Even where a motion for spoliation sanctions is denied, however, there may exist sufficient factual questions to justify presenting the issue to a jury. *Delta 2011*, 770 F. Supp. 2d at 1315 (denying motion for spoliation sanctions but expressly noting that that ruling "does not necessarily foreclose the possibility that, in the event that this case goes to trial, Plaintiffs may be able to introduce evidence and argue regarding Delta's failure to retain certain documents."); *Managed Care*

*Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1333 (S.D. Fla. 2010) (denying motion for sanctions but acknowledging "the possibility that plaintiff will be able to introduce evidence of the defendant's failure to retain relevant documents at trial."); *EEOC v. SunTrust Bank*, No. 8:12-cv-1325-T-33MAP, 2014 WL 1364982, at *11 (M.D. Fla. Apr. 7, 2014) (denying without prejudice a motion for adverse jury instruction based on spoliation but allowing the moving party "to introduce evidence at trial concerning . . . [the defendant's] failure to preserve the [evidence] at issue."). Plaintiffs argue that they are entitled to present Delta's discovery abuses to the jury at trial.

Based on the record that has been developed in this case to date, the Court will not permit Plaintiffs to present evidence to the jury regarding alleged spoliation by Delta. As detailed throughout this Order, the Court—after thoroughly reviewing the R&R, the parties' objections to the R&R, the parties' submissions to the special master on the third motion for sanctions, and the transcripts of the hearings that the special master presided over—agrees with the special master's conclusions regarding the elements of a spoliation claim, i.e., loss of

41

evidence, resulting prejudice, the existence of a duty to preserve, and

bad faith. The Court finds no disputed factual questions regarding

spoliation that need to be resolved by a jury. *Cf. SunTrust Bank*, 2014

WL 1364982, at *9-10 (allowing spoliation to go to the jury where the

defendant destroyed video footage in contravention of its own

document-retention policy and after relying on the footage to

investigate the plaintiff's claims, and the defendant could never explain

why it permitted the footage to be taped over); *see also Wandner v. Am.*

*Airlines*, ___ F. Supp. 3d ___, No. 14-cv-22011, 2015 WL 145019, at *2,

13 (S.D. Fla. Jan. 12, 2015) (recommending that the plaintiff be

permitted to make spoliation arguments at trial where the duty to

preserve the destroyed evidence was not in dispute, but there was a

question whether the content of the destroyed footage would have

helped the plaintiff's case).[13]

---

[13] To the extent that Plaintiffs complain that the special master acted
improperly in weighing the credibility of witnesses and finding that Plaintiffs had
not met their burden, the Court notes that on a motion for sanctions, unlike one for
summary judgment, credibility determinations are not reserved for the jury. *See*,
*e.g.*, *Ashton*, 772 F. Supp. 2d at 778 (noting that "[w]itness credibility" is "critical" to
the resolution of a motion for spoliation sanctions, particularly where the alleged
spoliator's intent is at issue). To accept Plaintiffs' argument would be to allow a

The Court is also of the opinion that evidence of Delta's alleged spoliation at trial is properly excluded under Rule 403 of the Federal Rules of Evidence. Admitting that evidence would transform what should be a trial about Defendants' alleged antitrust conspiracy into one on discovery practices and abuses, in precisely the same way that merits discovery has been sidelined by discovery on discovery. At a minimum, it would create the need for a "trial within a trial" regarding discovery, which raises the risk of confusing the issues and resulting in the presentation of cumulative evidence, the wasting of time, and undue delay. This case needs to be decided on its merits, and the Court questions whether that would be possible if trial is injected with issues of spoliation based only on the evidence presently before the Court.

Lastly, the Court finds that permitting a jury to consider Delta's alleged spoliation would create a significant risk of unfair prejudice to AirTran. Any adverse inference to be drawn against Delta would necessarily influence the jury's assessment of AirTran's culpability,

---

party to fabricate a jury question in any case by raising even the most specious claim of spoliation.

particularly in light of the nature of Plaintiffs' claims in this case. Yet AirTran has not been accused of, let alone shown to have committed, any discovery misconduct. And as discussed above, Plaintiffs have not proven that Delta's misconduct prejudiced them or resulted in the loss of unique and relevant evidence. Hence, the prejudice flowing to AirTran from the introduction of spoliation evidence at trial would be profoundly unfair. The Court will not permit Plaintiffs to present argument or evidence regarding the conduct that has been the subject of their sanctions motions at trial. Regardless of that ruling, the existence *vel non* of a jury question has no bearing on the Court's consideration of the R&R.

### 4. The R&R's Refusal to Impose Merits Sanctions Under a Non-Spoliation Theory

Next, Plaintiffs point to four reasons the Court should impose evidentiary sanctions even if it does not find spoliation to have occurred.

### a. Delta's Pattern of Discovery Violations

First, Plaintiffs object that the R&R erred by analyzing Delta's numerous discovery transgressions in isolation from each other. Viewed together, Plaintiffs argue, the evidence reveals a pattern of bad-faith

misconduct by Delta that warrants the imposition of merits sanctions. In support of this argument, Plaintiffs again rely on *Bates*, 2012 WL 453233, at *1, in which Judge Totenberg found that the defendant's discovery violations "could be seen as legitimate mistakes and misunderstandings" when "[v]iewed in isolation," but taken together, they showed a "pattern of prejudicial discovery abuse" and "subterfuge" amounting to a willful violation of the court's prior discovery orders.

As explained above, the Court finds *Bates* distinguishable from this case. Delta's discovery practices have time and time again been shown to be ineffective, inefficient, and inept. Throughout this litigation, Delta's left hand has not known what its right hand was doing, and "it often times appears that this litigation was conducted in an Inspector Clouseau-like fashion." *Coquina Invs. v. Rothstein*, No. 10-60786-Civ, 2012 WL 3202273, at *1 (S.D. Fla. Aug. 3, 2012). Such incompetence—while anything but laudable—does not rise to the level of misconduct exhibited by Michelin in *Bates*. Delta has admitted to its many missteps, on some occasions bringing issues to the Court's attention before Plaintiffs had become aware of them. Delta's various

45

misstatements appear to have been made in good faith and without

knowledge of their misleading character, unlike the *Bates*

misrepresentations. Moreover, it was Delta's suggestion to appoint an

independent discovery expert to investigate its e-discovery practices,

even though Delta would foot the bill for the expert and have to disclose

confidential and proprietary information to him.

The other cases relied upon by Plaintiffs are no more persuasive.

For example, in *Coquina Investments*, 2012 WL 3202273, at *13-14, the

recalcitrant party made belated document productions "on the eve [of]

or during trial" that "contained highly relevant documents," and the

opposing party suffered prejudice from being denied the opportunity to

effectively capitalize on the late-produced documents at trial. *See also*

*Bray & Gillespie Mgmt., LLC v. Lexington Ins. Co.*, No. 6:07-cv-222-Orl-

35KRS, 2010 WL 55595, at *5 (M.D. Fla. Jan. 5, 2010) (imposing non-

monetary sanction of dismissal of a claim where the plaintiff had "acted

willfully and in bad faith" and had "evidenced a pattern of inexcusable

disregard for the authority of this Court and the larger civil discovery

process."). Plaintiffs are correct that Delta's discovery abuses must be

viewed in the appropriate context and not in a vacuum. But so viewed,

the pattern of conduct that becomes apparent to the Court does not

warrant evidentiary sanctions and is instead appropriately remedied by

an award of monetary sanctions.

> **b.    Delta's Burden of Proving the Loss of Documents Was Harmless or Substantially Justified**

Plaintiffs also argue that Delta failed to carry its burden, under

Rules 16, 26, and 37, of showing that its misconduct was harmless or

substantially justified.[14] The only provision relied upon by Plaintiffs

---

[14] This argument is misplaced to the extent it relates to Rules 16(f), 26(g), and 37(b), each of which mandates only the award of monetary sanctions in the form of an award of attorneys' fees and other expenses caused by the violation, precisely what is recommended in the R&R. *See* FED. R. CIV. P. 16(f)(2) (sanctions for violations of Rule 16 must include "the reasonable expenses—including attorney's fees—incurred because of any noncompliance . . . , unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust"); FED. R. CIV. P. 26(g)(3) ("If a [discovery] certification violates this rule without substantial justification, the court . . . must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both."); FED. R. CIV. P. 37(b)(2)(C) (if a party or an attorney violates a discovery order, the court must order payment of "the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust"). The R&R found that "Delta [made] no credible argument that it has been in substantial compliance with its discovery obligations" and that "Delta does not and could not claim that, despite its due care, it was unable to comply." [520], pp.102-03. That the special master did not use the phrase "substantially justified" is of no consequence, because he went on to recommend exactly the sanction called for by Rules 16(f), 26(g), and 37(b).

that speaks to evidentiary sanctions, however, is Rule 37(c), which

provides as follows:

> If a party fails to provide information or identify a witness as
> required by Rule 26(a) or (e), the party is not allowed to use
> that information or witness to supply evidence on a motion,
> at a hearing, or at a trial, unless the failure was
> substantially justified or is harmless. In addition to *or
> instead of* this sanction, the court, on motion and after giving
> an opportunity to be heard:
>
> (A)  *may order payment of the reasonable expenses,
>       including attorney's fees, caused by the failure*;
>
> (B)  may inform the jury of the party's failure; and
>
> (C)  may impose other appropriate sanctions, including
>       any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

FED. R. CIV. P. 37(c)(1) (emphasis added). Under this rule, evidentiary

sanctions *may* be imposed—even absent a finding of bad faith or

willfulness—for discovery violations that are not substantially justified

or harmless, but "instead of this sanction," a court "may order payment"

of a monetary sanction, to include expenses and attorney's fees caused

by the violation. *See also Prieto v. Malgor*, 361 F.3d 1313, 1318 (11th

Cir. 2004) ("The district court may impose other appropriate sanctions .

. . in lieu of the evidentiary exclusion" called for by Rule 37(c)(1));

*Collins v. United States*, No. 3:08-cv-923-J-32JRK, 2010 WL 46463279,

at *5 n.7 (M.D. Fla. Nov. 9, 2010) ("The evidentiary exclusion sanction is not necessarily 'automatic,' even in the absence of substantial justification and harmlessness, because Rule 37(c)(1) provides that a court may impose other appropriate sanctions '[i]n addition to *or instead* of this sanction.'" (quoting FED. R. CIV. P. 37(c)(1))).

Delta's failure to justify its violations or show them to be harmless does merit sanctions under Rule 37(c) as well as Rules 16(f), 26(g), and 37(b). But in suggesting that this failure mandates more than monetary sanctions, Plaintiffs disregard the permissive language of Rule 37(c). The Court finds that substantial monetary sanctions are sufficient to remedy and punish Delta's recalcitrance in this case and deter future litigants from similar discovery violations.

### c. Delta's Willfulness and the Adequacy of Prior Sanctions

The third argument proffered by Plaintiffs in support of merits sanctions is that Delta has acted willfully and has not been deterred by prior monetary sanctions.

As to Delta's willfulness, such a finding is supported by "[c]onduct amounting to 'flagrant disregard' and 'willful disobedience.'" *Versage v.*

49

*Marriott Int'l, Inc.*, No. 6:05-cv-974-Orl-19JGG, 2006 WL 3614921, at \*3

(M.D. Fla. Dec. 11, 2006) (quoting *Phillips v. Ins. Co. of N. Am.*, 633

F.2d 1165, 1167 (5th Cir. Unit B 1981)); *see also Bray & Gillespie*

*Mgmt., LLC*, 2010 WL 55595, at \*5 (finding willfulness where the

sanctioned party's conduct "evidence[d] a pattern of inexcusable

disregard for the authority of this Court and the larger civil discovery

process."). Inexcusable though Delta's violations have been, they have

not been the result of willful disobedience or flagrant disregard of the

Court's authority. The Court rejects Plaintiffs' invitation to imply

willfulness merely because Delta's conduct was within its own control.[15]

---

[15] Certainly, conduct that is beyond a party's control is usually insufficient to warrant a finding of willfulness, *Emerick v. Fenick Indus., Inc.*, 539 F.2d 1379, 1381 (5th Cir. 1976), but it does not necessarily follow that every violation based on circumstances within a party's control is willful. The court in *Versage*, 2006 WL 3614921, at \*6, did make that logical leap, but such a broad definition of willfulness is at odds with the Eleventh Circuit's equation of willfulness with deliberate and intentional misconduct. *See, e.g., Shortz v. City of Tuskegee*, 352 F. App'x 355, 359-60 (11th Cir. 2009) (finding willfulness and bad faith where the plaintiff's misconduct was knowing, intentional, undertaken despite a warning of the sanction to be imposed, and accompanied by an "antagonistic relationship with defense counsel" and inappropriate demeanor before the court); *Maulatea v. Suzuki Motor Co.*, 987 F.2d 1536, 1538 (11th Cir. 1993) (defendants' willfulness was evidenced by "deliberately withholding discoverable information that the judge had ordered them to produce."). Even under this heightened standard, the facts of *Versage*—involving a plaintiff's repeated failure to appear for her deposition—and the case on which *Versage* relies—*Phillips*, involving a plaintiff's prolonged failure to execute a power-of-attorney form—would support a finding of willfulness.

Unpersuaded that Delta has acted willfully in connection with its discovery violations to date, the Court remains of the opinion that monetary sanctions—and severe ones, to be sure—are the appropriate remedy for Delta's misconduct. Although the Court regrets that its prior sanctions have not entirely prevented further violations, it disagrees with Plaintiffs' assertion that they have been altogether useless in deterring or dissuading such violations. It is doubtful, for instance, that Delta would have requested a discovery expert be appointed were it not for the prior sanctions and Delta's desire to avoid similar sanctions going forward. And at any rate, the many other factors addressed in this Order mitigate against imposing non-monetary sanctions.

### d.  Imposition of Non-Monetary Sanctions to Compensate, Penalize, and Deter

Plaintiffs also contend that the monetary sanction recommended in the R&R fails to serve the purposes of sanctions under Rule 37, which include: "1) compensating the court and other parties for the added expense caused by the abusive conduct; 2) compelling discovery; 3) deterring others from engaging in similar conduct; and 4) penalizing

the guilty party or attorney." *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (11th Cir. 1985).

Plaintiffs' aggrandized assertion that "Delta faces no consequence for the over four-year delay in the litigation," [529], p.11, is unsupported. To date, Delta has paid almost $5 million in discovery sanctions, exclusive of the additional sanctions imposed in this Order. By the same token, the Court's findings regarding the minimal loss of unique evidence and the lack of resulting prejudice to Plaintiffs render unpersuasive the contention that Plaintiffs have "no remedy for the loss of potentially relevant evidence."

However, the suggestion that the R&R requires Delta to reimburse only a fraction of the fees and expenses caused by its misconduct is well taken. The R&R's analysis of the pertinent evidence is sound, and the vast majority of its conclusions and recommendations are entirely appropriate in light of that evidence. But the Court's consideration of the full context within which the instant motion arises—including the long and agonizing road the case has traveled to this most recent impasse—lead to the conclusion that the monetary

sanction recommended by the special master is too generous to Delta and does not adequately compensate Plaintiffs or penalize or deter Delta's abusive conduct. Therefore, the Court will sustain Plaintiffs' objections to the extent they seek an increase in the amount of the monetary sanction to be imposed, as set forth below.

### 5. Calculation of the Monetary Sanctions To Be Awarded

Plaintiffs seek just less than three million dollars in monetary sanctions against Delta: $2,927,347.50 in sanctions calculated based on the historical billing rates of Plaintiffs' counsel, or $2,970,778.50 if counsel's current billing rates are applied to past time. As indicated above, Brown relies on counsel's historical rates and recommends imposing a sanction of $1,855,255.09, including $1,690,548.99 in attorneys' fees incurred since June 2013, and $164,706.10 in requested expenses. Brown disallowed all fees and expenses incurred before June 2013—totaling $172,695 using historical billing rates, or $193,972 using current rates—and also did not award fees or expenses attributable to Kelly Turner Brown's deposition and the October 2014 hearing that followed, totaling $238,704.05. Plaintiffs lodge a series of objections to

53

this recommendation and the reductions and disallowances through which Brown reached it.

### a.   Special Master's Use of Plaintiffs' Counsel's Historical Billing Rates

Because it affects the baseline from which any other adjustments to Plaintiffs' revised request must be made, the Court begins by analyzing whether, as Plaintiffs contend, the special master should have relied on counsel's current billing rates, rather than their historical rates, in calculating the monetary sanction to be awarded.

When there is a significant delay in payment of attorneys' fees incurred in the past, the party receiving the payment should be compensated for that delay. "In this circuit, where there is a delay the court should take into account the time value of money and the effects of inflation and generally award compensation at current rates rather than at historic rates." *Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1988). Other courts have accounted for the delay by "enhancing" an award of fees, usually by a certain percentage. *See*, *e.g.*, *Searcey v. Crim*, 692 F. Supp. 1363, 1367 (N.D. Ga. 1988) ("Plaintiffs next seek a 10% enhancement based on delay of

54

payment."); *Williams v. Marriott Corp.*, 669 F. Supp. 2, 6 (D.D.C. 1987) ("the fee award should be enhanced by . . . a 15 percent upward adjustment for delay in payment"); *Masonry Masters, Inc. v. Nelson*, 105 F.3d 708, 713 (D.C. Cir. 1997) (enhancing fees calculated by historical rates by the judgment rate of interest).

In the Eleventh Circuit, at least since *Norman*, the former practice of awarding fees measured by current billing rates is the "universal[]" approach to compensating for delay in payment. *Knight v. State of Ala.*, 824 F. Supp. 1022, 1030 (N.D. Ala. 1993); *see, e.g.*, *Searcey*, 692 F. Supp. at 1367 (awarding current rates and rejecting plaintiffs' request for "a 10% enhancement based on delay of payment"). The latter practice of enhancing fee awards is reserved for cases that are "unusual," "rare," and "exceptional." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554-55 (2010). Because the same end is served by using current billing rates and by enhancing fees measured by historical rates, it is an abuse of discretion to over-compensate for delay in payment by employing both methods. *Gray ex rel. Alexander v. Bostic*, 613 F.3d 1035, 1046 (11th Cir. 2010); *accord Searcey*, 692 F. Supp. at

1367 ("[N]o enhancement for delay is appropriate where plaintiffs are compensated at current rates.").

Delta appears to conflate these two notions when it argues that Plaintiffs seek the extraordinary relief of a fee enhancement.[16] Plaintiffs do not seek an enhancement[17]; they request an award calculated with current billing rates, which is standard in this circuit. Through the instant motion, Plaintiffs seek compensation for fees dating back to August 2012, almost three years ago, and as explained below, the Court will award fees incurred more than two years ago. That delay in payment—at least the vast majority of it—was caused by Delta's discovery failures. Under such circumstances, district courts in this circuit acknowledged that the use of current rates is "particularly

---

[16] *See, e.g.*, [546], pp.861-63 (Delta's counsel arguing that the application of current rates to past billing is an extraordinary remedy); [538], p.20 (Delta objecting that Plaintiffs "argue . . . that their revised fee request be enhanced."); Sept. 15, 2014 Letter from J. Denvir to B. Brown, p.2 ("Plaintiffs' counsel have not offered any further justification for an 'enhancement' of their hourly rates, which is reserved for only 'extraordinary circumstances' involving 'exceptional delay' caused by the opposing party." (quoting *Gray*, 613 F.3d at 1045)).

[17] In a footnote in their objections, Plaintiffs do make passing reference to the Eleventh Circuit's holding in *Gray* regarding the permissibility of awarding an enhancement, [529], p.39 n.117, but elsewhere in the record their position is clear that they seek compensation for delay in payment through an award of current rates. To the extent Plaintiffs do seek an enhancement, their request is denied.

applicable." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 355 (N.D. Ga. 1993) ("The use of current rates charged by the attorney . . . is particularly applicable when legal services are performed within a two or three-year period.").

In light of the delay in payment and the foregoing authorities, the Court will sustain Plaintiffs' objections to the extent they argue for an award of fees measured by Plaintiffs' counsel's current billing rates.

### b.   Fees and Expenses Attributable to Kelly Turner Brown's Deposition and October 7 Hearing

The special master refused, without explanation, to award Plaintiffs $222,743 in fees and $15,961.05 in expenses incurred in connection with the September 2014 deposition of Kelly Turner Brown and the October 7 hearing that followed it. The Court agrees this was erroneous. *Norman*, 836 F.2d at 1304 ("If the court disallows hours, it must explain which hours are disallowed and show why an award of these hours would be improper."). Ms. Brown's deposition testimony did not materially advance Plaintiffs' motion for sanctions, *see* [520], pp.84-89, but given that Plaintiffs incurred these costs in connection with

57

allegations by a current Delta employee who had testified at the hearing on the motion for sanctions that she was in possession of evidence of ongoing misconduct by Delta, they cannot be faulted for following up on that lead. It is apparent, therefore, that these fees and expenses are causally connected to Delta's misconduct and compensable. Upon review of Plaintiffs' supplemental request, the Court finds the amount requested reasonable and will award to Plaintiffs the full $238,704.05 requested.

### c.   Fees Incurred Prior to June 2013

Although Plaintiffs' motion was not filed until December 2013, Plaintiffs' counsel testified that they began work on it as early as August 2012 and continued to work on it "intermittently" as the case progressed. [546], p.839. The Court finds that Brown's disallowance of fees incurred between August 2012 and May 2013 is appropriate, because there is no rational basis from which to discern what efforts during this time period are fairly traceable to Delta's misconduct and what hours represent work on the merits of the case or time spent unnecessarily expanding the scope of Precision Discovery's engagement.

58

To briefly review the pertinent chronology, Defendants filed motions for summary judgment in August 2012. In September and October, Plaintiffs filed a supplemental brief in support of their motion for class certification, and the parties were swapping letter briefs relating to Plaintiffs' third motion for sanctions. November saw yet another discovery dispute and the beginning of the Pixley process, which would continue through May 2013. As the Court has previously noted, many of the efforts of Plaintiffs' counsel during those six months dramatically and improperly expanded the scope of Precision's engagement.

"A party seeking fees pursuant to Rule 37 bears the burden of showing its request is reasonable." *Miles v. Elliot*, No. 94-4669, 2011 WL 5524842, at *1 (E.D. Pa. Nov. 14, 2011). The Court does not doubt the veracity of Plaintiffs' counsel's testimony that the instant motion for sanctions was in the works during this time. But in light of the significant non-compensable work that was also being done and the fact that this work was so far removed in time from the filing of the motion for sanctions, the Court concludes that Plaintiffs have not met their

burden of showing that fees incurred between August 2012 and May 2013 are reasonable and traceable to Delta's discovery misconduct.[18] Furthermore, Plaintiffs' counsel testified that they were not seeking to recover fees incurred between November 2012 and May 2013. [546], p.966. Those fees were therefore properly omitted from the special master's recommendation.

### d.   Ten-Percent Reduction for Work on Merits

Even after May 2013, Plaintiffs continued to work simultaneously on their motion for sanctions and on their summary judgment response and class certification briefs. The special master found significant overlap between the work required to brief the sanctions motion and that which would have been necessary, even in the absence of a sanctions motion, in responding to Defendants' motions for summary judgment and briefing Plaintiffs' own motion for class certification. Most significant to Brown in this regard was Plaintiffs' Appendix C [413-2], pp.51-82, "where Plaintiffs marshal evidence of price-fixing

---

[18] As Plaintiffs' counsel has noted, "one of the things that's difficult" in this case is deciding "where to draw the line between what's happened before" and what is relevant to the instant motion. [546], p.953.

'plus factors'; alleged collusive communications before the parallel price increase; unilateral action against self-interest; pretextual reasons for imposing a first-bag fee; motive; antitrust defenses; and evidence supporting class certification." [520], p.112 (internal citations and punctuation omitted). Brown recommends a ten-percent across-the-board reduction in the requested fees to account for the fact that some of the work was not "caused by the failure" of Delta to comply with its discovery obligations. FED. R. CIV. P. 37(b)(2)(C).

Procedurally, the Court rejects Plaintiffs' argument that they had no chance to respond to this *sua sponte* reduction. Plaintiffs were heard at a day-long hearing addressing attorneys' fees, which included discussion regarding the extent to which Plaintiffs' sanctions motion involved work that would have been required in connection with summary judgment or class certification. [546], pp.799-800, 809, 839. Moreover, the Court is empowered to make an award of reasonable fees in light of "its own knowledge and experience," *Norman*, 836 F.2d at 1303, which encompasses the ability, if not the duty, to analyze the reasonableness of a fee request, even if the opposing party does not

contest the fees, *Claiborne v. Ill. Cent. R.R.*, 583 F.2d 143, 155 (5th Cir. 1978). *See also NAACP v. City of Evergreen, Ala.*, 812 F.2d 1332, 1334 (11th Cir. 1987) ("A trial judge cannot substitute his own judgment for uncontradicted evidence, without explanation and record support, but he does not have to accept uncontradicted evidence if there is a reason for rejecting it.").

To the extent Plaintiffs contend that they should be given further opportunity to supplement the voluminous record, the Court disagrees. Courts are permitted to order supplementation of a fee petition under certain circumstances, but the Eleventh Circuit recognizes that "[o]rdinarily, of course, the district court should not depart from its position of neutrality to coach either party on the proper preparation of their pleadings." *Norman*, 836 F.2d at 1303 n.2. In any event, Plaintiffs have now been given the opportunity to respond in their motion for reconsideration (when they did not raise this argument), and most recently, in their objections to the R&R. [529], pp.28-30. The Court will not remand the issue for further proceedings before the special master.

Turning to the substance of the ten-percent reduction, the Court agrees with the special master that there was some duplication of effort between Plaintiffs' motion for sanctions and their work on their summary judgment and class certification briefing. And there is no doubt that it would be an onerous if not impossible task to parse through Plaintiffs' fee submission to determine on an hour-by-hour basis what work was redundant and what work was unique to the motion for sanctions. But reducing the total fees requested by ten percent has the effect of denying compensation for work that was plainly not redundant, such as preparation for and attendance at hearings, reviewing Delta's briefs and exhibits, and cite-checking Plaintiffs' own briefs. It also disregards the testimony of Plaintiffs' counsel that their early work on summary judgment aided their motion for sanctions, not the other way around.

The special master correctly found that Plaintiffs' work on Appendix C is the most significant example of their duplication of effort. Plaintiffs' fee application reveals that they spent more than forty-five

hours and incurred more than $25,000 in preparing, revising, and

replying to Appendix C:

| Timekeeper | Entry Date | Rate | Duration | Total |
|---|---|---|---|---|
| D. Low | 4/2/2014 | $595 | 9.9 | $5,890.50 |
| A. Doyle | 4/2/2014 | $440 | 5.0 | $2,200.00 |
| D. Low | 4/3/2014 | $595 | 8.6 | $5,117.00 |
| A. Doyle | 4/3/2014 | $440 | 4.2 | $1,848.00 |
| D. Low | 4/4/2014 | $595 | 7.7 | $4,581.50 |
| R. Wood | 4/8/2014 | $600 | 4.8 | $2,880.00 |
| J. Ward | 4/8/2014 | $600 | 5.1 | $3,060.00 |
| | | **Total** | **45.3** | **$25,577.00** |

The Court will disallow the entirety of these fees, as the work is so

intertwined with work on the merits that it cannot be said to be caused

by Delta's misconduct and thus compensable under Rule 37(c).

In addition to fees expressly attributable to Appendix C, Plaintiffs

incurred approximately $325,000 in other work on their appendices and

reply appendices between November 2013 and July 2014:

| Timekeeper | Entry Date | Rate | Duration | Total |
|---|---|---|---|---|
| D. Low | 11/1/13 | $595 | 7.1 | $4,224.50 |
| D. Low | 11/2/13 | $595 | 3.9 | $2,320.50 |
| D. Low | 11/3/13 | $595 | 7.9 | $4,700.50 |
| D. Low | 11/4/13 | $595 | 8.6 | $5,117.00 |
| D. Low | 11/5/13 | $595 | 7.4 | $4,403.00 |
| D. Low | 11/6/13 | $595 | 6.7 | $3,986.50 |
| D. Low | 11/7/13 | $595 | 5.2 | $3,094.00 |
| D. Low | 11/8/13 | $595 | 5.2 | $3,094.00 |
| D. Low | 11/10/13 | $595 | 4.5 | $2,677.50 |
| D. Low | 11/11/13 | $595 | 6.4 | $3,808.00 |
| D. Low | 11/12/13 | $595 | 5.5 | $3,272.50 |
| D. Low | 11/14/13 | $595 | 5.7 | $3,391.50 |

| R. Wood | 11/14/13 | $600 | 0.1 | $60.00 |
|---|---|---|---|---|
| D. Low | 11/15/13 | $595 | 6.3 | $3,748.50 |
| D. Low | 11/16/13 | $595 | 5.1 | $3,034.50 |
| D. Low | 11/17/13 | $595 | 2.5 | $1,487.50 |
| D. Low | 11/18/13 | $595 | 9.6 | $5,712.00 |
| D. Low | 11/19/13 | $595 | 7.5 | $4,462.50 |
| R. Wood | 11/19/13 | $600 | 2.9 | $1,740.00 |
| D. Low | 11/20/13 | $595 | 11.9 | $7,080.50 |
| D. Low | 11/21/13 | $595 | 6.7 | $3,986.50 |
| J. Thompson | 11/21/13 | $375 | 3.6 | $1,350.00 |
| D. Low | 11/22/13 | $595 | 7.7 | $4,581.50 |
| J. Thompson | 11/22/13 | $375 | 2.9 | $1,087.50 |
| J. Thompson | 11/23/13 | $375 | 3.3 | $1,237.50 |
| D. Low | 11/24/13 | $595 | 3.8 | $2,261.00 |
| J. Thompson | 11/24/13 | $375 | 3.0 | $1,125.00 |
| D. Low | 11/25/13 | $595 | 10.6 | $6,307.00 |
| J. Thompson | 11/25/13 | $375 | 3.7 | $1,387.50 |
| D. Low | 11/26/13 | $595 | 2.1 | $1,249.50 |
| J. Thompson | 11/26/13 | $375 | 6.4 | $2,400.00 |
| R. Wood | 11/26/13 | $600 | 3.7 | $2,220.00 |
| J. Ward | 11/26/13 | $600 | 2 | $1,200.00 |
| D. Low | 11/27/13 | $595 | 13.0 | $7,735.00 |
| D. Kotchen | 11/27/13 | $645 | 7.6 | $4,902.00 |
| J. Thompson | 11/27/13 | $375 | 3.2 | $1,200.00 |
| R. Wood | 11/27/13 | $600 | 2.1 | $1,260.00 |
| J. Ward | 11/27/13 | $600 | 9.2 | $5,520.00 |
| D. Low | 11/28/13 | $595 | 0.8 | $476.00 |
| R. Wood | 11/28/13 | $600 | 0.2 | $120.00 |
| D. Low | 11/29/13 | $595 | 14.1 | $8,389.50 |
| D. Kotchen | 11/29/13 | $645 | 5.0 | $3,225.00 |
| J. Ward | 11/29/13 | $600 | 0.4 | $240.00 |
| D. Low | 11/30/13 | $595 | 14.0 | $8,330.00 |
| D. Kotchen | 11/30/13 | $645 | 4.5 | $2,902.50 |
| D. Low | 12/1/13 | $595 | 13.7 | $8,151.50 |
| D. Kotchen | 12/1/13 | $645 | 5.0 | $3,225.00 |
| A. Doyle | 12/1/13 | $440 | 8.0 | $3,520.00 |
| A. Doyle | 12/2/13 | $440 | 1.0 | $440.00 |
| J. Ward | 12/2/13 | $600 | 1 | $600.00 |
| J. Ward | 12/9/13 | $600 | 0.1 | $60.00 |
| R. McCulley | 12/13/13 | $575 | 1.2 | $748.00 |

| R. Wood | 12/13/13 | $600 | 0.2 | $120.00 |
|---|---|---|---|---|
| J. Ward | 12/13/13 | $600 | 0.3 | $180.00 |
| D. Kotchen | 3/4/14 | $645 | 10.5 | $6,772.50 |
| D. Kotchen | 3/5/14 | $645 | 9.7 | $6,256.50 |
| D. Kotchen | 3/6/14 | $645 | 10.3 | $6,643.50 |
| M. von Klemperer | 3/6/14 | $335 | 0.2 | $67.00 |
| D. Kotchen | 3/7/14 | $645 | 8.0 | $5,160.00 |
| M. von Klemperer | 3/9/14 | $335 | 1.2 | $402.00 |
| D. Kotchen | 3/10/14 | $645 | 8.0 | $5,160.00 |
| D. Kotchen | 3/12/14 | $645 | 8.0 | $5,160.00 |
| M. von Klemperer | 3/12/14 | $335 | 3.8 | $1,273.00 |
| D. Kotchen | 3/13/14 | $645 | 7.2 | $4,644.00 |
| M. von Klemperer | 3/13/14 | $335 | 2.5 | $837.50 |
| D. Kotchen | 3/14/14 | $645 | 8.7 | $5,611.50 |
| D. Kotchen | 3/20/14 | $645 | 2.3 | $1,483.50 |
| D. Low | 3/25/14 | $595 | 9.8 | $5,831.00 |
| D. Low | 3/26/14 | $595 | 10.1 | $6,009.50 |
| D. Low | 3/27/14 | $595 | 10.1 | $6,009.50 |
| D. Low | 3/28/14 | $595 | 6.5 | $3,867.50 |
| M. von Klemperer | 3/28/14 | $335 | 0.2 | $67.00 |
| D. Low | 3/30/14 | $595 | 5.3 | $3,153.50 |
| D. Kotchen | 4/4/14 | $645 | 6.7 | $4,321.50 |
| D. Kotchen | 4/5/14 | $645 | 5.0 | $3,225.00 |
| D. Low | 4/6/14 | $595 | 11.5 | $6,842.50 |
| D. Kotchen | 4/6/14 | $645 | 3.3 | $2,128.50 |
| D. Low | 4/7/14 | $595 | 11.3 | $6,723.50 |
| D. Kotchen | 4/7/14 | $645 | 6.1 | $3,934.50 |
| R. Wood | 4/7/14 | $600 | 2.6 | $1,560.00 |
| J. Ward | 4/7/14 | $600 | 1.6 | $960.00 |
| D. Low | 4/8/14 | $595 | 9.1 | $5,414.50 |
| D. Kotchen | 4/8/14 | $645 | 3.0 | $1,935.00 |
| S. Hosker | 4/8/14 | $120 | 1.5 | $180.00 |
| D. Low | 4/9/14 | $595 | 11.4 | $6,783.00 |
| R. Wood | 4/9/14 | $600 | 7.6 | $4,560.00 |
| J. Ward | 4/9/14 | $600 | 7.6 | $4,560.00 |
| K. McElveen | 4/9/14 | $375 | 6.3 | $2,362.50 |

| S. Hosker | 4/9/14 | $120 | 3.1 | $372.00 |
| D. Low | 4/10/14 | $595 | 14.1 | $8,389.50 |
| J. Ward | 4/10/14 | $600 | 8.4 | $5,040.00 |
| K. McElveen | 4/10/14 | $375 | 4.2 | $1,575.00 |
| S. Hosker | 4/10/14 | $120 | 3.3 | $396.00 |
| S. Hosker | 4/10/14 | $120 | 3.5 | $420.00 |
| D. Kotchen | 4/11/14 | $645 | 8.0 | $5,160.00 |
| J. Ward | 4/11/14 | $600 | 0.1 | $60.00 |
| D. Bain | 4/12/14 | $440 | 0.5 | $220.00 |
| J. Ward | 7/1/14 | $600 | 4.3 | $2,580.00 |
| S. Hosker | 7/1/14 | $120 | 3.5 | $420.00 |
| J. Ward | 7/2/14 | $600 | 7.7 | $4,620.00 |
| S. Hosker | 7/2/14 | $120 | 10 | $1,200.00 |
| R. Wood | 7/8/14 | $600 | 0.7 | $420.00 |
| S. Hosker | 7/8/14 | $120 | 3.5 | $420.00 |
| | | **Total** | **576.0** | **$324,344.50** |

In light of the factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), the Court finds that almost six hundred hours and more than three hundred thousand dollars is excessive and unreasonable for work on the appendices and reply appendices.[19] This is particularly true in light of the fact that it

---

[19] In reaching this conclusion, the Court finds particularly relevant the first two *Johnson* factors, which look to the time and labor required and the novelty or difficulty of the questions. As previously discussed, Plaintiffs' counsel's reliance on appendices in support of their motion for sanctions unnecessarily complicated what could have been a far less time- and labor-intensive process. Many of the issues addressed in the appendices had been raised in prior motions, and Plaintiffs' counsel testified that their contemporaneous work on their summary judgment response briefs aided their sanctions briefing, making the time and money spent preparing their appendices appear all the more unreasonably high. Furthermore, looking to the results obtained, the eighth *Johnson* factor, the Court notes that Plaintiffs ultimately failed to prove that spoliation occurred, further supporting the

was Plaintiffs' reliance on their appendices that unnecessarily complicated the process of briefing the instant motion. Thus, the Court finds that this amount, rather than the total amount of requested fees, is the appropriate starting point for the application of an across-the-board cut to reflect work on the merits.

"When a district court finds the number of hours claimed is unreasonably high, the court has two choices: it may conduct an hour-by-hour analysis or it may reduce the requested hours with an across-the-board cut." *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008). In light of the voluminous fee petition and record, the Court agrees with the special master that a ten percent across-the-board reduction is appropriate, but the Court will apply that reduction only to the $324,344.50 in fees requested in connection with work on Plaintiffs' appendices and will therefore reduce the award of fees by $32,434.45.

---

decision to reduce the award of the fees attributable to their efforts to prove spoliation, including through use of their appendices.

### e.    Twenty-Percent Partner/Associate Reduction

After reducing Plaintiffs' requested fees by ten percent across the board, the special master then applied a twenty-percent reduction "to reflect a more efficient allocation of time between partners and associates" at Plaintiffs' counsel's law firms. [520], p.113. The Court finds Plaintiffs' objections to this reduction not just persuasive, but compelling, and it will therefore decline to make this adjustment.

This reduction was driven in large part by the testimony of Delta's expert, Rocco Testani. Testani reviewed Plaintiffs' fee petition and testified that "[a] lot of activity that you would expect to be done by lower rate timekeepers was done by the most senior people in the file." [546], p.993. According to one example, "[i]n the case of Kotchen & Low, . . . the partner time was 80 percent of their submission," and "a lot of the activity . . . is work that you would normally expect to be pushed down to associates, lower cost timekeepers," including the firm's one associate or lawyers serving as "counsel" to the firm. *Id.*, p.996. Testani further testified that he "would expect that you would have certainly no more than a 50/50 ratio partner to associate, and probably more like a

69

40/60 or one-third to two-third ratio." *Id.*, p.999. By his calculation, if Plaintiffs' counsel had employed a less partner-heavy approach to the sanctions motion, their requested fees would have been "significantly" reduced, by "somewhere between 15 and 25 percent." *Id.*

On cross-examination, Testani conceded that "how law firms choose to organize" a project "is going to be pretty sui generis," in part because "clients want to have as low of a bill as possible for the best work possible." *Id.*, p.1007. He also testified that it is not unusual to see a direct relationship between the amount of attorneys' fees and the amount at stake and that higher attorneys' fees are to be expected where there are many issues being litigated in a single motion. *Id.*, pp.1008, 1014. Although he stood by his opinion that the hours spent on the discovery dispute were unreasonable and excessive, Testani indicated that he had not analyzed similar disputes in the specific context of an MDL such as this one. *Id.*, p.1009. Finally, Testani acknowledged the importance of efficiency: "[I]f [a partner] could do something in 30 minutes that it would take [an associate] 10 hours to

70

do, of course " it would be reasonable for the partner to execute that task. *Id.*, p.1022.

The Court finds that the special master assigned too much weight to Testani's testimony regarding the appropriate or expected allocation of work between partners and associates in this case. This is not based on any credibility findings, but on the fact that the entirety of Testani's twenty-two-year career has been spent at a single, large law firm. As knowledgeable as Testani appears to be on the issues of complex litigation and discovery disputes, his testimony fails to recognize the realities of staffing complex cases at small, Plaintiffs'-side law firms.

As numerous courts have recognized, "Plaintiffs' counsel's small firms are not structured like large defense firms," and "[t]hey should not suffer consequences in a fee award because a significant amount of the work fell on [partners'] shoulders due to the size of their firms." *Aguilar v. Zep Inc.*, No. 13-cv-563-WHO, 2014 Wl 4063144, at *7 (N.D. Cal. Aug. 15, 2014); *In re Vitamin C Antitrust Litig.*, Nos. 06-md-1738, 05-cv-453, 2013 WL 6858853, at *5 (E.D.N.Y. Dec. 30, 2013) ("It is also well known that plaintiffs' law firms frequently follow a different model

than large mega-firms in terms of the allocation of work between partners and associates, placing much more responsibility at higher levels. I see no general infirmity in using this model."); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, No. IP-96-1718-C-H/K, 2002 WL 1801647, at *6 (S.D. Ind. July 5, 2002) (objection to top-heavy billing was "misguided," "reflect[ed] a persistent but not always accurate caricature of law practice in which senior partners do relatively little hands-on work while more junior minions do the bulk of the work," and "undervalue[d] legal research and writing, which are often decisive, especially when dealing with complex and unusual issues."). "The court may not condition fees on plaintiffs' counsel's conformance to the typical commercial law firm's pyramidal staffing structure." *Aguilar*, 2014 WL 4063144, at *7.

Delta has a team of highly skilled lawyers with the resources of large law firms behind them to fight against sanctions. Conversely, Kotchen & Low, who did most of the work on the sanctions briefing, has only one associate, and at the time the motion was prepared and filed, he was just two years out of law school. Other firms serving as lead

Plaintiffs' counsel are similarly leveraged, and at least one lawyer representing Plaintiffs is a sole practitioner. Furthermore, this case involves a highly complex subject matter, and the instant motion is multifaceted and raised myriad questions regarding allegedly lost and destroyed data. This is not the first, nor the second, nor even the third time that Plaintiffs have moved for sanctions against Delta. Although Plaintiffs' efforts have not been uniformly successful in that regard, there is no question that their motions were necessitated by Delta's conduct and that each time, their efforts have led to admissions or findings of wrongdoing by Delta.

Under all these circumstances, the Court cannot fault Plaintiffs' counsel for employing what could otherwise be viewed as partner-heavy billing. The Court finds that Plaintiffs have met their burden of establishing that its fees are reasonable with respect to the allocation of work between partners and associates. The Court will reject that portion of the R&R that concludes otherwise.

### f.    Fees on Fees

The special master acknowledged that Plaintiffs would continue to incur fees and expenses relating to the motion for sanctions after the issuance of his R&R, but he explained that his award "is not intended to be open-ended" and that he "has already . . . taken into account" the fact that Plaintiffs will continue to litigate the fees issue without reimbursement. [520], p.114. "Unless there are reasons to the contrary, motion costs should be granted whenever underlying costs are allowed." *Novick v. AXA Network, LLC*, No. *4 (S.D.N.Y. Feb. 23, 2015) (internal punctuation omitted) (quoting *Valley Disposal, Inc. v. Cent. Vt. Solid Waste Mgmt. Dist.*, 71 F.3d 1053, 1060 (2d Cir. 1995)) (awarding fees on fees in context of Rule 37 sanctions motion). The Court finds no persuasive reason to preemptively cut off Plaintiffs' entitlement to fees on fees, particularly in light of the fact that many of their objections to the R&R were well taken.

In recognizing that Plaintiffs should receive fees on fees, the Court is loath to invite another round of disputes and briefing regarding these issues. Plaintiffs' counsel are directed to submit to Delta's counsel a

statement of all fees and expenses incurred since the date of the R&R that Plaintiffs contend are reasonably traceable to this sanctions motion. Delta shall review the supplemental request and notify Plaintiffs' counsel if it opposes any part of the requested fees. The parties are encouraged and expected to work together in good faith to resolve as many issues without the Court's involvement as they can.

In the unfortunate event that the parties are unable to come to an agreement regarding the amount of fees on fees that Plaintiffs should be awarded, Plaintiffs may file a supplemental fee petition with the Court that—exclusive of any billing records attached to or reproduced in the petition—does not exceed fifteen pages in length. Within seven days of the filing of such a petition, Delta may file a response brief that is likewise limited to fifteen pages, and Plaintiffs shall then have seven days to file a reply brief that is no more than ten pages long.

### g.    Expenses

Nobody has objected to the special master's recommendation that Plaintiffs be awarded the full $164,706.10 in requested expenses (in addition to expenses incurred in connection with the Kelly Turner

Brown deposition and hearing). The Court finds that request reasonable and will therefore adopt that recommendation.

### h.  Conclusion of Monetary Award

In conclusion, the Court will impose a monetary sanction of $2,718,795.05 against Delta, as set forth more fully below:

| Firm | Fees Since June 2013 | K.T. Brown Fees | Less Work on Appendix C | Less 10% Work on Appendices | K.T. Brown Expenses | Other Expenses | Total |
|---|---|---|---|---|---|---|---|
| Kotchen & Low, LLP | 1,796,129.85 | 152,608.50 | (19,637.00) | (27,835.10) | 8,903.70 | 23,841.76 | 1,934,011.71 |
| Schreeder, Wheeler & Flint, LLP | 83,961.00 | 22,519.50 | — | — | 76.40 | 39.26 | 106,596.16 |
| McCulley McCluer PLLC | 138,297.00 | 20,402.50 | — | (74.80) | — | 1,449.45 | 160,074.15 |
| Conley Griggs Partin LLP | 61,530.00 | 5,332.50 | — | — | — | 68.79 | 66,931.29 |
| Richardson, Patrick, Westbrook & Brickman, LLC | 288,139.50 | 21,660.00 | (5,940.00) | (4,502.55) | 6,980.95 | 139,077.21 | 445,415.11 |
| Berger & Montague, PC | 2,655.00 | — | — | — | — | 229.63 | 2,884.63 |
| Law Offices of David A. Bain, LLC | 2,684.00 | 220.00 | — | (22.00) | — | — | 2,882.00 |
| Total | 2,373,396.35 | 222,743.00 | (25,577.00) | (32,434.45) | 15,961.05 | 164,706.10 | **2,718,795.05** |

**Table 1**

## IV.   Plaintiffs' Remaining Motions

Since the R&R was issued and submitted to the undersigned for review, Plaintiffs have filed two motions that the Court must address.

### A.   Plaintiffs' Motion for Reimbursement of Fees Paid to the Special Master

First, Plaintiffs seek a reimbursement of the fees they have paid to the special master to date [530]. Under Rule 53(g)(3), a special master's fees must be allocated "among the parties after considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master." When the special master was appointed, the Court ordered that Plaintiffs cover forty-five percent of his fees and that Delta pay the remaining fifty-five percent. To date, Plaintiffs have paid more than $94,000 to the special master. They now seek to recover those fees from Delta, arguing that "Delta is 'more responsible than other parties for the reference to a master.'" [530], p.1.

The Court will deny Plaintiffs' motion. To the extent Plaintiffs contend that Delta is more responsible than they are for the filing of the

fourth motion for sanctions, the accuracy of that assertion is unquestioned, but it does not necessarily follow that Delta bears the bulk of the responsibility for the Court's decision to refer the motion to a special master. Plaintiffs' motion and supporting documentation were unnecessarily voluminous and complicated, necessitating an equally voluminous response from Delta, and thus creating a record that would be impossible for the Court to independently sift through while simultaneously managing the other cases on its docket. Plaintiffs' shared responsibility for the referral to the special master is appropriately reflected in the Court's prior order that they pay forty-five percent of the special master's fees.[20]

The authorities relied upon by Plaintiffs do not compel a different result. Those cases do not alter the Court's conclusion that the parties in this case are equally responsible for the need to involve a master; they merely stand for the proposition, not in dispute, that Rule 53 permits a court to allocate a master's fees heavily or entirely to "the

---

[20] The fact that Plaintiffs have incurred these fees and will not be reimbursed for them has also been taken into account by the Court in deciding the amount of the sanction to be imposed.

party primarily responsible for the involvement of the special master." *A.R. Arena Prods., Inc. v. Grayling Indus., Inc.*, No. 5:11-cv-1911, 2012 WL 2953193, at \*2 (N.D. Ohio July 19, 2012); *see also Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 112-13 (D.N.J. 2006) (concluding that "Defendants['] unreasonable behavior has occasioned the need to appoint a master"); *PIC Grp., Inc. v. LandCoast Insulation, Inc.*, No. 1:09-cv-662-KS-MTP, 2011 WL 2669144, at \*9 (S.D. Miss. July 7, 2011) (noting that "the Special Master's appointment was caused by Defendant's lack of diligence in discovery" and making no reference to any shared fault of the plaintiffs). Plaintiffs' motion for reimbursement of fees paid to the special master [530] will be denied.

## B.  Plaintiffs' Motion to Compel and Reopen Discovery

Second, Plaintiffs filed a motion [531] contemporaneously with their objections to the R&R seeking to compel the production of certain documents from Delta and to again reopen discovery. *See also* [529], pp.39-40, nn.121-22 (making the same request).

The motion to compel production, which seeks the Precision datasets and the documents identified by Ms. Brown, is due to be

denied as untimely. Pixley's "spot check" of the Precision database was complete in March 2014, and Ms. Brown raised the issue of new documents in September 2014. Plaintiffs waited until January 2015— after the R&R was issued on their motion for spoliation sanctions—to move to compel. Although Rule 37 does not provide a deadline for motions to compel, numerous courts have denied such motions when they are filed long after the information came to light, particularly where, as here, discovery has long-since closed. *See*, *e.g.*, *Gault v. Nabisco Biscuit Co.*, 184 F.R.D. 620, 622 (D. Nev. 1999) ("After two years of discovery in this case, it is not unreasonable to expect a motion to compel to be filed in close proximity to the discovery deadline."); *SunTrust Bank v. Blue Water Fiber, L.P.*, 210 F.R.D. 196, 200-01 (E.D. Mich. 2002) (identifying "numerous cases" in which "courts have denied tardy discovery motions that were filed after the close of discovery, especially where the moving party had all the information it needed to timely file the discovery motion").

Even if Plaintiffs were not unreasonably slow in moving to compel, the Court would deny their motion. The special master found that the

documents identified by Ms. Brown had no impact on the motion for

sanctions. With respect to the Precision dataset, that information was

provided by Delta to Precision under the Court's strict guarantees of

confidence and non-waiver of privilege, promises that would be

eviscerated if the Court were to now require Delta to provide the same

information to Plaintiffs' counsel. *See*, *e.g.*, [375], pp.7-8; [376], p.2;

[378], p.1; [394], p.40. Furthermore, Precision's search of this dataset

was both extensive and costly, yet the responsive documents generated

by that process were relatively few in number, and their relevance was

relatively minimal. The Court is not inclined to further delay this case

by essentially letting Plaintiffs recreate that process—something that

would inevitably lead to further discovery disputes—this late in the

game.

    For the same reasons, Plaintiffs' motion will be denied to the

extent it seeks to reopen discovery. Plaintiffs argue that they "have not

had an opportunity to take discovery related to late-produced

documents, and [they] have not had an opportunity to directly take

admissible discovery related to discovery-on-discovery issues." [531],

p.1. But in light of the Court's ruling above that no jury question exists regarding spoliation or Delta's discovery practices, there is no need for Plaintiffs to adduce admissible evidence on that issue. *See* [540], p.5 (justifying Plaintiffs' request to reopen discovery by reference to their argument that a jury question exists regarding spoliation).

For more than a year now, this case has been derailed by "discovery on discovery." Almost five years after the original discovery deadline of December 2010, discovery finally has and will remain closed. It is time for the parties' efforts and resources to turn to the merits of this case, a rare issue on which all parties agree. *See* [535], p.23 ("Delta points out that it is time for the case to proceed to the merits. Plaintiffs wholeheartedly agree."). Consequently, Plaintiffs' eleventh-hour motion to compel and reopen discovery [531] will be denied.

## V.   Conclusion

For all of the reasons set forth above, the Court will adopt in part and reject in part the R&R [520], as supplemented [523, 527].[21] Plaintiffs' motion for sanctions [413] is granted, and the Court orders Delta to pay \$2,718,795.05 to Plaintiffs' counsel, as set forth in Table 1 above. Plaintiffs' motion for reimbursement of fees paid to the special master [530] and their motion to compel and reopen discovery [531] are denied.

IT IS SO ORDERED this 3rd day of August, 2015.

_____

Timothy C. Batten, Sr.
United States District Judge

---

[21] Although the Court did not adopt all of the special master's findings and recommendations, the Court stresses its sincere appreciation for Brown's assistance in resolving the numerous, complex issues raised in Plaintiffs' motion.