# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE: DELTA/AIRTRAN BAGGAGE FEE ANTITRUST LITIGATION | CIVIL ACTION FILE NUMBER 1:09-md-2089-TCB **FILED UNDER SEAL** |

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. DENNIS W. CARLTON

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ............................................................................... ii

I.      INTRODUCTION .......................................................................................1

II.     FACTS ......................................................................................................2

III.    LEGAL STANDARD................................................................................6

IV.    ARGUMENT .............................................................................................7

        A.     Dr. Carlton's Antitrust Policy Argument Is Contrary to Law and Is Not Based on Reliable Methodology ................................... 7

        B.     Dr. Carlton's Opinion That Delta Would Have Implemented the First Bag Fee Absent Collusion Is Not Grounded in the Facts of the Case and Not Based on Reliable Methodology ......................................... 13

        C.     Dr. Carlton's Opinion That It Would Be Uneconomic for Delta and Northwest to Maintain Separate Fee Structures Immediately After the Merger Is Not Based on Reliable Economic Methodology.............. 17

V.     CONCLUSION .........................................................................................19

# TABLE OF AUTHORITIES

## Cases

*Cameron v. Peach County, Ga.*,
　No. 5:02–CV–41–1 (CAR), 2004 WL 5520003 (M.D. Ga. June 28, 2004) ...... 14

*Champagne Metals v. Ken-Mac Metals, Inc.*,
　458 F.3d 1073 (10th Cir. 2006) ...................................................................... 18

*City of Tuscaloosa v. Harcros Chems., Inc.*,
　158 F.3d 548 (11th Cir. 1998) .......................................................... 7, 8, 10, 17

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
　370 U.S. 690 (1962) ........................................................................................ 13

*Daubert v. Merrell Dow Pharms., Inc.*,
　509 U.S. 579 (1993) ........................................................................ 7, 9, 13, 16

*DeLong Equip. Co. v. Washington Mills Abrasive Co.*,
　887 F.2d 1499 (11th Cir. 1989) ...................................................................... 10

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
　906 F.2d 432 (9th Cir. 1990) ............................................................................ 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
　475 U.S. 574 (1986) ........................................................................................ 10

*Montgomery v. Aetna Cas. & Sur. Co.*,
　898 F.2d 1537  (11th Cir. 1990) ....................................................................... 8

*United States v. Beasley*,
　72 F.3d 1518 (11th Cir. 1996) ........................................................................ 18

*United States v. Downing*,
　753 F.2d 1224 (3d Cir. 1985) .................................................................... 13, 16

*United States v. Falcon*,
　245 F. Supp. 2d 1239 (S.D. Fla. 2003) .......................................................... 18

*Williamson Oil Co. v. Philip Morris USA*,
　346 F.3d 1287 (11th Cir. 2003) ...................................................................... 10

**Rules**

Fed. R. Evid. 702 ...........................................................6, 9, 10, 11, 13, 14, 16, 17

**Treatises**

Richard A. Posner, *Antitrust Law: An Economic Perspective* 146 (1976) .............. 9

# I.   **INTRODUCTION**

Defendant Delta Air Lines, Inc. ("Delta") has designated Dr. Dennis W. Carlton as an expert witness in economics.  Dr. Carlton offers three opinions, all of which should be excluded.  *See* Expert Report of Dennis W. Carlton ("Carlton Report") ¶ 5 (Jan. 7, 2011), Ex. 1.  First, Dr. Carlton makes policy arguments about what conduct antitrust law should prohibit.  *Id.* (cited in Delta Summ. J. Br. at 50 n.116).  Because his opinion is contrary to antitrust law (and policy) and would not assist the jury in determining any fact at issue, this opinion should be excluded.  Second, Dr. Carlton speculates that Delta would have imposed a first bag fee even in the absence of a conspiracy based on the fact that "[j]ust prior to the effective date of the Delta bag fee, the majority (65.8 percent) of non-Delta revenue went to airlines that had a first bag fee."  *Id.* ¶ 22.  But Dr. Carlton's opinion is not based on sufficient facts or reliable methodology, and does not fit the facts of the case.  During the time period examined by Dr. Carlton, almost all airlines that offered free first bags when Delta and AirTran adopted the fee *continued* to offer free first bags. Third, Dr. Carlton opines that it would be uneconomic for Delta and Northwest to maintain separate fee structures after their merger closed.  *Id.* ¶¶ 5, 25 (cited in Delta Summ. J. Br. at 14 n.29).  But he provides no economic basis for his opinion, relying instead on self-serving testimony of Delta witnesses.

## II.   <u>FACTS</u>

Plaintiffs allege that Delta and AirTran conspired to impose first bag fees through a series of private and public communications.  Internal AirTran documents reflect that AirTran's CEO instructed that AirTran communicate with Delta about AirTran's willingness to charge a first bag fee,[1] that AirTran carried out those instructions,[2] and that AirTran wanted to signal to Delta its desire to charge a first bag fee on an investor earnings call.[3]  On AirTran's October 23, 2008 earnings call, AirTran's CEO expressed a willingness to impose a first bag fee if Delta acted first.  This Court has held that "collusive communications can be based upon . . .

---

[1] E-mail from R. Fornaro to J. Smith, *et al.* (July 31, 2008) AIRTRAN 64261 (Dkt. #556 at PX112) ("[Delta] should hear through the grapevine that we are doing the programming to launch this effort.").

[2] E-mail from J. Smith to R. Fornaro, *et al.* (July 31, 2008) AIRTRAN 5002 (Dkt. # 556 at PX108) ("It will be communicated today."); E-mail from S. Fasano to J. Smith (July 31, 2008) AIRTRAN 28478 (Dkt. #556 at PX106) ("I spoke with two more people over there [at Delta].  They are holding and our name has been included in every conversation."); E-mail from S. Fasano to J. Smith (July 31, 2008) AIRTRAN 28488 (Dkt. #557 at PX107) ("I just went another route and planted the seed regarding our functionality."); E-mail from S. Fasano to K. Healy and J. Smith (Aug. 5, 2008) AIRTRAN 7810 (Dkt. #556 at PX126) ("I had a cup of coffee with one of my former colleagues . . . [who] is very connected on the high level operational and planning side of the house.  He claims that their functionality is ready to go live with 1st bag.  He said . . . [t]hey want us to jump first.").

[3] E-mail from K. Healy to R. Fornaro, *et al.* (July 31, 2008) AIRTRAN 5021 (Dkt. #556 at PX109) ("I was hoping we'd be asked on the [earnings] call [about first bag fees]. . . . [W]e'll push it out there.").

statements on earnings calls, and in other public ways."  Order at 24-25 (Aug. 2, 2010) (Dkt. #137).

Dr. Carlton recognizes that "[f]irms could conspire through public communications . . . [including] [e]arnings calls[.]"  D. Carlton 2/24/11 Dep. Tr. 55:17-56:12, Ex. 2.  He admits that "when I see demand declining, my gut reaction is I expect a decline in the overall fees." *Id.* at 144:11-13.  He also admits that in a "competitive market, as costs fall, I would expect prices to fall." *Id.* at 145:4-6.  And he concedes that in Mr. Fornaro's October 23, 2008 statements, "there's a suggestion that if Delta [imposes a first bag fee], it's quite likely that AirTran is going to follow." *Id.* at 117:2-118:11, Ex. 2.  Dr. Carlton further believes that "if . . . AirTran makes a particular statement and then that alters the behavior that would otherwise occur and, as a result, prices go up, . . . the appropriate way to prevent such action is to penalize the person making the communication, AirTran." *Id.* at 37:11-20; *see also id.* at 42:13-15 ("If someone has made a statement that violates the antitrust laws, . . . they should be penalized . . . .").

But he offers the opinion that antitrust policy should not prohibit parties (*e.g.*, Delta) from acting on invitations to collude if they are made publicly.  Carlton Report ¶ 19 ("Once information is disseminated to the public, as a matter of antitrust policy, it would be inconsistent with the goal of maximizing welfare to prevent firms from acting upon that information.").  Dr. Carlton does not offer an opinion as to whether

3

Defendants violated the Sherman Act.  D. Carlton 2/24/11 Dep. Tr. 24:8-13 ("I'm not a lawyer, so I'll leave that to others."), Ex. 2.  Rather, his opinion is that "we should hopefully fix the law" if it does not reflect the economic incentives he advocates.  *Id.* at 80:21-22.

Dr. Carlton does not take into consideration that, in addition to AirTran, Delta was also using earnings calls to send and receive price-related communications.[4] Nor has he updated his opinions to reflect that the DOJ opened a new collusion investigation in 2015 related to the continued use of earnings calls and analysts by Delta, Southwest, and two other airlines to communicate price-related messages.[5]

Before Delta and AirTran imposed first bag fees, 34.2% of non-Delta ticket revenue on Delta routes was earned by airlines without a first bag fee.  Carlton Report ¶ 22 Chart 1; All_Exhibits.xlsx, Ex. 3 (listing the raw data used by Dr.

---

[4] *See, e.g.*, E-mail from G. Hauenstein to R. Anderson (Oct. 24, 2008) DLTAPE 3257 (Dkt. #556 at PX223) ("They clearly want the first bag fees. Will look forward to our discussions on Monday."); E-mail from R. Anderson to S. Gorman, *et al.* (July 22, 2008) DLBF 183157 (Dkt. #557 at PX94) ("They are waiting for us.  We stand firm.") (attaching and underlining excerpts of Continental earnings call); E-mail from S. Fasano to A. Asbury, *et al.* (July 20, 2008) AIRTRAN 12420 (Dkt. #556 at PX92) ("There is a very clear message from DL."); E-mail from J. Robertson to L. Macenczak, *et al.* (April 26, 2007) DLBF 68188 (Dkt. #557 at PX3) ("message from UA" in earnings call); E-mail from G. Hauenstein to J. Esposito, *et al.* (Jan. 28, 2009) DLBF 186411 (Dkt. #556-1 at PX321) (referring to AirTran Q4 2008 Earnings Call Transcript, "Cheating on their capacity reductions").

[5] T. Maxon, *Justice Is Looking Into Airline Collusion on Holding Down Capacity*, Airline Biz Blog, Dallas Morning News (July 1, 2015) (Dkt. #556-1 at PX439); DOJ Airline Capacity CID Specifications (Dkt. #556-1 at PX447).

4

Carlton in preparing his chart).  After AirTran and Delta imposed first bag fees on December 5, 2008, that percentage fell to 27.6%.  *Id.*  By the end of 2009, additional carriers adopted first bag fees, but those carriers represented only a small percentage of the revenue on Delta routes, and the percentage of carriers on Delta routes without a first bag fee fell only nominally, from 27.6% to 26%.  *Id.*  Southwest continues to offer free first bags, and JetBlue offered a free first bag until 2015, which is after the end of the class period here.  Southwest has reported that it has profited from offering free first bags because of a corresponding gain in market share.[6]  Similarly, in an internal Delta analysis in 2010, Delta observed that "[m]arket share is affected by bag fee differences," and that Southwest has increased its revenue share by not charging first bag fees.[7]

Delta's internal Value Proposition analysis projected that Delta's lost market share would make first bag fees unprofitable unless AirTran matched.[8]  Dr. Carlton admitted that, if Delta's internal Value Proposition analysis reflected the prevailing view at Delta, then his opinion would be inaccurate where he suggested that Delta

---

[6] T. Reed, *Southwest Airlines' Capacity Gains Are Panned By Wall Street Analysts*, TheStreet (May 20, 2015) at 2 (Dkt. #556-1 at PX430) (quoting Southwest CEO Gary Kelly:  "You see the results that we have, which are affirmed by all the research that we do in marketing that say if we charged for bags, the defection rate of our customers would be such that it would more than wipe out the bag fee revenue.").

[7] Bag Fees Update (Mar. 9, 2010 draft) DLBF 183065, at DLBF 183069, Ex. 4.

[8] Value Proposition v4 (Oct. 22, 2008) at 15 (Dkt. #556 at PX213).

5

would likely have imposed a first bag fee regardless of AirTran's actions.  D. Carlton 2/24/11 Dep. Tr. 149:2-11 ("Q. So if the view prevailed that's laid out in the value proposition, assuming that – the accuracy of what's laid out there, your conclusions in your report would not be accurate, would they? A. No."), Ex. 2.

On May 2, 2011, Southwest and AirTran merged.[9]  They received a single operating certificate on March 1, 2012.[10]  Southwest continued to charge a first bag fee on AirTran flights until November 1, 2014, *i.e.*, 42 months after the merger closed.[11]

### III.  <u>LEGAL STANDARD</u>

The Eleventh Circuit has held that expert testimony is admissible under Fed. R. Evid. 702 if: "(1) the expert is *qualified* to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently *reliable* as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony *assists the trier of fact*, through the application of scientific, technical, or specialized expertise, to understand the evidence or to

---

[9]  *See* Southwest Press Release (May 2, 2011), *available at* http://swamedia.com/releases/c0c49e58-d303-3c07-e06c-d1004dbecfbf.

[10]  *See* Southwest Press Release (Mar. 1, 2012), *available at* http://swamedia.com/releases/7a0a9844-f48f-4eab-8d9b-8da95d16ebb5.

[11]  *See* Southwest Optional Travel Charges, *available at* http://www.southwest.com/html/customer-service/travel-fees.html?int=GNAVTRAVELFEES; Declaration of Robert Tenley, Southwest Airlines Director of Strategic Planning (Sept. 10, 2015) at ¶¶ 9-13 (Dkt. #553-1).

determine a fact in issue." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (emphasis added) (internal footnote omitted) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).

Under this framework, the district court should consider (1) whether the theory or technique can be or has been tested, (2) whether the theory or technique has been subjected to peer review, (3) the known or potential rate of error of the particular scientific technique, (4) the existence and maintenance of standards controlling the technique's operation, and (5) the "general acceptance" of the theory or technique. *Daubert*, 509 U.S. at 592.

## IV.   ARGUMENT

### A.   Dr. Carlton's Antitrust Policy Argument Is Contrary to Law and Is Not Based on Reliable Methodology

Dr. Carlton makes policy arguments about what antitrust law should prohibit, *i.e.*, "whether, from an economic point of view, . . . it would be desirable to penalize certain types of acts."  D. Carlton 2/24/11 Dep. Tr. 22:20-23:1, Ex. 2.  For example, he states that antitrust law should not prohibit firms from acting on information that is disseminated to the public, regardless of whether the information was an invitation to collude.  Carlton Report ¶ 19.  More specifically, Dr. Carlton opines that Delta should not be liable for imposing a first bag fee in response to AirTran's October 23, 2008 earnings call, even if the call constituted an invitation to collude, because the earnings call was public.  *Id.* ¶¶ 18-19. (He agrees, however, that AirTran should be

penalized for its statement if the statement led to a price increase. D. Carlton 2/24/11 Dep. Tr. 37:1-20, 41:17-42:12, Ex. 2).

Dr. Carlton's policy argument should be excluded for at least four reasons. First, an economist's opinion "regarding the legal standards applicable to the case are outside of his competence as an economist . . .  and should be excluded." *City of Tuscaloosa*, 158 F.3d at 567 n.27.  An expert witness "may not testify to the legal implications of conduct; the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990).

Although Dr. Carlton does not offer an opinion on what the applicable legal standards *are*, he offers an opinion regarding what the applicable legal standards *should be*, based on economic incentives.  For example, he states that collusion should be immune from antitrust law if it is reached through public statements. Carlton Report ¶ 19; D. Carlton 2/24/11 Dep. Tr. 80:21-22, Ex. 2.  In other words, instead of providing guidance on the applicable legal standard, Dr. Carlton is suggesting that the jury disregard the applicable legal standard and instead base its decision on Dr. Carlton's opinion on economic incentives.  Such testimony seeks to supplant the Court's role as the "only source of law" and is outside Dr. Carlton's competence as an economist.  *City of Tuscaloosa*, 158 F.3d at 567 n.27; *Montgomery*, 898 F.2d at 1541. Moreover, he is wrong as a matter of antitrust policy, as price-fixing conspiracies are detrimental to consumers regardless of whether they

8

are reached through public or private collusive communications.  Order at 36-37 (Dkt. #137) ("Indeed, Defendants' argument, if accepted, would essentially give businesses a free pass to collude in public forums and leave consumers who are harmed by such anticompetitive conduct no remedy.").[12]

Second, to be admissible under Rule 702, evidence must "help the trier of fact to understand the evidence or to determine a fact in issue[.]"  Fed. R. Evid. 702(a). Testimony that is unrelated to any issue in the case "is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591.  Whether an unlawful conspiracy can be reached through public communications is a legal issue that has already been decided by this Court.  *See* Order at 24-25 (Dkt. #137) ("[C]ollusive communications. . . can occur in speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways.") (collecting cases).[13] Because the jury is required to follow the law, Dr. Carlton's opinion about how "we should hopefully

---

[12] Am. Merits Rebuttal Report of H. Singer ("Singer Merits Rebuttal Report") ¶¶ 114-27; *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir. 1990) ("the *form* of the exchange—whether through a trade association, through private exchange . . . or through public announcements of price changes—should not be determinative of its legality") (quoting Richard A. Posner, *Antitrust Law: An Economic Perspective* 146 (1976)).

[13] *See also* Order at 36-37 (Dkt. #137); Analysis of Agreement Containing Consent Order to Aid Public Comment, *In re Valassis Communications, Inc.*, FTC File No. 051 0008, Delta Ex. 118 at 4 & n.9 (Dkt. #350-135) ("declaring that "antitrust law does not afford immunity to agreements that are brokered in public") (collecting cases).

fix the law" will not assist the jury in determining any fact in issue, and should be excluded.  D. Carlton 2/24/11 Dep. Tr. 80:21-22, Ex. 2; Fed. R. Evid. 702.

Third, Dr. Carlton implies that the legal standard for summary judgment should be lessened because of the potential to deter procompetitive activity.  Carlton Report ¶¶ 5, 15-20.  But the legal standard on summary judgment in antitrust cases already takes into account concerns about deterring procompetitive conduct.  *City of Tuscaloosa*, 158 F.3d at 571 (internal quotations omitted) ("[T]his requirement [of plus factors] ensures that unilateral or procompetitive conduct is not punished or deterred.").  Dr. Carlton also ignores that the recognized policy interests of antitrust law that should be considered by the courts include "the desire that illegal conspiracies be identified and punished."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 593-94 (1986).  Although the standard or burden may be different in a vertical price-fixing context[14] or where the alleged conspiracy is economically implausible,[15] there is not a variable standard based on the conduct alleged in a particular horizontal price-fixing case.

---

[14] *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1508 (11th Cir. 1989) ("The summary judgment standard in vertical restraint cases is more stringent than in other areas of antitrust law[.]").

[15] *Matsushita*, 475 U.S. at 594  ("[C]utting prices in order to increase business often is the very essence of competition."); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1305, 1308, 1323 (11th Cir. 2003) (involving a conspiracy that was "utterly implausible" economically, involved "typical industry reporting," and

Moreover, procompetitive behavior would not be deterred by a finding of liability for the conduct alleged in this case – the acceptance by a horizontal competitor of an invitation to collude that involved a future pricing announcement explicitly contingent on the behavior of the competitor. *Cf.* Singer Merits Rebuttal Report ¶¶ 114-27 (stating that Dr. Carlton's opinion is inconsistent with sound economic policy). Dr. Carlton's opinion is not based on any reliable economic methodology, but mere speculation unsupported by any facts or data. *See* Carlton Report ¶¶ 17-20 (failing to cite any facts or data in support of his opinion about antitrust policy); Fed. R. Evid. 702 (requiring expert opinions to be based on "sufficient facts or data").

Fourth, Dr. Carlton concedes that he failed to consider the majority of the evidence in this case, stating: "I have been asked by Counsel to assume that the only relevant communications with respect to first-bag fees are those public statements described above." Carlton Report ¶ 14 n.18. Dr. Carlton intentionally ignores, for example, evidence that AirTran *intended* to invite Delta to collude on AirTran's earnings call,[16] evidence that Delta and AirTran met and discussed each airline's

---

statements based on which "[n]o reasonable jury could infer that [defendant] agreed to any particular future course of conduct").

[16] E-mail from K. Healy to R. Fornaro, *et al.* (July 31, 2008) AIRTRAN 5021 (Dkt. #556 at PX109) ("I was hoping we'd be asked on the [earnings] call [about first bag fees]. . . . [W]e'll push it out there.").

desire to impose the first bag fee if the other airline would "jump first,"[17] and evidence of other private collusive communications.[18]  He admits that the existence of private collusive communications could change his opinion.[19]  Moreover, Dr. Carlton ignores evidence that Delta itself was using earnings calls to send and receive price-related signals.  *See supra* note 4.  And he has not updated his opinion to reflect that the DOJ has opened a new collusion investigation of Delta, Southwest,

---

[17] E-mail from S. Fasano to K. Healy and J. Smith (Aug. 5, 2008) AIRTRAN 7810 (Dkt. #556 at PX126) ("I had a cup of coffee with one of my former colleagues . . . [who] is very connected on the high level operational and planning side of the house. He claims that their functionality is ready to go live with 1st bag.  He said their current conversations are centered around 2 issues – 1.  They want us to jump first. (we need it more than they do)  2.  They are feeling some pressure to make a move soon if oil continues to come down . . . .  I let him know that we have a confirmed delivery date for our automation that will give us the versatility we need BUT our changes are dependent on moves by our competitors.").

[18] *See, e.g.*, E-mail from S. Fasano to J. Smith (July 31, 2008) AIRTRAN 28478 (Dkt. #556 at PX106) ("I spoke with two more people over there [at Delta].  They are holding and our name has been included in every conversation."); E-mail from S. Fasano to J. Smith (July 31, 2008) AIRTRAN 28488 (Dkt. #557 at PX107) ("I just went another route and planted the seed regarding our functionality."); S. Fasano 7/17/09 DOJ Dep. Tr. 88:10-92:6 (Dkt. #556-1 at PX348); S. Fasano 12/1/10 Dep. Tr. 38:1-39:5, 43:22-45:13, 86:4-17, 86:21-87:1 (Dkt. #557 at PX387); J. Smith 9/15/?]09 DOJ Dep. Tr. 65:13-17; 70:13-19 (Dkt. #556-1 at PX353); J. Smith 11/15/10 Dep. Tr. 52:7-12 (Dkt. #557 at PX381); E-mail from K. Healy to M. Klein, *et al.* (July 9, 2008) AIRTRAN 23599-600 (Dkt. #557 at PX59); E-mail from M. Klein to K. Brulisauer, *et al.* (July 9, 2008) AIRTRAN 2185257 (Dkt. #556 at PX57); E-mail from J. Smith to R. Fornaro, *et al.* (July 16, 2008) AIRTRAN 38684 (Dkt. #557 at PX82).

[19] D. Carlton 2/24/11 Dep. Tr. 111:15-19 ("if there was private communication . . . of the type that allowed them to coordinate the imposition of first bag fees, that could alter my opinion"), Ex. 2.

and two other airlines regarding the use of earnings calls and analysts to send and receive messages.

Because Dr. Carlton's opinion does not take into account evidence reflecting both public and private collusive communications, his opinions are not "based on sufficient facts[,]" Fed. R. Evid. 702(b), and are not "sufficiently tied to the facts of the case[.]" *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985) (quoted in *Daubert*, 509 U.S. at 591).  His conclusion that – ignoring certain evidence of collusion – Delta should not be liable for collusion, is not helpful to a jury that must take into account *all* of the relevant evidence, and is likely to mislead the jury.  *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

**B.    Dr. Carlton's Opinion That Delta Would Have Implemented the First Bag Fee Absent Collusion Is Not Grounded in the Facts of the Case and Not Based on Reliable Methodology**

Dr. Carlton offers an opinion that "Delta would have implemented a first-bag fee independently of any communication from AirTran."  Carlton Report ¶ 22.  In support of this opinion, he asserts that airlines tend to adopt similar pricing models, and that other airlines implemented and maintained first bag fees.  *Id.* ¶ 21.  He hypothesizes that, because approximately 65.8 percent of non-Delta revenue on

December 4, 2008 went to airlines that had a first-bag fee, Defendants would have implemented the fee even without a conspiracy. *Id.* ¶ 22.

This opinion should be excluded because: (1) it is not based on reliable facts and methodology; and (2) it does not fit the facts of this case. First, an expert opinion must be based on sufficient facts or data, and must be the product of reliable principles and methods. Fed. R. Evid. 702(b), (c). Dr. Carlton's opinion is based on the assumption that "airlines have tended to adopt similar pricing models unless they can differentiate themselves with a different model." Carlton Report ¶ 22. But Dr. Carlton provides no facts or data in support of this assumption, and he does not establish that Delta would not have benefited more from increased market share than from first bag fee revenue. *Cameron v. Peach County, Ga.*, No. 5:02–CV–41–1 (CAR), 2004 WL 5520003, at *5 (M.D. Ga. June 28, 2004) (excluding opinion where expert "identifie[d] no basis for such generalizations and has not cited to any professional or scientific source in support of his opinions.").

Dr. Carlton cites the fact that 65.8 percent of non-Delta revenue in late 2008 was on carriers with first bag fees, but provides no facts or data indicating the probability of an airline implementing a fee when 65.8 percent of other airline revenue went to airlines that had the fee. *See also* Singer Merits Rebuttal Report ¶ 131 ("Professor Carlton . . . does not explain . . . why 65.8 percent constitutes a

tipping point or critical level at which imposing a bag fee became profit-maximizing for Delta.").[20]

Moreover, Dr. Carlton's own data contradicts his conclusion and shows that Defendants almost certainly would *not* have adopted a first bag fee absent collusion. Every airline faced different competitive considerations, and the airlines that expected first bag fees to be profitable had presumably already adopted first bag fees by November 2008. As reflected in Dr. Carlton's data, after Delta and AirTran imposed a first bag fee, 27.6% of non-Delta ticket revenue on Delta routes was earned by airlines without a first bag fee. *See* All_Exhibits.xlsx (relied on by Dr. Carlton in creating Chart 1 to Carlton Report ¶ 22), Ex. 3. By December 31, 2009 (which marks the end of Dr. Carlton's chart), that percentage had fallen only slightly – to 26%. *Id.*[21] Thus, airlines without first bag fees before December 2008 (excluding Delta and AirTran) overwhelmingly chose to continue offering a free first

_____

[20] Dr. Carlton cites a single deposition transcript in support of his position that Delta could not have differentiated itself by not charging a first bag fee (Carlton Report ¶ 22 n.34), ignoring contemporaneous documents to the contrary. *See, e.g.*, Value Proposition (Oct. 24, 2008) at 10, 17 (Dkt. #556 at PX234); E-mail from M. Campbell to R. Anderson (June 13, 2008) DLTAPE 2909 (Dkt. #556 at PX42) (internal e-mail suggesting that Delta differentiate itself by publicizing its free first bag fee).

[21] In other words, of the revenue earned by airlines without a first bag fee as of December 5, 2008, fully 94% of that revenue continued to be earned by airlines without a first bag fee. *See* All_Exhibits.xlsx (reflecting that non-Delta ticket revenue on Delta routes earned by airlines without a first bag fee declined only slightly, from 27.6% to 26%), Ex. 3.

checked bag, almost certainly because the competitive conditions they faced dictated a free first bag.  This is precisely the scenario that Delta and AirTran faced when – instead of continuing to act unilaterally – they opted to jointly impose a first bag fee. *See* Value Proposition v4 (Oct. 22, 2008) at 15 (Dkt. #556 at PX213).

Second, the proposed expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Downing*, 753 F.2d at 1242, quoted in *Daubert*, 509 U.S. at 591; *see also* Fed. R. Evid. 702(d) (requiring that the witness "has reliably applied the principles and methods to the facts of the case").  Dr. Carlton relies on the fact that other airlines maintained first bag fees after imposing them (Carlton Report ¶ 23), but Dr. Carlton fails to account for the specific economic incentives faced by Delta in this case, including the higher level of low-cost carrier competition faced by Delta compared to airlines that imposed and maintained first bag fees.  *See* Value Proposition (Oct. 24, 2008) at 4 (Dkt. #556 at PX234) ("Why has Delta waited?  Delta much more exposed to LCCs"); Singer Merits Rebuttal Report ¶ 129.  Dr. Carlton acknowledged that if the competitive concerns described in Delta's internal Value Proposition analysis reflected the prevailing view, his opinion would be incorrect.  D. Carlton 2/24/11 Dep. Tr. 149:2-11, Ex. 2. Further, Dr. Carlton's conclusory generalization fails to explain why Delta did not impose a bag fee *before* AirTran's October 23, 2008 earnings call, when most non-Delta passengers on Delta routes were flying on

16

airlines charging first bag fees.  Carlton Report ¶ 22 Chart 1. And he fails to account for Southwest's continuing to offer free first bag fees, Southwest's statements that it has profited heavily from its free first bag fee policy,[22] and Delta's internal analyses showing that Southwest has gained market share from not charging first bag fees.[23]

**C.     Dr. Carlton's Opinion That It Would Be Uneconomic for Delta and Northwest to Maintain Separate Fee Structures Immediately After the Merger Is Not Based on Reliable Economic Methodology**

Dr. Carlton asserts that "it would be uneconomic [for Delta and Northwest] to maintain separate . . . fee structures, post-merger."  Carlton Report ¶ 25 & n.41 (relying on deposition testimony of R. Anderson and S. Gorman).  Rule 702 requires that an expert opinion be based on sufficient facts and data.  Fed. R. Evid. 702(b). *Daubert* requires that a Court consider the degree to which the relevant scientific community accepts the technique as reliable.  *City of Tuscaloosa*, 158 F.3d at 562 n.16.

---

[22] Southwest Q4 2012 Earnings Call Tr. at 16 (Jan. 24, 2013) (Dkt. #556-1 at PX423) (Southwest CEO Gary Kelly: "[W]e've consistently shared that the best estimate that we had was about $1 billion increase annually from these market share gains, which we attribute much of that to our [free] baggage policy."); T. Reed, *Southwest Airlines' Capacity Gains Are Panned By Wall Street Analysts*, TheStreet (May 20, 2015) at 2 (Dkt. #556-1 at PX430).

[23] Bag Fees Update (Mar. 9, 2010 draft) DLBF 183065, at DLBF 183069, Ex. 4; Value Proposition (Oct. 24, 2008) at 17 (Dkt. #556 at PX234).

Here, Dr. Carlton ignores the evidence that Delta was planning to withdraw the Northwest fee after acquiring the smaller airline.[24]   Moreover, Dr. Carlton's opinion regarding the economic viability is not based on any economic data, but on the self-serving subjective opinions of two Delta executives.  Carlton Report ¶ 25 & n.41.  In evaluating whether a business practice is economically feasible, economists may not accept subjective opinions of interested parties as reliable.  *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n.4 (internal quotations omitted) (10th Cir. 2006) (excluding economist's opinion that was "based on the self-serving statement[s] of an interested party"); *see also United States v. Falcon*, 245 F. Supp. 2d 1239, 1245 (S.D. Fla. 2003) ("[A]bsent extreme or unusual circumstances, expert scientific testimony concerning the truthfulness or credibility of a witness is inadmissible because it invades the jury's province in determining credibility.") (citing *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996)).

---

[24] *See, e.g.*, Fee Competitive Analysis (July 9, 2008) DLBF 360 (Dkt. #557 at PX62) ("Combined entity . . . 1st bag Free"); Fee Competitive Analysis (Sept. 23, 2008) DLBF 36433, at DLBG 36434 (Dkt. #557 at PX169) (same); Fees Combined Entity (Oct. 6, 2008) DLBAG 11006, at DLBAG 11007 (Dkt. #557 at PX184) (same); Fee Competitive Analysis (Oct. 24, 2008) DLTAPE 8573, at DLTAPE 8574 (Dkt. #557 at PX236) (same); E-mail from G. West to G. Grimmett (Sept. 5, 2008) DLTAPE 4040 (Dkt. #556 at PX149) ("I just plan to propose the current DL bag fees for the new DL.").

18

Moreover, Dr. Carlton's opinion is inconsistent with the empirical evidence. After the Southwest merger with AirTran closed, Southwest and AirTran maintained separate fee structures post-merger for 42 months.

Because Dr. Carlton's opinion about separate fee structures is based on self-serving deposition testimony rather than any economic expertise, and because it cannot be assessed for reliability, his opinion should be excluded.

## V.    CONCLUSION

For the foregoing reasons, the opinions and testimony of Dr. Carlton should be excluded.

Respectfully submitted,              Dated: November 6, 2015

*/s/ Daniel L. Low*
Daniel A. Kotchen                    James L. Ward, Jr.
Daniel L. Low                        Robert S. Wood
KOTCHEN & LOW LLP                    RICHARDSON, PATRICK,
1745 Kalorama Rd. NW                 WESTBROOK & BRICKMAN, LLC
Suite 101                            P.O. Box 1007
Washington, DC 20009                 1037 Chuck Dawley Blvd., Bldg. A
dkotchen@kotchen.com                 Mt. Pleasant, SC 29465
dlow@kotchen.com                     jward@rpwb.com
                                     bwood@rpwb.com

R. Bryant McCulley                   Cale H. Conley
Stuart H. McCluer                    Georgia Bar. #181080
McCULLEY MCCLUER PLLC                CONLEY, GRIGGS & PARTIN LLP
P.O. Box 505                         1380 West Paces Ferry Road NW
Isle of Palms, SC 29451             #2100
bmcculley@mcculleymccluer.com        Atlanta, GA 30327
smccluer@mcculleymccluer.com         cale@conleygriggs.com

19

*Interim Co-Lead Counsel for
Plaintiffs*

David H. Flint
Georgia Bar No. 264600
Andrew Lavoie
Georgia Bar No. 108814
SCHREEDER WHEELER &
FLINT, LLP
1100 Peachtree Street, NE, Suite
800
Atlanta, GA 30309-4516
dflint@swfllp.com
alavoie@swfllp.com

*Interim Liaison Counsel for
Plaintiffs*

## CERTIFICATION UNDER L.R. 7.1D

Pursuant to Northern District of Georgia Local Rule 7.1D, the undersigned counsel hereby certifies that the above and foregoing is a computer document prepared in Times New Roman (14 point) font in accordance with Local Rule 5.1B.

So certified, this 6th day of November, 2015.

/s/Daniel L. Low
Daniel L. Low
KOTCHEN & LOW LLP
1745 Kalorama Rd. NW, Suite 101
Washington, DC 20009
dlow@kotchen.com

*Interim Co-Lead Counsel for Plaintiffs*

20

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel certifies that on this day he filed the foregoing, under seal, with the Clerk of Court and caused the same to be delivered via e-mail to the following attorneys of record:

| **Counsel for Delta Air Lines, Inc.** | **Counsel for AirTran Airways, Inc.** |
|---|---|
| Randall Lee Allen<br>Sam Rutherford<br>Nowell Berreth<br>ALSTON & BIRD<br>1201 West Peachtree Street<br>One Atlantic Center<br>Atlanta, GA 30309-3424<br>randall.allen@alston.com<br>sam.rutherford@alston.com<br>nberreth@alston.com<br><br>James P. Denvir<br>Scott Gant<br>Michael Mitchell<br>BOIES SCHILLER & FLEXNER LLP<br>5301 Wisconsin Avenue, N.W., Suite 800<br>Washington, DC 20015<br>jdenvir@bsfllp.com<br>sgant@bsfllp.com<br>mmitchell@bsfllp.com | Bert W. Rein<br>WILEY REIN LLP<br>1776 K Street N.W.<br>Washington, DC 20006<br>brein@wileyrein.com<br><br>Alden L. Atkins<br>Vincent van Panhuys<br>VINSON & ELKINS L.L.P.<br>2200 Pennsylvania Avenue, N.W.<br>Suite 500 West<br>Washington, DC 20037<br>aatkins@velaw.com<br>vvanpanhuys@velaw.com<br><br>Roger W. Fones<br>Josh Hartman<br>Lauren Navarro<br>MORRISON & FOERSTER LLP<br>2000 Pennsylvania Avenue, N.W.<br>Suite 600<br>Washington, DC 20006<br>rfones@mofo.com<br>jhartman@mofo.com<br>lnavarro@mofo.com<br><br>Thomas W. Rhodes<br>William Parker Sanders<br>SMITH, GAMBRELL & RUSSELL, |

21

| | LLP<br>Suite 3100, Promenade II<br>1230 Peachtree Street, N.E.<br>Atlanta, GA 30309<br>trhodes@sgrlaw.com<br>psanders@sgrlaw.com |
|---|---|

So certified, this 6th day of November, 2015.

/s/Daniel L. Low
Daniel L. Low
KOTCHEN & LOW LLP
1745 Kalorama Rd. NW, Suite 101
Washington, DC 20009
dlow@kotchen.com

*Interim Co-Lead Counsel for Plaintiffs*