IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE DELTA/AIRTRAN BAGGAGE FEE ANTITRUST LITIGATION | CIVIL ACTION FILE No. 1:09-md-2089-TCB |

# O R D E R

This consolidated antitrust class action comes before the Court on
Defendants' motions for summary judgment [350, 353] and three
related motions to exclude expert testimony [625, 631, 632].[1]

## I.     Factual Background[2]

### A.     Delta and AirTran

Defendant Delta Air Lines, Inc., one of the world's largest airlines,
is headquartered in Atlanta and has its largest hub at Atlanta's

---

[1] The Court's July 12, 2016 order granting Plaintiffs' motion for class
certification [665] is presently on appeal to the Eleventh Circuit pursuant to Rule
23(f) of the Federal Rules of Civil Procedure, but such an appeal "does not stay
proceedings in the district court unless the district judge or the court of appeals so
orders." FED. R. CIV. P. 23(f). The Eleventh Circuit did not so order, and on October
19, 2016 this Court—consistent with the parties' wishes—declined to stay the case.

[2] Throughout this Order, citations to deposition testimony and to the parties'
briefs are to the page numbers that appear on the transcript or brief itself. All other
record cites refer to the page of the PDF document filed on the Court's electronic
docket, not to the page numbers (if any) reflected on the documents being cited.

Hartsfield-Jackson International Airport. Defendant AirTran Airways, Inc.—a subsidiary of Defendant AirTran Holdings, Inc. (collectively with AirTran Airways, "AirTran")—was an airline that also maintained a hub in Atlanta for many years until 2014, when it ceased operations after having been acquired by Southwest Airlines approximately three years earlier, in 2011.

Although the parties dispute the extent to which each airline was concerned about the other's activities, there is no dispute that Delta and AirTran were competitors for market share, particularly at their mutual hub in Atlanta. *See*, *e.g.*, [569] at 68 (Delta's CEO testifying that AirTran was "part of the [competition] equation" but not conceding that AirTran was Delta's largest competitor out of Atlanta); [580] at 13 (AirTran's CEO testifying that Delta was AirTran's number one competitor in Atlanta).

Delta is known as a "legacy carrier" because it had interstate routes in place at the time of airline deregulation in 1978. In and prior to early 2008, the legacy carriers in the United States included Delta,

2

Continental Airlines, Northwest Airlines, American Airlines, US Airways, and United Airlines.[3]

AirTran, by contrast, was what is known as a "low-cost carrier" ("LCC"). In its most literal sense, the LCC designation is indicative of airlines with business models that minimize costs and allow airlines to charge lower fares, but it is also used more generally as a "catchall name for post-deregulation new entry and, in fact, disguises diverse airlines and heterogeneous strategies." Eldad Ben-Yosef, *The Evolution of the Airline Industry: Technology, Entry, and Market Structure—Three Revolutions*, 72 J. AIR L. & COM. 305, 317 (2007); *see also* Erica Wessling, Note, Spirit Airlines, Inc. v. Northwest Airlines, Inc.*: A Case for Increased Regulation of the Airline Industry*, 6 WM. & MARY BUS. L. REV. 711, 724 (2015). Prominent LCCs during the time period in question included Southwest, JetBlue Airways, Allegiant Air, Frontier Airlines, and Spirit Airlines.

---

[3] Alaska Airlines is also a legacy carrier, but it flies only regional routes.

### B.     The Trend Toward Unbundling[4] and the Introduction of Bag Fees

For many years, the purchase of an airline ticket generally encompassed all or most of the services associated with air travel. In the early-to-mid-2000s, however, some airlines began to charge separate fees for services and products ancillary to the purchase of a seat, such as meals and snacks, premium beverages, call-center booking, airport ticketing, and curbside check-in.

In 2006 and 2007, low-cost carriers led the way in introducing fees for passengers' checked luggage: Allegiant introduced a $2-per-bag fee in November 2006; Spirit began charging for two or more checked bags in February 2007 and then for a first checked bag in June of that year; Skybus Airlines implemented fees for first, second, and third checked bags in May 2007; and Virgin America began charging for second checked bags in August 2007. In January 2008, even Southwest, which

---

[4] "Unbundling" is somewhat of a loaded term in the context of this litigation. The Court adopts Defendants' nomenclature only for ease of reference. It makes no finding and expresses no opinion about whether Defendants and other airlines introduced new fees or simply began to separately itemize charges that had previously been "bundled" into ticket prices.

markets itself as the "bags fly free" airline, introduced a fee for a third-checked bag.

Before long, legacy airlines began to follow suit. In February and March 2008, every legacy carrier except Alaska announced the introduction of fees for second-checked bags beginning in May. Delta was the third legacy carrier to do so, announcing on March 18 that it would implement a $25 second-bag fee beginning on May 1.[5] AirTran—which had previously refrained from charging baggage fees—announced on April 11 that it would implement a second-bag fee of $10 (if paid online) or $20 (if paid at the airport) beginning on May 15.[6]

American Airlines then became the first legacy carrier to introduce a first-bag fee, announcing on May 21, 2008 that it would implement a $15 first-bag fee effective June 15. On June 12, US

---

[5] Fees for second checked bags were announced by United on February 4, 2008, effective May 5; announced by US Airways on February 26, effective May 5; announced by Northwest on March 28, effective May 5; announced by Continental on April 4, effective May 5; and announced by American on April 28, effective May 12. Alaska, which as noted above is a regional legacy carrier, announced and implemented its second bag fee on July 1, 2008, later than its non-regional counterparts.

[6] Following AirTran's announcement, other LCCs that had yet to introduce a second-bag fee—including JetBlue, Frontier, and Republic Airlines—announced in April and May 2008 that they would do so beginning in June.

Airways and United both announced that they would impose $15 first-bag fees effective July 9 and August 18, respectively. On July 9, Northwest announced that it would begin charging a $15 first-bag fee on August 28,[7] and on September 5, Continental announced that it would introduce a $15 first-bag fee on October 7. By October 8, therefore, Delta and Alaska were the only legacy carriers that had not implemented a $15 first-bag fee, and AirTran was among the minority of LCCs that had not implemented a first-bag fee. *See generally* [353-29] at 34–36.

During this same time frame, Delta's legacy competitors made public statements indicating that they expected ancillary fees—including but not limited to first-bag fees—to prove profitable. On July 9, 2008, Northwest announced that it expected its fee structure, including its newly announced first-bag fee, to generate between $250 and $300 million in revenue annually. [350-63] at 4; *see also* [350-64] at 6 (reiterating during a July 23 earnings call that Northwest expected

---

[7] On April 14, 2008, approximately four months before Northwest announced that it would implement a first-bag fee, Delta and Northwest had announced that they would merge, forming a combined carrier that would be called Delta and of which Anderson would be CEO. [350-55] at 2.

increased baggage, service, and ticket-change fees to "drive between 250 and 300 million in annual revenue improvement"). American stated during its July 16 earnings call that it expected all of its fee increases (including its first-bag fee) "to drive several hundreds of millions of dollars of new revenue" and that its first-bag fee had resulted in no negative operational effects. [350-60] at 7, 19.

On July 22, 2008, both United and US Airways held earnings calls in which they too praised bag fees. [350-61] at 9, 11 (United stating that unbundling had "creat[ed] significant incremental revenue" and "estimat[ing] that the potential revenue from the new baggage service handling fees will be about $275 million annually in 2009"); [350-62] at 8, 17 (US Airways reporting that implementation of the bag fee had gone smoothly, that it was not seeing "any difference in market share or bookings between carriers that [had first-bag fees] and carriers that [didn't]," and that it estimated that shifting to "a la carte" pricing would yield between $400 and $500 million in revenue annually).

On September 5, 2008, when Continental announced its decision to charge for first-checked bags, it stated that it had not seen any gain

in market share by holding out. [350-73] at 2. On September 16, the Wall Street Journal reported that "airline fees are here to stay," explaining that "baggage fees and other charges [were] significantly improving the usually dismal finances of the industry" because passengers were "paying them, if begrudgingly, and [weren't] shifting in large numbers to the few airlines that don't charge fees . . . ." [350-89] at 2.

### C.   Delta's Bag-Fee Discussions During the Summer of 2008

American's May 21, 2008 first-bag-fee announcement prompted internal discussions about whether Delta should introduce a similar fee. In the days following American's announcement, Delta's CEO Richard Anderson and executive vice president ("EVP") of operations Steve Gorman were in agreement that the airline should not introduce a first-bag fee at that time due to concerns relating to customer dissatisfaction, operational impacts during the busy summer travel season, and Anderson's belief that "part of the basic bargain" when purchasing an airplane ticket included one checked bag. [350-49]. EVP of network planning and revenue management Glen Hauenstein concurred,

recommending that if the industry was moving toward charging a first-bag fee, Delta should "be the last in." [556] at 372. On May 28, Anderson closed the debate, at least for the time being, by sending Gorman an e-mail that read: "No $15.00 fee. Issue closed. Sit tight with no announcement." *Id.* President Ed Bastian testified in his deposition that he was in agreement with that decision. [350-22] at 114.

Following the June 12, 2008 first-bag-fee announcements by US Airways and United, Delta's internal bag-fee discussions intensified, although Anderson and Gorman remained opposed to the idea. [556] at 379. On June 16, Delta's Airport Customer Service ("ACS") group, which was headed by senior vice president ("SVP") Gil West, presented a written analysis of the first-bag fee to the Corporate Leadership Team ("CLT"). *See* [350-54]; [366] at 29.[8] The ACS presentation explained that a $15 first-bag fee could potentially yield $220 million annually in additional revenue even if forty percent of Delta's bag-checking passengers stopped checking a bag after the fee was introduced. [350-

---

[8] The CLT is a group of Delta's most senior executives—including, during the time period in question, Anderson, Bastian, Gorman, and Hauenstein—who serve as an advisory group to the CEO.

54] at 6. The presentation also recognized potential risks of introducing a first-bag fee, including negative operational results, the need for additional gate and ramp staff to collect fees and baggage, and concerns about the perception that the introduction of the fee might create. *Id.* Ultimately, ACS recommended that Delta not impose a first-bag fee "at this time" but that it "continue to monitor [other airlines] through the end of the summer and re-evaluate." *Id.*

Delta's leadership was receptive to ACS's recommendation, as Anderson and Bastian continued to believe that Delta should not charge a first-bag fee. *See* [350-58] at 2; [350-59] at 2; [556] at 491; [557] at 308. During a Delta earnings call on July 16, 2008, Kevin Crissey—an airline-industry analyst employed by UBS—asked about Northwest's recently announced first-bag fee. Bastian responded that Delta had "no plans to implement it at this point" but would "continue to study" the question. [350-67] at 18. On August 1, Anderson delivered a weekly recorded message to employees in which he explained that Delta would increase its second-bag fee but continue to not charge for a first-checked bag. [557] at 333. He explained that Delta had an "agreement" with its

customers that with the purchase of a ticket "every customer gets a carry-on brief case or purse, one regulation-sized roller bag and one checked bag weighing no more than 50 pounds." *Id.*; [570] at 189. Anderson also explained that Delta's bag-fee policy made sense both "in the fuel environment" and because Delta is primarily in the business of carrying passengers, not cargo. [557] at 333.

But internally, Delta was studying the first-bag fee more closely. In mid-August 2008, Delta's manager of baggage performance, Stephen Almeida, circulated a first-bag fee analysis that noted, among other things, that brand-tracking studies had indicated that "not charging for the 1st checked bag" was a primary reason some passengers chose to book Delta flights. [557] at 394–95. A September 2008 focus group indicated that Delta's customers understood the necessity of charging for bags but would actively seek out airlines that did not pass on those charges. [557-1] at 125. On September 30, Pam Elledge, Delta's SVP of global sales, sent an e-mail to Hauenstein, Grimmett, and others in which she explained that her department was continuing to "quantify" the issue but believed that "price, schedule and [frequent flyer] loyalty"

were the primary factors that motivated passengers to book Delta, with first-bag fee being a "tiebreaker." [557-1] at 106.

By late September 2008, some Delta executives were rethinking the wisdom of a first-bag fee. On September 23, Anderson gave remarks at a CEO forum in which he stated that Delta was "trying to decide whether or not [it] should charge for the first checked bag," noting that it "could bring [Delta] hundreds of millions in additional revenue next year." [557-1] at 129. On September 26, Delta CFO Hank Halter identified a $15 first-bag fee as an option to generate additional revenue, potentially as much as $29.7 million during the fourth quarter of 2008 alone. [350-94] at 2, 13. Two days later, Anderson e-mailed Bastian to suggest that Delta "think about implementing the [first-bag] fee post merger" because there was "Alot [sic] of revenue involved." [350-97]. Bastian agreed but noted that Hauenstein was opposed to the fee. *Id.* Anderson and Bastian both agreed that Delta should discuss the merits of the fee "at [the] right time." *Id.* The next day, September 29, 2008, Anderson, Bastian, Hauenstein, and other Delta executives attended a quarterly finance meeting at which first-bag fee was

12

discussed. A "key consideration" was the risk that Delta's LCC competition, including but not limited to AirTran, were promoting the fact that they did not have the fee. [557-1] at 67. An October 10 e-mail from Anderson noted that Delta was "still studying" the first-bag fee. [557-1] at 174.

### D. AirTran's Bag-Fee Discussions and Monitoring of Delta During the Summer of 2008

During the summer of 2008, AirTran was engaged in its own inquiry into the first-bag fee, and Delta was very much a consideration. That June, CEO Robert Fornaro told attendees at a Merrill Lynch transportation conference that AirTran had not instituted a first-bag fee because it would be "pretty uncomfortable" competing in Atlanta with Delta, which was not charging a first-bag fee at that time. [556] at 472; [556-1] at 1511.

When Northwest announced its first-bag fee on July 9, 2008, AirTran was anxiously waiting to see if Delta would follow suit. AirTran's SVP of customer service, Jack Smith, told his subordinate Greg Sayler that he hoped Delta was "right behind" Northwest. [557] at 197, 211. When senior director of pricing and distribution Matthew

Klein sent an e-mail praising the first-bag fee, SVP of marketing and planning Kevin Healy responded: "Cheer louder, the guys with the blue and red tails in ATL [i.e., Delta] need to hear you." *Id.* at 194. On July 10, AirTran was preparing to introduce a first-bag fee if Delta did, but it was somewhat concerned about technological limitations. [557] at 211. Healy suggested that perhaps AirTran should announce that it would implement a first-bag fee on a future date and back off if Delta didn't follow. *Id.* He also suggested "test[ing] the water" by charging for a first bag on AirTran's lowest flights, both to generate incremental revenue and to show its competitors that it supported first-bag fees. *Id.*

By mid-July, AirTran was "desperate for revenue" according to Klein, and the first-bag fee had become the airline's "new number one revenue priority." [557] at 253–256. Internal projections valued the fee at between $60 and $84 million per year, even if thirty percent of AirTran's bag-checking customers stopped checking bags in response to the fee. *Id.* at 258, 260. As AirTran worked to develop the technological capability to implement a first-bag fee, *id.* at 255–260, it remained very concerned about what Delta planned to do, *id.* at 314.

14

On July 12, 2008, Sayler sent an e-mail to Smith stating that while he had no "official" information, his wife Robin, who was employed by Northwest, believed that Delta would introduce a first-bag fee around August 28. [557] at 245; [577] at 52. Smith responded that he hoped that information was accurate,[9] then he forwarded Sayler's e-mail to Fornaro, adding only an explanation of who Robin was and her status as a Northwest employee. [557] at 245–47.

Another employee who reported to Smith was Scott Fasano, AirTran's director of customer service standards and a former Delta employee. On July 31, 2008, Fasano sent an e-mail to Smith reporting that Delta and AirTran were "in a stand-off" regarding first-bag fees and Delta was "carefully watching [AirTran] for a move." [556] at 591. Smith forwarded that information to Fornaro and indicated it came from Fasano's "internal [Delta] grapevine." *Id.* In response, Fornaro stated: "They should hear through the grapevine that we are doing the programming to launch this effort." Smith assured Fornaro "[i]t will be

---

[9] It turned out not to be, as Delta did not announce until November 5 that it would be imposing a first-bag fee effective December 5.

communicated today." *Id.* at 597.[10] Healy also informed Fornaro that AirTran was ready to implement the first-bag fee for travel beginning on September 4. *Id.* at 591. He had hoped someone would ask about it on the most recent earnings call,[11] but he assured Fornaro that he would continue to "push it out there." *Id.*

On July 31, 2008, Fasano attempted to send e-mails to two individuals he had worked with while at Delta—Gerry Boeckhaus and Amanda Burman—to inquire about Delta's first-bag-fee plans. [556] at 853–85.[12] However, unbeknownst to Fasano, both Boeckhaus and Burman had left Delta's employ, and it is undisputed that they did not

---

[10] Smith later testified that he did not recall what, if anything, he did with that information and that he did "not always" do what he told Fornaro he would. [556-1] at 1050, 1056; *see also* [577] at 67 (answering, in response to whether he typically followed through with things he tells his boss he will do: "Normally, but not always with Mr. Fornaro. Sometimes mandates are sent out that I don't act on.").

[11] For AirTran's second-quarter 2008 earnings call held in July 2008, Fornaro had not included first-bag fees in his prepared remarks but had considered how he would answer a question about first-bag fees from analysts. [361-2] at 216; [560] at 91–92. "At that point, it was a variation of, you know, we're working on the technology, and we haven't made a decision. You know that changed to we have the technology, and we haven't made a decision." [361-2] at 216–217. However, as just noted, that question was not asked on the second-quarter earnings call.

[12] Burman had been involved in Delta's first-bag-fee analysis. [557] at 67. Boeckhaus's responsibilities included baggage handling, so Fasano believed that he would be in a position to know about Delta's bag-fee policies. [582] at 130–31.

16

receive the e-mails Fasano sent to their Delta e-mail addresses. [554-1] at ¶106; [350-24] at 21; [350-25] at 8. Fasano then spoke with Mike Rossano and Mike Ringler, who were Delta's station managers in Knoxville and Miami, respectively. [556] at 587; [363] at 46–47, 66–67; [582] at 28.[13] Fasano reported to Smith that Delta was "holding and [AirTran had] been included in every conversation." [556] at 587. Both Ringler and Rossano denied having spoken with Fasano about bag fees, and Ringler denied having spoken with Fasano at all during the time period in question. [350-40] at 59; [350-41] at 79.

On August 4, 2008, Healy sent an e-mail to two AirTran employees—Rocky Wiggins and Ted Hutchins—asking what was known about Delta's technological capabilities with respect to the first-bag fee. [557] at 345. He also advised that "we don't need to maintain confidentiality on the fact that we're working on this as well." *Id.*

---

[13] Neither Rossano nor Ringler was involved in or had knowledge of the process leading to Delta's decision to impose a first-bag fee. [350-40] at 64; [350-41] at 91. Rossano did participate in weekly "baggage calls," but the undisputed evidence is that those meetings focused on "operational performance" and bag fees were never discussed. [584] at 148–51; [350-41] at 25, 40, 91.

17

The next morning, Fasano sent an e-mail to Healy and Smith "following up on [their] conversation" from the day before. [556] at 610. Fasano explained that he "had a cup of coffee with one of [his] former colleagues who is still embedded in the team amongst the Northwest crew." Fasano's colleague—who remained unnamed but was described by Fasano as being "very connected on the high level operational and planning side" of Delta's operations—had informed Fasano that Delta's functionality was in place to go live with a first-bag fee, but Delta "want[ed AirTran] to jump first." [556] at 610. Healy reprimanded Fasano and "made it very clear" that the conversations reflected in his e-mail "can't happen." [353-90] at 187; [353-81] at 161–62.[14] There is no suggestion that Fasano made any further attempts to contact Delta or learn of its plans vis-à-vis a first-bag fee. On August 8, 2008, Fornaro sent an e-mail to Fornaro and others stating that AirTran would not impose a first-bag fee unless Delta did. [556] at 623.

---

[14] Healy did relay to Wiggins and Hutchins that he had "heard . . . that [Delta is] ready and can go anytime." [557] at 350.

### E.    October 2008: Defendants' Final Decisions Are Made

On October 15, 2008, before either Defendant had decided to impose a first-bag fee, Delta held its third-quarter earnings call, during which it stated that "a la carte pricing is where we need to go as an industry" and the impending merger with Northwest would give Delta "another opportunity to look again with respect to where the fee-based revenues align." [350-99] at 18.

In the meantime, Delta continued to study the first-bag fee internally. Revenue management, with some input from other departments such as ACS, prepared a "value proposition" analysis of the first-bag fee, which it generally opposed. The PowerPoint deck analyzed the first-bag fee under best-case, worst-case, and mid-range scenarios by taking the estimated revenue of the first-bag fee and offsetting it by the estimated share-shift to other airlines, including AirTran. The latter factor depended in part on the likelihood that other airlines would match Delta's first-bag fee. Initially, Delta predicted there was only a fifty percent probability that AirTran would match,

19

yielding a mid-range estimate of a $46 million loss to Delta. [556] at 756–57, 786–87.

On October 23, 2008, AirTran held its third-quarter earnings call. The prepared remarks did not mention first-bag fees, but the first question, which came from Kevin Crissey, did: "First check bag fee, you don't have one, do you? And will you?" Fornaro responded:

> Kevin, good question. Let me tell you what we've done on the first bag fee. We have the programming in place to initiate a first bag fee. And at this point, we have elected not to do it, primarily because our largest competitor in Atlanta where we have 60% of our flights hasn't done it. And I think, we don't think we want to be in a position to be out there alone with a competitor who we compete on, has two-thirds of our nonstop flights and probably 80 to 90% of our revenue is not doing the same thing. So I'm not saying we won't do it. But at this point, I think we prefer to be a follower in a situation rather than a leader right now.

[353-16] at 7. Crissey followed up by asking, "But if they were, you'd consider it? It's not a matter of practice?" Fornaro responded: "We would strongly consider it, yes." *Id.*

Delta executives soon learned of Fornaro's statements and immediately questioned the wisdom of them.[15] Revenue management updated the value proposition deck on October 23 and early October 24, 2008, to increase the likelihood that AirTran would match any first-bag fee from fifty percent to seventy-five percent, bringing the estimated annual loss down from $46 million to between $19 and $35 million. [557-1] at 290–91, 358–59. Later on October 24, the value proposition was revised to reflect a ninety-percent likelihood that AirTran would match. [556] at 844–45. This change was made at Hauenstein's direction, [586] at 24, who made the number up but thought it was a more "realistic" expectation, [567] at 124–25. At that increased likelihood, Delta's mid-range estimate became "slightly positive" for the

---

[15] Gorman found Fornaro's comments "inappropriate" in light of Defendants' antitrust training and compliance and explained that Delta was left in "almost disbelief that he made such a comment." [588] at 31. Hauenstein similarly described the statement as "[un]wise" given "antitrust compliance" and prohibitions on discussing future pricing. [567] at 122. Bastian "found it kind of odd . . . that AirTran would even talk about that topic on the call . . . [b]ecause we know not to talk about pricing matters in a public call." [366] at 49. Gail Grimmett in revenue management described the conversations as "could you believe . . . that he made a pricing comment on a call." [565] at 200.

first time. [556] at 844–45.[16] Also on October 24, Hauenstein reported to Anderson that AirTran "clearly want[ed] bag fees" and that the issue would be discussed at the CLT meeting that was planned for the following Monday, October 27. [556] at 798.

At the October 27, 2008 CLT meeting, revenue management presented its value proposition analysis—with the calculations based on a ninety-percent probability that AirTran would match Delta's first-bag fee—and generally advocated against the fee. Gorman and West reiterated their support for the fee. Bastian then spoke and advocated in favor of the fee based on the expected revenues it would generate during the tough economic times, including Delta's need to fund its employee pension plan. Anderson agreed, and ultimately the CLT approved the first-bag fee at the October 27 meeting.[17]

---

[16] Delta disputes that the value proposition reflects the "views" of Delta, as Plaintiffs contend it does. Rather, Delta asserts that the value proposition was an "advocacy piece" prepared by revenue management, which opposed a first-bag fee both before and after October 23, 2008.

[17] Bastian testified that he came into the October 27 CLT meeting inclined to adopt the first-bag fee but that he "wanted to hear the discussion and the debate" before firmly committing. [350-22] at 45.

One week later, on November 5, 2008, Delta issued a press release—titled "Delta Aligns Policies and Fees to Offer Consistency for Customers Traveling on Delta- and Northwest-Operated Flights"—in which it announced that for travel beginning on December 5, domestic passengers would be charged "$15 for the first checked bag and $25 for the second checked bag . . . , consistent with Northwest's existing policies." [350-127] at 3.[18]

Anderson testified that Fornaro's October 23 comments "didn't have any bearing on [the CLT's] decision to put in place a first bag fee." [350-2] at 94; *see also* [350-20] at 68 (Anderson testifying that "AirTran's match really wasn't relevant to the decision"). Bastian similarly testified that Fornaro's statement had "[n]o impact whatsoever" on his stance; his concern was Delta's survival and that he "thought the need was for Delta to take care of itself and not worry about what a relatively small carrier was going to do." [350-23] at 77, 85. AirTran was not relevant to Gorman's opinion on the first-bag fee

---

[18] In the same press release, Delta announced it was eliminating certain fuel surcharges, reducing  phone-reservation charges, eliminating its curbside check-in fee, and reducing its second-bag fee from $50 to $25.

either. [350-29] at 44; [350-30] at 60. Grimmett, West, and Eric Phillips (one of the authors of the value proposition analysis) did not recall the chance of AirTran matching being brought up at the CLT meeting, [350-31] at 214; [350-44] at 185; [350-38] at 306–07. Hauenstein testified that Delta would have made the decision to impose a first-bag fee without regard to what AirTran did. [350-32] at 127.

Delta's November 5, 2008 press release was circulated within AirTran shortly after it was published. When Healy was asked by another AirTran employee whether AirTran should "take the plunge right away or . . . test whether this provides any advantage in ATL?," Healy responded that he was "[n]ot sure yet . . . ." [350-128]. Healy then sent an e-mail to Klein and other AirTran employees saying that he did not believe AirTran had a choice about imposing a first-bag fee, and the question to him was whether AirTran should charge a "discount[ed]" fee of $5, $7, or $10. [350-129]. Klein responded that he was "working on the new valuation" but believed $15 was the way to go, and Healy instructed him that his valuation should "make some estimate for the value of not implementing the first bag fee," such as share shift and

good will. *Id.* At 11:06 p.m. on November 5, Klein e-mailed Fornaro, AirTran's CFO Arne Haak, Healy, and others and attached a spreadsheet describing the "staggering potential for 1st bag revenue." [353-21]. A November 6 e-mail from Haak to Healy stated, "Should we charge the fee? (I think we have already decided this.)" [556-1] at 8.

On the morning of Friday, November 7, 2008, AirTran executives "discuss[ed] the merits of whether [AirTran] should implement or not implement" a first-bag fee. [353-93] at 206; [353-25]. Smith recalled that some people were "certainly . . . in favor of not charging first-bag fees, saying that it would give [AirTran] a competitive advantage." [353-104] at 129. He, however, "was of the opinion that we should do first-bag fees," and he was "pretty disgusted at the end of the call because we had the people who were responsible for generating revenue saying, [']Gee, I don't know if we really want to do this. We may lose customers.[']" *Id.* at 130. Shortly after that meeting, AirTran's senior director of corporate finance Jason Bewley circulated an update to the first-bag-fee analysis that Klein had circulated late on November 5. Bewley's analysis

25

"mirror[ed]" Klein's and estimated "approximately $100MM of revenue in 2009" from imposing a first-bag fee. [353-26].

AirTran's executives decided to "let it sit over the weekend," and the final decision to impose a first-bag fee was made on the morning of November 10, 2008. [353-83] at 85–86. On November 12, AirTran issued a press release announcing that it too would impose a $15 first-bag fee on December 5. [556-1] at 23.

These lawsuits were subsequently filed alleging that Defendants' simultaneous imposition of a $15 first-bag fee was the result of unlawful collusion in violation of § 1 of the Sherman Act. Defendants have moved for summary judgment.

## II.   *Daubert* **Motions**

As noted above, the parties have filed several motions to exclude expert testimony that must be resolved before the Court turns to the merits of Defendants' motions for summary judgment.

## A.    Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert

testimony and provides that an expert "may testify in the form of an

opinion or otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court construed and expounded upon Rule 702's

requirements in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579, 594–95 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

145 (1999), emphasizing that "the inquiry envisioned by Rule 702 is . . .

a flexible one." *Daubert*, 509 U.S. at 594.

In this circuit, *Daubert* motions are governed by a three-pronged

test:

> Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which

27

the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted). "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005).[19]

When a *Daubert* motion challenges the reliability or helpfulness of an expert opinion, the Court must be wary of excluding it "based on skepticism as to believability," for credibility or believability is "an assessment to be made by the jury" alone. *Bullock v. Volkswagen Grp. of Am., Inc.*, 107 F. Supp. 3d 1305, 1309 (M.D. Ga. 2015); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016) ("Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury."); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,

---

[19] None of the *Daubert* motions presently at issue questions the experts' qualifications, and the Court finds that each expert is qualified by his knowledge, skill, experience, training, and education to testify competently to the matters contained in his report.

326 F.3d 1333, 1341 (11th Cir. 2003) (*Daubert* "is not intended to supplant the adversary system or the role of the jury," and a court should not "make ultimate conclusions as to the persuasiveness of the proffered evidence."). Doubts regarding the credibility of or weight that should be given to otherwise reliable and relevant testimony are best addressed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

### B. Defendants' Motion to Exclude Hal Singer's Merits Testimony [625]

Defendants have jointly moved to exclude certain opinions of Hal Singer, Plaintiffs' expert economist, regarding the merits of Plaintiffs' claims.[20] Defendants argue that Singer has impermissibly opined about the ultimate legal issue in this case, adopted a definition of collusion that is contrary to the Eleventh Circuit's definition, relied on factual findings and assumptions that are not supported by the evidence, and weighed the evidence and witness credibility.

---

[20] Defendants previously moved [399] to exclude the opinions offered by Singer in support of Plaintiffs' motion for class certification, but those opinions are not at issue in the instant motion.

### 1.    Ultimate Legal Issue

Defendants first argue that Singer has impermissibly opined about the ultimate legal issue in this case, namely, whether Defendants colluded to impose a first-bag fee. However persuasive this argument might be with respect to Singer's initial reports and testimony—in which he expressly opined about the existence of "collusion" or a "conspiracy"[21]—it does not compel exclusion of the opinions contained in his amended reports, which are the only opinions presently at issue. Singer supplemented and then amended his prior reports to "clarify that [his] testimony at trial will focus on whether Defendants' conduct was consistent with anticompetitive coordination, as opposed to whether Defendants in fact 'colluded.'" [566-1] at 1679.[22]

---

[21] *See, e.g.*, [269-4] at ¶ 2 ("Defendants engaged in collusion to jointly impose first bag fees."); *id.* at ¶ 33 ("Delta's and AirTran's decisions to adopt first bag fees were the result of collusion."); [269-8] at ¶ 1 ("Delta and AirTran engaged in an anticompetitive conspiracy to charge a first bag fee . . . ."); [626-4] at 882 (Singer testifying that "Defendants in my opinion have conspired to raise bag fees").

[22] *See, e.g.*, [556-1] at 1562 ("Defendants' actions are more consistent with a conspiracy to jointly impose first bag fees than with unilateral conduct."); *id.* at 1565 (concluding that "Defendants' actions were inconsistent with unilateral conduct"); *id.* at 1575 (opining that certain evidence confirms that Defendants' decisions to adopt first-bag fees "were more consistent with conspiracy than unilateral conduct); *id.* at 1688 (replacing a prior reference to "an anticompetitive

Courts in this circuit and others regularly admit expert testimony that certain conduct or evidence is "consistent with a finding that Defendants engaged in a conspiracy to fix prices." *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1355 (N.D. Ga. 2000); *Harcros*, 158 F.3d at 565 (holding that expert testimony is admissible so long as it "constitute[s] one piece of the puzzle that the plaintiffs endeavor to assemble before the jury"); *see also In re Urethane Antitrust Litig.*, 152 F. Supp. 3d 357, 359–61 (D.N.J. 2016) (admitting expert economic testimony that certain evidence was "not consistent with the existence of a price-fixing conspiracy"); *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 424 (E.D. Pa. 2015) ("An economic expert may permissibly testify as to whether certain conduct is consistent with collusion or an entity or individual's self-interest . . . ."); *U.S. Info. Sys., Inc. v. IBEW Local Union No. 3*, 313 F. Supp. 2d 213, 240 (S.D.N.Y. 2004) ("Economists often explain whether conduct is

---

conspiracy to charge a first bag fee" with a reference to actions that "are more consistent with conspiracy than unilateral conduct").

indicative of collusion.").[23] The Court will not exclude Singer's

testimony on this basis.

### 2.   Singer's Definition of Collusion

Defendants next urge that even if an expert may, as a general

principle, testify that certain conduct is consistent with conspiracy,

Singer's opinions remain inadmissible because his definition of collusion

is at odds with the Eleventh Circuit's definition. Specifically,

Defendants accuse Singer of defining collusion in an overly broad

manner that would encompass situations the Eleventh Circuit has

defined as "conscious parallelism." If true, this would indeed mandate

exclusion of Singer's testimony. *Williamson Oil Co. v. Philip Morris*

*USA*, 346 F.3d 1287, 1323 (11th Cir. 2003) (affirming exclusion of

expert testimony where expert "defined 'collusion' to include conscious

parallelism," i.e., he failed to "differentiate between legal and illegal

pricing behavior, and instead simply grouped both of these phenomena

under the umbrella of illegal, collusive price fixing").

---

[23] In fact, Defendants' own experts have submitted their opinions that
Defendants' conduct was more consistent with unilateral activity than collusion.
*See, e.g.*, [632-3] at ¶ 16 (Andrew Dick opining that Defendants' conduct was
"consistent with economic theories and principles identifying unilateral conduct").

When isolated and taken out of context, the deposition testimony quoted by Defendants might support their position. However, when the entirety of Singer's opinions is considered in context, it is apparent that he properly distinguishes between unlawful collusion and lawful conscious parallelism. *See generally E.I. Dupont de Nemours & Co. v. Kolon Indus., Inc.*, No. 3:09-cv-58, 2011 WL 13079484, at *1 (E.D. Va. June 15, 2011) (denying motion to exclude testimony that was "based largely on statements taken out of context from [the expert's] report or deposition"); *Reed v. City of Greenwood*, No. 4:02-cv-287, 2005 WL 6000490, at *1 (N.D. Miss. Sept. 30, 2005) ("The Court has reviewed the deposition testimony at issue and finds that when [the expert's] testimony is viewed in its entirety rather than in isolation as presented by the defendants, it is evident that the defendants' motion to strike [the expert's opinions] is without merit.").

Singer defines collusion as "a type of coordinated interaction whereby ostensibly independent firms act jointly *only as a result of a prior assurance between firms*." [399-4] at ¶19 (emphasis added). He never purported to define collusion solely by reference to whether a

33

communication "had a material effect" on a competitor's decision, as Defendants suggest. [625-1] at 8 (quoting [626-5] at 1089). According to Singer, such a showing is necessary—but not by itself sufficient—to support a finding of collusion:

> [I]f the fact finder here concludes that . . . AirTran's overtures had no bearing on Delta's decision making, then I would gladly admit that consumers are no worse off as a result of the communication. . . . I do think that . . . to generate economic harm . . . a critical inquiry is whether or not the communication had a material effect on Delta's decision making.

[626-5] at 1089.

Throughout his reports and his deposition testimony, Singer properly contrasts unlawful collusion with other types of "coordinated interaction," much of which he concedes is not "illegal under the antitrust laws" and is "generally considered benign when each firm acts independently." [399-4] at ¶19. He also testified that "the facts and the evidence in this case, when analyzed under the proper economic lens, *is more consistent with plaintiff's allegations of a conspiracy than it is with the alternative hypothesis of unilateral conduct or . . . conscious*

*parallelism.*" [626-6] at 115–16 (emphasis added); *see also id.* at 118–19 (explaining the difference between collusion and conscious parallelism).

When viewed in the appropriate context, Singer's testimony and opinions properly account for the well recognized distinction between conscious parallelism and unlawful collusion. Thus, the Court will deny this aspect of Defendants' motion to exclude as well.

### 3.    Singer's Game-Theory Analysis

Singer's opinions regarding collusion employ an economic modeling tool known as game theory, and specifically, a permutation thereof known as the prisoner's dilemma. The prisoner's dilemma model purports to depict the payoffs to two "players" of various strategies in a "game" played with each other in order to predict the strategy that each player will pursue and provides insight, from an economic perspective, into the effects of those choices on individual and collective welfare.

Singer relies on the prisoner's dilemma "to test whether Delta and AirTran, as rational, profit-maximizing firms, would have chosen to adopt first bag fees unilaterally (that is, absent the alleged conspiracy)." According to him, "[t]he results of [his] analysis show that neither Delta

nor AirTran would have rationally adopted a first bag fee independently." [556-1] at 1572. Defendants, however, assert that the output of Singer's game-theory analysis is rendered unreliable by virtue of the inputs Singer relied on.

Defendants fault Singer's game-theory analysis insofar as it relies on figures contained in the value proposition document as a proxy for measuring Delta's payoffs. Defendants argue that the undisputed evidence shows that "those slides neither represented the views of 'Delta' nor were intended to be Delta's estimates of revenues that might be gained or lost if Delta implemented a first bag fee." [625-1] at 15. Defendants also argue that Singer's analysis is inadmissible because he improperly weighed the credibility of witnesses and substituted his own views of the evidence for the testimony of those with firsthand knowledge. Finally, Defendants assert that the model erroneously assumes that Defendants were making their bag-fee decisions with complete information about each other, simultaneously and as though those decisions could not subsequently be changed. Whatever fodder

these arguments might provide for cross-examination of Singer about his game-theory model, they do not warrant exclusion of his opinions.

"When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts." FED. R. EVID. 702 advisory committee's note to 2000 amendments. The critical inquiry at this stage of the analysis is whether Singer's testimony and opinions have "a reasonable factual basis." *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988) (noting that an expert's opinion is admissible "provided that he states the assumptions on which his opinions are based," even if those assumptions omit certain evidence). In other words, the facts relied upon by an expert "must find some support . . . in the record" and "must be supported by more than subjective belief and unsupported speculation," but "mere weaknesses in the factual basis of an expert witness' opinion bear on the weight of the evidence rather than on its admissibility." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800–01 (6th Cir. 2000) (internal punctuation omitted); *accord Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (expert testimony should be excluded where

"it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," but "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony") (internal punctuation omitted).

Courts have excluded expert testimony founded upon facts that find no support in the record. *See, e.g., Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1288 (N.D. Ga. 2002) (where an expert premised his opinions "to a major degree" on what he admitted to be a "mistaken" understanding of the evidence, that opinion was inadmissible), *aff'd sub nom Williamson Oil*, 346 F.3d at 1323. But so long as the expert relies upon record evidence and identifies the facts on which he relies, "it is for opposing counsel to inquire into the expert's factual basis," and "[i]mportantly, the jury is instructed that it is completely free to accept or reject an expert's testimony, and to evaluate the weight given such testimony in light of the reasons the expert supplies for his opinion." *0.161 Acres of Land*, 837 F.2d at 1040–41.

38

Singer's game-theory analysis satisfies these criteria. His reports and testimony set out in detail the record evidence on which he bases his opinions. When there is additional or conflicting evidence in the record, Singer addresses it head-on in his reports, which at times does include his analysis of the credibility of other witnesses. *See generally Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir. 2001) (noting that an expert is permitted to make reasonable assumptions and explain them). But he does not intend to offer such testimony at trial, [556-1] at ¶3, and the Court will disregard his opinions regarding witness credibility for purposes of resolving the pending motions for summary judgment. Nor does Singer fail to account for alternative explanations in a manner that is fatal to the admissibility of his opinions. In sum, the Court finds that the inputs relied upon by Singer in connection with his game theory model are not so unsound or unsupported as to render the model's outputs unreliable. Because Singer's opinions are supported by a reasonable—even if not infallible—factual basis, they are admissible.

In conclusion, Singer's opinions satisfy the requirements of Rule 702 and *Daubert*, and Defendants' arguments to the contrary merely

highlight issues that go to the weight that a fact-finder should give Singer's opinions. Defendants' motion to exclude Singer's testimony will therefore be denied.

### C. Plaintiffs' Motion to Exclude Dennis Carlton's Testimony [631]

Plaintiffs have filed a motion to exclude each of the three opinions offered by Dennis Carlton, Delta's expert economist. The Court will address each in turn.

### 1. Antitrust Policy

Carlton first opines that even if Delta did rely on AirTran's public statement in deciding to impose a first-bag fee, there are "good economic reasons why Delta should not be held liable for acting upon publicly-available information to maximize its profits." [631-2] at ¶5. Specifically, Carlton explains that "[a] pro-competitive antitrust policy should allow companies to act upon public information" in order to vindicate "the goals of antitrust policy," avoid "uncertainty for companies," and ultimately increase consumer welfare. *Id.* The Court agrees with Plaintiffs that this opinion is not admissible.

It is well settled that an expert may not "merely tell the jury what result to reach." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). Thus, while an expert may testify about whether certain conduct is or is not indicative of collusion, an expert may not testify that certain conduct did or did not violate the law. *In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318, 2013 WL 1855980, at *4 (D. Md. May 1, 2013).

> [E]xpert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's.

*Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (internal punctuation and citation omitted).

Carlton's first opinion runs afoul of these bedrock principles because he plainly expresses an opinion about what conduct the antitrust laws should and should not punish. Such testimony accomplishes nothing more than telling the jury what result to reach and supplanting the Court's instructions about the law. Moreover, insofar as Carlton opines about antitrust law in aspirational terms, his

41

opinion potentially encourages jury nullification by encouraging the trier of fact to make a decision based not on the law as it currently exists but as it should, in Carlton's opinion, be applied by the courts. *See generally Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988) ("[W]hen the purpose of [expert] testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed.").Thus, Carlton's first opinion will be excluded.

## 2.   Inevitability of Delta's Bag-Fee Decision

Second, Carlton opines that given the trend in the industry toward charging first-bag fees in 2008, "Delta very likely would have implemented the first-bag fee even in the absence of information about AirTran's willingness to implement a first-bag fee." [631-2] at ¶5. Plaintiffs contend that this opinion is unreliable and does not fit the facts of this case, but the Court concludes that the arguments raised by Plaintiffs—much like the arguments raised by Defendants with respect to Singer—relate to the weight that Carlton's second opinion should be given and not its admissibility.

Carlton discusses in his report several reasons for his opinion, including that "airlines have tended to adopt similar pricing models unless they can differentiate themselves with a different model." [631-2] at ¶22. He explains that although Southwest was able to differentiate itself as the "bags fly free" airline, "Delta believed that it could not successfully reposition itself as a no fee/low fee carrier, so it was more likely to keep a pricing model that was similar to other legacy carriers." *Id.* (footnotes omitted) (citing the DOJ deposition of Delta's president Ed Bastian). Additionally, the legacy carriers that had imposed first-bag fees had left them in place, suggesting to Delta— at least according to Carlton—that the fees were profitable. *Id.* at ¶23.

Carlton's opinion is distinguishable from the expert opinion at issue in *Cameron v. Peach County*, No. 5:02-cv-41-1 (CAR), 2004 WL 5520003, at *5 (M.D. Ga. June 28, 2004), on which Plaintiffs rely. There, an expert opined about risks posed by a landfill site, but the court found that the opinion consisted of "blanket generalizations," was premised on unsupported assumptions, and failed to account for the county's efforts to mitigate or prevent the danger posed by the landfill.

In the case at hand, by contrast, Carlton has not drawn such blanket generalizations. His reasoning, though not impervious to cross-examination, is outlined and relies on no logical fallacies or speculative leaps of faith. Plaintiffs disagree with his conclusion, but they have pointed to nothing that warrants exclusion of this opinion. The Court will therefore deny the motion to exclude Carlton's second opinion.

### 3.    Delta's Business Justifications

Finally, Carlton is of the opinion that "Delta had economically rational business justifications for implementing the first-bag fee when it did." [631-2] at ¶5. Specifically, he explains that following the consummation of the Delta-Northwest merger, "it would be uneconomic to maintain separate . . . fee structures . . . ." *Id.* at ¶25. And for the same reasons supporting his second opinion, Carlton opines that it made sense for the post-merger combined airline to retain the first-bag fee that Northwest had already implemented. *Id.* at ¶26.

Plaintiffs assert that this opinion is inconsistent with empirical evidence showing that AirTran and Southwest maintained separate fee structures for more than three years after their merger. Plaintiffs also

contend that Carlton's third opinion is based not on economic data but on the self-serving testimony of Delta's executives, and that it ignores documents suggesting that Delta was planning to withdraw Northwest's bag fee after the merger. But the AirTran/Southwest merger took place three years after Carlton issued his report, and Plaintiffs fail to explain how his opinion is rendered unreliable by failing to account for facts that had not yet occurred. Moreover, as all of Carlton's opinions are supported by a reasonable evidentiary basis, the Court finds that his testimony is admissible. *See Larson v. Kempker*, 414 F.3d 936, 940 (8th Cir. 2005) (holding that expert testimony that "is so fundamentally unreliable that it can offer no assistance to the jury" must be excluded, but "otherwise, the factual basis of the testimony goes to the weight of the evidence"); *Quiet Tech.*, 326 F.3d at 1345 (noting that the role of cross-examination is to identify flaws in otherwise reliable expert evidence). Accordingly, this opinion is likewise admissible.

In sum, the Court is persuaded by Plaintiffs' arguments concerning Carlton's first opinion—regarding what antitrust law should

45

or should not prohibit—and will grant the *Daubert* motion as to that opinion. The motion will be denied in all other respects.

### D.   Plaintiffs' Motion to Exclude Andrew Dick's Testimony [632]

The final evidentiary motion before the Court is Plaintiffs' motion to exclude three opinions offered by Andrew Dick, AirTran's expert economist.

### 1.   Economic Theory's Definition of Collusion

The first opinion with which Plaintiffs take issue is Dick's testimony regarding the manner in which economic theory defines collusion. In his deposition and his expert report, Dick opines that "the economic plausibility of [P]laintiffs' allegations" must be evaluated with respect to economic theory's definition of collusion, which he explains consists of "three pillars":

> One is the mutual exchange of assurances leading to an agreement or its equivalent; second is that there has to be a means to detect deviations or cheating from that . . . agreement; and the third is that there has to be credible threats of punishment for deviations or cheating from the . . . agreement.

46

[593] at 21; [632-3] at 12. For Dick to conclude that Defendants colluded in this case, he would have to see "evidence to indicate that there's a likelihood that each of those criteria—high likel[ihood] that each of those criteria is met." [593] at 22. He has seen no such evidence, *id.*, and therefore opines in his rebuttal report that "the absence of credible mechanisms to monitor and punish defections from the alleged agreement" causes "Plaintiffs' theory of collusion [to] fail[] as a matter of economics," [632-4] at 2.

The Court agrees with Plaintiffs that this opinion is inadmissible, at least when it is framed in terms of preconditions to a finding of collusion. Experts may not testify as to governing legal standards or legal implications of conduct; "the court must be the jury's only source of law." *Montgomery*, 898 F.2d at 1541; *see also Burkhart v. WMATA*, 112 F.3d 1207, 1213 (D.D.C. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards."). However, as noted above, an expert economist may testify that certain conduct is or is not consistent with a finding of collusion. *See*, *e.g.*, *Polypropylene Carpet*, 93

F. Supp. 2d at 1355. Thus, although Dick may not testify that the jury may find in favor of Plaintiffs only if all three of his conditions are satisfied, he may testify to his opinion that Defendants' conduct is inconsistent with collusion because one or more of those criteria are missing.[24]

The Court disagrees with Plaintiffs, however, to the extent they suggest that Dick's testimony is inadmissible because it contains internal inconsistencies. In response to a question asking him to assume that Defendants exchanged explicit mutual assurances, Dick testified that he would find collusion occurred. But that is not because mutual assurances alone are sufficient, as Plaintiffs contend, but because in an economist's view, there is a reasonable expectation that such *explicit* mutual assurances contain built-in means of detecting and punishing defections. [593] at 21–24. The Court does not find Dick's testimony in this regard inconsistent; to the extent any incongruity

---

[24] Insofar as Plaintiffs dispute the applicability of those criteria, they are free to cross-examine Dick about them, but the Court declines to preclude his testimony as to their relevance from an economic perspective.

48

exists, it is more appropriately addressed on cross-examination than in a *Daubert* motion.

### 2. Effect of AirTran's Public Statements

In Dick's report, he analyzes and tests Singer's prisoner's dilemma model in light of the "cheap talk" framework in economic literature, which views one company's non-binding forward-looking statements as insufficient to influence a competitor's strategic choices and facilitate reaching an agreement unless those statements are both self-signaling and self-committing. *See* [632-3] at ¶¶116–121. Disagreeing with Singer's conclusions, Dick opines that under this paradigm "Delta would . . . rationally ignore AirTran's [October 23, 2008 earnings call] announcement as being unreliable." *Id.* at ¶120.

Plaintiffs reject Dick's reliance on the "cheap talk" paradigm, which some economists—including Delta's expert Dennis Carlton—have rejected. But other economists embrace the technique. *See* [632-3] at ¶¶115–16 & accompanying footnote citations. To pass muster under *Daubert* and Rule 702, an expert's methods must be reliable, but they need not be universal. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d

717, 744 (3d Cir. 1994) ("The evidentiary requirement of reliability is lower than the merits standard of correctness. . . . The grounds for the expert's opinion merely have to be good, they do not have to be perfect."); *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 332 (D. Vt. 2007) ("*Daubert* requires general, not universal acceptance; even substantial criticism as to one theory or procedure will not be enough to find that the theory/procedure is not generally accepted.") (internal punctuation omitted); *United States v. Monteiro*, 407 F. Supp. 2d 351, 366 (D. Mass. 2006) ("*Daubert* and *Kumho Tire* do not make the perfect the enemy of the reliable; an expert need not use the best method of evaluation, only a reliable one."). The "cheap talk" paradigm is not without its critics, but the Court is not persuaded that it is so unfounded as to render Dick's opinion unreliable.

Plaintiffs also take issue with Dick's application of the cheap-talk paradigm to Singer's analysis, arguing that Dick ignores evidence that AirTran intended to use its earnings call to send a signal to Delta about AirTran's willingness to collude. Additionally, they suggest that Dick's opinion is unhelpful because this case is about what Delta actually did,

not about what it rationally might have done. But as is true of many of the arguments raised in both parties' *Daubert* motions, these issues speak to the weight of Dick's opinions, not their admissibility. The factual predicates on which his opinion rests find support in the record, and the challenged opinion is relevant to—even if not dispositive of— the question of Defendants' self-interests and incentives. Moreover, because the challenged opinion serves to test Singer's own paradigm, the Court finds that the concerns Plaintiffs raise are best addressed through cross-examination. The Court therefore finds that this opinion is admissible.

### 3.   Disputed Factual Issues

Finally, Plaintiffs seek to prevent Dick from offering five opinions that Plaintiffs characterize as disputed factual issues unrelated to his economic expertise. Again, the Court disagrees.

The Court's decision above that Dick's methods are reliable renders moot Plaintiffs' argument that some of the factual assertions in his report are not supported by "any reliable economic test" and ignore portions of the record. [632-1] at 16. Other factual assertions Plaintiffs

point to in Dick's report—for example, his reference to the need to harmonize a fee structure for Delta and Northwest in view of their impending merger—are nothing more than Dick's explanation of the factual foundations on which his opinions rest. As discussed above, an expert's opinion is admissible if the facts upon which it is premised "find some support . . . in the record," even where the opposing party contends that those assumptions are contradicted by other evidence. *McLean*, 224 F.3d at 800–01.

In still other instances, Dick relies on testimony and other evidence from this case to apply or explain the general economic principles discussed in his report. For example, after explaining how unbundling can stimulate passenger demand, Dick relies on Healy's deposition testimony to illustrate how, in his opinion, AirTran's introduction of a first-bag fee might have facilitated the air line's route expansion. [632-3] at ¶138. Elsewhere, he relies on Fornaro's deposition testimony as an example comporting with the concept of the "signal-to-noise" ratio. *Id.* at ¶42 & n.33. As Plaintiffs pointed out in defense of Singer's expert report, it is permissible for an expert "to review the

factual record and formulate a hypothesis that can then be tested using economic theory." *Processed Egg Prods.*, 81 F. Supp. 3d at 424. Indeed, Singer's amended merits report takes a similar approach: after giving his opinion that Defendants' actions were inconsistent with unilateral conduct, he "demonstrate[s] how this analysis is supported and corroborated by direct evidence." [556-1] at 1565.

Just as the Court declined to exclude Singer's opinions because he relied on facts that Defendants dispute, it declines to exclude Dick's opinions because he relies on facts that Plaintiffs dispute. None of the expert witnesses in this case has relied on facts that are so lacking in evidentiary support that it renders the ensuing opinions unreliable.

For these reasons, the Court will disregard Dick's legal conclusion that Plaintiffs' theory fails under economic theory's definition of collusion, but it will deny the remainder of Plaintiffs' motion to exclude Dick's opinions and testimony.

## III.   Defendants' Motions for Summary Judgment

### A.   Summary Judgment in the Context of § 1 Price-Fixing Claims

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When analyzing a motion for summary judgment, the Court must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997); *Williamson Oil*, 346 F.3d at 1298.

These general principles are well settled and apply with as much force to this antitrust case as any other type of lawsuit. *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 396 (3d Cir. 2015) ("[T]he summary judgment standard in antitrust cases is generally no different from the standard in other cases."); *see also Eastman Kodak Co. v.*

54

*Image Tech. Servs., Inc.*, 504 U.S. 451, 468 (1992) (noting that there is

no "special burden on plaintiffs facing summary judgment in antitrust

cases"). However, "antitrust law limits the range of permissible

inferences from ambiguous evidence in a § 1 case." *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *see also*

*Holiday Wholesale*, 231 F. Supp. 2d at 1269 ("[T]he inferences that can

be drawn on summary judgment are limited in the antitrust context.").

> This inferential limitation is grounded in the unique nature
> of the law of antitrust conspiracy. . . . [A] Sherman Act
> conspiracy differs sharply from the more typical concept of
> conspiracy found in other contexts. Under the criminal drug
> laws, for example, both the underlying act and the
> conspiracy are illegal—that is, the laws make it an offense
> for anyone to violate, as well as conspire to violate, the
> federal drug statutes. In contrast, under the Sherman Act, it
> is the conspiracy alone that is prohibited; the underlying
> independent conduct is not necessarily unlawful and, indeed,
> may be precompetitive and of a nature that the antitrust
> laws would want to foster. . . .

*Coleman v. Cannon Oil Co.*, 849 F. Supp. 1458, 1465 (M.D. Ala. 1993)

(internal citation omitted).

Along those lines, the Eleventh Circuit has highlighted the

"important" distinction "between collusive price fixing, i.e., a 'meeting of

the minds' to collusively control prices, which is prohibited under the

Sherman and Clayton Acts, and 'conscious parallelism,' which is not."
*Williamson Oil*, 346 F.3d at 1298–99 (footnote omitted); *see also id.* at
1291 (describing conscious parallelism as "a perfectly legal phenomenon
commonly associated with oligopolistic industries"). Conscious
parallelism refers to synchronous pricing and related behaviors that
"are the product of a rational, independent calculus by each member of
[an] oligopoly," even when they result in the setting of prices "at a
profit-maximizing, supracompetitive level" and are based on the
recognition of the oligopolists' "shared economic interests and their
interdependence with respect to price and output decisions." *Id.* at 1299.

But it is often difficult to discern when lawful coordination crosses
the line and becomes unlawful collusion. "Over time, courts have
become attuned to the economic costs associated with using
circumstantial evidence to distinguish between altogether lawful,
independent, consciously parallel decision-making within an oligopoly
on the one hand, and illegal, collusive price fixing on the other." *Id.* at
1300. "In order to ensure that only potentially meritorious claims
survive summary judgment, the Supreme Court has required that

56

inferences of a price fixing conspiracy drawn from circumstantial evidence be reasonable." *Id.*

To survive summary judgment, therefore, § 1 plaintiffs must do more than come forward with "evidence of conduct that is consistent with both legitimate competition and an illegal conspiracy." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995); *accord Williamson Oil*, 346 F.3d at 1300 ("Evidence that does not support the existence of a price fixing conspiracy any more strongly than it supports conscious parallelism is insufficient to survive a defendant's summary judgment motion."). They "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Put differently, plaintiffs "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [them]." *Id.*

Applying this standard requires the Court to employ a three-step approach to summary judgment in the price-fixing context:

> First, the court must determine whether the plaintiff has
> established a pattern of parallel behavior. Second, it must
> decide whether the plaintiff has demonstrated the existence
> of one or more plus factors that tends to exclude the
> possibility that the alleged conspirators acted independently.
> The existence of such a plus factor generates an inference of
> illegal price fixing. Third, if the first two steps are satisfied,
> the defendants may rebut the inference of collusion by
> presenting evidence establishing that no reasonable
> factfinder could conclude that they entered into a price fixing
> conspiracy.

*Williamson Oil*, 346 F.3d at 1301 (internal citation omitted).

"[I]t unquestionably is the duty of the district court to evaluate the evidence proffered by the plaintiffs *not* to ascertain its credibility, but instead to determine whether that evidence, if credited, 'tends to' establish a conspiracy *more* than it indicates conscious parallelism." *Id.* (emphasis added). Plaintiffs need not affirmatively exclude the possibility of conscious parallelism, nor must the existence of a conspiracy be the sole inference that a reasonable juror could draw. *Id.* at 1302. They must simply present *some* evidence that *tends to* exclude the possibility of conscious parallelism or that tends to establish a price-fixing conspiracy; "nothing more, nothing less." *Id.*

> *Matsushita* teaches that the determination of whether
> underlying circumstantial conduct is sufficient to support an

58

> inference of a Sherman Act violation, and thus to fall within
> the prohibitive reach of the Act, is a legal issue for the court.
> Of course, if the underlying conduct is sufficient to support
> such an inference, it is still up to the jury to make the
> inference.

*Coleman*, 849 F. Supp. at 1465.

In making this inquiry, the Court should not "tightly compartmentaliz[e] the various factual components and wipe the slate clean after scrutiny of each" because "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). A "trap to be avoided in evaluating evidence of an antitrust conspiracy for purposes of ruling on the defendants' motion for summary judgment is to suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002). It is only "[w]here the record *taken as a whole* could not lead a rational trier of fact to find for the

non-moving party" that "there is no 'genuine issue for trial.'"

*Matsushita*, 475 U.S. at 587 (emphasis added).[25]

With these standards in mind, the Court now turns to the merits
of Defendants' motions for summary judgment.

### B.   Implied Preclusion

The Court begins its analysis by briefly revisiting an argument it
has previously rejected. Shortly after these cases were consolidated,
both Defendants moved to dismiss Plaintiffs' claims. Among the
grounds raised by AirTran was that the federal securities laws
precluded any antitrust claim arising from statements made on
quarterly earnings calls. *See* [72-1] at 33. The Court rejected that
argument, noting that "at [that] early stage of the case, Defendants
ha[d] failed to demonstrate that implied preclusion applie[d]" and that
"[n]otably, Defendants ha[d] not cited any cases in which the securities

_____

[25] In their briefs, the parties disputed whether a heightened summary-
judgment standard might apply in this case. *See, e.g.*, [632-1] at 7; [643] at 9. At the
hearing held on the pending motions for summary judgment, however, Defendants
conceded that no such heightened standard applies, and even absent that
concession, the Court would not find any heightened standard appropriate. Rather,
the Court applies general summary-judgment principles subject only to the
inferential limitations that apply in all antitrust-conspiracy cases.

laws precluded an antitrust challenge to collusion reached through public disclosures." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1364 & n.12 (N.D. Ga. 2010).

Defendants renew their implied-preclusion argument in their motions for summary judgment, but that argument fares no better today than it did seven years ago. Implied preclusion remains disfavored and applies only when antitrust and securities laws are "clearly incompatible." *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 271, 275 (2007); *see also Hinds County v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 406 (S.D.N.Y. 2010) ("The Supreme Court in *Billing*[, 551 U.S. at 271,] was careful to caution that competing statutory schemes should be reconciled where possible, 'rather than holding one completely ousted.'"). Whether the securities laws and the antitrust laws are so repugnant that the former can be said to preclude the latter is determined by four factors:

> (1) whether the challenged practices lie squarely within an area of financial market activity that the securities laws seek to regulate; (2) the existence of regulatory authority under the securities laws to supervise the activities in question; (3) ongoing SEC regulation; and (4) a resulting risk

> that the securities laws and antitrust laws, if both
> applicable, would conflict.

*Delta/AirTran Baggage Fee*, 733 F. Supp. 2d at 1364 (citing *Billing*, 551

U.S. at 285).

The Court is unpersuaded that its initial assessment of the four

*Billing* factors warrants reconsideration. Only rarely have the securities

laws been held to impliedly preclude application of the antitrust laws,

and never in a case in which a conspiracy otherwise unrelated to

securities was merely alleged to have been effected through earnings

calls. *Cf. Billing*, 551 U.S. at 285 (applying preclusion to antitrust

lawsuit brought against securities underwriters that marketed and

distributed securities); *Elec. Trading Grp., LLC v. Banc of Am. Sec.*

*LLC*, 558 F.3d 128 (2d Cir. 2009) (applying preclusion to antitrust

lawsuit alleging that securities brokers conspired to fix the prices of

certain securities).

Defendants cite to no caselaw, and the Court has located none,

that would support immunizing Defendants from antitrust liability

based on anything said on an earnings call. Indeed, in the years since

AirTran first raised this argument, other courts have come to recognize

that earnings calls can be vehicles for public signaling. *See*, *e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, ___ F. Supp. 3d ___, Misc. No. 15-1404 (CKK), 2016 WL 6426366, at *8 (D.D.C. Oct. 28, 2016) (denying motion to dismiss § 1 claim premised on "statements made by Defendants' executives during earnings calls, industry summits, industry conferences, and investment conferences"). The Court therefore again rejects Defendants' implied-preclusion arguments.

## C.   Existence of an Agreement to Restrain Trade

The existence of an agreement to restrain trade is "a threshold requirement of every antitrust conspiracy claim" under the Sherman Act. *Harcros*, 158 F.3d at 569. In the absence of any direct evidence of collusion, Plaintiffs here attempt to establish the existence of an agreement by showing a pattern of parallel behavior by Defendants and the existence of "plus factors" that tend to exclude the possibility of independent action. *Williamson Oil*, 346 F.3d at 1301.

The first inquiry is quickly resolved in Plaintiffs' favor, as the undisputed record evidence plainly shows that Defendants engaged in a pattern of parallel conduct when they simultaneously imposed first-bag

63

fees of $15 effective on December 5, 2008. True, Plaintiffs rely on only a single pricing decision, but that is not fatal to their claim. *See In re Travel Agency Comm'n Antitrust Litig.*, 898 F. Supp. 685, 687 (D. Minn. 1995) (denying summary judgment in a § 1 case arising from the defendants' one-time revision of a commission structure).

Similarly, the fact that Defendants' once-parallel pricing diverged after six months does not defeat the requisite finding of synchronous action.[26] "What is critical is that the jury could . . . reasonably conclude from the evidence that the defendants engaged in parallel pricing for some of their . . . products for substantial periods of time." *Coleman*, 849 F. Supp. at 1466; *see also Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993) (defining "parallel behavior" to require similar—but not identical—behavior); *Domestic Airline Travel*, 2016 WL 6426366, at *13  (noting that parallel conduct does not require Defendants to have acted in "exactly the same way").

---

[26] Delta increased its first-bag fee in July 2009 and then again in January 2010. AirTran kept its first-bag fee at $15 until September 2010. [353-29] at 35–36.

It is well settled that a pattern of parallel behavior, standing alone, is insufficient to withstand a motion for summary judgment in a § 1 case. Rather, parallel conduct gives rise to an inference of conspiracy only in combination with "'plus factors' that 'tend to exclude the possibility that the defendants merely were engaged in lawful conscious parallelism.'" *Holiday Wholesale*, 231 F. Supp. 2d at 1274 (quoting *Harcros*, 158 F.3d at 572); *see also Williamson Oil*, 346 F.3d at 1301 ("[P]rice fixing plaintiffs must demonstrate the existence of 'plus factors' that remove their evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious parallelism.").

There is no finite list of potential plus factors. "Although our caselaw has identified some specific plus factors, . . . any showing . . . that 'tends to exclude the possibility of independent action' can qualify as a 'plus factor.'" *Williamson Oil*, 346 F.3d at 1301 (quoting *Harcros*, 158 F.3d at 571 n.35). But "[m]erely labeling something a 'plus factor' does not make it so . . . ." *Holiday Wholesale*, 231 F. Supp. 2d at 1272. "A 'plus factor' . . . needs to have some substance in order to tilt the balance. . . . , and a weak 'plus factor' is not sufficient to withstand a

motion for summary judgment because the 'plus factor' analysis is really a surrogate for looking at a case in its entirety." *Id.*

In this case, Plaintiffs identify six plus factors that they contend support their claim and preclude summary judgment in favor of Defendants: "(1) an invitation to collude; (2) collusive communications followed closely by a parallel price increase; (3) evidence that collusive communications affected Delta's [first-bag-fee] decision; (4) actions against unilateral economic self-interest; (5) pretextual explanations for changed business practices; and (6) motive and intent to conspire." [554] at 51–52. The Court will address each in turn.

### 1.   **Invitation to Collude**

Plaintiffs first contend that a plus factor exists by virtue of Fornaro's statements on AirTran's October 23, 2008 earnings call, which they characterize as an invitation to Delta to engage in collusion.

"The term 'invitation to collude' describes an improper communication from a firm to an actual or potential competitor that the firm is ready and willing to coordinate on price or output or other important terms of competition." *In re Fortiline, LLC a N.C. Ltd. Liab.*

66

*Co.*, File No. 151-0000, 2016 WL 4379041, at *11 (F.T.C. Aug. 9, 2016).

The quintessential invitation to collude was discussed in *United States*

*v. American Airlines, Inc.*, 743 F.2d 1114, 1116 (5th Cir. 1984), in which

the president of an airline called the president of a competitor and said:

"I have a suggestion for you. Raise your . . . fares twenty percent. I'll

raise mine the next morning. . . . You'll make more money and I will

too."

Numerous cases have recognized that an invitation to collude can

serve as evidence of a conspiracy. *See*, *e.g.*, *Interstate Circuit v. United*

*States*, 306 U.S. 208, 227 (1939) ("Acceptance by competitors, without

previous agreement, of an invitation to participate in a plan, the

necessary consequence of which, if carried out, is restraint of interstate

commerce, is sufficient to establish an unlawful conspiracy under the

Sherman Act."); *Gainesville Utilities Dep't v. Fla. Power & Light Co.*,

573 F.2d 292, 300–01 (5th Cir. 1978)[27] (holding that correspondence

that "contemplated and invited" concerted action was a plus factor);

---

[27] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit
decisions issued before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206,
1209 (11th Cir. 1981) (en banc).

*Fishman v. Wirtz*, Nos. 74 C 2814 & 78 C 3621, 1981 WL 2153, at *59 (N.D. Ill. Oct. 28, 1981) ("One of the strongest circumstantial indicators of a conspiracy is the existence of a common invitation or request to join into a concerted plan of action.").

But Defendants correctly point out that many of the cases discussing invitations to collude—including *In re Fortiline* and *American Airlines*—involved claims under § 5 of the Federal Trade Commission ("FTC") Act or analogous laws prohibiting even unilateral unfair methods of competition. *See*, *e.g.*, *Liu v. Amerco*, 677 F.3d 489 (1st Cir. 2012) (discussing invitation to collude in the context of a claim under a Massachusetts statute that, like § 5 of the FTC Act, prohibits unfair methods of competition and reaches even unsuccessful solicitations to conspire); *see also* Susan S. DeSanti & Ernest A. Nagata, COMPETITOR COMMUNICATIONS: FACILITATING PRACTICES OR INVITATIONS TO COLLUDE? AN APPLICATION OF THEORIES TO PROPOSED HORIZONTAL AGREEMENTS SUBMITTED FOR ANTITRUST REVIEW, 63 Antitrust L.J. 93, 93 (1994) (describing invitations to collude as potential violations of § 5 of the FTC Act or, "[u]nder more limited circumstances," § 2 of the

68

Sherman Act, but making no mention of § 1). Defendants dispute that a mere "invitation" can properly be viewed as a plus factor under § 1 of the Sherman Act, which unlike § 5 of the FTC Act prohibits "contract[s]" and "conspirac[ies]" in restraint of trade. *See generally N.C. Bd. of Dental Examiners v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013) (noting that § 1 applies only to "concerted action" and "unilateral conduct is excluded from its purview").

Even assuming that an invitation to collude may constitute a plus factor in some cases, however, it is not a plus factor here. The Eleventh Circuit has stated in no uncertain terms that evidence may be characterized as a plus factor in a given case only if it "tends to exclude the possibility of independent action." *Harcros*, 158 F.3d at 571 n.35; *Williamson Oil*, 346 F.3d at 1301. Thus, courts have refused to construe corporate communications as invitations to collude where the communications contain "the type of information companies legitimately convey to their shareholders," instead restricting such findings to cases involving "far more detailed communications with no public purpose." *Holiday Wholesale*, 231 F. Supp. 2d at 1276.

69

In *Gainesville Utilities*, 573 F.2d at 300–01, for example, the former Fifth Circuit found that the "continuous exchange of correspondence between high executives of" two competitors "border[ed] on a blatant agreement to divide the market" and gave rise to an "irresistible" inference that the correspondence "contemplated and invited" collusion. Likewise, in *In re Medical X-Ray Film Antitrust Litigation*, 946 F. Supp. 209, 218–21 (E.D.N.Y. 1996), the court found that an agreement to fix prices could be inferred from evidence showing that competitors exchanged internal pricing memoranda and met privately to discuss and exchange pricing information in advance of announcing price increases.

Significant, though not dispositive, is the fact that "invitations to collude" in the context of antitrust conspiracy claims have almost universally been private communications, not public disclosures like the AirTran comments at issue in this case. The Court does not suggest that public remarks by a company could *never* give rise to liability under § 1 of the Sherman Act, because "'the *form* of the exchange— whether . . . through private exchange . . . or through public

70

announcements of price changes—should not be determinative of its legality.'" *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir. 1990) (quoting RICHARD POSNER, ANTITRUST LAW: AN ECONOMIC PERSPECTIVE 146 (1976)). But courts must "be careful not to permit inferences of antitrust conspiracy when to do so would create a significant irrational dislocation in the market or would result in significant anticompetitive effects." *Petroleum Prods.*, 906 F.2d at 440 (citing *Monsanto*, 465 U.S. at 763–64). That instruction cannot be squared with Plaintiffs' allegations of an invitation to collude.

Fornaro's statement was made publicly on a quarterly earnings call with AirTran's analysts and investors. It concerned a topic that was of interest to the airline industry at the time, as evidenced by both the widespread adoption of bag fees by airlines during the first three quarters of 2008 and the fact that bag fees and ancillary fees were discussed on several airlines' earnings calls in 2008.[28] This is precisely

---

[28] *See* [350-99] at 18 (Delta's third-quarter earnings call transcript); [350-103] at 32 (JetBlue's third-quarter earnings call transcript); [350-103] at 47–48 (US Airways' third-quarter earnings call transcript). The question was also asked

"the type of information companies legitimately convey to their shareholders," *Holiday Wholesale*, 231 F. Supp. 2d at 1277, and courts are properly reluctant to characterize them as evidence of unlawful conspiracies, *Petroleum Prods.*, 906 F.2d at 440. "Because in competitive markets, particularly oligopolies, companies will monitor each other's communications with the market in order to make their own strategic decisions, antitrust law permits such discussions even when they relate to pricing . . . ." *Holiday Wholesale*, 231 F. Supp. 2d at 1276.

Plaintiffs speculate that AirTran planted the bag-fee question for its third-quarter earnings call, but even if that would alter the Court's analysis of this plus factor, it is unsupported by the evidence. Kevin Crissey—the UBS analyst who posed the question to AirTran—declared under penalty of perjury that the question was not planted and that he asked it because of his own interest in bag fees. [434-16] at 17–19. This declaration testimony is uncontradicted,[29] and it is corroborated by

during second-quarter earnings calls for airlines that had already introduced it at that point. *See*, *e.g.*, [350-60] at 19 (American Airlines' second-quarter earnings call transcript).

[29] Plaintiffs' cursory assertion that the question Crissey posed was "incongruent with his level of sophistication and more consistent with planted

other earnings-call transcripts, which reveal that Crissey asked several airlines about bag fees. *See*, *e.g.*, [350-60] at 19 (Crissey asking American Airlines in July 2008 about the operational impact of having introduced the first-bag fee); [350-67] at 18 (Crissey asking Delta in July 2008 about Northwest's first-bag fee); [350-103] at 32 (Crissey asking JetBlue in October 2008 about the effect of ancillary fees on its revenue practices); *Id.* at 47–48 (Crissey asking US Airways in October 2008 whether its first-bag fee had led to a significant decrease in the number of checked bags).

"The public announcement of a pricing decision cannot be twisted into an invitation or signal to conspire; it is instead an economic reality to which all other competitors must react." *Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 670 n.23 (E.D.N.C. 2003) (granting summary judgment on § 1 claims and finding that the defendants' statements in trade press articles and interviews were not plus factors supporting an

---

questions," [554] at n.55, is insufficient to contradict Crissey's declaration testimony for purposes of withstanding summary judgment.

inference of conspiracy), *aff'd sub nom. Hall v. Am. Airlines, Inc.*, 118 F. App'x 680 (4th Cir. 2004).

Plaintiffs' invitation-to-collude argument, at least under the circumstances of this case, would take unilateral action by a company (i.e., Delta) and deem it collusive merely because it was preceded in time by another unilateral action by a competitor (i.e., AirTran). But one company's public statements cannot "immobilize[]" a competitor and preclude it from subsequently taking otherwise lawful actions. *United States v. Standard Oil Co.*, 316 F.2d 884, 896 (7th Cir. 1963).

Two additional facts make the inference Plaintiffs would draw particularly untenable. First, the conduct at issue—the imposition of a first-bag fee in the fall of 2008—was not unprecedented but rather Defendants' conformity to a decision made by many of their competitors in the preceding months. Those competitors, in turn, had uniformly reported that they had experienced little if any share shift and operational problems from bag fees. Second, the evidence shows that AirTran was not firmly committed to a first-bag fee at the time it extended the would-be invitation to Delta. Between November 5 and 7,

74

AirTran executives circulated quantitative analyses of the first-bag fee and conferred with each other about the decision whether to impose one. The final decision was not made until November 10, more than two weeks after the October 23 earnings call. It is therefore far from clear that AirTran was "ready and willing to coordinate" activity on October 23. *In re Fortiline*, 2016 WL 4379041, at *11.

In *Williamson Oil*, 346 F.3d at 1307, the Eleventh Circuit rejected the argument that forward-looking pricing statements such as "we have no wish to escalate [the price war, b]ut we shall be ready to respond tactically where necessary" constituted improper signals. The statements that Plaintiffs would construe as an invitation to collude in this case are, at best, on par with the "signals" in *Williamson Oil*. The Court therefore finds that an invitation to collude is not a plus factor because the evidence Plaintiffs point to is "no more indicative of collusion than it is of lawful, rational pricing behavior." *Id.*

### 2. Collusive Communications Followed Closely by Parallel Price Increases

Plaintiffs next assert that a conspiracy to fix prices can be inferred from what they describe as an "overwhelming pattern of [collusive]

75

communications" between Defendants in the time period leading up to their parallel imposition of a first-bag fee. [554] at 53, 57.[30]

The first such communication Plaintiffs rely on is Fornaro's June 18, 2008 statement at the investor conference that "AirTran had not instituted a first bag fee because AirTran would be uncomfortable competing in Atlanta with Delta, which was not charging a first bag fee." But Plaintiffs concede that this statement "did not elicit any reaction by Delta." [554] at 7. "[C]ommunications between competitors do not permit an inference of an agreement to fix prices unless those communications rise to the level of an agreement, tacit or otherwise." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) (internal punctuation omitted) (holding that the district court properly

---

[30] At the outset, AirTran suggests that a communication may be credited as a plus factor only if three criteria are satisfied, *see* [604] at 17–18, but the Court disagrees. Whether a communication constitutes a plus factor is an inquiry not susceptible to determination by any rigid test. *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 878 (7th Cir. 2015), on which AirTran relies, did not treat any particular factors as dispositive; it merely suggested that the evidence before it would have been more persuasive if those factors were present. And Plaintiffs correctly point out that the causation requirement AirTran would impose improperly puts the cart before the horse in the context of a motion for summary judgment in a § 1 conspiracy claim. However, the other considerations identified by AirTran—the parties to the conversation, the detail of its contents, and its timing vis-à-vis the challenged action—are certainly among those relevant to whether a communication constitutes a plus factor.

discounted evidence about allegedly collusive communications where, among other things, the defendant receiving those communications "generally did not act on any information obtained through" them).

Plaintiffs next rely on Fasano's communications and attempted communications with Delta during July and August 2008. But this too is unavailing. Fasano's e-mails to Boeckhaus and Burman were never received because Boeckhaus and Burman had already left Delta's employ, so they clearly do not tend to establish a conspiracy between Defendants. As for the rest of Fasano's communications discussed above, "[e]vidence of sporadic exchanges of shop talk among [employees] who lack pricing authority is insufficient to survive summary judgment. Furthermore, to survive summary judgment, there must be evidence that the exchanges of information had an impact on pricing decisions." *Baby Food*, 166 F.3d at 125. Fasano's communications show, at most, the AirTran was anxious about competing with Delta and wanted to know, perhaps desperately so, what Delta was going to do on a first-bag fee. This is not inconsistent with, and thus does not tend to exclude the possibility of, conscious parallelism, as "[c]ompetitors in concentrated

77

markets watch each other like hawks." *Text Messaging*, 782 F.3d at

875.[31] In the absence of evidence that Fasano ever communicated with

anybody involved in Delta's first-bag fee decision, these communications

are not a plus factor tending to exclude the possibility of independent

conduct.

The other communications Plaintiffs point to are equally

unavailing as plus factors. A statement cannot constitute a plus factor if

it requires the jury to engage in speculation and conjecture to such a

degree as to render its finding a guess or mere possibility. *Williamson*

*Oil*, 346 F.3d at 1302. Plaintiffs allege very generally that at

unspecified times in 2008, "a lot of competitive information . . . was

relayed through vendors," AirTran's employees "very frequently"

relayed what they learned about competitors, and Defendants'

employees had discussions "all the time." [554] at 55-56. Other than

offering string citations to a litany of exhibits without even so much as

a parenthetical explanation as to the significance of those exhibits,

---

[31] Indeed, Jack Smith confirmed that AirTran was "always looking to see what the grapevine is . . . on what other competitors [were] doing," even though such information usually came in the form of "gossip, chatter, and rumors" that were of unreliable accuracy. [360] at 69–70.

Plaintiffs wholly fail to explain the content of these so-called communications. Having concluded that the comments Plaintiffs did specifically point to are insufficient to constitute a plus factor, the Court declines Plaintiffs' invitation to parse through the voluminous record in a search for anything else that might possibly be construed as collusive communications. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

The communications on which Plaintiffs rely are perfectly consistent with conscious parallelism by members of an oligopoly. Plaintiffs rely on hindsight to paint them as collusive in light of Defendants' parallel pricing—which occurred many months later than some of the communications at issue—but a reasonable factfinder could not so find. These communications do not tend to exclude the possibility of independent action.

### 3. Evidence that Exchanges of Information Affected Delta's First-Bag-Fee Decision

Plaintiffs also argue that a plus factor exists in this case because the evidence shows that exchanges of information between Defendants affected Delta's first-bag-fee decision. There is no question that the

mere "exchange of price data and other information among competitors does not invariably have anticompetitive effects" and therefore does "not constitute a per se violation of the Sherman Act." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *see also Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1505 (11th Cir. 1985) ("Absent an agreement to fix prices, there is nothing  unlawful about competitors meeting and exchanging price information or discussing problems common in their industry, or even exchanging information as to the cost of their product."). However, there are circumstances under which the exchange of such information followed by a parallel price increase can give rise to an inference of a conspiratorial agreement to fix prices. *See*, *e.g.*, *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004); *In re SRAM Antitrust Litig.*, No. 07-md-1819 CW, 2010 WL 5138859, at *6–7 (N.D. Cal. Dec. 10, 2010).

In *SRAM*, 2010 WL 5138859, at *6, an employee who was indisputably "involved in setting prices" (even though he personally lacked "ultimate pricing authority") "relayed regular reports about competitors' pricing and production directly to pricing authorities . . . as

well as to other [of the defendant's] personnel, who appear to have played roles in setting prices . . . ." "He exchanged information with other high level managers from competitor firms, and exercised direct influence over the prices that buyers paid" for the products at issue. *Id.* Thus, the court concluded that there was sufficient evidence from which a jury could infer the existence of a conspiratorial price-fixing agreement.

The *SRAM* court analogized the facts before it to those of *Flat Glass*, 385 F.3d at 368–69. In that case, the Third Circuit concluded that the plaintiffs had presented sufficient evidence of a price-fixing conspiracy to survive summary judgment where the defendants' high-level employees had exchanged pricing information and the evidence was sufficient to infer that the defendants had used that information to implement collusive price increases. For example, one defendant (AFG) had faxed to another defendant (PPG) an internal memorandum about a planned future price increase that had not been publicly announced. PPG then announced an identical increase before AFG, and the rest of the producers followed with identical price increases. In addition,

"[s]everal . . . key documents emphasize[d] that the relevant price increases were not economically justified or supportable, but required competitors to hold the line." *Id.* at 369.

Both *SRAM* and *Flat Glass* found their facts factually distinguishable from those in *Baby Food*, 166 F.3d at 124–26, in which the Third Circuit affirmed the grant of summary judgment to the defendants where "the evidence did not support an inference of a conspiracy to fix prices but portrayed nothing more than intense efforts on the part of three large and strong competing companies . . . to ascertain 'what their competitors would be doing with regard to pricing, promotions, and products.'" (quoting the district court's opinion). The documents that the competitors had exchanged—primarily between lower level employees—reflected "competitive information concerning the discontinuance of products or changes in product ingredients or in packaging," and thus the exchange of that information "was consistent with independent action and not grounds for assuming 'some shadowy conspiracy.'" *Id.* at 125.

As explained by the *Flat Glass* court, 385 F.3d at 369, "[t]he *In re Baby Food* plaintiffs simply could not correlate information exchanges with specific collusive behavior," instead making "the more amorphous claim that the exchanges of information 'impacted the market as a whole.'" The *SRAM* court, 2010 WL 5138859 at *7, further elaborated that "[t]here was no indication" in *Baby Food* that the employee who had obtained a competitor's pricing information "communicated the information directly to pricing authorities at the firm, or participated in any discussions to decide what prices would be set."

The Court concludes that the facts of this case are more analogous to *Baby Food* than *Flat Glass*, *SRAM*, or other cases in which the exchange of pricing information was found to support an inference of conspiracy. The information exchanges Plaintiffs point to might reflect "intense efforts" to monitor competitors' activity, even pricing activity, but they do not tend to exclude the possibility of unilateral action by oligopolists. "Gathering competitors' price information can be consistent with independent competitor behavior," particularly within the airline industry, which at all relevant times has been so concentrated and

highly competitive that "it makes common sense to obtain as much information as possible of the pricing policies . . . of one's competitors." *Baby Food*, 166 F.3d at 126; *see also Text Messaging*, 782 F.3d at 875 ("Competitors in concentrated markets watch each other like hawks.").

Plaintiffs place much stock in the fact that Delta's value proposition analysis was revised after AirTran's third-quarter earnings call, and they characterize Delta's decision to impose a first-bag fee as an "abrupt shift from the past." [554] at 61 (citing *Toys 'R' Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000)). But Delta's decision not to impose a first-bag fee during the summer of 2008 does not make any subsequent revisiting of that decision conspiratorial, especially in light of the fact that every other legacy airline except Alaska had adopted first-bag fees by the time Delta did so. An inference of conspiracy is less plausible from this so-called "abrupt shift" in light of the fact that Defendants' alleged collusive behavior involved conformity to what had become industry norms, even if those norms were not universally in place. *See Baby Food*, 166 F.3d at 135 ("Parallel pricefixing must be so

unusual that in the absence of an advance agreement, no reasonable firm would have engaged in it.").

Furthermore, even giving full credit to Plaintiffs' characterization of the value proposition document as reflecting Delta's views on the issue, the fact that Delta "analyzed possible competitor responses" is "a strong indicator that there was no actual agreement among the airlines, as it shows that [Delta was] uncertain of [its] rivals' potential reaction." *Hall*, 296 F. Supp. 2d at 671. This is all the more true where the analysis was driven not by clandestine internal exchanges but by the public statements of a competitor. *See Williamson Oil*, 346 F.3d at 1305 ("[I]n competitive markets, particularly oligopolies, companies monitor each other's communications with the market in order to make their own strategic decisions."). Those public statements, moreover, were viewed by Delta employees as "inappropriate," "[un]wise," "odd," and otherwise problematic specifically because of Defendants' antitrust obligations, *see supra* n. 14, making the inference that Delta would have accepted any such invitation less plausible. And Delta's employees testified uniformly that AirTran's comments were simply not discussed

as a factor at Delta's October 27, 2008 CLT meeting. Thus, it is far less clear in this case than in *Flat Glass* that any information exchanges actually affected Delta's decision to impose a first-bag fee in a way that is at all inconsistent with conscious parallelism within an oligopolistic market.

### 4. Actions Against Unilateral Economic Self-Interest

"One prominent 'plus factor,' to which antitrust plaintiffs often take recourse, is a showing that the defendants' behavior would not be reasonable or explicable (i.e., not in their legitimate economic self-interest) if they were not conspiring to fix prices or otherwise restrain trade . . . ." *Harcros*, 158 F.3d at 571; *see also Williamson Oil*, 346 F.3d at 1310 ("It is firmly established that actions that are contrary to an actor's economic interest constitute a plus factor that is sufficient to satisfy a price fixing plaintiff's burden in opposing a summary judgment motion.").

> But the concept of 'action against self interest' is an ambiguous one and one of its meanings could merely constitute a restatement of interdependence. For example, refusing to raise or lower prices unless rivals do the same could be against a firm's self interest but it would constitute

mere interdependence. . . . Therefore, to satisfy the requirements of a conspiracy, the action that is against self interest must go beyond mere interdependence. . . . [P]arallel price fixing which would be so unusual that *in the absence of advanced agreement no reasonable firm would engage . . .* could be sufficient to establish a conspiracy.

*Coleman*, 849 F. Supp. at 1467 (emphasis added).

Moreover, courts "must exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest we be too quick to second-guess well-intentioned business judgments of all kinds." *Williamson Oil*, 346 F.3d at 1310. "[F]irms must have broad discretion to make decisions based on their judgments of what is best for them and . . . business judgments should not be second-guessed even where the evidence concerning the rationality of the challenged activities might be subject to reasonable dispute." *In re Citric Acid Litig.*, 191 F.3d 1090, 1101 (9th Cir. 1999). "[I]f a benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor. Equipoise is not enough to take the case to the jury." *Williamson Oil*, 346 F.3d at 1310. "Thus, no conspiracy should be inferred from ambiguous evidence or from mere parallelism when

defendants' conduct can be explained by independent business reasons." *Baby Food*, 166 F.3d at 122.

In the fall of 2008, the airline industry faced nearly unprecedented circumstances. "[T]he economy was collapsing, and [Delta was] seeing a tremendous amount of reductions in terms of bookings." [366] at 59; *see also* [559] at 39–40 (Healy testifying that AirTran similarly projected a decreased demand in the fall and winter of 2008). At Delta, these industry-wide issues were compounded by concerns about funding Delta's pension. [366] at 72. By this same time period, every other legacy carrier except Alaska had introduced first-bag fees and reported them to be profitable and to have resulted in no significant share-shift. On September 16, the Wall Street Journal reported that "airline fees are here to stay," explaining that "baggage fees and other charges [were] significantly improving the usually dismal finances of the industry" because passengers were "paying them, if begrudgingly, and [weren't] shifting in large numbers to the few airlines that don't charge fees . . ." [350-89] at 2. As early as June 2008, one article noting the divide in the airline industry over first-bag fees posited that Delta and

Northwest might have been holding off in light of their need to obtain regulatory approval for their pending merger: "'They don't want to swat the hornets' nest,' [aviation consultant Robert] Mann says." [556] at 472.

As Plaintiffs point out, there were differing opinions within Delta about whether to impose a first-bag fee, and some employees worried about adding or increasing fees during a period of softening demand. [366] at 63; [556] at 694; [363] at 91–92. And Plaintiffs' expert posits that from an economic perspective, there were valid justifications to refrain from introducing these fees, including that fuel costs were falling. But "evidence of a price increase disconnected from changes in cost or demand only raises the question" of what motivated the price increase, it does not answer that question. *Chocolate Confectionary*, 801 F.3d at 400.

The overwhelming evidence before the Court reflects Defendants' subjective beliefs that there were valid reasons to impose a first-bag fee, including Defendants' need for revenue during an economic downturn. The Court declines to infer the existence of a conspiratorial agreement

merely because the wisdom of Defendants' decisions might not be impervious to questioning. *See H.L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir. 1981) ("[T]he mere fact that a business reason advanced by a defendant . . . is undermined does not, by itself, justify the inference that the conduct was therefore the result of a conspiracy."); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1574 (11th Cir. 1991) ("[W]hen the defendant puts forth a plausible, procompetitive explanation for his actions, we will not be quick to infer, from circumstantial evidence, that a violation of the antitrust laws has occurred.").

### 5. Pretextual Explanations for Changed Business Practices

Plaintiffs next attempt to conjure a plus factor from what they characterize as Defendants' pretextual explanations for imposing first-bag fees. *See generally Chocolate Confectionary*, 801 F.3d at 410–11 (citing case law for the proposition that "pretextual explanations for disputed conduct would disprove the likelihood of independent action") (internal punctuation omitted). "Although pretextual reasons have some probative value, . . . they are insufficient to create a genuine issue of

material fact without other evidence pointing to a price-fixing agreement." *Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.*, 476 F.3d 442, 452 (7th Cir. 2007). Too, the "pretextual" reasons Plaintiffs rely on are not inconsistent or false. Rather, Plaintiffs point to evidence showing only the business reality that a business must contend with a multitude of factors when making any significant decision. Such evidence does not tend to exclude the possibility of independent action by Defendants and is thus not a plus factor.

### 6. Motive and Intent to Conspire

The final plus factor on which Plaintiffs rely is Defendants' motive and intent to conspire. *See* [554] at 31–32. But the Eleventh Circuit has repeatedly held that "the mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy." *Williamson Oil*, 346 F.2d at 1319 (quoting *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991)); *Seagood Trading*, 924 F.2d at 1574 (same); *see also Holiday Wholesale*, 231 F. Supp. 2d at 1306 ("As an initial matter, the court notes that the characterization of motive as a 'plus factor' is questionable."). And the

91

Eleventh Circuit is not alone, as other courts have similarly recognized that "common motive does not suggest an agreement" and is not indicative of anything beyond interdependence. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015).

However, the Court need not decide whether motive could ever be a plus factor because in this case, Plaintiffs' reliance on this would-be plus factor is little more than a rehashing of their prior arguments. *See* [554] at 31–32 (arguing that Defendants were motivated to conspire because they "both understood that it was contrary to their economic interest[s] to unilaterally impose a [first-bag fee] before the other"). In the absence of any other evidence from which an agreement to fix prices could reasonably be inferred, there is no basis to infer such an agreement from the mere motive or intent to conspire. Such evidence, even if it existed here, "could not be said by a reasonable factfinder to tend to exclude the possibility of independent behavior." *Williamson Oil*, 346 F.3d at 1302.

### 7.   Cumulative Effect of Plus Factors

Even when viewed in the light most favorable to Plaintiffs, the evidence in this case simply does not permit a reasonable factfinder to infer the existence of a conspiracy, as it does not "'tend[] to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588 (quoting *Monsanto*, 465 U.S. at 764). Although the Court has analyzed each of Plaintiff's would-be plus factors sequentially, the outcome is the same when they are considered cumulatively. *See generally Continental Ore*, 370 U.S. at 699 ("[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole"); *High Fructose Corn Syrup*, 295 F.3d at 655 (cautioning against a supposition that "if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment").

"In other words, in this case the whole of the manufacturers' actions is no greater than the sum of its parts." *Williamson Oil*, 346 F.3d at 1310. "[T]he record taken as a whole could not lead a rational

93

trier of fact to find" that Defendants engaged in a conspiracy to fix prices rather than lawful conscious parallelism. *Matsushita*, 475 U.S. at 587. Accordingly, "there is no 'genuine issue for trial,'" and Defendants are entitled to summary judgment. *Id.*

## IV.   Conclusion

For the foregoing reasons, Defendants' motion to exclude Singer's testimony [625] is denied; Plaintiffs' motion to exclude Carlton's testimony [631] is granted as to Carlton's first opinion but otherwise denied; Plaintiffs' motion to exclude Dick's testimony [632] is granted as to his opinion regarding the definition of collusion from an economics perspective but otherwise denied; Delta's motion for summary judgment [350] is granted; and AirTran's motion for summary judgment [353] is granted.

In light of this holding, Delta's motion for summary judgment as to the claim asserted by Plaintiff Henryk Jachimowicz [219] and Delta's

motion to exclude the opinions and testimony of Bruce Pixley [433] are denied as moot.[32]

IT IS SO ORDERED this 28th day of March, 2017.


Timothy C. Batten, Sr.
United States District Judge

---

[32] Nine of Plaintiffs' exhibits—Exhibits 444, 446–452, and 454—were timely provided to the Court for filing in connection with Plaintiffs' opposition to Defendants' motions for summary judgment but inadvertently omitted from the docket. These documents have been provided to the Clerk's office today for filing to ensure that the record is complete, and nothing about their belated entries on the docket should suggest that they were not available for the Court's review in connection with the pending motions.